Brendan Cummings (Bar No. 193952)
Anchun Jean Su (Bar No. 285167)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
T: (510) 844-7100; F: (510) 844-7150
bcummings@biologicaldiversity.org; jsu@biologicaldiversity.org

Brian Segee (Bar No. 200795)
Center for Biological Diversity
111 W. Topa Topa Street
Ojai, CA 93023
T: (805) 750-8852
bsegee@biologicaldiversity.org

John Peter Rose (Bar No. 285819)
Center for Biological Diversity
660 South Figueroa Street, Suite 1000
Los Angeles, CA 90017
T: (213) 785-5400
jrose@biologicaldiversity.org

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Center for Biological Diversity, a non-profit organization;<br><br>        Plaintiff,<br><br>        v.<br><br>U.S. Department of Homeland Security; U.S. Customs and Border Protection; and Elaine Duke, in her official capacity as Acting Secretary, U.S. Department of Homeland Security,<br><br>        Defendants. | Case No. 3:17-cv-01215-GPC-WVG<br><br>**Second Amended Complaint for Declaratory and Injunctive Relief** |

## **INTRODUCTION**

1.     In this action for declaratory and injunctive relief, Plaintiff Center for Biological Diversity ("the Center")—an environmental conservation organization that works to protect native wildlife species and their habitats—challenges the failure of the U.S. Department of Homeland Security ("DHS") and U.S. Customs and Border Protection ("CBP") (collectively, "the Agencies" or "Federal Defendants") to comply with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, in relation to border wall construction projects in San Diego County, including: (1) the border wall prototype project, which would also serve as the first new segment of border barrier built in California in several years ("border wall prototype project"); and (2) the replacement of the westernmost portion of the existing border fence (14 miles of existing primary and double layer border fencing running from the Pacific Ocean to the eastern edge of Otay Mesa) ("border wall replacement project").

2.     The border wall prototype project and border wall replacement project are each federal actions that will impact the environment as well as several threatened and endangered species, and are thus subject to the procedural and substantive requirements of NEPA and the ESA, respectively.

3.     Federal Defendants have not provided the Center or the general public with notice or opportunity to comment under NEPA for the border wall prototype project or border wall replacement project.  Indeed, the Agencies have not prepared *any* NEPA or ESA analysis for either the border wall prototype project or the border wall replacement project.

4.     Although NEPA does not require a plaintiff to provide federal agencies with notice of alleged violations prior to filing suit, on June 1, 2017, the Center wrote to the Agencies to provide notice of NEPA violations in relation to

the border wall prototype project. The Agencies have not acknowledged or responded to this Notice.

5.     In addition, on June 1, 2017, the Center also provided the Agencies with formal notice of violations of the ESA for their failure to consult with U.S. Fish and Wildlife Service ("FWS") in order to ensure that the border wall prototype project does not jeopardize the continued existence of threatened or endangered species, or result in the destruction or adverse modification of their critical habitat. Similarly, on July 7, 2017, the Center provided the Agencies with formal notice of ESA violations for their failure to consult with FWS in relation to the border wall replacement project. Federal Defendants have failed to remedy the alleged ESA violations during the 60-day notice period, and thus this second amended complaint includes those violations.

6.     In light of the Agencies' failure and/or refusal to provide the public with any information regarding their compliance with NEPA, the ESA, and other environmental laws in relation to the border wall prototype project, on May 2, 2017, the Center submitted two requests for public records pursuant to FOIA, one to DHS and one to CBP, seeking records pertaining to the Agencies' NEPA environmental analysis, as well as compliance with other environmental laws, for the border wall prototype project.

7.     Defendants have violated FOIA, or alternatively, the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), with respect to the Center's May 2, 2017 FOIA requests for records related to the Agencies' compliance with NEPA and other laws in relation to the border wall prototype project. Although the Agencies have acknowledged their receipt of the FOIA requests, they have failed to provide any responsive records or state when they might do so. Accordingly, the Agencies are unlawfully withholding the records by failing to search for and provide all responsive records.

8.     On August 2, 2017—approximately a month and a half after the

filing of this case—former DHS Secretary John Kelly issued a Determination in the *Federal Register* purporting to waive the application of NEPA, the ESA, the APA, and more than 30 additional laws not at issue in this lawsuit, to "various border infrastructure projects" in "an approximately fifteen mile segment of the border within the San Diego Sector that starts at the Pacific Ocean and extends eastward," pursuant to section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").  *Codified at* 8 U.S.C. § 1103 note.  *Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, As Amended*, 82 Fed. Reg. 35,984. According to the *Federal Register* determination, the specific "border infrastructure projects" subject to the purported waiver include the border wall prototype project and the border wall replacement project at issue in this litigation. *Id*.

9.     IIRIRA section 102(c)(1) provides that "[n]otwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements to ensure expeditious construction of the barriers and roads under this section."  Once a waiver determination is issued, IIRIRA sections 102(c)(2)(A)-(C) restrict judicial review by providing federal district courts with exclusive jurisdiction to hear all causes of action or claims arising from a waiver, purporting to limit such causes of action or claims to those alleging a violation of the Constitution of the United States, requiring such causes of action or claims to be brought not later than 60 days after the DHS Secretary's waiver determination, and eliminating appellate court review of the district court decision regarding constitutional claims, and instead only permitting plaintiffs to seek review of the district court decision on constitutional claims through a petition for writ of certiorari to the U.S. Supreme Court.

10.     As a threshold matter, Plaintiff Center for Biological Diversity challenges former DHS Secretary Kelly's August 2, 2017 waiver determination as

*ultra vires,* because the determination was outside of the scope of authority vested in the DHS Secretary pursuant to IIRIRA section 102(c).  Specifically, neither the border wall prototype project nor the border wall replacement project is among "the barriers and roads" subject to IIRIRA section 102(c) waivers.  Federal courts are empowered to consider challenges to *ultra vires* executive actions despite language limiting or precluding statutory judicial review such as that found under IIRIRA section 102(c).  *See, e.g.*, *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1998) ("[T]he Veterans' Administrator cannot issue oil drilling permits—nor can the Secretary of Labor rescind television licenses—and expect to escape judicial review by hiding behind a finality clause.").

11.    In addition, Plaintiff Center for Biological Diversity alleges that the DHS Secretary's August 2, 2017 waiver determination, and the waiver authority provided by IIRIRA section 102(c) generally, violate the U.S. Constitution in several respects, including the Take Care Clause, the Separation of Powers Doctrine, the Non-Delegation Doctrine, and the Presentment Clause.

## JURISDICTION

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346, 5 U.S.C. §§ 701 to 706, 8 U.S.C. § 1103 note, and 5 U.S.C. § 552(a)(4)(B).  The causes of action arise under the laws of the United States, including NEPA, the ESA, FOIA, the APA, and IIRIRA, and the implementing regulations established pursuant to these federal statutes, and the U.S. Constitution.  The relief requested is authorized pursuant to 28 U.S.C. §§ 1651 and 2201 to 2202, and 5 U.S.C. §§ 705 and 706.

## VENUE

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e), because the violations are occurring here, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by Federal Defendants, and/or failure(s) to act by Federal

Defendants.  In addition, venue is proper in this judicial district pursuant to 5 U.S.C. § 552(a)(4)(B), which provides venue for FOIA cases in this district, because a portion of the responsive records may be found in this district.

## PARTIES

14.    Plaintiff Center for Biological Diversity is a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and environmental law.  The Center has more than 1.5 million members and online activists.  The Center is headquartered in Tucson, Arizona, and has offices in Los Angeles and Oakland in California, as well as numerous additional regional offices located throughout the country, and an international office in Baja California Sur, Mexico.

15.    The Center's members and staff live in or regularly visit the U.S.-Mexico borderlands region in San Diego County, as well as the borderlands region of Baja California Norte, Mexico.   The Center's members and staff regularly use the myriad federal, state, and local protected lands along the U.S.-Mexico border in San Diego County, including areas impacted by and/or adjacent to the location of the border wall prototype project and the border wall replacement project, for hiking, camping, viewing and studying wildlife, photography, and other vocational and recreational activities.   The Center's members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from their activities in these areas.  The Center has a long history of environmental advocacy within the borderlands region generally and San Diego County borderlands region specifically.  The Center's members and staff have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

16.    The Center has an established track record of active participation in the oversight of government activities and decision-making as well as consistent practice of informing, educating, and counseling the public regarding

environmental issues, policies, and laws relating to environmental issues.  The Center has displayed its ability to disseminate information obtained pursuant to FOIA to the general public through far-reaching media, including news media, the Center's website and newsletters, and social media.  The Center and its members are harmed by Federal Defendants' FOIA violations as they preclude the Center from gaining a comprehensive understanding of the activities, decisions, priorities, and communications related to the border wall prototype project and border wall replacement project.

17.   The Center has worked for nearly two decades to oppose environmentally harmful border fencing and other harmful border security projects along the U.S.-Mexico border generally, and the San Diego region specifically.  The Center also has a long history of advocating for the protection of rare wildlife habitat that would be impacted by the San Diego border wall prototype and border wall replacement project, as well as advocating for specific species that would be harmed by the San Diego border wall prototype and border wall replacement project, including the western snowy plover, California least tern, Quino checkerspot butterfly, San Diego and Riverside fairy shrimp, and coastal California gnatcatcher.

