Gloria D. Smith (CA No. 200824)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5532
gloria.smith@sierraclub.org

Brett M. Paben (FL No. 0416045)
Defenders of Wildlife
535 16th Street
Denver, CO 80202
Telephone: (720) 943-0457
bpaben@defenders.org
*Pro hac vice*

Anthony T. Eliseuson (IL No. 6277472)
Sarah K. Hanneken (OR No. 165104)
Animal Legal Defense Fund
919 SW Taylor Street, #400
Portland, OR 97205
Telephone: (707) 795-2533
aeliseuson@aldf.org, shanneken@aldf.org
*Pro hac vice*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: BORDER INFRASTRUCTURE ENVIRONMENTAL LITIGATION,** | Case No. 17-cv-01215-GPC-WGV<br><br>Consolidated with<br>Case No. 17-cv-01873-GPC-WVG<br>Case No. 17-cv-01911-GPC-WVG<br><br>**Plaintiffs Defenders of Wildlife, Sierra Club, and Animal Legal Defense Fund's First Amended Complaint for Declaratory and Injunctive Relief** |

### INTRODUCTION

1.      As a candidate for president, Donald Trump's standard stump speech included a refrain to build a 1900-mile border wall from the Pacific Ocean to the Gulf of Mexico. Upon taking office, President Trump issued an executive order directing the Department of Homeland Security (DHS) to "take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border." This case challenges the DHS's authority to expedite the construction of barriers, roads and a prototype border wall in the vicinity of the United States and Mexico border near San Diego and Calexico, California, and pursuant to Section 102(c)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), as amended by the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 306, by waiving the application of all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of more than three dozen federal statutes.

2.      On August 2, 2017, DHS Secretary John F. Kelly issued a waiver pursuant to Section 102(c) of IIRIRA, allowing DHS and its components, including the U.S. Customs and Border Protection (CBP) and U.S. Border Patrol (Border Patrol), to proceed with constructing border infrastructure in the Border Patrol 's San Diego Sector. Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, As Amended, 82 Fed. Reg. 35,984 (hereinafter "San Diego" or "August 2, 2017" Waiver). This Waiver includes area in the vicinity of the U.S.-Mexico border near the San Diego, California, starting at the Pacific Ocean and extending approximately 15 miles eastward, by purportedly waiving "all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to" thirty-seven validly enacted federal statutes.

3.      On September 12, 2017, Acting DHS Secretary Elaine Duke issued a similar waiver covering activities in Border Patrol's El Centro Sector to expedite the construction of barriers and roads in the vicinity of the U.S.-Mexico border near city of Calexico,

California, purportedly waiving "all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to" twenty-eight validly enacted statutes. Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 82 Fed. Reg. 42,829, 42,830-31 (hereinafter "Calexico" or "September 12, 2017" Waiver).

4.     These waivers purportedly allow construction and related activities to transpire without adhering to legal protections Congress has established for, *inter alia*, endangered species, migratory birds, water pollution, historic preservation, safe drinking water, noise pollution, hazardous waste disposal, coastal zones, public lands, outdoor recreation, religious freedom and practice, and administrative procedures.

5.     Plaintiffs allege that the Secretary's Waivers are *ultra vires* agency actions, made outside the scope of authority granted by Section 102(c) of IIRIRA, as amended. Neither the replacement or prototype border wall projects authorized in the San Diego Waiver, for example, are among the activities eligible for waivers under Section 102(c) of IIRIRA. In addition, the statute does not support the continued, unlimited application of Section 102(c) waivers to the construction of physical barriers and roads beyond those initially specified by Congress when enacting IIRIRA in 1996. DHS has, nonetheless, completed specific congressional mandates in Section 102(b), and the Secretary's authority to identify and construct other border walls and roads expired in 2008.

6.     Plaintiffs further allege that the Secretary's conclusions, made pursuant to Section 102(a) of IIRIRA, that both the San Diego and El Centro Sectors are "areas of high illegal entry into the United States," and decision to not comply with the consultation requirements of Section 102(b) are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2).

7.     Plaintiffs further allege that the Secretary's waiver, and the authority to waive all laws provided by IIRIRA, as amended by the REAL ID Act, violate the principles of Separation of Powers contained in Articles I, II, and III of the U.S. Constitution.

Specifically, the waiver violates the Presentment Clauses, Article I, Section 7, clauses 2 and 3, the nondelegation doctrine embodied in Article I, Section I, which directs that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," and infringes on the Judicial Power of the federal courts, Article III, Section 1.

8.     Plaintiffs therefore seek a declaration that the waiver and the statutory provision authorizing such waivers are unconstitutional, as well as an injunction barring DHS or any of its components from constructing any border infrastructure in the Border Patrol's San Diego and El Centro Sectors without full adherence to all applicable laws.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1346(a)(2) (civil action against the United States), and 5 U.S.C. §§ 701-706.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (3), because defendants are officers, employees, or agencies of the United States and a substantial part of the events or omissions giving rise to the claim occurred, and the property that is the subject of the action is situated here.

## PARTIES

11.     Plaintiff DEFENDERS OF WILDLIFE (Defenders) is a nonprofit organization with hundreds of thousands of members across the nation, including tens of thousands of members in California. Defenders' mission is to preserve wildlife and emphasize appreciation and protection for all species in their ecological role. within the natural advocacy, litigation, and other efforts, Defenders works to preserve species and the habitats upon which they depend. Defenders has been closely involved in policy and litigation matters associated with border wall construction along the United States-Mexico border for more than a decade. Defenders maintains a Field Office with five full-time employees in California.

12.     Defenders has organizational and membership-based interests in the preservation and conservation of the borderlands of the Southwestern United States that will be harmed by the expeditious construction of barriers and roads at issue in this case. For

more than two decades, Defenders has worked for the protection of borderland wildlife and ecosystems. Defenders has played a leading role in efforts to educate the public and advocate for better integration of environmental considerations into immigration policy generally, and into border security efforts specifically.

