Gloria D. Smith (CA No. 200824)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5532

Brett M. Paben (FL No. 0416045)
Defenders of Wildlife
535 16th Street
Denver, CO 80202
Telephone: (720) 943-0457
*Pro hac vice*

Anthony T. Eliseuson (IL No. 6277472)
Sarah K. Hanneken (OR No. 165104)
Animal Legal Defense Fund
919 SW Taylor Street, #400
Portland, OR 97205
Telephone: (707) 795-2533
*Pro hac vice*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: BORDER INFRASTRUCTURE ENVIRONMENTAL LITIGATION,** | Case No. 17-cv-01215-GPC-WGV<br><br>Consolidated with<br>Case No. 17-cv-01873-GPC-WVG<br>Case No. 17-cv-01911-GPC-WVG<br><br>**Memorandum of Points and Authorities in support of Plaintiffs Defenders of Wildlife, Animal Legal Defense Fund, and Sierra Club's Motion for Summary Judgment**<br><br>Judge:     Hon. Gonzalo P. Curiel<br>Courtroom: 2D<br>Date:      February 9, 2018<br>Time:      1:30 p.m. |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ...................................................................................... 1

LEGAL STANDARDS ............................................................................... 3

ARGUMENT............................................................................................... 4

I.    The Secretaries' Determinations that the Projects are in "Areas of High Illegal Entry" and to Proceed with the Projects without Satisfying the Consultation Requirement Violate the Administrative Procedure Act.   4

    A.    The Secretary's actions required by subsections (a) and (b) of section  102 of IIRIRA are reviewable under the APA......................................................... 4

    B.    The Secretary's decisions required by subsections 102(a) and (b) of IIRIRA are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law................................................................................. 8

II.   Defendants' Waivers Are Void Ultra Vires Acts that are not Authorized under Section 102. ...................................................................................12

    A.    This Court has inherent authority to determine if the waivers exceeded  the Secretary's statutory authority. .................................................................12

    B.    The waivers are *ultra vires* because they fall outside the statutory scope of authority Congress granted to the Secretary. ................................................13

        1.    The Secretary's use of section  102(c) waivers to "replace existing primary fencing" are ultra vires.........................................................14

        2.    The San Diego prototype project will not deter illegal crossing and falls outside of section 102's grant of authority................................15

        3.    The waivers are also *ultra vires* because they are not "necessary to ensure expeditious construction" as required by section 102(c).........16

        4.    The Secretary's waivers are *ultra vires* because section 102's grant of authority was limited to the construction activities specifically mandated by Congress. ...................................................................16

III.  The Broad and Unbridled Grant of Waiver Authority in Section 102 Violates the Non-Delegation Doctrine as Demonstrated by Defendants Attempt to Use it for Purely Political Objectives.....................................................................20

IV.   The Waiver Authority—if Deemed to Authorize the Projects at Issue—Violates the Presentment Clause by Allowing the Secretary to Engaging in Legislative Repeals. ...................................................................................................................27

V.    The Jurisdictional Stripping Provision is Unconstitutional under Separation of Powers and Federalism Grounds. ..............................................................................27

    A.   Without inherent ultra vires jurisdiction, section 102(c)(2) would run afoul of fundamental separation of powers protections. .......................................27

    B.   Congress lacks the power to eliminate the concurrent jurisdiction of state courts *unless* it vests that power in an inferior federal court. ......................28

    C.   Subsection 102(c)(2) violates the Coalition Plaintiffs' due process rights and impairs their First Amendment right to petition the government. ................29

CONCLUSION ..............................................................................................................30

**TABLE OF AUTHORITIES**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)............................25

*ANA Int'l, Inc. v. Way*, 393 F.3d 886 (9th Cir. 2004) ........................................ 5

*Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936 (9th Cir. 2017) ..........................................16

*Barlow v. Collins*, 397 U.S. 159 (1970) ........................................................ 4

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32 (1991) .............. 5

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986)................................4, 7

*California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072 (9th Cir. 2011) .....10

*Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ...................................... 6

*Clinton v. City of New York*, 524 U.S. 417 (1998)..........................................................27

*Cnty. of El Paso v. Chertoff*, No. EP-08-CA-196, 2008 WL 4372693 (W.D. Tex. Aug. 29, 2008)..........................................................................................13, 24

*Cnty. of Esmeralda v. U.S. Dep't of Energy*, 925 F.2d 1216 (9th Cir. 1991) .................... 8

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157 (9th Cir. 2007)..........................................................................................6, 7

*Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*, 97 F. Supp. 3d 1210 (D. Haw. 2015) ..........................................................................................26

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102 (1980)................. 5

*Corley v. United States*, 556 U.S. 303 (2009)....................................................... 6

*Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017) ............................26

*DART v. U.S.*, 848 F.2d 217 (D.C. Cir. 1988) ............................................................12

*Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007)...............13, 23, 24

*Defenders of Wildlife. See City of El Paso v. Chertoff*, No. EP-08-CA-196-FM, 2008 U.S. Dist. LEXIS 83045 (W.D. Tex. Aug. 29, 2008) ........................................................23

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) .................................... 6

*Geo–Energy Partners–1983 Ltd. v. Salazar*, 613 F.3d 946 (9th Cir. 2010) ....................16

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982)............................................... 7

*Haywood v. Drown*, 556 U.S. 729 (2009) ........................................................28

*Healy v. Ratta*, 292 U.S. 263 (1934). ............................................................29

*Heckler v. Chaney*, 470 U.S. 821(1985) .......................................................... 6

*Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013)...........................................10

*In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108 (S.D. Cal. 2015)
.......................................................................................................... 3

*Kucana v. Holder*, 558 U.S. 233 (2010) ......................................................... 5

*Leedom v. Kyne*, 358 U.S. 184 (1958).............................................................12

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001)...................................29

*Maldonado v. Fasano*, 67 F. Supp. 2d 1170 (S.D. Cal. 1999) .......................... 5

*Markham v. Cabell*, 326 U.S. 404, 411 (1945).................................................. 7

*Mistretta v. United States*, 488 U.S. 361 (1989) ...............................21, 22, 23

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) ................................................. 5

No. 2:10-cv-1413-SRB, 2011 WL 13137062 (D. Ariz. Oct. 21, 2011)............................ 6

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)...................................23, 25

*Pinnacle Armor, Inc. v. United States*, 648 F.3d 708 (9th Cir. 2011) .............................. 5

*Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527 (7th Cir.1999),.....................................10

*Save Our Heritage Org. v. Gonzales*, 533 F. Supp. 2d 58 (D.D.C. 2008).......................23

*Save Our Heritage Org. v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008).......................13

*Sharp Healthcare v. Leavitt*, 555 F. Supp. 2d 1121 (S.D. Cal. 2008) .............................. 7

*Sierra Club v. Ashcroft*, No. 04-cv-272-LAB, 2005 U.S. Dist. LEXIS 44244 (S.D. Cal.
Dec. 12, 2005)...........................................................13, 14, 17, 18, 22, 24, 25

*Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 689 (9th Cir. 2003) ...............12

*Staacke v. U.S. Sec'y of Labor*, 841 F.2d 278 (9th Cir. 1988) ........................................12

*Tinian Women Ass'n v. U.S. Dep't of the Navy*, No. 16-cv-00022, 2017 U.S. Dist. LEXIS
170080 (N. Mariana Islands 2017) ................................................................26

*Touby v. United States*, 500 U.S. 160 (May 20, 1991)..............................................24, 25

*Traynor v. Turnage*, 485 U.S. 535 (1988) ...................................................... 4

*United States v. Arce-Hernandez,* 163 F.3d 559 (9th Cir. 1998).........................................5

*United States v. Bozarov*, 974 F.2d 1037 (9th Cir. 1992) ...............................................12

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) ...........................25

*United States v. Dahl*, 314 F.3d 976 (9th Cir. 2002) .......................................................6

*Valenzuela Gallardo v. Lynch*, 818 F.3d 808 (9th Cir. 2016) ......................................28

*Webster v. Doe*, 486 U.S. 592 (1988) ...............................................................................5

*Wheeler v. Premier Credit of North Am., LLC*, 80 F. Supp. 3d 1108 (S.D. Cal. 2015) ..... 3

*Wilkinson v. Austin*, 545 U.S. 209 (2005).........................................................................30

*Zivotofsky v. Kerry*, 135 U.S. 2076 (2015) ...............................................................25, 26