18.   The Center and its members' interests are harmed by Defendants' violations of NEPA and the ESA.  The proposed border wall prototype project and border wall replacement project will result in construction of border barriers where none currently exist (in the case of the prototypes), and the construction of new border wall that is much higher and more impermeable than currently existing border fencing.  The border wall replacement project will entail a massive construction operation with associated noise, lighting, and other impacts, and which will likely necessitate new land clearing, grading, staging, and other associated activities that will impact the surrounding environment.  The  violations of NEPA and the ESA, and the construction which will occur without the benefit

of compliance with these laws, will negatively impact the wildlife habitat and imperiled species described above, which will injure the Center and its members' aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests in those habitats and species. These injuries would be redressed by the requested relief directing Defendants to comply with those laws.

19. The Center and its members are harmed by the Agencies' violations of FOIA, or alternatively the APA, as well as its violations of NEPA, pertaining to public notice and participation, as such violations will result in harm to the Center and its members' interests, and will preclude the Center and its members from gaining a full understanding of the activities, decisions, priorities, and communications related to the border wall prototype project and border wall replacement project.

20. The Center and its members are harmed by former DHS Secretary Kelly's August 2, 2017 Determination under IIRIRA section 102(c) purporting to waive NEPA, the ESA, the APA, and more than 30 additional laws not at issue in this litigation. In waiving these laws, the August 2, 2017 Determination will allow the border wall prototype and border wall replacement projects to proceed without any compliance with NEPA and the ESA. The absence of environmental law compliance will negatively impact the wildlife habitat and imperiled species described above, which will injure the Center and its members' aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests in those habitats and species. These injuries would be redressed by the requested relief to void the waiver determination as inapplicable and unconstitutional, and directing Defendants to comply with NEPA, the ESA, and all other applicable laws. The August 2, 2017 Determination will also result in harm to the Center and its members' interests by precluding the application of NEPA, the ESA, and the APA, which will preclude public notification and transparency.

21.     Defendant DHS is an agency within the executive branch of the U.S. government.   DHS is responsible for ensuring border security along the U.S.-Mexico border consistent with applicable legal requirements, including NEPA and the ESA.   In addition, DHS is in possession and control of the records that the Center seeks under FOIA, and as such, it is subject to FOIA pursuant to 5 U.S.C. § 552(f).

22.     Defendant CBP is an agency within DHS.   CBP is responsible for ensuring border security along the U.S.-Mexico border consistent with applicable legal requirements, including NEPA and the ESA.   In addition, CBP is in possession and control of the records that the Center seeks under FOIA, and as such, it is subject to FOIA pursuant to 5 U.S.C. § 552(f).

23.     Defendant Elaine Duke, Acting DHS Secretary, is sued in her official capacity.   Acting Secretary Duke is the official ultimately responsible under federal law for ensuring that the actions and management decisions of DHS comply with all applicable laws and regulations. Acting Secretary Duke's predecessor, former DHS Secretary John Kelly, invoked the IIRIRA section 102(c) waiver in relation to the border wall prototype project and border wall replacement project on August 2, 2017.

## **LEGAL BACKGROUND**

**A.    NEPA**

24.     NEPA is the "basic national charter for protection of the environment."   40 C.F.R. § 1500.1(a)(1978).   It was enacted with the ambitious objectives of "encouraging productive and enjoyable harmony between man and his environment . . . promoting efforts which will prevent or eliminate damage to the environment and biosphere and stimulating the health and welfare of man; and enriching the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.

25.       In order to achieve these goals, NEPA contains several "action

forcing" procedures, most significantly the mandate to prepare an environmental impact statement ("EIS") on major Federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C).

26.    The Council on Environmental Quality ("CEQ") was created to administer NEPA and has promulgated NEPA regulations, which are binding on all federal agencies. *See* 42 U.S.C. §§ 4342, 4344; 40 C.F.R. §§ 1500–1508 (1978).

27.    When a federal agency is not certain whether an EIS is required, it must prepare a briefer document, known as an environmental assessment ("EA"). 40 C.F.R. § 1508.9 (1978).  If the agency concludes in an EA that a project may have significant impacts on the environment, then an EIS must be prepared.  40 C.F.R. § 1501.4 (1978).  If an EA concludes that there are no significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a Finding of No Significant Impact ("FONSI").  40 C.F.R § 1508.13 (1978).

28.    The Supreme Court has found that the preparation and public circulation of EISs and EAs promotes NEPA's broad environmental objectives in two primary ways: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Methow Valley Citizens Council*, 490 U.S. at 349.

29.    NEPA requires that "agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."  40 C.F.R. § 1501.2 (1978); *id*. § 1502.5 (1978) ("An agency

shall commence preparation of an [EIS] as close as possible to the time the agency is developing or is presented with a proposal . . .").   The Ninth Circuit has interpreted these regulations as requiring the NEPA process to be conducted "before any irreversible and irretrievable commitment of resources."   *Connor v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1998).

30.   DHS has not promulgated regulations to implement NEPA, but has issued an Instruction Manual.   Instruction Manual 023-01-001-01, Revision 01, Implementation of NEPA (Nov. 6, 2014) ("DHS NEPA Manual").   The Manual specifically includes "proposed construction, land use, activity, or operation that has the potential to significantly affect environmentally sensitive areas" as an action "normally requiring" the preparation of at least an EA.

31.   Echoing the general NEPA requirements regarding the need to conduct NEPA early in the process, the DHS NEPA Manual directs DHS to "integrate[] the NEPA process with other planning efforts at the earliest possible stage so that environmental factors are considered with sufficient time to have a practical influence on the decision-making process before decisions are made." DHS NEPA Manual, at p. IV-1.   The Manual directs that agency components that process applications for DHS funding or approval, such as the contracts that have been and/or will be issued for the border wall prototype project and the border wall replacement project, "have a responsibility to integrate NEPA requirements early in the application process," and to ensure that "completion of the NEPA process occurs before making a decision to approve" the proposal.

32.   Other agencies which commonly contract with private entities to build public construction projects, such as the border wall prototype project and border wall replacement project, have also promulgated regulations specifying that NEPA must be completed as early as possible in the contracting or procurement process and requiring that NEPA's environmental and mitigation measures must be incorporated into the contract.   *See, e.g.*, 23 C.F.R. § 635.505(b)

(2016) (Department of Transportation ("DOT") contracting agency "shall not perform or contract for construction services (including early work packages of any kind) prior to the completion of the NEPA process"); *id*. § 635.505(h) (2016) (DOT contract "must include appropriate provisions ensuring that all environmental and mitigation measures identified in the NEPA documentation and committed to in the NEPA determination for the selected alternative will be implemented."); 10 C.F.R. § 1021.216(i) (1992) (Department of Energy agencies shall complete NEPA "before taking any action pursuant to the contract or award of financial assistance.").

33.    NEPA requires that the Agencies involve the public in preparing and considering environmental documents that implement the Act.   40 C.F.R. § 1506.6; *id*. § 1506.6(b)(1) (1978) (requiring federal agencies to "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected").

34.    The CEQ regulations further direct federal agencies to "insure that environmental information is available to public officials and citizens before decisions are made," and mandate that "public scrutiny [is] essential to implementing NEPA."  40 C.F.R. § 1500.1(b) (1978).

35.    The Ninth Circuit has held that a "complete failure to involve or even inform the public" about the agency's preparation of a NEPA document violates the statute's public participation requirements.  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003); *see also Brodsky v. Nuclear Regulatory Comm'n*, 704 F.3d 113, 122 (2nd Cir. 2013) ("The record before us fails to provide any agency explanation for why *no* public participation was deemed practicable or appropriate with respect to the challenged exemption.") (emphasis in original).

36.    Underlying all of NEPA's procedural requirements is the mandate

that agencies take a 'hard look' at all of the environmental impacts and risks of a proposed action.   As stated by the Ninth Circuit, "general statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (internal citations omitted).

**B.     Endangered Species Act**

37.     The ESA, 16 U.S.C. §§ 1531–1544, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978).  Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b).

38.     To achieve these objectives, the ESA directs the Secretary of the Interior, through the FWS, to determine which species of plants and animals are "threatened" and "endangered" and place them on the list of protected species.  *Id*. § 1533.  An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range," or "likely to become endangered in the near future throughout all or a significant portion of its range," respectively.  *Id*. § 1532(6), (20).

39.     Once a species is listed, the ESA provides a variety of procedural and substantive protections to ensure not only the species' continued survival, but its ultimate recovery, including the designation of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species, and the requirement for interagency consultation.  *Id*.  §§ 1533(a)(3), (f), 1538, 1536.

40.     The ESA recognizes that federal agencies, such as DHS and CBP, have a critical role to play in meeting these statutory purposes.   The ESA

establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the ESA. *Id.* § 1531(c)(1).

41.    To implement this policy, Section 7(a)(1) of the ESA requires that "Federal agencies shall, in consultation with and with the assistance of [FWS], utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species." *Id.* § 1536(a)(1).

42.    In addition to this overarching mandate, the ESA requires that "[e]ach Federal agency shall, in consultation with . . . [FWS], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat]." *Id.* § 1536(a)(2).

43.    FWS' regulations define an agency "action" to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02 (2016).

44.    Section 7(a)(2) contains both procedural and substantive mandates. Substantively, it requires that all federal agencies avoid actions that: (1) jeopardize listed species; or (2) destroy or adversely modify designated critical habitat. Procedurally, to ensure compliance with the substantive standards, the federal agency taking action and FWS take part in a cooperative analysis of potential impacts to listed species and their designated critical habitat known as the consultation process. 16 U.S.C. § 1536(a)(2). The consultation process has been described as the "heart of the ESA." *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011).