13.     Defenders' members live near and regularly visit the borderlands near San Diego and the Imperial Valley for wildlife observation, recreation, and other uses. Defenders' members also live in other areas along the California border adversely impacted by the border wall projects being constructed throughout the area. These members have aesthetic, educational, professional, health, and spiritual interests that will be harmed by the environmental impacts that will result from the DHS Secretary's decision to waive the 37 laws, and the procedural and substantive protections that would have otherwise been provided, to expedite the construction of barriers and roads by waiving expedite the San Diego border wall, and the unconstitutional grant of legislative powers to the DHS Secretary contained in Section 102(c) of the REAL ID Act.

14.     Plaintiff ANIMAL LEGAL DEFENSE FUND (ALDF) is a nonprofit 501(c)(3) organization with more than 200,000 members and supporters, nearly 25,000 of whom reside in California and 2,000 of whom reside in San Diego County. ALDF represents its members interests by working to protect the lives of animals, including wildlife, through the legal system. ALDF is headquartered on Cotati, California, with regional offices in Los Angeles and Portland, Oregon.

15.     ALDF has an organizational and membership-based interest in ensuring the letter and spirit of wildlife- and wildland-protection statutes are fully upheld and the constitutional principles enabling these laws' implementation are respected. ALDF pursues its purpose of safeguarding animal welfare in part by persistently advocating for government adherence to wildlife-protection laws such as the National Environmental Policy Act, the Endangered Species Act, the Migratory Bird Treaty Act, and the Administrative Procedure Act (to name a few)—each of which has been waived by the DHS Secretary in conjunction with San Diego border wall construction. ALDF has

expended significant organizational resources on advocacy and public education efforts to improve environmental protections for wildlife living on protected lands such as the borderlands at issue here, and will continue to do so if the border wall is built without adherence to the laws the DHS Secretary is attempting to waive.

16.     ALDF's members live in or regularly visit the U.S.-Mexico borderlands region in San Diego County. ALDF's members regularly use the myriad federal, state, and local protected lands along the U.S.-Mexico border in San Diego County—including areas impacted by and/or adjacent to the location of the border wall prototype project and the border wall replacement project—for hiking, camping, wildlife viewing and photography, and other vocational and recreational activities. ALDF's members derive recreational, educational, and aesthetic benefit from their activities in these areas. ALDF's members have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

17.     ALDF has an established track record of active participation in the oversight of government activities and decision-making, particularly with regard to laws and policies affecting wildlife. ALDF expends considerable organizational resources in doing so, including costs associated with litigation and educating the public. ALDF regularly represents its members' interests in this regard by filing lawsuits, training law students and professionals, and publishing and disseminating informational materials to its members.

18.     ALDF and its members are harmed by Federal Defendants' constitutional violations, in that the unconstitutional grant of legislative powers to the DHS Secretary contained in Section 102(c) of the REAL ID Act, and the DHS Secretary's decision to waive the procedural and substantive protections of the 37 laws in order to expedite the construction of barriers and roads associated with the San Diego border wall, pose an imminent impact on the local ecosystems, including wildlife populations. These impacts will directly harm ALDF's members' aesthetic and recreational interests in their continued enjoyment of the San Diego County borderlands, and will additionally harm

ALDF as an organization due to the forced diversion of ALDF resources to protect the wild animals affected by the illegal border wall construction in fulfillment of its mission.

19.     Plaintiff SIERRA CLUB is incorporated in the State of California as a nonprofit public benefit corporation with headquarters in Oakland, California. The Sierra Club is a national organization with 67 chapters and more than 825,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's San Diego chapter has more than 9,700 members. Sierra Club's San Diego members' advocacy at the southern border includes educating and mobilizing the public on issues of habitat destruction, divided local communities, land use and myriad other human and environmental impacts associated with border wall construction activities. Sierra Club has been actively involved in southern border issues for many years, including work to protect the Tijuana Estuary, an ecosystem rich with birds and other wildlife species.

20.     Sierra Club brings this action on its own behalf and on behalf of its members. Sierra Club members live near and frequently visit the California-Mexico border around San Diego for hiking, bird watching, photography and other recreational and aesthetic uses. Sierra Club and its San Diego members have been and continue to be injured by the construction activities on the southern border. This is particularly true because the Department of Homeland Security is proceeding with border work absent compliance with decades-old environmental and public safety laws and regulations, enacted for the very purpose of protecting the places and values Sierra Club members work to protect. The requested relief will redress this injury.

21.     Defendant DEPARTMENT OF HOMELAND SECURITY (DHS) is the executive department responsible for, inter alia, enforcing and administering laws related to immigration and securing and managing the nation's borders.

22.     Defendant ELAINE DUKE (Secretary), Acting Secretary of Homeland Security, is sued in her official capacity. Acting Secretary Duke exercised the waiver provision of

Section 102(c) of IIRIRA in her September 12, 2017 Determination. Acting Secretary Duke is the successor to DHS Secretary John Kelly, who exercised the waiver provision of Section 102(c) of IIRIRA in his August 22, 2017 Determination. Acting Secretary Duke is responsible for ensuring that DHS actions comply with applicable laws.[1]

23.    Defendant UNITED STATES OF AMERICA is responsible for enacting and enforcing laws that are consistent with the Constitution of the United States.

## FACTUAL ALLEGATIONS

### Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act

24.    Section 102(a) the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), as amended by the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 306, as amended by the Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638, as amended by the Department of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V, § 564(a), 121 Stat. 2090-91 (Dec. 26, 2007), directs the Secretary to "take such actions as may be necessary to install additional physical barriers and roads … in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." 8 U.S.C. § 1103 note (hereinafter "Section 102" or "IIRIRA § 102").