**Statutes**

5 U.S.C. § 500 ......................................................................................................................4

5 U.S.C. § 701(a)(1) .............................................................................................................5

5 U.S.C. § 706(2)(A) .........................................................................................................4, 6

6 U.S.C. § 256 ....................................................................................................................18

21 U.S.C. § 811(h) ..............................................................................................................24

Consolidated Appropriations Act, 2008, Pub. L. No. 110-161 ................................1, 7, 22

IIRIRA § 101(a)....................................................................................................................6

IIRIRA § 101(b) ...................................................................................................................6

IIRIRA § 102 ....................................................... 1, 2, 7, 8, 10, 15, 16, 20, 21, 24, 27, 28

IIRIRA § 102(a)....................................................4, 5, 6, 7, 8, 10, 14, 15, 17, 22

IIRIRA § 102(b) ...................................................... 4, 5, 6, 7, 11, 17, 18

IIRIRA § 102(b)(1) ............................................................................................................17

IIRIRA § 102(b)(1)(A) ...................................................................................................1, 17

IIRIRA § 102(b)(1)(B)........................................................................................................17

IIRIRA § 102(b)(1)(C)....................................................................................................6, 10

IIRIRA § 102(b)(2) .............................................................................................................18

IIRIRA § 102(c).............................................. 1, 2, 4, 5, 6, 7, 16, 17, 18, 22, 23, 25

IIRIRA § 102(c)(1) ....................................................................................................5, 16, 18

IIRIRA § 102(c)(2) ................................................................. 3, 12, 27, 28, 29, 30

REAL ID Act of 2005, Pub. L. No. 109-13 ......................................... 1

Secure Fence Act of 2006, Pub. L. No. 109-367 .............................1, 24

**Regulations**

82 Fed. Reg. 35,984 (Aug. 2, 2017) .........................................8, 14, 15

82 Fed. Reg. 35,985 (Aug. 2, 2017) ..........................................14, 16

82 Fed. Reg. 42,829 (Sept. 12, 2017) ............................................ 8

**Constitutional Provisions**

U.S. Const. art I, § 1 ...................................................................20

U.S. Const. art. III, § 1 ................................................................28

**Legislative History**

151 Cong. Rec. E243-03 (Feb. 15, 2005) ......................................18

151 Cong. Rec. H437-02 (Feb. 9, 2005).....................................19, 20

151 Cong. Rec. H453-04 (Feb. 9, 2005).....................................18, 19

151 Cong. Rec. H527-03 (Feb. 10, 2005).......................................19

151 Cong. Rec. H536-03 (Feb. 10, 2005)...................................19, 28

**INTRODUCTION**

Over twenty years ago, in the face of perceived exigent threats from illegal immigration and drug trafficking, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. That Act, and a series of subsequent Acts in 2005, 2006, and 2008, required the Department of Homeland Security ("DHS") to take such actions as necessary "to gain operational control of the southwest border" including by completing priority barriers by the end of 2008. *See* IIRIRA § 102(b)(1)(A).[1]

These Acts envisioned that portions of the southwest border would be secured by physical barriers. Congress in fact mandated certain specific barriers be constructed to shut down known smuggling corridors. Yet in 2005, after nearly a decade of delay completing "the last piece of fence" in an area near San Diego, Congress granted extraordinary power to the Secretary of DHS to waive an unlimited number of federal, state, and local laws to finally complete the job mandated in 1996. The proponents of the 2005 amendment repeatedly discussed the Secretary's extraordinary waiver authority in the context of ensuring the completion of this very specific portion of fencing.

Now, after nearly a decade without any further Congressional action regarding section 102, the Defendants[2] have dusted off section 102(c) and invoked the extraordinary waiver power to build "replacement" barriers and prototypes that will not yield any additional fencing. These projects are not actual attempts to "deter illegal

---

[1] The law at issue here is "section 102" of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), *as amended by* REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 306, *as amended by* Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638, *as amended by* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V, § 564(a), 121 Stat. 2090-91 (2007).

[2] Defendants Department of Homeland Security, Acting Secretary Elaine Duke, and the United States of America (collectively, "Defendants" or "Government")

crossings" or secure the border as required by section 102, a conclusion supported by undisputed facts as the Coalition Plaintiffs[3] demonstrate below.

As a result, the waivers are invalid under the Administrative Procedure Act. Under section 102, the Secretary only has authority to construct "additional barriers" that will "deter illegal crossings in areas of high illegal entry," a requirement that it not captured by the waiver provision. Yet the projects at issue here will neither deter illegal crossings nor be constructed in areas of high illegal entry.

Even if this Court adopted the Governments' interpretation of the scope of the Secretary's waiver authority, and held she could waive compliance with a challenge to the very requirements contained in Section 102 itself, that would not displace this Court's inherent *ultra vires* authority. The waivers here are *ultra vires* for the same reasons they cannot withstand scrutiny under the APA as well as those discussed below.

The Government's attempt to invoke section 102 authority for these projects also confirms the concerns raised in litigation a decade ago. The waivers here demonstrate the Government has interpreted section 102 in a manner that results in an impermissibly broad and vague delegation of authority that cannot withstand constitutional scrutiny. In 2005, a court in this district upheld section 102 against a non-delegation challenge because it interpreted subsection 102(c)'s waiver authority as limited to the project near San Diego mandated by the 1996 legislation. Yet, contrary to the decision in that case, the Government now seeks to extend this waiver authority to any border project, thereby resulting in section 102 violating the non-delegation doctrine.

Similarly, the waiver authority violates the Constitution's Presentment Clause by, "[i]n both legal and practical effect," authorizing the Secretary of the DHS to repeal acts of Congress in her sole discretion. Since it must retain the authority to repeal legislation, Congress is constrained from vesting that power in the Secretary.

---

[3] Plaintiffs Defenders of Wildlife, Animal Legal Defense Fund, and Sierra Club (collectively, "Coalition Plaintiffs" or "Plaintiffs").

1    Finally, the Government attempts to preclude this Courts' review of its actions by

2  adopting an overreaching view of the jurisdictional stripping provision of subsection

3  102(c)(2). Under this interpretation, no court has the authority to determine whether the

4  Secretary has exceeded her statutory authority. This reading of the law is contrary to

5  Ninth Circuit and Supreme Court *ultra vires* review precedent. Furthermore, if such

6  reading is accepted, it would confirm Congress's unconstitutional overextension of power

7  in Subsection 102(c)(2) by insulating congressional as well Secretarial action from

8  judicial scrutiny in violation of Article III and bedrock principles of separation of powers

9  and federalism.

10    Consequently, Defendants' conduct here is unauthorized, unconstitutional, and

11  void, and this Court is within its judicial authority to declare precisely that and invalidate

12  the waivers at issue here by granting the Coalition Plaintiffs summary judgment.

13                              **LEGAL STANDARDS**

14    "Summary judgment is appropriate if the 'pleadings, depositions, answers to

15  interrogatories, and admissions on file, together with the affidavits, if any, show that

16  there is no genuine issue as to any material fact and that the moving party is entitled to

17  judgment as a matter of law.'" *Wheeler v. Premier Credit of North Am., LLC*, 80 F. Supp.

18  3d 1108, 1111 (S.D. Cal. 2015) (quoting FED. R. CIV. P. 56(c)). Summary judgment is

19  particularly appropriate where the issues presented involve pure questions of law. *See,*

20  *e.g., In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108, 1114 (S.D.

21  Cal. 2015).

22

23

24

25

26

27

28

**ARGUMENT**

I. **THE SECRETARIES' DETERMINATIONS THAT THE PROJECTS ARE IN "AREAS OF HIGH ILLEGAL ENTRY" AND TO PROCEED WITH THE PROJECTS WITHOUT SATISFYING THE CONSULTATION REQUIREMENT VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.**

Prior to utilizing the waiver authority in section 102(c) of IIRIRA, the Secretary must (1) determine that additional physical barriers are "necessary" to deter illegal crossings in "areas of high illegal entry," and (2) "consult" with the Secretaries of Interior and Agriculture, and States, among others, "to minimize the impact on the environment, culture, commerce, and quality of life…" IIRIRA § 102(a), (b). Judicial review of the Secretary's decisions pursuant to these subsections is governed by the APA, under which the Court must decide whether the decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As discussed below, Secretaries Duke and Kelly issued the San Diego and Calexico waivers without complying with these prerequisites in violation of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

A. **The Secretary's actions required by subsections (a) and (b) of section 102 of IIRIRA are reviewable under the APA.**

The Supreme Court has "repeatedly" acknowledged "the strong presumption that Congress intends judicial review of administrative action." *Traynor v. Turnage*, 485 U.S. 535, 542 (1988) (providing examples) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)). "Indeed, judicial review of [] administrative action is the rule, and nonreviewability an exception which must be demonstrated… [by] 'clear and convincing evidence'" *Barlow v. Collins*, 397 U.S. 159, 166-67 (1970) (citation omitted). "This presumption is overcome only in two narrow circumstances. The first … is when Congress expressly bars review by statute… The second applies in 'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718-19 (9th Cir.