45.    Through the formal Section 7 consultation process, FWS prepares a

1   "biological opinion" as to whether the action is likely to jeopardize the species or

2   destroy or adversely modify critical habitat and, if so, suggests "reasonable and

3   prudent alternatives" to avoid that result.  16 U.S.C. § 1536(b)(3)(A).  During the

4   consultation process, both agencies must "use the best scientific and commercial

5   data available." *Id*. § 1536(a)(2); 50 CFR § 402.14(d).

6   **C.    Freedom of Information Act**

7   46.    FOIA's basic purpose is government transparency.  It establishes the

8   public's right to access all federal agency records unless such records may be

9   withheld pursuant to one of nine, narrowly construed FOIA exemptions.  5 U.S.C.

10  § 552(b)(1)-(9).

11  47.    FOIA imposes strict and rigorous deadlines on federal agencies when

12  they receive a request for records pursuant to FOIA.  Specifically, an agency must

13  determine whether to disclose responsive records and notify the requester of its

14  determination within 20 working days of receiving a FOIA request, and it must

15  make records "promptly" available, unless it can establish that certain unusual

16  circumstances are present and/or that it may lawfully withhold records, or portions

17  thereof, from disclosure.  *Id.* § 552(a)(3)(A), (a)(6).  Also within 20 working days,

18  the agency must inform the requester that it has a right to appeal the agency's

19  determination.  *Id.* § 552(a)(6)(A)(i).

20  48.    FOIA places the burden on the agency to prove that it may withhold

21  responsive records from a requester.  *Id.* § 552(a)(4)(B).

22  49.    Congress has specified limited circumstances in which federal

23  agencies may obtain more time to make the determination that is required by 5

24  U.S.C. § 552(a)(6)(A)(i).

25  50.    First, an agency may toll the 20-working-day deadline to seek

26  additional information or clarification from a requester, but that tolling period

27  ends when the agency receives such information or clarification.  *Id.* §

28  552(a)(6)(A).

51.    Second, an agency may extend the 20-working-day deadline for an additional 10 working days by giving a written notice to the requester that sets forth "unusual circumstances" to justify a deadline extension, which also requires that it provide the date by which the agency expects to make the determination. *Id.* § 552(a)(6)(B)(i).    However, to invoke such "unusual circumstances," the agency must provide the requester with "an opportunity to limit the scope of the request so that it may be processed within [20 working days] or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request."   *Id.* § 552(a)(6)(B)(ii).   In addition, when asserting unusual circumstances, the agency "shall make available its FOIA Public Liaison" to "assist in the resolution of any disputes between the requester and the agency." *Id.*

52.    FOIA requires each agency to make reasonable efforts to search for records in a manner that is reasonably calculated to locate all records that are responsive to the FOIA request.   *Id.* § 552(a)(3)(C)-(D).

53.    FOIA requires federal agencies to expeditiously disclose requested records, *see id.* § 552, and mandates a policy of broad disclosure of government records.   Any inquiry under FOIA brings with it a strong presumption in favor of disclosure.

54.    Congress recognized that in certain, limited instances, records may be withheld as exempt from FOIA's broad disclosure mandate, and thus it created nine categories of exemptions.   *Id.* § 552(b).   These exemptions, however, are narrowly construed in light of FOIA's dominant objective of disclosure, not secrecy.

55.    The U.S. district courts have jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."   *Id.* § 552(a)(4)(B).

56.    Alternatively, an agency's response to a FOIA request is subject to

judicial review under the APA, which confers a right of judicial review on any person who is adversely affected by an agency action, 5 U.S.C. § 702, and authorizes district courts to compel agency action that is unlawfully withheld or unreasonably delayed.  *Id.* § 706(1).  District courts must set aside any agency action that is found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  *Id.* § 706(2)(A).

**D.     The Illegal Immigration Reform and Immigrant Responsibility Act of 1996**

57.     Section 102 of the 1996 IIRIRA was the first legislative enactment under which Congress specifically authorized the Attorney General to construct "border barriers and roads."[1]  P.L. 104-208, div. C., *codified at* 8 U.S.C. § 1103 note.

58.     Prior to IIRIRA's enactment, USBP in 1990 (with the assistance of the U.S. Army Corps of Engineers and the National Guard) began constructing a border fence in the San Diego region, utilizing Army surplus carbon steel mats which were used as landing strips during the Vietnam War.  The San Diego border fence—the first in history to be constructed along the U.S.-Mexico border (other than chain link)—was  completed in 1993, beginning at the Pacific Ocean and running approximately 14 miles eastward to the Otay Mesa region.

59.     The 1994 *Border Patrol Strategic Plan: 1994 and Beyond*, emphasized a "prevention through deterrence" strategy under which the agency

---

[1] Prior to the September 11, 2001 terrorist attacks, the Attorney General was vested with the authority over immigration laws.  The Attorney General had, in turn, delegated that authority to the Immigration and Naturalization Service ("INS") and its component agency U.S. Border Patrol ("USBP"), which were located within the Department of Justice.  Pursuant to the Homeland Security Act of 2002, P.L. 107-296, DHS was created, the INS was abolished, and the INS immigration functions, as well as its component agency USBP, were transferred to DHS.  Under DHS, USBP became a component of the newly created agency CBP.  IIRIRA section 102 was subsequently amended to substitute the DHS Secretary for the Attorney General as having responsibility over border barriers and roads.

significantly increased agent numbers, deployed technological aids such as ground sensors and surveillance cameras, and proposed extensive construction of border fences, roads, and other border security infrastructure.

60. As part of the prevention through deterrence strategy, and in recognition that Congress had never provided INS and USBP with specific statutory authority to construct border barriers, Congress enacted IIRIRA in 1996. IIRIRA section 102, for the first time, provided INS and USBP with general authorization to build border barriers, as well as specific direction regarding the location and extent of specific border barriers to be constructed.

61. Amended several times, IIRIRA section 102 remains the primary federal statute addressing border barriers, pursuant to three primary provisions: (i) section 102(a) (providing general authority to construct border fences and other border barriers); (ii) section 102(b) (carrying out subsection (a), by providing specific mandates for border barrier construction, and the deadlines for such construction, among other requirements); and (iii) section 102(c) (legal waiver authority).

62. IIRIRA section 102(a), which remains substantively the same as originally enacted in 1996, provided the Attorney General (now the DHS Secretary) with the general authority to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."

63. IIRIRA section 102(b) "carr[ies] out subsection (a)" by identifying specific border barriers to be constructed, establishing specific deadlines for the construction of such barriers, and other requirements.

64. The only border fence segment initially mandated by Congress under IIRIRA section 102(b) was the construction of a double and triple layer border fence to further fortify the 14-mile long San Diego "primary" border fence that

1  was finished in 1993.

2      65.    As originally enacted, IIRIRA section 102(c) stated that the

3  provisions of NEPA and the ESA "[were] waived to the extent the Attorney

4  General determines necessary to ensure expeditious construction of the barriers

5  and roads under this section."   At the time of its enactment, the Department of

6  Justice and INS opposed IIRIRA section 102(c) and established a policy not to use

7  the waiver authority.   *See* March 6, 1997 Memorandum from INS Assistant

8  Commissioner David Yentzer.

9      66.    The IIRIRA Section 102(c) waiver modifier "under this section"

10  refers to the specific border fencing required under IIRIRA section 102(b), which

11  by its plain language "carries out" DHS's general authority to "install additional

12  physical barriers and roads" under IIRIRA section 102(a).   At the time of

13  IIRIRA's enactment, the specific border fencing directed under IIRIRA section

14  102(b) was limited to the 14-mile double and triple layer San Diego border fence.

15  **E.    The 2005 REAL ID Act Amendments to IIRIRA Section 102(c)**

16      67.    Enacted in 2005 as an unrelated legislative rider to the "Emergency

17  Supplemental Appropriations Act for Defense, the Global War on Terror, and

18  Tsunami Relief, 2005," section 102 of the REAL ID Act amended the section

19  102(c) IIRIRA waiver provision.[2]   P.L. 109-13, div. B.  Specifically, the REAL

20  ID Act amendment expanded the IIRIRA section 102(c) waiver authority beyond

21  NEPA and the ESA to permit the DHS Secretary "to waive all legal requirements

22  such Secretary, in such Secretary's sole discretion, determines necessary to ensure

23  expeditious construction of the barriers and roads under this section."

24

25  [2] It is a potentially confusing coincidence that section 102 of the REAL ID Act
26  amended section 102 of the IIRIRA.   The REAL ID Act addressed border
   security, including the amendment to IIRIRA section 102(c), but its scope was
27  much broader, consisting of four additional titles addressing: asylum and removal;
   drivers' licenses; H-2B temporary worker provisions; and Australian E
28  nonimmigrant and EB-3 nurses visas.

68.    In addition, section 102 of the REAL ID Act amended the IIRIRA section 102(c) waiver authority to restrict judicial review in the following respects: purporting to limit "all causes or claims" arising from any waiver determination made by the DHS Secretary to alleged constitutional violations; requiring any such constitutional challenge to be filed not later than 60 days after the Secretary's determination; and eliminating appellate court review of the district court's decision on the alleged constitutional violations, instead only permitting review upon a writ of certiorari to the Supreme Court.