25.    Section 102(c), as amended by the REAL ID Act of 2005, authorizes the Secretary "to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1).

26.    Section 102(c) purports to restrict judicial review of Secretarial waiver determinations to the district courts of the United States, which may only hear a "cause of

---

[1] In this pleading, the term "Secretary" appearing without additional qualifier refers to Secretary Elaine Duke. The phrase "Secretary Kelly" is used when describing actions or events associated with former DHS Secretary John F. Kelly.

action or claim … alleging a violation of the Constitution of the United States" that is filed within 60 days of Secretary's decision. IIRIRA § 102(c)(2)(A), (B).

27.     The IIRIRA also seeks to preclude review of district court decisions by a court of appeals, and instead states that such decisions "may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States." IIRIRA § 102(c)(2)(C).

28.     Congress enacted the Section 102(c) waiver authority more than twelve years ago, which the Secretary has utilized five times prior to August 2, 2017.

29.     The first Section 102(c) waiver, issued by DHS Secretary Michael Chertoff, became effective on September 22, 2005, and included waiving eight laws to facilitate the construction of border fences and roads starting at the Pacific Ocean and extending 14 miles eastward. Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 as Amended by Section 102 of the REAL ID Act of 2005, 70 Fed. Reg. 55,622, 55,623 (2005).

30.     In 1996, Congress specifically identified the 14-miles of border infrastructure covered in this waiver in IIRIRA Section 102(b)(1), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-554. In 2002, Congress expressed that completing this "14-mile border fence project … should be a priority for the Secretary." 6 U.S.C. § 256.

31.     The legislative history for the REAL ID Act of 2005 demonstrates the waiver provision was only intended to allow the remaining portions of this specific fence to be completed. It was not intended to allow replacement wall, prototype construction, or other wall construction outside of this specific area.

**The San Diego Waiver**

32.     On August 2, 2017, the Secretary utilized the waiver authority of Section 102(c) to "immediately implement various border infrastructure projects… on an approximately fifteen mile segment of the border within the San Diego Sector that starts at the Pacific Ocean and extends eastward." 82 Fed. Reg. 35,984.

33.     The "Project Area" included under the San Diego Waiver extends for approximately fifteen-miles and is described as the "area in the vicinity of the United

States border, located in the state of California within the United States Border Patrol's San Diego Sector… Starting at the Pacific Ocean and extending to approximately one mile east of Border Monument 251." Id. at 35,985.

34.     The Secretary issued the San Diego Waiver to expedite "the construction of roads and physical barriers (including, but not limited to, accessing the Project Area, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, and safety features) in the Project Area." Id.

35.     Under color of the San Diego Waiver, "DHS will replace existing primary fencing in the Project Area … [and] also build prototype border wall in the Project Area near the eastern terminus of the existing secondary barrier." Id. at 35,984-85 (emphasis added).

36.     In the San Diego Waiver, the Secretary purportedly waived, "in their entirety… all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of" thirty-seven enumerated statutes:

a.     National Environmental Policy Act (Pub. L. 91-190, 83 Stat. 852 (Jan. 1, 1970) (42 U.S.C. § 4321 et seq.));

b.     Endangered Species Act (Pub. L. 93-205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. § 1531 et seq.));

c.     Federal Water Pollution Control Act (commonly referred to as the Clean Water Act (33 U.S.C. § 1251 et seq.));

d.     National Historic Preservation Act (Pub. L. 89-665, 80 Stat. 915 (Oct. 15, 1966), as amended, repealed, or replaced by Pub. L. 113-287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. § 470 et seq., now codified at 54 U.S.C. § 100101 note and 54 U.S.C. 300101 et seq.));

e.     Migratory Bird Treaty Act (16 U.S.C. § 703 et seq.);

f.     Migratory Bird Conservation Act (16 U.S.C. § 715 et seq.);

g.     Clean Air Act (42 U.S.C. § 7401 et seq.);

h.   Archeological Resources Protection Act (Pub. L. 96-95 (16 U.S.C. § 470aa et seq.));

i.   Paleontological Resources Preservation Act (16 U.S.C. § 470aaa et seq.);

j.   the Federal Cave Resources Protection Act of 1988 (16 U.S.C. § 4301 et seq.);

k.   National Trails System Act (16 U.S.C. § 1241 et seq.);

l.   Safe Drinking Water Act (42 U.S.C. § 300f et seq.);

m.   Noise Control Act (42 U.S.C. § 4901 et seq.);

n.   Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.);

o.   Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.);

p.   Archaeological and Historic Preservation Act (Pub. L. 86-523, as amended, repealed, or replaced by Pub. L. 113-287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. § 469 et seq., now codified at 54 U.S.C. § 312502 et seq.));

q.   Antiquities Act (formerly codified at 16 U.S.C. § 431 et seq., now codified 54 U.S.C. § 320301 et seq.);

r.   Historic Sites, Buildings, and Antiquities Act (formerly codified at 16 U.S.C. § 461 et seq., now codified at 54 U.S.C. §§ 3201-320303 & 320101-320106);

s.   Wild and Scenic Rivers Act (Pub. L. 90-542 (16 U.S.C. 1281 et seq.));

t.   Farmland Protection Policy Act (7 U.S.C. § 4201 et seq.);

u.   Coastal Zone Management Act (Pub. L. 92-583 (16 U.S.C. § 1451 et seq.));

v.   Wilderness Act (Pub. L. 88-577 (16 U.S.C. § 1131 et seq.));

w.   Federal Land Policy and Management Act (Pub. L. 94-579 (43 U.S.C. § 1701 et seq.));

x.   National Wildlife Refuge System Administration Act (Pub. L. 89-669 (16 U.S.C. § 668dd-668ee));

y.   National Wildlife Refuge System Improvement Act of 1997 (Pub. L. 105-57);