2011) (citing 5 U.S.C. § 701(a)(1); *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991)) (quoting *Webster v. Doe*, 486 U.S. 592, 599 (1988)).

The Supreme Court has "consistently applied this interpretive guide to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction." *Kucana v. Holder*, 558 U.S. 233, 235 (2010). "The default rule [] that agency actions are reviewable. … applies in the post-IIRIRA immigration context." *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 890 (9th Cir. 2004) (citations omitted). Recognizing the importance of preserving judicial review, "lower courts have … read the jurisdiction-removing statutes of IIRIRA narrowly (and Supreme Court precedents broadly) …" *Maldonado v. Fasano*, 67 F. Supp. 2d 1170, 1182 n.13 (S.D. Cal. 1999). Courts have further found that Congress made "specific reference" within IIRIRA when it intended to "amend or repeal statutes granting jurisdiction to the federal courts." *United States v. Arce-Hernandez,* 163 F.3d 559, 563 (9th Cir. 1998).

The waiver authority and jurisdictional limitation in subsection 102(c) has no bearing on judicial review of subsections 102(a) and (b). Starting with "the language of the statute itself," *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980), the pertinent text of the waiver provides: "*Notwithstanding any other provision of law*, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary *to ensure expeditious construction* of the barriers and roads under this section." IIRIRA § 102(c)(1) (emphasis added). "The ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by,'" *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (citations omitted), and "other" commonly means "being the one or ones distinct from that or those first mentioned or implied." Merriam-Webster, https://www.merriam-webster.com/dictionary/other ("not the same").

The Ninth Circuit has determined the "reach" of the phrase "notwithstanding" by "taking into account the whole of the statutory context in which it appears." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1168 (9th Cir.

2007) (citation omitted). Under this view, the phrase "notwithstanding" demonstrates an intent to limit the waiver authority solely to laws *other than* the one in which the waiver is contained, meaning the requirements of the section itself are not waivable. *See, e.g., United States v. Dahl*, 314 F.3d 976, 978 (9th Cir. 2002) ("notwithstanding any other provision of law" read "to mean just what it says"); *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10 (1993) (phrase interpreted as "to supersede *all other laws*" (emphasis added)); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1083 (9th Cir. 2014) (such clauses "nullify *conflicting* provisions of law." (emphasis in original)).

The court in *United States v. Arizona* also indicated that some DHS actions under section 102 "are reviewable under § 706(2)(A)." *United States v. State of Arizona,* No. 2:10-cv-1413-SRB, 2011 WL 13137062, at *8-*9 (D. Ariz. Oct. 21, 2011) (but dismissing claims due to "ongoing, non-final actions" and finding § 102(b) did "not mandate any discrete agency action"). Similarly, the Congressional Research Service has also indicated that APA review is available for subsection 102(b). Michael John Garcia, Cong. Research Serv., R43975, Barriers Along the U.S. Borders: Key Authorities and Requirements 16 (2017) ("Secretary's determination not to place fencing at a location would be afforded a very high degree of deference by a reviewing court" and "the 'notwithstanding' clause enables DHS to readily answer claims by parties seeking to compel some portion of the required border fencing at a [specific] location").

The "high illegal entry" and consultation requirements of subsections 102(a) and (b) are, in fact, conditions that must be satisfied before Secretary can invoke the subsection 102(c) authority. Unless the barriers' purpose is to control access in "areas of high illegal entry" and the Secretary has consulted with the parties identified in subsection 102(b)(1)(C), the waiver is unavailable. Accordingly, the conditions in subsections 101(a) and (b) must be given effect. *See, e.g., Heckler v. Chaney*, 470 U.S. 821, 829 (1985) ("statute generally should be read "to give effect, if possible, to every clause…'" (citation omitted); *Corley v. United States*, 556 U.S. 303, 314 (2009) ("statute should be construed … so that no part will be inoperative or superfluous, void or

insignificant."); *Consejo*, 482 F.3d at 1168-69 ("cardinal principle of statutory construction is to save and not to destroy.").

Congress's addition of the consultation requirement to subsection 102(b) after the waiver authority had been expanded in 2005, *see* Pub. L. No. 110-161 Div. E § 564 (2007), further supports construing subsection (c) as extraneous to the remaining subsections 102(a) and (b). It would be absurd for Congress to adopt a requirement upon the Secretary and, simultaneously, grant the Secretary authority to waive that very requirement in the same amendment. *See Markham v. Cabell*, 326 U.S. 404, 411 (1945) ("the normal assumption is that where Congress amends only one section of a law, leaving another untouched, the two were designed to function as parts of an integrated whole."). This is particularly so as the consultation requirement addresses environmental issues that would otherwise be subject to laws Congress had originally envisioned as waivable by the Secretary.

This restrained reading of subsection 102(c)'s influence is also consistent with the congressional intent for the waiver: allowing the Secretary to disregard laws that may hinder "expeditious construction" of border infrastructure – *e.g.*, NEPA and the ESA. Determining locations to be areas of high illegal entry and consulting with affect parties, however, are directed to project location and design, rather than potentially time-consuming permitting and procedural compliance. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

Judicial review of subsections 102(a) and (b) would also not endanger the general purpose of section 102. "Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen*, 476 U.S. at 681. If Congress intended to shield the Secretary's determinations regarding necessity and "areas of high illegal entry" from review, including such prerequisites in subsection (a) would have been unnecessary. *See Sharp Healthcare v. Leavitt*, 555 F. Supp. 2d 1121, 1125 (S.D. Cal. 2008) (argument

against review implied agency "may disregard Congress's express statutory command."). Since it does not endanger the general purposes of section 102, judicial review of the Secretary's actions are appropriate. *See Cnty. of Esmeralda v. U.S. Dep't of Energy*, 925 F.2d 1216, 1218-19 (9th Cir. 1991) (statute making determinations "at the discretion of the Secretary" not "endangered by judicial review").

**B.      The Secretary's decisions required by subsections 102(a) and (b) of IIRIRA are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.**

On August 2, 2017, former DHS Secretary Kelly "determined" that the San Diego Sector "remains an area of high illegal entry." Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 82 Fed. Reg. 35,984, 35,984 (Aug. 2, 2017). Similarly, on September 17, 2017, Secretary Duke also "determined" that the "Border Patrol's El Centro Sector is an area of high illegal entry." Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 82 Fed. Reg. 42,829, 42,830 (Sept. 12, 2017). Combined, the Secretaries provided five sentences of "support" for these determinations. The Secretaries' "areas of high illegal entry" determinations pursuant to subsection 102(a), however, are contradicted by DHS data concerning the amount of illegal entry, Border Patrol's effectiveness, and practices.

As DHS reported in September 2017, "With respect to border enforcement outputs, available data indicate that the southwest land border is more difficult to illegally cross today than ever before." Statement of Undisputed Material Facts in Support of Plaintiffs Defenders of Wildlife, Animal Legal Defense Fund, and Sierra Club's Motion for Summary Judgment ¶ 13 (hereinafter "Pls.' Stmt."). The number of apprehensions "serves as a long-standing proxy measure of illegal flows." *Id.* ¶ 15. Throughout the Southwest Border, Border Patrol made 408,870 apprehensions in 2016, a 75 percent drop from 1.64 million in 2000. *Id.* ¶¶ 13, 16. Over this same period, apprehensions decreased by 79 percent in the San Diego Sector and 92 percent in the El Centro Sector. *Id.* ¶¶ 17-

18. When IIRIRA was first passed in 1996, the San Diego Sector's 483,815 apprehensions accounted for 32 percent of all Border Patrol apprehensions along the Southwest border, but, by 2016, less than 8 percent of apprehensions occurred in this sector. *Id.* ¶ 18.