69.    The REAL ID Act was introduced by Judiciary Chairman James Sensenbrenner in the House of Representatives on January 26, 2005, and assigned the bill number H.R. 418.  Despite significant controversy concerning the section 102 waiver provisions and numerous other provisions of H.R. 418, there were no Committee hearings held on the bill in either Chamber of Congress.

70.    Two weeks after introduction, H.R. 418 was considered in the full House on February 9, 2005 (151 Cong. Rec. H453-471) and February 10, 2005 (151 Cong. Rec. H527-566).

71.    The REAL ID Act was never specifically considered in the Senate, as it was added to the Emergency Supplemental Appropriations Act during conference committee.  As stated by one Senator, the bill "was simply grafted onto the emergency supplemental appropriations bill that provides funding for our military operations and our troops, without debate or participation by the conferees."  151 Cong. Rec. S4820 (daily ed. May 10, 2005) (Statement of Senator Byrd).

72.    Congress intended the REAL ID Act's amendment and expansion of that 102(c) waiver authority, like the IIRIRA section 102(c) waiver authority as originally enacted in 1996, to apply to the specific border barrier and road requirements at IIRIRA section 102(b), which carries out the general border barrier authority at IIRIRA section 102(a).  At that time, the only specific border

barriers required under section 102(b) remained the 14-mile San Diego double and triple layer fence proposals.

73.    Congress's intent that the expansion of the IIRIRA section 102(c) waiver authority under section 102 of the REAL ID Act continue to be limited to the specific border barriers mandated by IIRIRA section 102(b) is evidenced by the bill's plain language, as well as statements by the bill's author and co-sponsors during the limited House Floor debate.

74.    Indeed, the bill's official title made clear that Congress's intent in expanding the IIRIRA section 102(c) waiver authority was specific to the border barrier segments identified under section 102(b): "To establish and rapidly implement regulations for State driver's license and identification document security standards, to prevent terrorists from abusing the asylum laws of the United States, to unify terrorism-related grounds for inadmissibility and removal, *and to ensure expeditious construction of the San Diego border fence*." (emphasis added).

75.    The intended limitation of the IIRIRA section 102(c) waiver authority to the San Diego double and triple layered fence specified under IIRIRA section 102(b) was also repeatedly emphasized by the bill's supporters on the House Floor.  As stated by the bill's author:

> [T]he REAL ID Act will waive Federal laws *to the extent necessary to complete gaps in the San Diego border security fence*, which is still stymied 8 years after congressional authorization.

151 Cong. Rec. H454 (daily ed., Feb. 9, 2005)(Statement of Rep. Sensenbrenner)(emphasis added); *see also* Cong. Rec. H471 ("H.R. 418 provides the Secretary of Homeland Security with authority to waive environmental laws, *so that the border fence running 14 miles east from the Pacific Ocean at San Diego may finally be completed*.") (daily ed., Feb. 9, 2005)(Statement of Rep.

Hoekstra)(emphasis added).

**F.      The 2006 Secure Fence Act Amendments to IIRIRA Section 102(b)**

76.      President George W. Bush signed the Secure Fence Act on October 26, 2016. P.L. 109-367.

77.      Section 3 of the Secure Fence Act ("Construction of Fencing and Security Improvements in Border Area from Pacific Ocean to Gulf of Mexico") significantly expanded upon IIRIRA section 102(b) and its previous sole focus on the 14-mile San Diego double and triple layer fence construction.   Under the Secure Fence Act amendments to IIRIRA section 102(b), Congress directed DHS to "provide for at least 2 layers of reinforced fencing [and] the installation of additional physical barriers, roads, lighting, cameras, and sensors" in five specific segments along the U.S.-Mexico border totaling approximately 850 miles. IIRIRA, former §102(b)(1)(A)(i)-(v). The required border barrier construction included one California segment, two Texas segments, one segment encompassing portions of both California and Arizona, and one segment encompassing portions of both New Mexico and Texas.

78.      Section 3 further amended IIRIRA section 102(b) to add the specific requirement that two of these segments be considered "priority areas," with construction deadlines of May 30, 2008 and December 31, 2008.  Former IIRIRA § 102(b)(1)(B)(i)-(ii).[3]

79.      Congress did not specifically consider the impact of the Secure Fence Act amendments on the scope of the IIRIRA section 102(c) waiver.

---

[3] In addition to its IIRIRA amendments, the Secure Fence Act directed the DHS Secretary to achieve and maintain operational control over the borders of the United States [including the northern and coastal borders] through surveillance activities and physical infrastructure enhancements to prevent unlawful entry and facilitate CBP's access to the borders.  Pub. L. No. 109-367, § 3, *codified at* 8 U.S.C. § 1701 note.

**G.     The 2008 Consolidated Appropriations Act Amendments to IIRIRA Section 102(b)**

80.     Just over a year after enactment of the Secure Fence Act, President George W. Bush signed the 2008 Consolidated Appropriations Act on December 26, 2007.  P.L. 110-161, div. E.

81.     Section 564 of the 2008 Consolidated Appropriations Act again amended section 102(b) of the IIRIRA to scale back DHS's duties with respect to border barriers and roads as defined under the 2006 Secure Fence Act amendments.   These modifications—which remain the law today—include: (1) eliminating the requirement that border barriers be built in any specific locations, and instead specifying that such barriers be placed "along not less than 700 miles of the southwest border where fencing would be most practical and effective"; (2) eliminating the requirement of double-layered fencing; and (3) amending the "priority areas" requirement to direct that DHS identify and construct 370 miles of border barriers by December 31, 2008.  IIRIRA § 102(b)(1)(A)-(B).

82.     The 2008 Appropriations Act also added a new consultation requirement to IIRIRA section 102(b), directing that DHS "shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites where" border barriers are constructed.  IIRIRA § 102(b)(1)(C).

## FACTUAL BACKGROUND

**A.     Past Construction of Border Barriers and Use of the Waiver Authority Under IIRIRA**

83.     Enabled by billions of dollars in Congressional appropriations, and in response to IIRIRA's amendments by the 2005 REAL ID Act, 2006 Secure Fence Act, and 2008 Consolidated Appropriations Act, DHS has greatly increased the

1    extent of border barriers and roads along the U.S.-Mexico border.

2        84.    In order to facilitate this extensive construction, during the George

3    W. Bush Administration's second term, former DHS Secretary Michael Chertoff

4    published five "notices of determination" in the *Federal Register* that he was

5    invoking the IIRIRA Section 102(c) authority to waive in their entirety a total of

6    more than 35 laws that would have otherwise applied to construction of border

7    fencing and roads.  These waivers applied to border barrier and road construction

8    in the following areas: (i) San Diego, 70 Fed. Reg. 55,622 (Sept. 22, 2005)(13.9

9    miles); (ii) Barry M. Goldwater Range, Arizona, 72 Fed. Reg. 2,535 (Jan. 19,

10   2007)(37.3 miles); (iii) San Pedro Riparian National Conservation Area

11   (administered by U.S. Bureau of Land Management), Arizona, 72 Fed. Reg.

12   60,870 (Oct. 26, 2007)(5.5 miles); (iv) Hidalgo County, Texas, 73 Fed. Reg.

13   19,077 (April 3, 2008)(corrected on April 8, 2008)(21 miles); (v)  Various Areas

14   in Texas, New Mexico, Arizona, and California, 73 Fed. Reg. 18,293 (April 3,

15   2008)(546.5 miles).

16       85.    In all five of these determinations, the former DHS Secretary waived

17   application of NEPA and the ESA. In addition to these laws, the former DHS

18   Secretary waived application of the Clean Water Act, 33 U.S.C. § 1251 *et seq*.;

19   National Historic Preservation Act, Pub. Law 89-665; Migratory Bird Treaty Act,

20   16 U.S.C. § 703 *et seq*.; Clean Air Act, 42 U.S.C. § 7401 *et seq*.; Archeological

21   Resources Protection Act, 16 U.S.C. § 470aa et seq.; Safe Drinking Water Act, 42

22   U.S.C. § 300f *et seq*.; Wild and Scenic Rivers Act, 16 U.S.C. § 1281 *et seq*.;

23   Wilderness Act, 16 U.S.C. § 1131 *et seq*.; National Forest Management Act, 16

24   U.S.C. § 1600 *et seq*.; Native American Graves Protection and Repatriation Act,

25   42 U.S.C. § 2000bb;  and American Religious Freedom Act, 42 U.S.C. § 1996, as

26   well as numerous additional laws.

27       86.    Collectively, the five REAL ID Determinations waived laws that

28   otherwise would have applied to approximately 624.5 miles of border barrier and

road construction.

87.   Clearly, DHS has taken aggressive action to comply with Congress's IIRIRA mandates, including the repeated use by former DHS Secretary Chertoff of the IIRIRA section 102(c) waiver to "ensure expeditious construction" of the specific barriers and roads mandated by IIRIRA section 102(b), which have been identified by Congress as necessary to carry out DHS's general authority to construct border barriers and roads necessary to deter illegal crossing in areas of high illegal entry into the United States under IIRIRA section 102(a).

88.   Consequently, DHS has met its statutory responsibilities to construct the specific "fencing and road improvements along the border" as currently defined by IIRIRA section 102(b).

89.   As of February 2017, DHS has constructed 654 miles of "primary" border barriers and approximately 5,000 miles of roads along the U.S.-Mexico border. *See* "Southwest border security: Additional actions needed to better assess fencing's contributions to operations and provide guidance for identifying capability gaps." U.S. Government Accountability Office ("GAO") Report 17-331, a report to congressional requesters (February 2017).