z.   National Fish and Wildlife Act of 1956 (Pub. L. 84-1024 (16 U.S.C. § 742a, et seq.));

aa.   Fish and Wildlife Coordination Act (Pub. L. 73-121 (16 U.S.C. § 661 et seq.));

bb.   Wild Horse and Burro Act (16 U.S.C. § 1331 et seq.);

cc.   Act of Oct. 30, 2000, Pub. L. 106-398, 1, 114 Stat. 1654 (enacting into law § 2848 of Part II of Subtitle D of Title XXVIII of Division B of H.R. 5408 (114 Stat. 1654A-426), as introduced on Oct. 6, 2000);

dd.   Administrative Procedure Act (5 U.S.C. § 551 et seq.);

ee.   Otay Mountain Wilderness Act of 1999 (Pub. L. 106-145);

ff.   sections 102(29) and 103 of Title I of the California Desert Protection Act (Pub. L. 103-433);

gg.   Rivers and Harbors Act of 1899 (33 U.S.C. § 403);

hh.   Eagle Protection Act (16 U.S.C. § 668 et seq.);

ii.   Native American Graves Protection and Repatriation Act (25 U.S.C. § 3001 et seq.);

jj.   American Indian Religious Freedom Act (42 U.S.C. § 1996); and,

kk.   Religious Freedom Restoration Act (42 U.S.C. § 2000bb).

Id.

37.   DHS's Border Patrol operates nine "sectors" along the Southwest Border, including the San Diego Sector and El Centro Sector.

38.   When IIRIRA was enacted in fiscal year 1996, the Border Patrol apprehended more than 1.5 million unlawful migrants in its Southwest border sectors. CBP, U.S.

Border Patrol – Southwest Border Sectors, Total Illegal Alien Apprehensions by Fiscal Year (FY 1960 – FY 2016).[2]

39.    When the REAL ID Act was enacted in fiscal year 2005, Border Patrol's apprehensions totaled more than 1.1 million in its Southwest border sectors. Id.

40.    In fiscal year 2016, Border Patrol apprehended 408,870 unlawful migrants, a drop of 73 percent from fiscal year 1996. Id.

41.    Similarly, the San Diego Sector accounted for 483,815 undocumented immigrant apprehensions in fiscal year 1996, and 126,904 in 2005. Id.

42.    In 1996, the San Diego Sector accounted for 32 percent of individuals apprehended along the Southwestern border. Id.

43.    In fiscal year 2016, the San Diego Sector accounted for 31,891 unlawful migrants apprehensions, a drop of 75 percent from fiscal year 1996. Id.

44.    In fiscal year 2016, the San Diego Sector accounted for approximately 7.8 percent of individuals apprehended and 0.7 percent of marijuana seized along the Southwestern Border. See CBP, U.S. Border Patrol Sector Profile – Fiscal Year 2016 (Oct. 1st through Sept. 30th).[3]

45.    Similarly, in the ten months of fiscal year 2017 prior to the Secretary's August 2, 2017 Waiver, the San Diego Sector accounted for 8.3 percent of Border Patrol's apprehensions along the Southwest Border. See USBP Southwest Border Apprehensions by Sector, CBP (Nov. 3, 2017), https://www.cbp.gov/newsroom/stats/usbp-sw-border-apprehensions (21,605 of 259,075 apprehensions).

46.    The "Project Area" includes areas with significant environmental values and irreplaceable natural resources.

---

[2] Available at https://www.cbp.gov/sites/default/files/assets/documents/2016-Oct/BP%20Southwest%20Border%20Sector%20Apps%20FY1960%20-%20FY2016.pdf.

[3] Available at https://www.cbp.gov/sites/default/files/assets/documents/2017-Jan/USBP%20Stats%20FY2016%20sector%20profile.pdf.

47.     Within approximately 150-feet of the U.S.-Mexico border in the approximately fifteen-mile long "Project Area," the U.S. Fish and Wildlife Service's (FWS) Information for Planning and Consultation (IPaC) project planning tool identifies twenty-seven species listed pursuant to the Endangered Species Act and designated Critical Habitat for five of these listed species. See IPaC Information for Planning and Consultation, FWS, https://ecos.fws.gov/ipac/ (last visited Nov. 17, 2017).

48.     Sixteen of the species potentially found in the Project Area are that are listed as endangered.

49.     Seventeen of the listed species potentially found in the Project Area are restricted to southern California and found nowhere else, including Coastal California gnatcatcher (*Polioptila californica californica*), Least Bell's vireo (*Vireo bellii pusillus*), Light-Footed Clapper rail (*Rallus longirostris levipes*), Pacific Pocket mouse (*Perognathus longimembris pacificus*), Arroyo (=arroyo Southwestern) Toad (*Anaxyrus californicus*), Quino Checkerspot butterfly (*Euphydryas editha quino* (=*e. e. wrighti*)), Riverside fairy shrimp (*Streptocephalus woottoni*), Riverside fairy shrimp (*Streptocephalus woottoni*), California Orcutt grass (*Orcuttia californica*), Encinitas baccharis (*Baccharis vanessae*), Mexican flannelbush (*Fremontodendron mexicanum*), Otay mesa-mint (*Pogogyne nudiuscula*), Otay tarplant (*Deinandra* (=*hemizonia*) *conjugens*), Salt Marsh bird's-beak (*Cordylanthus maritimus ssp. maritimus*), San Diego ambrosia (*Ambrosia pumila*), San Diego button-celery (*Eryngium aristulatum var. parishii*), San Diego thornmint (*Acanthomintha ilicifolia*), and Spreading navarretia (*Navarretia fossalis*).