The decrease in illegal migration has been more dramatic during since the Trump Administration has been in office. During the period from when this Administration began to the time when Secretary Kelly issued the San Diego Waiver (February through July 2017), the available data demonstrates a drop in apprehensions by more than 60 percent from the same period in 2016 along the Southwest Border, as well as 51 percent in the San Diego Sector and 28 percent in the El Centro Sector. *Id.*

In addition to the decrease in apprehensions, Border Patrol has also increased its interdiction effectiveness between points of entry on the Southwest border every year it has been reported by DHS, from 79.3 percent in fiscal year 2014 to 82.7 percent in 2016. *Id.* ¶ 22. The San Diego and El Centro Sectors also have had better apprehension rates than any other southwestern sector. *Id.* ¶ 35.

Similar to the performance measures, the allocation of Border Patrols' resources does not support the "areas of high illegal entry" conclusions. Border Patrol "resources are deployed to those areas deemed to be the highest risk." *Id.* ¶ 27 ("Border Patrol uses … data, to assign risk scores to each sector, which informs resource deployments."). In 2016, there were more than three times the number of Border Patrol agents in the Southwest Border Sectors than there were in 1996. *Id.* ¶ 26. Although the number of agents along the Southwest border was 8.6 percent lower in 2016 than the peak in 2013, agents deployed in the San Diego and El Centro Sectors dropped by 19 and 10 percent, respectively, over the last three full fiscal years. *Id.* ¶¶ 29-31. Also, twenty years ago, agents in the San Diego sector accounted for 27 percent of all Border Patrol agents in the Southwestern border, which dropped to 12 percent by 2016. *Id.* ¶ 28. Thus, in addition to the decrease in illegal border crossings and improved performance, Border Patrol has

been allocating its human resources away from the San Diego and El Centro Sectors in comparison to its other Southern border sectors.

In addition to not being "areas of high illegal entry," there is no indication that the replacement and the prototype walls are "necessary … to deter illegal crossings." IIRIRA § 102(a). DHS has already spent more than $2 billion to install 705 miles of fencing along the border. Pls.' Stmt. ¶ 33. "Despite these investments, CBP cannot measure the contribution of fencing to border security operations along the southwest border because it has not developed metrics for this assessment." *Id.* The existing data does nonetheless suggest that barriers may not be the most effective means of preventing illegal immigration. From 2013 through 2015, for example, the San Diego Sector "had the highest estimated apprehension rate in the sector (77 percent) in zones with no fencing." *Id.* ¶ 35. The El Centro Sector's apprehension rate was 70 percent in in areas with no fencing, which is above the total rate of 67 percent throughout the sector. *Id.*

In addition to these determinations required by subsection 102(a), the Secretary has a nondiscretionary duty to "consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners" under subparagraph 102(b)(1)(C). Though not defined in section 102, "consultation" in common use means "[t]he act of asking the advice or opinion of someone…, or "[a] meeting in which parties consult or confer." *Black's Law Dictionary* (10th ed. 2014). "Consultation implies an exchange of views or a request for advice… Consulting with others supplements the information an individual has in order to reach a final judgment." *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 536-37 (7th Cir.1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). "An ordinary meaning of the word consult is to 'seek information or advice from (someone with expertise in a particular area)' or to 'have discussions or confer with (someone), typically *before* undertaking a course of action.'" *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1087 (9th Cir. 2011) (emphasis in original) (citation omitted).

For the San Diego Waiver,[4] DHS prepared a memorandum summarizing resource surveys, analyzes potential effects, and provides best management practices. *See* Doc. #18-2 (Ex. 14). Although the Secretary had already determined it necessary to waive thirty-seven statutes on August 2, 2017, CBP did not have "[f]ield surveys for natural and cultural resources … conducted [until] August 23, 2017." Doc. #18-2 (Ex. 14), PageID.425. The environmental analysis, moreover, was also "[b]ased on the results of the field surveys and [CBP's] knowledge of the Project Area," without any input from other parties. *Id.* at PageID.427. This process is also inconsistent with DHS practices in previous use of waivers. Under the waivers issued between 2008 and 2011, "[p]rior to fence construction, CBP prepared Environmental Stewardship Plans (ESPs) that summarized the natural and cultural resource surveys conducted during fence planning and estimated the potential environmental impacts based on the initial fence design." Pls.' Stmt. at ¶ 38. The ESPs were also made available to the public on the CBP website. *Id.* Prior to preparing the ESP, in some instances, CBP "prepared a Biological Resources Plan (BRP) to identify the presence of sensitive biological resources … and potential impacts on these resources … provided the BRP to affected resource agencies and land managers for review. The BRP was [then] appended to the [ESP]." *Id.* ¶ 39. After construction, CBP would prepare Environmental Stewardship Summary Reports (ESSRs) "to document the final impacted area, as compared to the original estimates contained in the ESPs…" *Id.* ¶ 38.

Although the Secretary may be afforded broad discretion to determine consultation procedures, none of what DHS or its components have completed remotely satisfy the consultation requirement under subsection 102(b).

---

[4] Plaintiffs are unaware of any similar review conducted for the Calexico Waiver.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II. DEFENDANTS' WAIVERS ARE VOID ULTRA VIRES ACTS THAT ARE NOT AUTHORIZED UNDER SECTION 102.

### A. This Court has inherent authority to determine if the waivers exceeded the Secretary's statutory authority.

Notwithstanding Congressional bars on judicial review, courts retain inherent authority to determine whether "the Secretary acted in excess of [her] delegated authority." *United States v. Bozarov*, 974 F.2d 1037, 1045 (9th Cir. 1992) (citing *Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988) and *Leedom v. Kyne*, 358 U.S. 184, 185 (1958)); *see also Staacke v. U.S. Sec'y of Labor*, 841 F.2d 278, 281 (9th Cir. 1988) ("Even where the statutory provision absolutely bars judicial review, . . . jurisdiction exists where defendant is charged with violating a clear statutory mandate or prohibition"). As the Ninth Circuit explained, a statute that seeks to preclude judicial review cannot remove a Court's inherent *ultra vires* review authority because the Constitution mandates that an aggrieved party have "a meaningful and adequate opportunity for judicial review of the regulation that he argue[s] was promulgated in excess of the agency's statutory authority." *Bozarov*, 974 F.2d at 1045, n.8 (explaining *MCorp. Financial*, 502 U.S. 32). Where a statute itself fails to provide such an avenue of "meaningful and adequate" judicial review, the Court's inherent *ultra vires* authority fills that gap. *Id.* (following *Dart*, 848 F.2d at 222 (same principle)); *see also Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 689 (9th Cir. 2003) (recognizing that even if different provisions of IIRIRA that preclude all review of certain decisions applied, "the courts retain jurisdiction to review whether a particular decision is *ultra vires* [as to] the statute in question"). Thus, subsection 102(c)(2)'s jurisdictional stripping provision cannot eliminate this Court's inherent *ultra vires* jurisdiction.

**B.** **The waivers are *ultra vires* because they fall outside the statutory scope of authority Congress granted to the Secretary.**

The Secretary's waivers here go far beyond those that were the subject of prior litigation and are *ultra vires* for several reasons. In prior waiver cases,[5] courts upheld the constitutionality of section 102 because the specific projects at issue squarely fell within the limited scope of those intended by Congress, *i.e.*, projects specifically mandated by subsection 102(b). Here, the waivers do not relate to the construction of any "additional barriers," much less mandated ones, and instead involve *replacement* of fencing and a *prototype* construction project to allow for the evaluation of future barrier designs.

In upholding those prior waivers, the courts held that section 102's waiver authority was subject to several boundaries, including the requirement that waiver must be "*necessary* to ensure expeditious construction" of "*additional* physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry." *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 127 (D.D.C. 2007) (emphasis added) (quoting § 102). The *Defenders of Wildlife* court, though acknowledging it was unprecedented in theoretical breadth as to the substantive laws that could be waived, concluded the section 102 waiver authority was indeed limited because "the Secretary may only exercise the waiver authority for the 'narrow purpose' prescribed by Congress: '*expeditious completion*' of the border fences authorized by IIRIRA in areas of high illegal entry." *Id.* at 128 (emphases added) (quoting *Sierra Club v. Ashcroft*, No. 04-cv-272-LAB, 2005 U.S. Dist. LEXIS 44244, at *20 (S.D. Cal. Dec. 12, 2005)). The *Sierra Club* court went even further, concluding that "Congress simply broadened the scope of the waiver authority of the pre-existing delegation to 'all laws,' but again *only for the narrow purpose of*

---

[5] *See Sierra Club v. Ashcroft*, No. 04-cv-272-LAB, 2005 U.S. Dist. LEXIS 44244 (S.D. Cal. Dec. 12, 2005); *Cnty. of El Paso v. Chertoff*, No. EP-08-CA-196, 2008 WL 4372693 (W.D. Tex. Aug. 29, 2008); *Save Our Heritage Org. v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008); *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007).