90.   DHS has met its specific mandate to identify and construct 370 miles of border fencing in "priority areas . . . where fencing would be most practical and effective." IIRIRA § 102(b)(1)(B).

91.   DHS has also met its specific mandate to "construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective." IIRIRA § 102(b)(1)(A). In addition to the 654 miles of primary fencing constructed by DHS, the agency has constructed an additional 37 miles of double-layered fencing and 14 miles of triple-layered fencing. In total, DHS has deployed a total of 705 miles of reinforced border fencing, exceeding the 700-mile minimum under IIRIRA section 102(b)(1)(A).

92.   As summarized recently by the GAO:

1
2
3
4
5
6
7

> From fiscal years 2005 through 2015, CBP increased the total miles of primary border fencing on the southwest border from 119 miles to 654 miles—including 354 miles of primary pedestrian fencing and 300 miles of primary vehicle fencing.   With 654 miles of primary fencing currently deployed, CBP officials have stated that CBP is in compliance with its legal requirements for the construction of the southwest border fencing on the substantial discretion provided to the Secretary of Homeland Security to determine the appropriate placement of fencing.

8  GAO Report, at p. 8.

9
10  **B.     January 25, 2017 Executive Order 13767 ("Border Security and Immigration Enforcement Improvement")**

11  93.     On January 25, 2017, President Donald J. Trump issued Executive
12  Order No. 13767, entitled "Border Security and Immigration Enforcement
13  Improvement" ("Executive Order"), which directed DHS to construct a "secure,
14  contiguous, and impassable physical barrier" along the entirety of the nearly 2,000
15  mile-long U.S.-Mexico border.  The Executive Order defined "wall" to mean "a
16  contiguous, physical wall or similarly secure, contiguous, and impassable physical
17  barrier."

18  94.     On February 17, 2017, former DHS Secretary John Kelly issued a
19  memorandum regarding "Implementing the President's Border Security and
20  Immigration Enforcement Improvements Policies" ("Kelly Memorandum"),
21  which directed CBP to "immediately begin planning, design, construction, and
22  maintenance of a wall, including the attendant lighting, technology (including
23  sensors), as well as patrol and access roads, along the land border with Mexico in
24  accordance with existing law . . . ."  Further, the Kelly Memorandum directed the
25  DHS Undersecretary for Management, in consultation with CBP, to "immediately
26  identify and allocate all sources of available funding for the planning, design,
27  construction, and maintenance of a wall . . . ."

28

## C.     Border Wall Prototype Project

95.     In accordance with the Executive Order and the Kelly Memorandum, on March 17, 2017, DHS released two Requests for Proposals ("RFPs")—one for a "Solid Concrete Border Wall Prototype" and the second for an "Other Border Wall Prototype."   The "threshold requirements" for the two prototypes are identical, with the exception that the "other border wall prototype" does not have to be constructed of "reinforced concrete."   These contractual thresholds include requirements that the wall design "shall be physically imposing in height." The government's "nominal concept is for a 30-foot high wall," and designs "with heights of less than 18 feet are not acceptable."   The RFPs further specify that the wall designs "shall prevent digging or tunneling below it for a minimum of 6 feet below the lowest adjacent grade," "shall be constructible to slopes up to 45 percent," and shall be built in a manner that it would take at least an hour to breach with a "sledgehammer, car jack, pickaxe, chisel, battery operated impact tools, battery operated cutting tools, Oxy/acetylene torch or other similar hand-held tools."

96.     The 30-foot border wall envisioned under the Executive Order and called for under the RFP's would significantly differ from existing border fencing and other border barriers with respect to height, construction materials, and permeability, and would pose distinct and additive environmental risks and harms.

97.     Phase I of the RFPs required bidders to submit Concept Papers by April 4, 2017.   Up to 20 bidders from Phase I could be invited to contract for participation in Phase II of the bidding process.

98.     Phase II requires the Contractors to "provide for the design and construction of a full-scale prototype, which shall be 30 feet long, and "will be constructed at a location in San Diego, CA as determined by the Government."

99.     The border wall prototype project will be constructed on federally-owned land in San Diego, California, within the vicinity of Otay Mesa near the

base of the Otay Mountain Wilderness and the eastern terminus of existing secondary fencing within the approximately 14-mile long, westernmost segment of the current border fence beginning at the Pacific Ocean.

100.    The Otay Mesa area, where the border wall prototype project will take place, is of high environmental and natural resources value.  It contains several vernal pools—one of the most imperiled wildlife habitats in San Diego County—and designated critical habitat for numerous listed threatened and endangered species, including the Quino checkerspot butterfly and San Diego fairy shrimp, as well as habitat for non-listed sensitive and rare species, such as the burrowing owl.

101.    On August 31, 2017, Acting CBP Deputy Commissioner Ronald Vitiello held a press briefing in which he announced that CBP had chosen four vendors to construct the "Solid Concrete Wall" prototypes, and that the agency would announce four additional vendors to construct the "Other Border Wall" prototypes at a later date.

**D.    San Diego County Border Wall Replacement Project**

102.    In addition to the border wall prototype project, Federal Defendants are implementing the Executive Order and the Kelly Memorandum through the proposed construction of a border wall to replace the existing 14-mile primary and secondary fencing in San Diego County.  This construction has been described by Federal Defendants in various pronouncements and agency documents, including the March 2017 document, entitled "Building The Wall: The Strategy & Way Forward" ("Wall Strategy Document"), and the August 2, 2017 IIRIRA section 102(c) determination by former DHS Secretary Kelly

103.    The 14-mile San Diego border wall replacement project will likely impact numerous ESA-listed endangered and threatened species, and their designated critical habitat, including the arroyo toad, the California least tern, and the Southwestern willow flycatcher.  The proposed 30-foot high replacement wall

is notably higher than the existing border fencing, and may be constructed of impermeable concrete, both of which would exacerbate environmental impacts of the existing border fencing.

104.   Even though this region has already been heavily impacted by prior border fence  construction and other activities and infrastructure, the border wall replacement project is a major construction project that poses significant additional threats to aquatic resources and other rare wildlife habitats, as well as the numerous endangered species and imperiled habitats that lie within the path of the wall.  Some of these impacts could likely be avoided or mitigated by prior compliance with NEPA, the ESA, and other laws.

105.   Federal Defendants have failed to comply with NEPA, the ESA, or other environmental laws for the border wall prototype project and border wall replacement project.  Federal Defendants have also failed to fulfill their IIRIRA Section 102(b)(1)(C) consultation requirements.

106.   As a consequence of Federal Defendants' failure to provide for any public participation or consultation in their consideration and authorization of the border wall prototype project and border wall replacement project, the Center and other members of the public did not have any opportunity to obtain information about or provide input prior to approval of those projects.

**E.     Prior IIRIRA Section 102(c) Waivers Are Inapplicable to the Border Wall Prototype Project and Border Wall Replacement Project**

107.   Former DHS Secretary Chertoff's first use of the IIRIRA section 102(c) waiver authority applied to the 14-mile border fence  segment that would be replaced under the border wall replacement project.  70 Fed. Reg. 55,622 (Sept. 22, 2005).  As stated in that notice, former Secretary Chertoff determined that it was necessary to waive NEPA, ESA, and several other laws "with respect to the construction of the barriers and roads" associated with the 14-mile border fence.

108.   As reflected in the language of the notice, the 2005 waiver applied to

the initial construction of the 14-mile border fence, not the border wall prototype project and border wall replacement project now proposed. The 2005 waiver cannot reasonably be interpreted to exempt compliance with the waived laws in perpetuity for subsequent work to maintain or repair the existing 14-mile border fence, or the construction of border wall prototypes, even if the footprint for those projects falls within the geographical boundaries of the 2005 waiver.

**F.     The August 2, 2017 IIRIRA Section 102(c) Waiver**

109.     On August 2, 2017, former DHS Secretary John Kelly issued a Determination in the *Federal Register* purporting to invoke IIRIRA section 102(c) in order to waive the application of NEPA, the ESA, and more than 30 additional laws not at issue in this lawsuit to "various border infrastructure projects" in the "project area," which is defined as "an approximately fifteen mile segment of the border within the San Diego Sector that starts at the Pacific Ocean and extends eastward," starting at "the Pacific Ocean and extending to approximately one mile east of Border Monument 251." 82 Fed. Reg. 35,984-85.

110.     The additional laws purportedly waived by the August 2, 2017 determination are the: Clean Water Act, 33 U.S.C. § 1251 *et seq.*; National Historic Preservation Act, Pub. L. 89-665; Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*; Clean Air Act, 42 U.S.C. § 7401 *et seq.*; Archaeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*; Paleontological Resources Preservation Act, 16 U.S.C. § 470aaa *et seq.*; Federal Cave Resources Protection Act of 1988, 16 U.S.C. § 4301 *et seq.*; National Trails System Act, 16 U.S.C. § 1241 *et seq.*; Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*; Noise Control Act, 42 U.S.C. § 4901 *et seq.*; Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, and the Comprehensive Environmental Response, Compensation and Liability Act (Superfund), 42 U.S.C. § 9601 *et seq.*; Archaeological and Historic Preservation Act, 54 U.S.C. § 320301 *et seq.*; Antiquities Act, 54 U.S.C. § 320301 *et seq.*; Historic Sites, Buildings, and

Antiquities Act, 54 U.S.C. § 3201-320303 & 320101-320106; Wild and Scenic Rivers Act, 16 U.S.C. § 1281 *et seq.*; Farmland Protection Policy Act, 7 U.S.C. § 4201 *et seq.*; Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.*; Wilderness Act, 16 U.S.C. § 1131 *et seq.*; Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*; National Wildlife Refuge System Administration Act and National Wildlife Refuge System Improvement Act, 16 U.S.C. § 668dd-668ee; National Fish and Wildlife Act of 1956, 16 U.S.C. § 742a *et seq.*; Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*; Wild Horse and Burro Act, 16 U.S.C. § 1331 *et seq.*; Pub. L. 106-398; Otay Mountain Wilderness Act of 1999, Pub. L. 106-145; sections 102(29) and 103 of Title I of the California Desert Protection Act, Pub. L. 103-433; Rivers and Harbors Act of 1899, 33 U.S.C. § 403; Eagle Protection Act, 16 U.S.C. § 668 *et seq.*; Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq.*; American Indian Religious Freedom Act, 42 U.S.C. § 1996; and Religious Freedom Restoration Act, 42 U.S.C. § 2000bb.