50.     The FWS has designated Critical Habitat for five species in the Project Area, including the Coastal California Gnatcatcher, 72 Fed. Reg. 72,010, 72,086 (2007); Quino Checkerspot Butterfly, 74 Fed. Reg. 28,776, 28,859 (2009); Riverside Fairy Shrimp, 77 Fed. Reg. 72,069, 72,138 (2012); San Diego Fairy Shrimp, 72 Fed. Reg. 70,648, 70,712-14 (2007); and Western Snowy Plover, 77 Fed. Reg. 36,727, 36,869 (2012).

51.     In addition to the federally-listed species, thirty FWS Birds of Conservation Concern might be affected by construction activities in the Project Area, including certain

birds normally protected under the Migratory Bird Treaty Act, as well as other non-listed sensitive and rare species, such as the burrowing owl (*Athene cunicularia*).

52.     The Project Area intersects Otay Mountain Wilderness, a congressionally designated component of the National Wilderness Preservation System, which "one of the last remaining pristine locations in western San Diego County … internationally known for its diversity of unique and sensitive plants." Pub. L. No. 106-145 § 2, 113 Stat. 1711 (1999).

53.     The Project Area includes the Tijuana River Slough National Wildlife Refuge, Tijuana River National Estuarine Research Reserve and Border Field State Park, all of which protect sand dunes and beaches, vernal pools, tidal channels, mudflats and coastal sage habitat. The Tijuana Estuary is particularly important as essential feeding, breeding and nesting habitat for wildlife, and is a key stopover point on the Pacific Flyway for over 370 species of migratory and native birds, including six endangered species.

**The Calexico Waiver**

54.     On September 12, 2017, the Secretary utilized the waiver authority of Section 102(c) to "take immediate action to replace existing primary fencing." in Border Patrol 's El Centro Sector. 82 Fed. Reg. at 42,830.

55.     The Calexico "Project Area" is described as the "area in the vicinity of the United States border, located in the State of California … [s]tarting at the Calexico West Land Port of Entry and extending approximately three miles westward." Id.

56.     In the September 12, 2015 Waiver, the Secretary purportedly waived, "in their entirety… all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of" twenty-eight enumerated statutes:

     a.     National Environmental Policy Act (Pub. L. 91-190, 83 Stat. 852 (Jan. 1, 1970) (42 U.S.C. § 4321 et seq.));

     b.     Endangered Species Act (Pub. L. 93-205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. § 1531 et seq.));

c.   Federal Water Pollution Control Act (commonly referred to as the Clean Water Act (33 U.S.C. § 1251 et seq.));

d.   National Historic Preservation Act (Pub. L. 89-665, 80 Stat. 915 (Oct. 15, 1966), as amended, repealed, or replaced by Pub. L. 113-287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. § 470 et seq., now codified at 54 U.S.C. § 100101 note and 54 U.S.C. § 300101 et seq.));

e.   Migratory Bird Treaty Act (16 U.S.C. § 703 et seq.);

f.   Migratory Bird Conservation Act (16 U.S.C. § 715 et seq.);

g.   Clean Air Act (42 U.S.C. § 7401 et seq.);

h.   Archeological Resources Protection Act (Pub. L. 96-95 (16 U.S.C. § 470aa et seq.));

i.   Paleontological Resources Preservation Act (16 U.S.C. § 470aaa et seq.);

j.   Federal Cave Resources Protection Act of 1988 (16 U.S.C. 4301 et seq.);

k.   Safe Drinking Water Act (42 U.S.C. § 300f et seq.);

l.   Noise Control Act (42 U.S.C. § 4901 et seq.);

m.   Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.);

n.   Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.);

o.   Archaeological and Historic Preservation Act (Pub. L. 86-523, as amended, repealed, or replaced by Public Law 113-287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. § 469 et seq., now codified at 54 U.S.C. § 312502 et seq.));

p.   Antiquities Act (formerly codified at 16 U.S.C. 431 et seq., now codified 54 U.S.C. § 320301 et seq.);

q.   Historic Sites, Buildings, and Antiquities Act (formerly codified at 16 U.S.C. § 461 et seq., now codified at 54 U.S.C. §§ 3201-320303 & 320101-320106);

r.    Farmland Protection Policy Act (7 U.S.C. § 4201 et seq.);

s.    Federal Land Policy and Management Act (Pub. L. 94-579 (43 U.S.C. § 1701 et seq.));

t.    section 10 of the Reclamation Project Act of 1939 (53 Stat. 1196, as amended by 64 Stat. 463 (43 U.S.C. § 387));

u.    National Fish and Wildlife Act of 1956 (Pub. L. 84-1024 (16 U.S.C. § 742a, et seq.));

v.    Fish and Wildlife Coordination Act (Pub. L. 73-121 (16 U.S.C. § 661 et seq.));

w.    Administrative Procedure Act (5 U.S.C. § 551 et seq.);

x.    Rivers and Harbors Act of 1899 (33 U.S.C. § 403);

y.    Eagle Protection Act (16 U.S.C. § 668 et seq.);

z.    Native American Graves Protection and Repatriation Act (25 U.S.C. § 3001 et seq.);

aa.   American Indian Religious Freedom Act (42 U.S.C. § 1996); and (28) the Religious Freedom Restoration Act (42 U.S.C. § 2000bb).

Id.

57.   In the September 12, 2017 Waiver, the Secretary declared that the

El Centro Sector is an area of high illegal entry. … [T]hrough the construction of border infrastructure and other operational improvements, the Border Patrol has been able to make significant gains in border security within the El Centro Sector; however, more work needs to be done. The El Centro Sector remains an area of high illegal entry for which there is an immediate need to construct border barriers and roads.

82 Fed. Reg. at 42,830.

58.   Border Patrol apprehended 66,873 unlawful migrants in its El Centro Sector in fiscal year 1996 and 55,722 in fiscal year 2005. CBP, U.S. Border Patrol – Southwest Border Sectors, Total Illegal Alien Apprehensions by Fiscal Year (FY 1960 – FY 2016).