*expeditious completion of the Triple Fence authorized by the IIRIRA.*" *Sierra Club*, 2005 U.S. Dist. LEXIS 44244 (emphasis added).

### 1.   The Secretary's use of section 102(c) waivers to "replace existing primary fencing" are ultra vires.

The grant of authority contained in section 102(a) is limited to "such actions as may be *necessary* to install *additional* physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a) (emphasis added). The Secretary's waiver notices, however, declared that DHS will "replace existing primary fencing." 82 Fed. Reg. at 35,985; *id.* at 42,830. By its ordinary, obvious meaning, these "replacement" fences fall outside this clear statutory mandate.

A replacement fence, first of all, is not an "*additional* physical barrier," even under the Government's interpretation of that phrase, because it does not "add" a barrier, create "more" barriers, or provide "extra" or "supplementary" barriers. *See* Doc. #18 at 23 (using the quoted terms to define "additional"). By definition, "replacement" results in no net gain (no "addition") because the new barrier is merely a substitute or successor to the fence it is replacing. *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/replacement ("one that replaces another especially in a job or function"); https://www.merriam-webster.com/dictionary/replaces ("to take the place of especially as a substitute or successor"). This conclusion is compelled from the language of the waivers themselves, which, instead of moving to "install *additional* physical barriers" as required by subsection 102(a), clearly state that stating DHS "will *replace existing* primary fencing," 82 Fed. Reg. at 35,984; *id.* at 42,380 (emphasis added).

Second, the replacement projects near Calexico and San Diego are not in areas of high illegal entry. *See* discussion *supra* § I.B. The "areas" in which these barriers will be constructed already have fences, meaning there should be little to no illegal crossings occurring in these areas. If, conversely, illegal crossings continue to occur despite the existing fences, then support for the subsection 102(a) requirement that the barrier "deter

illegal crossings" would be lacking. *See* Pls.' Stmt. ¶¶ 36-37. Either way, one of the subsection 102(a) requirements must inherently be absent and the waivers *ultra vires*.

The Government's attempt to side-step this fatal flaw is unpersuasive. The waivers and the Government's prior briefing rely solely on sector-wide statistics. *See* 82 Fed. Reg. at 35,984; *id. at* 42,380; Doc. #18 at 27. These are massive sectors, however, with opportunities for crossings in varying levels of difficulty. The San Diego Sector's operational area includes 60 miles of land border with Mexico, 114 miles of costal border, and encompasses 56,830 square miles. Pls.' Stmt. ¶ 5. The El Centro Sector is responsible for 70 miles of land border and covers 107,750 square miles. *Id.* ¶ 7. To facilitate Border Patrol's ability to manage such large areas, these sectors are broken down into smaller subunits of stations and geographic zones. *Id.* ¶¶ 5-7. Illegal entry into San Diego 39 border zones or El Centro's 50 border zones is not uniform, yet the Secretaries have declared all 164,000 square miles in these sectors to be areas of high illegal entry. The sector-wide statistics, therefore, are not an appropriate measure for projects that are addressing specific segments of the border area, especially since Congress focused on closing specific points of illegal entry in enacting section 102.

### 2. The San Diego prototype project will not deter illegal crossing and falls outside of section 102's grant of authority.

The border wall prototypes project—to evaluate various design features for potential inclusion in a border wall going forward—is similarly well outside the scope of section 102 as it has no direct deterrent effect whatsoever.[6] Adopting the Secretary's interpretation of subsection 102(a), which allows any actions that might indirectly benefit future barrier design qualifies for a waiver, nullifies any limits to section 102. Under this logic, the Secretary could issue a waiver covering Glacier National Park along the U.S-

---

[6] Media footage of the already complete prototype project demonstrates as much. *See* Jennifer Medina, *Eight Ways to Build a Border Wall*, N.Y. Times, Nov. 8, 2017, https://nyti.ms/2j8STIR (showing major gaps between each model, none of which were built directly on the borderline).

Canadian border, to build prototype walls if she believes that would facilitate evaluation of future barrier design. Yet, that is clearly inconsistent with section 102's intent based on the statutory text when read as a whole.

Under the Government's view, moreover, that action would be both appropriate and also beyond judicial review, leaving no legal mechanism for preventing the Secretary from carrying out such a plan. That logical implication of the Government's position demonstrates the waivers here far exceed any statutory mandate, and are therefore *ultra vires*.

### 3. The waivers are also *ultra vires* because they are not "necessary to ensure expeditious construction" as required by section 102(c).

Section 102's waiver provision is expressly limited to situations in which a waiver of laws is "*necessary* to ensure *expeditious* construction of the barriers and roads under this section." IIRIRA § 102(c)(1). Yet, the waivers here fail to provide any basis to support that conclusion and merely parrot the statutory language. *See* 82 Fed. Reg. at 35,985; *id.* at 42,830. The Secretary's failure to provide any information or basis to support her conclusion that these waivers were necessary makes them *ultra vires* and beyond the scope of authority granted her by Congress.

### 4. The Secretary's waivers are *ultra vires* because section 102's grant of authority was limited to the construction activities specifically mandated by Congress.

When section 102 is construed as a whole, these projects also fall outside of the limits of the waiver authority because Congress did not intent subsection 102(c) to apply projects beyond those specifically mandated in the 1996, 2005, 2006, and 2008 Acts. *Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936, 940-41 (9th Cir. 2017) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, *and the broader context of the statute as a whole*.") (emphasis added) (quoting *Geo–Energy Partners–1983 Ltd. v. Salazar*, 613 F.3d 946, 956 (9th Cir. 2010)).

1   Several features of section 102 make this conclusion evident. First, the grant of

2   authority in section 102 turns on a showing of necessity. Subsection 102(a), for example,

3   authorizes actions *necessary* to install *additional* barriers to deter illegal crossings in

4   areas of high illegal entry. In subsection 102(c), the waiver provision's scope is limited to

5   waivers that are *necessary* to ensure *expeditious* construction of those additional barriers.

6   Subsection 102(b), in turn, provides the context as to what Congress meant both by

7   additional barriers and by necessity. In subsection 102(b)(1), Congress expressly

8   mandated that the Secretary take all necessary steps to "gain operational control of the

9   southwest border," and to do so by completing construction of fencing in "priority areas"

10   by "not later than December 31, 2008." IIRIRA § 102(b)(1)(A) & (B). It is these "priority

11   areas" that would allow the Secretary to achieve "operational control" of the southwest

12   border by the end of 2008, thus making expeditious construction "necessary." *See* Pls.'

13   Stmt. ¶¶ 6, 7.

14   Along these line, a judge in this District construing this language concluded that

15   "the 'barriers and roads' alluded to" in subection 102(c) are "the Triple Fence project

16   located along the U.S.-Mexico border in the vicinity of San Diego," *Sierra Club*, 2005

17   U.S. Dist. LEXIS 44244, at *19, which were those mandated in subsection 102(b) at the

18   time. This analysis was central to Judge Burn's determination that the delegation of

19   authority was specifically limited because the waiver went only to the "completion of this

20   particular 14-mile California border Triple Fence authorized by IIRIRA, and only upon

21   the Secretary making a determination of necessity. The delegation is restricted to *waiver*

22   of laws solely in the context of construction of this Triple Fence, not their 'repeal.'" *Id.* at

23   *21 (emphasis in original). Citing to the Government's brief to support this narrow

24   construction, Judge Burns adopted the position that "the sole purpose for the Waiver"

25   was to terminate the litigation at issue. *Id.* (citing Defs.' Br. at 11:2-4). Again, quoting the

26   Government, the court found that "Congress enacted (and amended) the Waiver

27   Legislation to permit the Secretary to *expedite* construction of *this fence* by removing

28

certain legal impediments that presented an obstacle." *Sierra Club*, No. 04-cv-272-LAB, Defs.' Br., ECF No. 36 at 15:3-8 (emphasis supplied by the Government).