111.    The August 2, 2017 determination identifies specific projects within the broader "project area" as including both projects at issue in this litigation—the replacement of "existing primary fencing", as well as "prototype border wall . . . near the eastern terminus of the existing secondary barrier."   82 Fed. Reg. at 35,985.

**G.    May 2, 2017 DHS and CBP FOIA Requests: Border Wall Prototype Project**

112.    In response to Federal Defendants' failure and/or refusal to provide the Center or public generally with information regarding NEPA and other environmental compliance in relation to the border wall prototype project, on May 2, 2017, the Center submitted via email a FOIA request to DHS for the following information:

1. All National Environmental Policy Act, 42 U.S.C. §§ 4321-4370h ("NEPA") environmental impact statements, environmental assessments, categorical exclusions, and/or other NEPA analysis prepared for "prototype" border wall construction as part of the border wall request for proposal ("RFP") process;

2. All other environmental analysis and/or compliance records prepared for prototype border wall construction, including but not limited to analysis conducted pursuant to the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA"), Clean Water Act, 33 U.S.C. §§ 1251-1387 ("CWA"), and Coastal Zone Management Act, 16 U.S.C. 22 ("CZMA"); and

3. All inter- and intra-agency correspondence records mentioning, referencing and/or including reference to compliance with environmental and/or all other applicable laws relevant to prototype border wall construction.

113. In response, on May 2, 2017, DHS acknowledged the Center's request and assigned it tracking number 2017-HQFO-00717 ("the DHS FOIA Request"). DHS also invoked a 10-working-day extension pursuant to 5 U.S.C. § 552(a)(6)(B)(i) due to DHS's claim that the DHS FOIA Request "seeks documents that will require a thorough and wide-ranging search."

114. A determination on the DHS FOIA Request was due by June 14, 2017, which is 30 working days after DHS's acknowledgement of the DHS FOIA Request.

115. As of the date of the filing of this second amended complaint, which is past the 30-working-day deadline, DHS has not requested additional time to respond, provided any responsive records, or provided a determination in response to the DHS FOIA Request.

116. None of FOIA's nine exemptions to the statute's disclosure mandate apply to the records that are responsive to the DHS FOIA Request. *Id.* § 552(b).

117. On May 2, 2017, the Center submitted via email a FOIA request to CBP for the following records:

1. All National Environmental Policy Act, 42 U.S.C. §§ 4321-4370h ("NEPA") environmental impact statements, environmental assessments, categorical exclusions, and/or other

NEPA analysis prepared for "prototype" border wall construction as part of the border wall request for proposal ("RFP") process;

2. All other environmental analysis and/or compliance records prepared for prototype border wall construction, including but not limited to analysis conducted pursuant to the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA"), Clean Water Act, 33 U.S.C. §§ 1251-1387 ("CWA"), and Coastal Zone Management Act, 16 U.S.C. 22 ("CZMA"); and

3. All inter- and intra-agency correspondence records mentioning, referencing and/or including reference to compliance with environmental and/or all other applicable laws relevant to prototype border wall construction.

118.    In response, on May 2, 2017, CBP acknowledged the Center's request and assigned it the tracking number CBP-2017-053692 ("the CBP FOIA Request").  On May 3, 2017, CBP sent the Center an automated notice stating that the "average time to process a FOIA request related to 'travel/border incidents' is a minimum of 3-6 months."  The notice failed to provide any completion date by which CBP is to provide the requested records.

119.    A determination on the CBP FOIA Request was due by May 31, 2017, which is 20 working days after CBP's acknowledgement of the CBP FOIA Request.

120.    As of the date of the filing of this second amended complaint, which is past the 20-working-day deadline, CBP has not requested additional time to respond, provided any responsive records, or provided a determination in response to the CBP FOIA Request.

121.    None of FOIA's nine exemptions to the statute's disclosure mandate apply to the records that are responsive to the CBP FOIA Request.  *Id.* § 552(b).

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### *Ultra Vires* Violations
### (August 2, 2017 IIRIRA Section 102(c) Determination)
### (Facial Violation of IIRIRA Section 102(c))

122.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

123.   IIRIRA section 102(c) provides the DHS Secretary with "the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section."

124.   The scope of the IIRIRA section 102(c) authority granted to the DHS Secretary to waive laws "under this section" is limited to the specific border barriers and roads required to be constructed pursuant to IIRIRA section 102(b). IIRIRA section 102(a) provides general authority to DHS to construct border barriers and roads in areas of high illegal entry into the United States, while IIRIRA section 102(b) identifies the specific "construction of fencing and road improvements along the border" necessary to "carry[] out subsection(a)."

125.   At the time of the original 1996 enactment of IIRIRA, as well as its 2005 amendment by section 102 of the REAL ID Act, the specific border barrier construction required under IIRIRA section 102(b) was limited to the San Diego 14-mile double and triple layer border fence.

126.   Congress subsequently amended IIRIRA section 102(b) under the 2006 Secure Fence Act and 2008 Consolidated Appropriations Act.   The 2006 Secure Fence Act amended IIRIRA section 102(b) to require DHS to construct five specific segments of double-layered border fencing totaling approximately 850 miles.   A year later, with the enactment of the 2008 Consolidated Appropriations Act, Congress again amended IIRIRA section 102(b) to its current version, which requires that DHS identify and construct 370 miles of border

barriers by December 31, 2008, and that the agency construct border barriers "along not less than 700 miles of the southwest border where fencing would be most practical and effective."

127. Congress has not amended the IIRIRA section 102(c) waiver since the 2005 REAL ID Act amendments, and did not discuss or consider the scope of the waiver during its deliberations or discuss how the existing 102(c) waiver authority would apply to the expanded scope of IIRIRA section 102(b) under the 2006 Secure Fence Act and 2008 Consolidated Appropriations Act amendments.

128. Nonetheless, former DHS Secretary Chertoff invoked IIRIRA section 102(c) on five occasions to waive laws on the vast majority of the specific border barriers required under IIRIRA section 102(b) pursuant to Secure Fence Act and 2008 Appropriations Act amendments.

129. Former Secretary Chertoff's expansion of the IIRIRA section 102(c) waiver authority beyond the San Diego double and triple layer fence proposal that was included in the original IIRIRA section 102(b) was not contested in previous litigation concerning the five waivers issued by the former Secretary. No court addressed whether the IIRIRA section 102(c) waiver authority was properly applied by former Secretary Chertoff to the greatly expanded scope of IIRIRA section 102(b) under the 2005 REAL ID Act amendments and 2008 Consolidated Appropriations Act amendments.

130. Even presuming that the section 102(c) waiver authority is applicable to the expansion of 102(b) specific border barrier mandates beyond the double and triple layer San Diego fence, DHS has now fulfilled its requirements under that subsection.

131. Specifically, DHS has met its duty to identify and construct 370 miles of border barriers within "priority areas" by December 31, 2008 as required by IIRIRA section 102(b)(1)(B), as well as its duty to construct a total of not less than 700 miles of border barriers as required by IIRIRA section 102(b)(1)(A).

1      132.   Because the scope of the IIRIRA section 102(c) waiver is limited to

2 the border barriers and road requirements specified by IIRIRA section 102(b), the

3 requirements of which have already been fulfilled, the purported waiver of

4 NEPA, the ESA, the APA, and more than 30 additional laws under Secretary

5 Kelly's August 2, 2017 Determination pursuant to IIRIRA section 102(c) is an

6 unlawful *ultra vires* act subject to review by this Court, and the restrictions on

7 judicial review and appellate review under that subsection are inapplicable to that

8 determination.

9      133.   Even in the event that the Court finds the IIRIRA section 102(c)

10 waiver authority is not limited to the border barriers and road requirements

11 specified by IIRIRA section 102(b), the purported waiver of laws under the

12 August 2, 2017 IIRIRA section 102(c) Determination is nonetheless an unlawful

13 *ultra vires* act subject to review by this Court for at least three additional reasons.

14      134.   First, the IIRIRA section 102(c) waiver authority, by its plain

15 language, was intended to apply to the initial construction of border barriers, not

16 the border wall *replacement* or the border wall *prototype* projects at issue in this

17 litigation.