59.     In fiscal year 2016, Border Patrol apprehended 19,448 undocumented immigrants in its El Centro Sector, 71 percent fewer apprehensions than 1996.

60.     In fiscal year 2016, the El Centro Sector accounted for less than 4.8 percent of individuals apprehended and 0.2 percent of marijuana and 3 percent of cocaine seized along the Southwestern Border. See CBP, USBP Sector Profile – Fiscal Year 2016 (Oct. 1st through Sept. 30th).

61.     Similarly, in the eleven months of fiscal year 2017 previous to the Secretary's September 12, 2017, the El Centro Sector accounted for less than 5.3 percent of Border Patrol's apprehensions along the Southwest Border. See USBP Southwest Border Apprehensions by Sector, CBP (Nov. 3, 2017), https://www.cbp.gov/newsroom/ stats/usbp-sw-border-apprehensions (14,765 of 259,075 total apprehensions).

62.     The Yuma Clapper Rail (*Rallus longirostris yumanensis*), listed as an endangered species under the Endangered Species Act, may be found in the Project Area. See IPaC Information for Planning and Consultation, FWS, https://ecos.fws.gov/ipac/ (last visited Nov. 17, 2017).

63.     In addition, eighteen FWS Birds of Conservation Concern might be affected by construction activities in the Project Area, including certain birds normally protected under the Migratory Bird Treaty Act and the Eagle Protection Act. Id.

64.     The Secretary's decision to issue the foregoing waivers is based on political, not security or immigration concerns, to fulfil a campaign promise made by now President Trump. Notably, in response to campaign rhetoric about building the wall, governmental officials tasked with responsibility for securing the southern border from illegal immigration testified and stated that the wall would not achieve that objective. The Secretary's contrary assertion in issuing the waivers is not factually supported and is arbitrary and capricious.

# FIRST CLAIM FOR RELIEF

## (*Ultra Vires* Agency Action under Section 102(c) of IIRIRA)

65.     Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as though fully set forth herein.

66.     Section 102(a) of IIRIRA, as amended, authorizes the Secretary to "take such actions as may be necessary to install <u>additional</u> physical barriers and roads … in the vicinity of the United States border <u>to deter illegal crossings in areas of high illegal entry</u> into the United States." (Emphasis added).

67.     Section 102(b) of IIRIRA directs the Secretary to "construct reinforced fencing … where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border" to the extent necessary "in carrying out subsection (a)."

68.     Section 102(c)(1) of IIRIRA authorizes the Secretary to "waive all legal requirements such Secretary … determines necessary to ensure expeditious construction of the barriers and roads <u>under this section</u>." (Emphasis added.)

69.     The Section 102(c) of IIRIRA waiver authority applies only to the installation of new, "<u>additional</u> physical barriers and road," IIRIRA § 102(a) (emphasis added), and cannot be used for the border wall <u>replacement</u> or the <u>prototype</u> border wall project included in the San Diego and Calexico Waivers.

70.     As enacted in 1996, Section 102(b) of IIRIRA applied only to the border area "[n]ear San Diego, California," being limited to "construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences." Pub. L. No. 104-208, Div. C, § 102(b) 110 Stat. 3554.

71.     Seventeen months after adding the waiver provision to Section 102(c) of IIRIRA in the REAL ID Act of 2005, the Secure Fence of 2006 amended Section 102(b) of IIRIRA by striking "Near San Diego, California," and directing the Secretary to construct at "least 2 layers of reinforced fencing, the installation of additional physical barriers, roads,

1    lighting, cameras, and sensors" in five specific areas totaling approximately 850 miles.

2    Pub. L. No. 109-367 § 3, 120 Stat 2639.

3    72.    Fourteen months after passing the Secure Fence Act of 2006, Section 102(b) of

4    IIRIRA was again amended in the DHS Appropriations Act, 2008, by removing previous

5    specified areas and requiring the Secretary to "construct reinforced fencing along not less

6    than 700 miles of the southwest border where fencing would be most practical and

7    effective." Pub. L. No. 110-161, Div. E, Title V, § 564(a), 121 Stat. 2090 (2007).

8    73.    In addition, the 2008 Appropriations Act required the Secretary to "identify" and

9    "construct" "370 miles, or other mileage determined by the Secretary, whose authority to

10   determine other mileage shall expire on December 31, 2008, along the southwest border

11   where fencing would be most practical and effective." Id.

12   74.    Section 102(c) of IIRIRA's waiver provision has remained unchanged by Congress

13   since the amended by the REAL ID Act of 2005.

14   75.     There is no indication that Section 102(c) of IIRIRA applies to the 2006 and 2008

15   amendments to Section 102(b), nor that it was intended to apply to future border wall

16   projects after the DHS obtained "operational control" of the border.

17   76.    Assuming, *arguendo*, the enlarged barrier border authorization in the 2008 IIRIRA

18   amendments were eligible for waivers under Section 102(c), DHS has completed those

19   specified mandates and the Secretary's authority to identify and construct other mileage

20   expired on December 31, 2008.

21   77.    Further, the purported Waivers are not necessary to ensure the "expeditious"

22   construction of the border wall prototype project and border walls envisioned twelve

23   years ago in the 2005 REAL ID Act amendment. The Section 102(c) waiver authority has

24   not been further amended by Congress in the 12 years since its 2005 consideration and

25   enactment, despite the extensive amendments to IIRIRA section 102(b) by the 2006

26   Secure Fence Act and 2008 Consolidated Appropriations Act. The plain meaning of

27   broadly allowing the waiver of any laws determined by the DHS Secretary as necessary

28   to ensure the "expeditious construction" under Section 102(c) of IIRIRA was to provide

the DHS Secretary with the authority to waive laws in order to build border barriers as soon as possible after the law's enactment (*i.e.*, the REAL ID Act of 2005 12 years ago).