The legislative history of section 102 further supports this plain reading. To that end, the 1996 Act largely focused on constructing reinforced, second, and third fences in the 14-mile section of the border near San Diego. Congress, for example, required the Attorney General to "promptly acquire such easements as may be necessary" to complete that mandate. Pub. L. No. 104-208, div. C, § 102(b)(2). Thus, Congress authorized the Attorney General to waive the provisions of the Endangered Species Act and National Environmental Policy Act, if necessary, "to ensure expeditious construction of the barriers and roads under this section." *Id.* at § 102(c).

The fact that this 14-mile stretch of additional fencing had not been completed, despite the mandate, led supporters of the REAL ID Act of 2005 to expand the scope of the section 102(c) waiver to complete the Triple Fence project as previously mandated in 1996. *See*, *e.g.*, 6 U.S.C. § 256 ("It is the sense of the Congress that completing the 14-mile border fence project required to be carried out under section 102(b) of the [IIRIRA of 1996] should be a priority for the Secretary.") As the sponsor of the bill, Rep. Sensenbrenner stated: "[T]he REAL ID Act will waive Federal laws *to the extent necessary to complete gaps in the San Diego border security fence which is still stymied 8 years after congressional authorization*." 151 Cong. Rec. H453-04 atH454 (Feb. 9, 2005) (emphasis added).

Many proponents of the REAL ID Act shared this narrow understanding of the waiver and assured the bill's opponents the new 102(c)(1) authority would not be overly broad. *Compare*, *e.g.*, 151 Cong. Rec. E243-03 at E243 (Feb. 15, 2005) (statement of Rep. Udall) (expressing concern about the overbreadth of the waiver authority), *with*, *e.g.,* 151 Cong. Rec. H453-04 at H471 (Feb. 9, 2005) (statement of Rep. Hoekstra) ("H.R. 418 provides the Secretary . . . with authority to waive environmental laws, so that the border fence running 14 miles east from the Pacific Ocean at San Diego may finally be completed."); *id.* (statement of Rep. Bono) ("The San Diego fence is a project that was

started several years ago, but a 3.5-mile section of the fence was not completed due to environmental concerns. . . . This legislation puts those priorities front and center . . ."); *id.* at H457 (statement of Rep. Lungren) ("H.R. 418 will remove the impediments to completing the fence along the San Diego corridor of our southern border.").

Some opponents of the new waiver authority shared this view that it was limited to completing the San Diego fence. Rep. Hastings, for example, stated:

> H.R. 418 also allows the Secretary of Homeland Security to waive all laws necessary *for the construction of the San Diego border wall*. None of us are of a mind to believe that the completion of the 3-mile gap in that wall should not be undertaken.

151 Cong. Rec. H527-03 at H529 (Feb. 10, 2005) (emphasis added). An exchange between two California representatives on competing sides of the issue further confirms that "completing the 3 1/2 miles of border fencing" was "the issue driving this extreme [waiver] language." 151 Cong. Rec. H536-03 at H557 (Feb. 10, 2005).

The Congressional Budget Office's estimate of the impact of H.R. 418 was also based on a narrow understanding of the scope of the waiver authority.

> [IIRIRA] provided for the construction of a series of roads and fences along the U.S.-Mexico border near San Diego to deter entry of illegal immigrants. All but about three miles of this barrier have been completed. Since February 2004, completion of the barrier has been delayed because of environmental conflicts with the Coastal Zone Management Act (CZMA). H.R. 418 would permit DHS to waive this act and any other laws as necessary to complete construction of the barrier.

Congressional Budget Office, Cost Estimate, H.R. 418 – REAL ID Act, *as appearing in* 151 Cong. Rec. H437-02 at H438 (Feb. 9, 2005). In interpreting the waiver provision, the CBO concluded it would not impose significant additional costs because it merely authorized

> the Secretary of the Department of Homeland Security to waive any laws necessary *to complete construction of a physical barrier between the United States and Mexico near San Diego, California*, and prohibit any court from having jurisdiction to hear claims or ordering relief for damage resulting from the waiver of such laws. This provision would preempt state authority.

1   *Id.* (emphasis added).

2       This legislative history confirms the plain reading of section 102 as a whole: the

3   waiver power means what it says by being limited to only those projects that were

4   "necessary" in 2005, 2006, and 2008 to complete the "priority areas" and allow the

5   Secretary to gain "operational control." Congress did not intend to give future Secretary's

6   authority to waive all laws (federal, state, and local) for projects that could not be

7   envisioned a decade ago.

8   **III.   THE BROAD AND UNBRIDLED GRANT OF WAIVER AUTHORITY IN SECTION 102**
    **VIOLATES THE NON-DELEGATION DOCTRINE AS DEMONSTRATED BY**
9   **DEFENDANTS ATTEMPT TO USE IT FOR PURELY POLITICAL OBJECTIVES.**

10      As explained above, the scope of section 102's authority is limited to situations

11  where "expeditious" construction of "additional" barriers are actually "necessary to deter

12  illegal crossings in areas of high illegal entry." Because the waivers here fail that test,

13  they violate the Administrative Procedures Act and are *ultra vires* actions. To avoid that

14  conclusion, however, the Government argues for an interpretation of section 102's

15  authority that is essentially without limit. Under the Government's view, Congress has

16  provided the Secretary with unfettered, and unreviewable discretion to waive any and all

17  laws for a project even the very conditions precedent for the exercise of that authority

18  contained in section 102 itself. If that interpretation is accepted, then section 102 violates

19  the Constitution's non-delegation doctrine under longstanding Supreme Court precedent.

20      Separation of powers between the three coordinate branches of our federal

21  government is a fundamental cornerstone of our democratic system of governance. A

22  component of separation of powers is the non-delegation doctrine, which protects the

23  partition of authority between the legislative and executive branches. Under Article I of

24  the Constitution, "[a]ll legislative powers herein granted shall be vested in a Congress of

25  the United States." U.S. Const. art I, § 1. As shown below, in its adoption and repeated

26  amendments of IIRIRA's section 102, Congress improperly delegated undefined and

27  open-ended power to the Secretary of DHS in violation of the non-delegation doctrine.

28

As described above, the waivers at issue here relate to unauthorized "prototypes," "replacement" and "improvement" projects and other ambiguous work not contemplated in section 102. That the Government asserts the Secretary has authority to proceed with the projects demonstrates that, under the Government's interpretation of section 102, the law runs afoul of the non-delegation doctrine's requirement that the Executive carry out work that adheres to the direction provided by Congress. As the Supreme Court described the requirement, to pass muster, legislation must articulate "an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). To assess whether an Executive agency is operating under an intelligible principle, Congress is required to clearly define its delegation by describing (1) the general policy to be achieved, (2) the public agency to implement it, and (3) the boundaries of the delegated authority. *Id.* at 372-73.

*Mistretta* upheld the constitutionality of Congress's creation of the federal Sentencing Commission under the 1984 Sentencing Reform Act. Under the statute, the Commission was directed to create sentencing guidelines for various categories of offenses and defendants, with judicial review limited to appeals of sentences outside of, or incorrectly applying to, the guidelines' ranges of imprisonment. 488 U.S. at 367-68. Importantly, the *Mistretta* Court took great care distinguishing the three elements of the test and the substance of the authorization itself. The Court focused on the fact that the legislation created multiple goals and purposes to articulate sentencing policy, such as to effectuate certainty and fairness in sentencing, to avoid unwarranted disparities among similarly situated defendants, to maintain flexibility for individualized sentences, and to provide needed correctional treatment. *Id.* at 374. Congress also "prescribed the specific tool—the guidelines system—for the Commission to use in regulating sentencing," which represents the substance of the authorization. *Id.*

In addition, the Court pointed to two sets of seven and eleven factors Congress had provided to "guide the Commission in its formulation of offense categories." *Mistretta*,

488 U.S. at 375. The numerous agency constraints represented the boundaries of the delegated authority, so that the Commission's discretion was limited by the grade of the offense, nature and degree of harm, and the offender's age, education, or mental and emotional condition. *Id.* at 374-76. Congress even provided explicit limits on the range of minimum and maximum sentences, which effectively (and in the case of statutory range limits, literally) act as additional boundaries in developing just sentences. *Id.* Such clearly delineated policies and boundaries satisfied the Court in *Mistretta* by providing an intelligible principle, distinct from the authorization itself, to guide and circumscribe an agency's implementation of that authorization.