18      135.   Second, the purported waiver of laws by former DHS Secretary Kelly

19 under the August 2, 2017 Determination does not contain any rationale

20 demonstrating that the "approximately fifteen mile segment" of the San Diego

21 border subject to the purported waiver is necessary to "deter illegal crossings in

22 areas of high illegal entry into the United States," as required by the general

23 border barrier and road authorization at IIRIRA section 102(a). Indeed, the

24 Determination does not contain *any* Findings specific to the fifteen mile segment

25 of waived laws, but instead states in conclusory and circular fashion that the

26 overall San Diego Sector "remains an area of high illegal entry." 82 Fed. Reg. at

27 35,985.

28      136.   If the San Diego border region at issue in the purported waiver does

indeed qualify as "an area of high illegal entry," such a Finding would call the entire DHS border fencing and prevention through deterrence strategy into question, as DHS has expended more resources and constructed more intensive border barriers in this region than any other along the U.S.-Mexico border, and has already utilized the IIRIRA section 102(c) waiver authority to finish construction on the existing San Diego double and triple layer border fence.  70 Fed. Reg. 55,622 (Sept. 22, 2005).

137.   Third, the purported waiver of laws by former DHS Secretary Kelly under the August 2, 2017 Determination cannot have been necessary to ensure the "expeditious" construction of the border wall prototype project and border wall replacement project at issue in this litigation.

138.   The IIRIRA section 102(c) waiver authority was enacted in 1996, and then significantly expanded by the 2005 REAL ID Act amendment.  The IIRIRA section 102(c) waiver authority has not been further amended by Congress in the 12 years since its 2005 consideration and enactment, despite the extensive amendments to IIRIRA section 102(b) by the 2006 Secure Fence Act and 2008 Consolidated Appropriations Act.

139.   The plain meaning of broadly allowing the waiver of any laws determined by the DHS Secretary as necessary to ensure the "expeditious construction" under IIRIRA section 102(c) was to provide the DHS Secretary with the authority to waive laws in order to build border barriers *as soon as possible after the law's enactment* (*i.e.* the 2005 REAL ID Act amendment). This interpretation is further supported by Congress's subsequent establishment of specific deadlines in its amendments to IIRIRA section 102(b) under the 2006 Secure Fence Act and 2008 Consolidated Appropriations Act; most notably, its direction that at least 370 miles of border barriers be constructed by December 31, 2008, and its explicit termination of the Secretary's authority to designate "priority areas" for such construction by that same date.  IIRIRA § 102(b)(2)(A)-

(B).

140.   The purported August 2, 2017 waiver of laws under former DHS Secretary Kelly could only be lawful if the term "expeditious" was construed to permit DHS to apply such waivers *in perpetuity*, long after the deadlines set by the statute for the construction of any such barriers, and in relation to the construction of additional barriers that have not been specifically directed by Congress.

141.   Due to fact that the border wall prototype project and border wall replacement project are not subject to the scope of the IIRIRA section 102(c) waiver authority, former DHS Secretary Kelly's purported waiver of laws under the August 2, 2017 Determination is an unlawful *ultra vires* act subject to review by this Court, and the restrictions on judicial review and appellate review under that subsection are inapplicable to that determination.

**SECOND CLAIM FOR RELIEF**
**Constitutional Violation**
**Violation of the Take Care Clause of the U.S. Constitution**
**Article II, Section 3**
**(August 2, 2017 IIRIRA Section 102(c) Determination)**

142.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

143.   Under IIRIRA section 102(c), and subject to the *ultra vires* restrictions described in the First Claim for Relief, once the DHS Secretary invokes the waiver authority, the "only cause or claim" that may be brought arising from the waiver is one "alleging a violation of the Constitution of the United States."  IIRIRA section 102(c) further  provides that "[t]he district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any" such action, which "shall be filed not later than 60 days after the date of action or decision" at issue."  IIRIRA § 102(c)(2)(A)-(C).

144.   Article II of the U.S. Constitution provides that "The executive Power shall be vested in a President," and that he or she "shall take Care that the Laws be faithfully executed."  U.S. Constitution Article II, § 3.

145.   Among the laws the Take Care Clause mandates be "faithfully executed" are NEPA and the ESA, as well as the conditions and limitations of IIRIRA section 102 itself.  Among the conditions and limitations of IIRIRA section 102 are the limitations of barrier construction to areas of "high illegal entry" under subsection (a), the geographical and temporal restrictions for such construction, along with the requirements for consultation with affected entities under subsection (b), and the restriction on waiver authority under subsection (c) to the "expeditious construction of the barriers and roads" otherwise authorized by the statute.

146.   DHS Secretary Kelly's purported waiver of NEPA, the ESA, the APA, and more than 30 additional laws under the August 2, 2017 Determination failed to comply with the laws that the Executive Branch is required to "faithfully execute."

### THIRD CLAIM FOR RELIEF
### <u>Constitutional Violation</u>
### <u>Violation of the Separation of Powers of the U.S. Constitution</u>
### <u>(IIRIRA Section 102(c) and</u>
### <u>August 2, 2017 IIRIRA Section 102(c) Determination)</u>

147.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

148.   Article I, Section 1 of the United States Constitution directs that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."

149.   Article II, Section 1 of the Constitution directs that "[t]he executive Power shall be vested in a President of the United States of America."

150.   Under these constitutional provisions, Congress may not delegate legislative authority to an executive branch agency, or in the case of IIRIRA section 102(c), may not delegate legislative authority to an individual executive branch official.

151.   IIRIRA section 102(c) unconstitutionally delegates legislative powers to the DHS Secretary, an executive branch official, and unconstitutionally purports to exempt the Executive Branch from complying with its constitutional obligation to faithfully execute the laws.

152.   Former DHS Secretary John Kelly's purported waiver of NEPA, the ESA, the APA, and more than 30 other laws in relation to "border infrastructure projects" within "an approximately fifteen mile segment" of the border within San Diego, 82 Fed. Reg. 35,984 (Aug. 2, 2017) is an unconstitutional exercise of legislative power by an executive branch official, and consequently violates the U.S. Constitution's separation of powers and non-delegation requirements.

**FOURTH CLAIM FOR RELIEF**
**Constitutional Violation**
**Violation of the Presentment Clause of the U.S. Constitution**
**Article I, Section 7**
**(IIRIRA Section 102(c) and the**
**August 2, 2017 IIRIRA Section 102(c) Determination)**

153.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

154.   Article I, § 7 of the Constitution provides that any federal statute must pass both houses of Congress, and "before it become a Law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House it which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it."

155.   The "[a]mendment and repeal of statutes, no less than enactment," must conform with the presentment and bicameralism requirements of Article I.

*INS v. Chadha*, 462 U.S. 919, 954 (1983).

156.   The August 2, 2017 Determination by former DHS Secretary Kelly purported to waive NEPA, the ESA, the APA, and more than 30 other laws that would otherwise apply to border infrastructure projects, including the border wall prototype project and border wall replacement project at issue in this litigation.

157.   The IIRIRA section 102(c) waiver authority and former DHS Secretary Kelly's August 2, 2017 Determination are unconstitutional infringements upon the lawmaking procedures required under Article I, § 7 of the Constitution.

**FIFTH CLAIM FOR RELIEF**
**<u>NEPA Violations</u>**
**<u>(Border Wall Prototype Project and Border Wall Replacement Project)</u>**

158.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

159.   Federal Defendants are required to prepare an environmental impact statement ("EIS") on major Federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332 (2)(C).  A federal agency "bears the primary responsibility to ensure that it complies with NEPA." *'Ilio'Ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006).  "When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr. for Environment v. U.S. Forest Service*, 189 F.3d 851, 859 (9th Cir. 1999).

160.   Federal Defendants have violated NEPA and NEPA's implementing regulations by authorizing the border wall prototype project and border wall replacement project without first conducting the necessary environmental analysis of the impacts of the projects in an EA or EIS in light of the potentially significant impacts  that each of the two projects will have.

161. Federal Defendants have further violated NEPA and NEPA's implementing regulations by failing to initiate and complete NEPA at the earliest possible time in the planning process.

162. Federal Defendants' failure and/or refusal to conduct NEPA is inconsistent with provisions of the DHS NEPA Manual, including provisions requiring preparation of at least an EA when a proposed project may impact important environmental resources, and directing that NEPA shall be applied as early as possible in the planning process.

163. Federal Defendants have failed to provide any explanation or reasoning for the failure to conduct any NEPA analysis for the border wall prototype project or border wall replacement project. This lack of explanation renders it impossible to determine if Federal Defendants have taken a "hard look" at the potential environmental consequences of the border wall prototype project or border wall replacement project, in violation of NEPA.

164. Federal Defendants' failure and/or refusal to prepare NEPA analysis for the border wall prototype project or border wall replacement project also renders it impossible for the Agencies to avoid and/or mitigate environmental impacts that would otherwise likely be identified through the NEPA process, in violation of NEPA.

165. NEPA requires that the Agencies involve the public in preparing and considering environmental documents that implement the Act. 40 C.F.R. § 1506.6 (1978); *id.* § 1506.6(b)(1) (requiring federal agencies to "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected").

166. Federal Defendants have utterly failed and/or refused to involve the public in its decision-making processes for the border wall prototype project and border wall replacement project. Federal Defendants' failure to provide for any

public participation in relation to their approval of the border wall prototype project and border wall replacement project violates NEPA and its implementing regulations.

167.   The border wall prototype project and border wall replacement project decisions are therefore arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, and are subject to judicial review pursuant to the APA, 5 U.S.C. §§ 702–704.