78.     This interpretation is further supported by Congress's subsequent establishment of specific deadlines in its amendments to IIRIRA section 102(b) under the 2006 Secure Fence Act and 2008 Consolidated Appropriations Act; most notably, its direction that at least 370 miles of border barriers be constructed by December 31, 2008, and its explicit termination of the Secretary's authority to designate "priority areas" for such construction by that same date. IIRIRA § 102(b)(2)(A)-(B).

79.     As such, the wall prototype project and border wall replacement project are not subject to the scope of the IIRIRA section 102(c) waiver authority, and the San Diego and Calexico Waivers are unlawful ultra vires acts subject to review by this Court, and the restrictions on judicial review and appellate review under that subsection are inapplicable to that determination.

80.     Since the San Diego and Calexico Waivers authorize activities that are beyond the scope of Section 102(c) of IRRIRA's waiver provision, the Waivers are unlawful *ultra vires* acts subject to review by this Court, and, moreover, Section 102(c)(2)'s restrictions on judicial review are inapplicable to the San Diego and Calexico Waivers.

81.     Additionally, Section 102(c)'s waiver provision contains other conditions precedent, including the obligation to consult and to make a determination of high illegal entry as further detailed below in the Second Claim for Relief. Those allegations are incorporated by reference here. Because those conditions were not met, the Secretary had no power to issue a waiver, making these actions void and *ultra vires* for that additional reason.

## SECOND CLAIM FOR RELIEF
### (Violation of Section 102(a) and 102(b)(1)(C))

82.     Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as though fully set forth herein.

83.   Subsection 102(a) of IIRIRA requires the Secretary, prior to taking actions "to install additional physical barriers and roads," under the authority of IIRIRA, to determine that locations where such installations are to take place are "areas of high illegal entry into the United States."

84.   Subparagraph 102(b)(1)(C) of IRRIRA requires the Secretary, prior to taking actions to carry out IIRIRA, to

> consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

85.   Section 102 of IIRIRA is not included among the combined thirty-eight federal statutes waived by the Secretary in either the San Diego or the Calexico Waivers.

86.   Paragraph 102(c)(1) of IIRIRA authorizes the Secretary to waive all legal requirements "[n]otwithstanding any _other_ provision of law." (Emphasis added).

87.   Subsections 102(a) and (b) are not "other provision[s] of law," but part of the same law as the subsection (c) waiver authority.

88.   The restriction on judicial review in subparagraph 102(c)(2)(A) of IIRIRA applies only to "any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph [102(c)](1)."

89.   The requirements of subsections 102(a) and (b), in fact, are prerequisites to the Secretary using the waiver authority of subsection 102(c).

90.   The Secretary has failed to provide an explanation or reasoning for the August 2, 2017 Waiver's conclusion that "[t]he San Diego Sector remains an area of high illegal entry."

91.   The Secretary has failed to provide an explanation or reasoning for the September 12, 2017 Waiver's conclusion that the "El Centro Sector is an area of high illegal entry."

92.     It is the Plaintiffs' understanding and belief that the Secretary has not consulted with any or all of the entities required by subparagraph102(b)(1)(C) prior to either the San Diego or Calexico Waivers.

93.     The Secretary's decisions the San Diego and El Centro Sectors are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law. 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF

### (Violation of the U.S. Constitution, Art. I, § 7, Cls. 2 and 3)

### (The Presentment Clauses)

94.     Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as though fully set forth herein.

95.     Section 102(c)(1) of IIRIRA, as amended, provides the Secretary "authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads" in the vicinity of the United States border.

96.     The Secretary's Calexico Waiver, issued pursuant to Section 102(c)(1) of IIRIRA, as amended, abrogates 28 enacted federal statutes and an undetermined number of "federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of" those statutes.

97.     Under Article I, Section 7, Clause 2 of the U.S. Constitution, "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States."

98.     Under Article I, Section 7, Clause 3 of the U.S. Constitution, "Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives."

99.     Section 102(c)(1) of IIRIRA provides the Secretary *de facto* repeal authority, allowing him to nullify validly enacted statutes without passing both the Senate and House of Representatives and without being presented to the President.

100.   Section 102(c)(1) of IIRIRA is unconstitutional as it violates the lawmaking procedures set forth in the Presentment Clauses expressed in Article I, Section 7, Clauses 2 and 3 of the U.S. Constitution.

101.   The Secretary's San Diego and Calexico Waivers made pursuant to Section 102(c)(1) of IIRIRA violates the lawmaking procedures set forth in the Presentment Clauses expressed in Article I, Section 7, Clauses 2 and 3 of the U.S. Constitution.

**FOURTH CLAIM FOR RELIEF**

**(Violation of the U.S. Constitution, Art. I, § 1 and Art. II § 1)**

**(Nondelegation Doctrine)**

102.   Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as though fully set forth herein.

103.   Article I, Section 1 if the U.S. Constitutions vests "[a]ll legislative Powers herein granted … in a Congress of the United States."

104.   "This text permits no delegation of those powers." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472 (U.S. 2001).

105.   Article II, Section 1 of the Constitution provides: "The executive Power shall be vested in a President of the United States of America."

106.   Section 102(c) of IIRIRA is an unconstitutional delegation of legislative power to an officer of the executive branch, in violation of Article I, Section 1 of the U.S. Constitution and the doctrine of Separation of Powers fundamental to our constitutional system.

107.   The Secretary's San Diego and Calexico Waivers made pursuant to Section 102(c)(1) of IIRIRA is an unconstitutional exercise of legislative authority by an officer of the executive branch, in violation of the lawmaking procedures set forth in the Presentment Clauses expressed in Article I, Section 7, Clauses 2 and 3 of the U.S.

Constitution in violation of Article I, Section 1 of the U.S. Constitution and the doctrine of Separation of Powers fundamental to our constitutional system.