Applying the three prongs of *Mistretta*, the Government can only point with clarity to the second element – the public agency applying the legislation. In 2008, Congress amended section 102 and replaced the Attorney General with the Secretary of Homeland Security. Pub. L. No. 110-161, Div. E, Title V, § 564(a). This is the only aspect of IIRIRA that comports with *Mistretta*.

Section 102 authorizes two actions: to "install additional physical barriers and roads . . . in areas of high illegal entry into the United States" and to "waive all legal requirements" in support of such construction. IIRIRA § 102(a), (c). These represent the entire substance of the delegated legislative authority. A meaningful application of *Mistretta* shows Congress failed to provide any specific general policies or boundaries to constitute an intelligible principle for installing physical barriers along the southern border. See *Mistretta*, 488 U.S. at 372–373 (finding constitutional question satisfied when Congress, through the statute, "clearly delineates" among the three requisite elements).

To start, section 102(a) provides no general policy guidance by which this Court can assess *Mistretta*'s first prong. In fact, earlier district courts, heavily relied upon by the Government, could not agree on which language might serve as IIRIRA's general policy. For example, the court in *Sierra Club v. Ashcroft* found that "improvement of U.S. border protection is the clearly delineated general policy." 2005 U.S. Dist. LEXIS 44244, at *20.

However, the *Defenders of Wildlife v. Chertoff* court found the policy to be "to expeditiously install additional physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry," 527 F. Supp. 2d at 127. These are not mere differences in semantics. While *Sierra Club* established a general policy of improving border protection, however vague, *Defenders of Wildlife* conflated the policy of the authorization with the authorization itself.

A stated policy of installing physical barriers cannot be the substantive guide to waiving laws for installing such physical barriers. The waiver provision was not amended after the *Sierra Club* decision, yet other courts repeated the same circular error made by *Defenders of Wildlife*. *See City of El Paso v. Chertoff*, No. EP-08-CA-196-FM, 2008 U.S. Dist. LEXIS 83045, at *11 (W.D. Tex. Aug. 29, 2008); *Save Our Heritage Org. v. Gonzales*, 533 F. Supp. 2d 58, 63 (D.D.C. 2008). When courts cannot identify a common statutory policy goal, and the policy some did point to was incorrect, the statutory scheme cannot survive *Mistretta* scrutiny.

Nor can section 102 satisfy the third element of *Mistretta*: discernable boundaries of delegated authority. 488 U.S. at 372-73. The Government's proffered interpretation of the statute, and the waiver provision in particular, provides no substantive boundaries as to which laws should be waived under what conditions or when. Arguably, section 102(c) by its terms established the boundaries of the waiver authority as those laws the Secretary "determines necessary to ensure expeditious construction of the barriers and roads under this section." But the waivers here effectively read out any limiting force to this language. Such a reading would provide "virtually unfettered" discretion to the Executive in this way would undermine the separation of power principle accurately described in *Panama Refining Co. v. Ryan*, 293 U.S. 388, 416 (1935) ("Congress left the matter to the President without standard or rule, to be dealt with as he pleased.")

The earlier district courts also tried to establish the boundaries set out in section 102, per *Mistretta*'s second prong, but there they could not agree either. The *Sierra Club* court found the boundary to be the "waiver of laws and regulations which the DHS

Secretary determines impede completion of this particular 14-mile California border Triple Fence authorized by IIRIRA." 2005 U.S. Dist. LEXIS 44244, at *20-21 (emphasis in original) (citing the Secure Fence Act of 2006, Pub. L. No. 109-367, § 3). Contrast that with *Defenders of Wildlife* which held the boundary to be "Congress's requirement that the Secretary may waive only those laws that he determines necessary to ensure expeditious construction." 527 F. Supp. 2d at 127. It seems the *Sierra Club* court aimed to establish an actual physical boundary, which has since expired; yet, both decisions are circularly rooted in the construction of the authorization itself, and provide no intelligible boundaries concerning which laws the DHS Secretary may waive under what circumstances. Emphatically, the "expeditious construction of barriers and roads" cannot serve as the Congressional boundary which defines and guides DHS's act of "expeditious construction of barriers and roads."

Also in some of the earlier cases, the plaintiffs asked the district courts to invalidate section 102 based on the scope of the waiver authority, *i.e.*, the sheer number of laws that could be waived, rather than assessing whether the policies and boundaries Congress articulated in section 102 were clearly delineated as an intelligible principle under *Mistretta. Cty. of El Paso*, 2008 U.S. Dist. LEXIS 83045, at *9–13; *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *17-19; *Defenders of Wildlife*, 527 F. Supp. 2d at 128-29. Plaintiffs here do not challenge section 102 on that ground, so that aspects of the holdings are irrelevant to the instant case.

Next, Defendants, like the district courts cited herein, hope to show a successfully bounded scope of discretion for any statute that included the word "necessary." Doc. #18-1 at 35. For example, compare the waiver authority in IIRIRA, "necessary to ensure expeditious construction of barriers and roads" to the Controlled Substances Act's "necessary to avoid an imminent hazard to the public safety." *Touby v. United States*, 500 U.S. 160, 163 citing 21 U.S.C. § 811(h). The similarities of the two legislative approaches cease with the use of the word "necessary," however. In *Touby*, the Court upheld an amendment to the Controlled Substance Act because Congress had made clear

1   it was allowing the Attorney General to temporarily schedule a controlled substance, for a

2   limited time to combat an emerging problem with illegal designer drugs. 500 U.S. at 163

3   (emphasis added). Still, even under the temporary authority, the Attorney General was

4   required to consider three of the eight codified factors for permanent scheduling. *Id.* And,

5   based on the limited procedural requirements, Congress only allowed the Drug

6   Enforcement Agency's temporary scheduling order to be valid for one year, during which

7   time the agency could initiate a permanent scheduling order in full compliance with the

8   Controlled Substances Act and the Administrative Procedures Act. *Id.* at 164.

9        In contrast, the only substantive limit to the waiver power in section 102(c) is the

10   number of laws the Secretary decides might be standing in his or her way. Even

11   Defendants' brief can do no better than asserting "the waiver authority is limited to

12   construction along the border for which a necessary determination has been made. Doc.

13   #18-1 at 35:4-16. Defendants want this Court to find that the occurrence of the word

14   "necessary" serves as a sufficient boundary for purposes of Constitutional separation of

15   powers. Under the delegation doctrine's well-settled principles, this cannot be.

16        Finally, Defendants and earlier district courts emphasized the fact that this

17   delegation of authority concerned issues of border control and national security. Doc.

18   #18-1 at 35-36; *see also, e.g., Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *22. The

19   Sierra Club decision distinguished the IIRIRA waivers from other Supreme Court

20   precedent on grounds that the Executive Branch is afforded immense deference on

21   matters of foreign affairs. *Id.* at *25 (*citing Panama Refining*, supra, and *A.L.A. Schechter*

22   *Poultry Corp. v. United States*, 295 U.S. 495 (1935). Significantly, however, the Supreme

23   Court recently limited the deference afforded to the President in matters of foreign

24   relations. *Zivotofsky v. Kerry*, 135 S.Ct. 2076, 2089-90 (2015).

25        *Zivotofsky* concerned the President's power to recognize foreign states and their

26   borders and capitals. While the Court found that power plenary and independent from

27   Congressional interference, it also squarely addressed years of unclear precedent

28   (particularly *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936))

regarding the President's general foreign affairs authority. *Zivotofsky*, 135 S.Ct. at 2084-90. The Supreme Court expressly "decline[d] to acknowledge that unbounded power" and ruled that prior precedent did not hold that "the President is free from Congress' lawmaking power in the field of international relations." *Id.* at 2089–90. Instead, "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law," and "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Id*. at 2090.

Other courts have followed this approach, explicitly questioning unrestrained deferential treatment earlier cases presumed in matters of foreign affairs: "When confronting a statutory question touching on subjects of national security and foreign affairs, a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 821-29 (9th Cir. 2017) (applying federal statutes to construction of a military base overseas); *Tinian Women Ass'n v. U.S. Dep't of the Navy*, No. 16-cv-00022, 2017 U.S. Dist. LEXIS 170080, at *31-48 (D.N. Mar. I. Oct. 13, 2017) (applying federal statutes to relocation of marines among overseas military bases); *Conservation Council for Haw. v. Nat'l Marine Fisheries Serv*., 97 F. Supp. 3d 1210, 1220-38 (D. Haw. 2015) (applying federal statutes to Naval sonar testing offshore). This Court should afford no weight to this aspect of Defendants' arguments and the prior district court cases, because the cited precedent has been sharply curtailed.