**SIXTH CLAIM FOR RELIEF**
**ESA Violations**
**(Border Wall Prototype Project and Border Wall Replacement Project)**

168.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

169.   Section 7(a)(2) of the ESA requires that "[e]ach Federal agency shall, in consultation with . . . [FWS], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat]." *Id.* § 1536(a)(2).

170.   FWS's regulations define an agency "action" to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02.

171.   The border wall prototype project and border wall replacement projects directly, indirectly, and cumulatively impact numerous species listed as threatened or endangered under the ESA, as well as designated critical habitat for many of those species.

172.   Despite the presence of many listed species, the documented impacts of DHS border barrier and road construction on many of these species, and the

significant number of species listings and critical habitat designations in the borderlands region, Federal Defendants have failed to initiate, reinitiate, or complete consultation with FWS in order to ensure that the border wall prototype project and border wall replacement project do not jeopardize the continued existence of any listed species or adversely modify or destroy the designated critical habitat for any of those species, in violation of Section 7(a)(2). 16 U.S.C. § 1536(a)(2).

173. Federal Defendants have also failed to take any affirmative action to conserve the many threatened or endangered species impacted by the border wall prototype project and border wall replacement project, in violation of Section 7(a)(1) of the ESA. 16 U.S.C. § 1536(a)(1).

### SEVENTH CLAIM FOR RELIEF
### FOIA Violations
### May 2, 2017 FOIA Requests
### to DHS (2017-HQFO-00717) and CBP (CBP-2017-053692)

174. The Center re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

175. The Agencies failed to comply with the mandates of FOIA consequent to each Agency's failure and refusal to: (1) search for and disclose records that are responsive to the respective FOIA requests; (2) make a timely and lawful determination on the respective FOIA requests; (3) conduct a search that is reasonably calculated to locate all records that are responsive to the respective FOIA requests; (4) provide Plaintiff with records that are responsive to the respective FOIA requests that may not be withheld pursuant to any of FOIA's narrowly construed exemptions to mandatory disclosure; and (5) provide Plaintiff with reasonably segregable portions of records responsive to the respective FOIA requests which contains any material that may be lawfully withheld under an exemption(s).

176.   Plaintiff has a statutory right to a lawful final determination from the Agencies on the FOIA requests in a manner that complies with FOIA.   The Agencies have violated Plaintiff's rights in this regard by unlawfully delaying their responses beyond the deadlines that FOIA mandates.   5 U.S.C. § 552(a)(6)(A)(i).

177.   Based on the nature of Plaintiff's organizational activities, it will undoubtedly continue to employ FOIA's disclosure provisions in record requests to the Agencies in the foreseeable future.

178.   Plaintiff's organizational activities will be adversely affected if the Agencies are allowed to continue violating FOIA's provisions as they have in this case.

179.   Unless enjoined and made subject to a declaration of Plaintiff's legal rights by this Court, the Agencies will continue to violate Plaintiff's rights to receive public records under FOIA.

## APA Violations
### (In the Alternative to the FOIA Violations)

180.   Plaintiff re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

181.   The Agencies violated FOIA's statutory mandates due to each Agency's failure and refusal to: (1) search for and disclose records that are responsive to the respective FOIA requests; (2) make a timely and lawful determination on the respective FOIA requests; (3) conduct a search that is reasonably calculated to locate all records that are responsive to the respective FOIA requests; (4) provide Plaintiff with records that are responsive to the respective FOIA requests that may not be withheld pursuant to any of FOIA's narrowly construed exemptions to mandatory disclosure; and (5) provide Plaintiff with reasonably segregable portions of records responsive to the respective FOIA requests which contains any material that may be lawfully withheld under an

exemption(s).   By repeatedly violating FOIA's statutory mandates, the Agencies' actions are arbitrary, capricious, an abuse of discretion, or not in accordance with the law and therefore actionable pursuant to the APA, 5 U.S.C. § 706(2)(A). Alternatively, the Agencies' failures constitute agency action unreasonably delayed and therefore actionable pursuant to the APA, 5 U.S.C. § 706(1).

182.   As alleged above, the Agencies' failure to comply with the mandates of FOIA has injured Plaintiff's interests in public oversight of governmental operations and is in violation of each Agency's statutory duties under the APA.

183.   Plaintiff has suffered a legal wrong as a result of the Agencies' failure to comply with the mandates of FOIA.  As alleged above, the Agencies violated their statutory duties under the APA and injured Plaintiff's interests in public oversight of governmental operations.

184.   Plaintiff has no other adequate remedy at law to redress the violations noted above.

185.   Plaintiff is entitled to judicial review under the APA, 5 U.S.C. § 702.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Center for Biological Diversity prays that this Court:

1.   Declare that Former DHS Secretary Kelly and Federal Defendants lacked the authority under IIRIRA section 102(c) to waive NEPA, the ESA, the APA, and other laws in the August 2, 2017 *Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, As Amended*, 82 Fed. Reg. 35,984.

2.   Declare that the purported waiver pursuant to IIRIRA section 102(c) of NEPA, the ESA, the APA, and other laws in the August 2, 2017 *Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, As Amended*, 82 Fed. Reg. 35,984, violates the U.S. Constitution's Take Care Clause.

3.     Declare that the purported waiver pursuant to IIRIRA section 102(c) of NEPA, the ESA, the APA, and other laws in the August 2, 2017 *Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, As Amended*, 82 Fed. Reg. 35,984, violates the U.S. Constitution's fundamental Separation of Powers principles.

4.     Declare that the purported waiver pursuant to IIRIRA section 102(c) of NEPA, the ESA, the APA, and other laws in the August 2, 2017 *Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, As Amended*, 82 Fed. Reg. 35,984, violates the U.S. Constitution's Presentment Clause.

5.     Set aside and declare null and void former DHS Secretary Kelly's purported waiver pursuant to IIRIRA section 102(c) of NEPA, the ESA, the APA, and other laws in the August 2, 2017 *Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, As Amended*, 82 Fed. Reg. 35,984, due to the *ultra vires* nature of that Determination.

6.     Set aside and declare null and void the waiver of laws authority contained in IIRIRA section 102(c) due to its constitutional infirmities.

7.     Declare that Federal Defendants have violated NEPA and its implementing regulations with respect to the border wall prototype project and/or the border wall replacement project by, *inter alia*, failing to conduct any NEPA analysis, by failing to provide any opportunity for public participation, and by failing to take a "hard look" at the potential environmental impacts of the border wall prototype project and/or border wall replacement project.

8.     Declare that Federal Defendants violated the ESA by failing to initiate or complete ESA section 7(a)(2) consultation with FWS in order to ensure that the border wall prototype project and border wall replacement project do not jeopardize the continued existence of any listed species or adversely modify or destroy the designated critical habitat for those species.

9.     Declare that Federal Defendants violated the ESA by failing to take any affirmative action to conserve threatened or endangered species impacted by the border wall prototype project and border wall replacement project, in violation of section 7(a)(1) of the ESA.

10.     Enjoin Federal Defendants from implementing the border wall prototype project or border wall replacement project, until and unless Federal Defendants comply with NEPA, the ESA, and the implementing regulations for those laws.

11.     Declare that Federal Defendants unlawfully failed to timely make determinations on the FOIA Requests, failed to properly apply FOIA exemptions, failed to undertake a search for and disclose to Plaintiff all records that are responsive to the FOIA Requests, and failed to provide Plaintiff with reasonably segregable portions of records which may be lawfully subject to a FOIA exemption, and Order Federal Defendants to conduct searches that are reasonably calculated to locate all records responsive to the FOIA Requests, with the cut-off date for such searches being the date that the searches are conducted, and to provide Plaintiff without charge all responsive records and reasonably segregable portions of lawfully exempt records sought in this action by a reasonable date certain.

12.     Retain jurisdiction in this action to ensure compliance with the Court's Orders.

13.     Award Plaintiff its reasonable costs of litigation, including reasonable attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or FOIA 5 U.S.C. § 552(a)(4)(E), and/or other authority; and

14.     Grant such other and further relief as the Court may deem just and proper.

1    DATED: September 6, 2017          Respectfully submitted,

2

3                                      *s/ Brian Segee*

4                                      Brian Segee (Bar No. 200795)
                                       Center for Biological Diversity
5                                      111 W. Topa Topa Street
                                       Ojai, CA 93023
6                                      T: (805) 750-8852
7                                      bsegee@biologicaldiversity.org

8                                      Brendan Cummings (Bar No. 193952)
9                                      Anchun Jean Su (Bar No. 285167)
                                       Center for Biological Diversity
10                                     1212 Broadway, Suite 800
                                       Oakland, CA 94612
11                                     T: (510) 844-7100; F: (510) 844-7150
12                                     bcummings@biologicaldiversity.org
                                       jsu@biologicaldiversity.org
13

14                                     John Peter Rose (Bar No. 285819)
15                                     Center for Biological Diversity
                                       660 South Figueroa Street, Suite 1000
16                                     Los Angeles, CA 90017
                                       T: (213) 785-5400
17                                     jrose@biologicaldiversity.org
18

19                                     *Attorneys for Plaintiff*

20

21

22

23

24

25

26

27

28

---

Second Amended Complaint
Page 49                                                          17cv01215

1

**CERTIFICATE OF SERVICE**

2   I hereby certify that on September 6, 2017, I electronically filed Plaintiff's Second

3   Amended Complaint for Declaratory and Injunctive relief with the Clerk of the Court

4   using the CM/ECF system, which will send notification of such to the attorneys of

5   record.

6

7                                    *s/ Brian Segee*

8                                    Brian Segee

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28