## FIFTH CLAIM FOR RELIEF

**(Violation of the U.S. Constitution, Art. III,; amend. I, Right to Petition; amend. X; and amend. V, Due Process)**

**(Judicial Power)**

108.   Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as though fully set forth herein.

109.   Section 102(c)(2)(A) of IIRIRA, as amended, purports restricts judicial review. The clause reads in full:

(2) Federal court review.-

(A) In general.-The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

(B) Time for filing of complaint.-Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

(C) Ability to seek appellate review.-An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

110.   Section 102(c)(2)(A) of IIRIRA, as amended, seeks to both wrest concurrent jurisdiction from state courts by giving federal district courts "exclusive jurisdiction" over all claims, but then purports to eliminate significant aspects of the very "exclusive jurisdiction" just created by purporting to eliminate the federal district court's power to hear non-constitutional claims.

111.   Article III, Section 1 of the U.S. Constitution vests "[t]he judicial Power of the United States … in one supreme court."

112.   Article III, Section 2 of the U.S. Constitution provides: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."

113.   Section 102(c)(2)(A) of IIRIRA, as amended, is an unconstitutional, *ultra vires* legislative infringement of the judicial Power expressed in Article III, Sections 1 and 2 of the U.S. Constitution and the doctrine of Separation of Powers fundamental to our constitutional system.

114.   By purporting to eliminate judicial review of non-constitutional claims, Section 102(c)(2)(A) of IIRIRA also violates the First Amendment's right to "petition the Government for a redress of grievances."

115.   Similarly, Section 102(c)(2)(A) of IIRIRA, as amended, violates the Tenth Amendment of the Constitution by purporting to remove the concurrent jurisdiction of the state courts over non-constitutional federal challenges but then failing to provide an adequate federal judicial forum for such claims.

116.   Section 102(c)(2)(A) of IIRIRA, as amended, also violates Fifth Amendment Due Process by attempting to deprive Plaintiffs and all other citizens of the United States from accessing *any* court to raise non-constitutional challenges to the Secretary's actions under Section 102. Adequate access to the Courts is a protectable right and interest under the Constitution; Section 102(c)(2)(A) of IIRIRA, as amended, purports to deprive Plaintiffs of that right; and the deprivation was without due process for all the reasons articulated herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

     a.   Declare that the border wall replacement and prototype activities purportedly authorized by the San Diego and Calexico Waivers are unlawful *ultra vires* acts;

b.  Declare that Secretary's conclusions that the San Diego and El Centro Sectors are areas of high illegal entry are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

c.  Declare that the waiver authority delegated to the Secretary by paragraph (c)(1) of Section 102  of IIRIRA, Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (1996) (codified at 8 U.S.C. § 1103 note), as amended by the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 306, is unconstitutional;

d.  Declare that the San Diego Waiver of thirty-seven federal statutes and associated laws to expedite the construction of barriers and roads in the vicinity of the United States and Mexico border near San Diego, California, is unconstitutional;

e.  Declare that the Calexico Waiver of twenty-eight statutes and associated laws to expedite the construction of barriers and roads in the vicinity of the United States and Mexico border near Calexico, California, is unconstitutional;

f.  Set aside the waiver authority contained in Section 102 of IIRIRA Act, and the Secretary's exercise of that authority in the San Diego and Calexico Waivers;

g.  Enjoin Defendants from constructing any border wall, fence, or other barrier, and any related road or infrastructure, in the vicinity of the United States and Mexico border near San Diego, California, unless and until Defendants come into compliance with all applicable laws;

h.  Enjoin Defendants from constructing any border wall, fence, or other barrier, and any related road or infrastructure, in the vicinity of the United States and Mexico border near Calexico, California, unless and until Defendants come into compliance with all applicable laws;

1    i.    Declare that subparagraph (c)(2)(A) of Section 102 of IIRIRA, as amended,

2          is unconstitutional and void;

3    j.    Award Plaintiffs their costs and reasonable attorney fees in this action; and,

4    k.    Grant such other and further relief as the Court may deem just and proper.

10   DATED: November 21, 2017                    Respectfully submitted,

12                                               s/ Gloria D. Smith

13                                               Gloria D. Smith (CA No. 200824)
14                                               SIERRA CLUB
                                                 2101 Webster Street, Suite 1300
15                                               Oakland, CA 94612
                                                 Telephone: (415) 977-5532
16                                               gloria.smith@sierraclub.org

17
18                                               *Attorney for Plaintiff Sierra Club*

19                                               Brett M. Paben (FL No. 0416045)
20                                               DEFENDERS OF WILDLIFE
                                                 535 16th Street
21                                               Denver, CO 80202
                                                 Telephone: (720) 943-0457
22                                               bpaben@defenders.org
23                                               *Pro hac vice*

24
25                                               *Attorney for Plaintiff Defenders of Wildlife*

26                                               Anthony T. Eliseuson (IL No. 6277472)
27                                               ANIMAL LEGAL DEFENSE FUND
                                                 1755 W. Roscoe Street, Unit 3
28                                               Chicago, Illinois 60657

Telephone: (707) 795-2533
aeliseuson@aldf.org
*Pro hac vice*

Sarah K. Hanneken (OR No. 165104)
ANIMAL LEGAL DEFENSE FUND
919 SW Taylor Street, #400
Portland, OR 97205
Telephone: (707) 795-2533
shanneken@aldf.org
*Pro hac vice*

*Attorneys for Plaintiff*
*Animal Legal Defense Fund*

**CERTIFICATE OF SERVICE**

I, Kathleen M. Krust, declare as follows:

I hereby certify that on this 21st day of November, 2017, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send notice

of such filing to all registered CM/ECF users.

Executed on November 21, 2017.

s/ Kathleen M. Krust
Kathleen M. Krust