To conclude, illustrative of what can happen when Congress fails to provide adequate policy guidance to Executive agencies is the two DHS waivers at issue in this case. With little more to go on than "install additional physical barriers and roads" in "areas of high illegal entry into the United States," the Government hopes to greatly exceed that directive by waiving legal oversight for replacement and improvement projects, prototypes of barriers, along with open-ended "upkeep" and "supporting" projects. Defendants' proposed work, which would be exempt from federal law, has unlawfully strayed from Congress's scant directive of "expeditious construction of

barriers and roads." (emphasis added.) Through three amendments over twelve years, the section 102 waiver authority has always pertained to the construction of "additional" fencing and physical barriers. IIRIRA has never contemplated replacement work or construction of prototypes DHS now proposes. Nor is there any showing this work would be undertaken in areas of high illegal entry. Pls.' Stmt. ¶¶ 13-20. When Congress fails to provide clear policy goals and defined boundaries of its intended delegated authority, *i.e*., no overarching intelligible principle, agency overreach in inevitable. Granting this motion would stop such unlawful overreach.

## IV. THE WAIVER AUTHORITY—IF DEEMED TO AUTHORIZE THE PROJECTS AT ISSUE—VIOLATES THE PRESENTMENT CLAUSE BY ALLOWING THE SECRETARY TO ENGAGING IN LEGISLATIVE REPEALS.

Subection 102(c)(2)'s waiver provision also runs afoul of the Presentment Clause because it effectively grants a broad power of repeal to the Secretary. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (holding line-item veto power violated the presentment clause because "[i]n both legal and practical effect, the President has amended two Acts of Congress by repealing a portion of each," just as the Secretary has done here with regard to *dozens* of Acts of Congress). The Coalition Plaintiffs' adopt and incorporate the arguments made on this point by the State of California and Center for Biological Diversity without burdening the Court with unnecessary repetition.

## V. THE JURISDICTIONAL STRIPPING PROVISION IS UNCONSTITUTIONAL UNDER SEPARATION OF POWERS AND FEDERALISM GROUNDS.

### A. Without inherent ultra vires jurisdiction, section 102(c)(2) would run afoul of fundamental separation of powers protections.

The Government has taken the position in this case that "all non-constitutional claims are barred" under section 102(c)(2)'s jurisdictional stripping provision. Doc. #18-1 at 12; *see also id.* at 13 ("The only avenue for challenging agency action here is a constitutional claim."). While this view is wrong because this Court retains its inherent *ultra vires* jurisdiction, *see* discussion *supra* § 2, the Government's interpretation would

render section 102(c)(2) unconstitutional.[7] Indeed, the *ultra vires* cases rest on a recognition of the fundamental constitutional problem that would otherwise arise if *all* judicial review were eliminated to challenge actions that exceed Congressional authority.

> **B.   Congress lacks the power to eliminate the concurrent jurisdiction of state courts *unless* it vests that power in an inferior federal court.**

Section 102 is not just remarkable in the unbridled (and impermissible) delegation of authority granted to the Secretary to waive vital federal (as well as state and local) laws, it is also remarkable with regard to the hurdles its drafters inserted in an attempt to prevent judicial review of such waivers. While Congress is empowered to establish or eliminate "inferior [federal] Courts" under Article III, § 1, that is not what subsection 102(c)(2) seeks to accomplish. Rather, this provision seeks to unwind the Madisonian Compromise that forms the basis for the *concurrent* judicial power of state and federal courts that provides a bedrock to the Constitution. "This so-called Madisonian Compromise bridged the divide 'between those who thought that the establishment of lower federal courts should be constitutionally mandatory and those who thought there should be no federal courts at all except for a Supreme Court with, *inter alia*, appellate jurisdiction to review state court judgments.'" *Haywood v. Drown*, 556 U.S. 729, 745-46 (2009) (Thomas, J., dissenting) (quotation omitted). "The assumption that state courts would continue to exercise concurrent jurisdiction over federal claims was essential to this compromise." *Id.* (citation omitted).

This fundamental problem with section 102(c)(2) was known to Congress. A legal analysis of the jurisdictional stripping provision recognized that the wresting of concurrent jurisdiction from the state courts was a novel—and potentially fatal—aspect of the law. *See* 151 Cong. Rec. H536-03 at H557 (Feb. 10, 2005) (recognizing that "an

---

[7] Conversely, if this Court correctly determines the waivers are void under its *ultra vires* jurisdiction, then there is no need to reach these constitutional issues. *See, e.g., Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 816-17 (9th Cir. 2016) (discussing the constitutional avoidance doctrine).

argument can be made that Congress does not possess the authority to regulate the jurisdiction of state courts directly," as state courts are "independent and autonomous from the federal court system" and broadly vested with concurrent jurisdiction).

Put simply, Congress has the authority to vest exclusive jurisdiction in a federal court (thereby removing concurrent judicial power from the state courts), and the power to remove judicial power from the federal courts (thereby leaving that judicial power solely to the state courts). But Congress does *not* have the authority to remove the judicial power from *both* the state and federal courts by vesting "exclusive jurisdiction" over issues into a federal court only then to also remove that judicial power from the very federal court it just vested with that power. *Cf. Healy v. Ratta*, 292 U.S. 263, 270 (1934). Yet that is precisely what section 102(c)(2) impermissibly seeks to accomplish, which renders it unconstitutional.

### C.   Subsection 102(c)(2) violates the Coalition Plaintiffs' due process rights and impairs their First Amendment right to petition the government.

Subsection 102(c)(2) also unconstitutionally deprives the Coalition Plaintiffs of their due process rights and impairs their First Amendment right to petition the government. In striking down a legal funding statute that restricted the ability of government-provided attorneys to raise certain arguments, the Supreme Court has recognized that "[t]he restriction imposed by the statute here threatens severe impairment of the judicial function," by removing arguments regarding "questions of statutory validity and constitutional authority," which created "[a] scheme so inconsistent with accepted separation-of-powers principles" that it could not withstand scrutiny under the First Amendment's freedom of speech. *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 546 (2001). Importantly, the Court also recognized Congress's intent was "designed to insulate the Government's interpretation of the Constitution from judicial challenge. The Constitution does not permit the Government to confine litigants and their attorneys in this manner." *Id.* at 548-49. Similarly, the Coalition Plaintiffs' property and liberty interests in ensuring environmental laws and interests are protected cannot be removed

without fair procedures, and, under the Government's interpretation, section 102(c)(2) removes *any* procedure that would protect those interest from arbitrary and capricious conduct by the Secretary. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

## CONCLUSION

In sum, for all the foregoing reasons and those contained in the briefs filed by the State of California and Center for Biological Diversity, Defendants' conduct here is unauthorized, unconstitutional, and void, and this Court is well within its judicial authority to declare precisely that and invalidate the waivers at issue here by granting the Coalition Plaintiffs summary judgment.

DATED: November 22, 2017                    Respectfully submitted,

                                            s/ Gloria D. Smith

                                            Gloria D. Smith (CA No. 200824)
                                            SIERRA CLUB
                                            2101 Webster Street, Suite 1300
                                            Oakland, CA 94612
                                            Telephone: (415) 977-5532
                                            gloria.smith@sierraclub.org

                                            *Attorney for Plaintiff Sierra Club*

                                            Brett M. Paben (FL No. 0416045)
                                            DEFENDERS OF WILDLIFE
                                            535 16th Street
                                            Denver, CO 80202
                                            Telephone: (720) 943-0457
                                            bpaben@defenders.org
                                            *Pro hac vice*

                                            *Attorney for Plaintiff Defenders of Wildlife*

                                            Anthony T. Eliseuson (IL No. 6277472)
                                            ANIMAL LEGAL DEFENSE FUND

1755 W. Roscoe Street, Unit 3
Chicago, Illinois 60657
Telephone: (707) 795-2533
aeliseuson@aldf.org
*Pro hac vice*

Sarah K. Hanneken (OR No. 165104)
ANIMAL LEGAL DEFENSE FUND
919 SW Taylor Street, #400
Portland, OR 97205
Telephone: (707) 795-2533
shanneken@aldf.org
*Pro hac vice*

*Attorneys for Plaintiff*
*Animal Legal Defense Fund*