XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
Senior Assistant Attorney General
TIMOTHY R. PATTERSON (SBN 72209)
MICHAEL P. CAYABAN (SBN 179252)
DAVID G. ALDERSON (SBN 231597)
Supervising Deputy Attorneys General
JOHN APPELBAUM (SBN 149643)
NOAH GOLDEN-KRASNER (SBN 217556)
JANELLE M. SMITH (SBN 231801)
AMIE MEDLEY (SBN 266586)
BAINE P. KERR (SBN 265894)
JULIA FORGIE (SBN 304701)
JESSICA BARCLAY STROBEL (SBN 280361)
Deputy Attorneys General
600 West Broadway, Suite 1800
San Diego, California 92101
Telephone: (619) 738-9313
Fax: (619) 645-2271
E-mail: Mike.Cayaban@doj.ca.gov
*Attorneys for the People of the State of
California, by and through Xavier Becerra,
Attorney General, and the California Coastal
Commission*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE:  BORDER INFRASTRUCTURE ENVIRONMENTAL LITIGATION,** | Case No. 17cv1215-GPC(WVG) |
| | Consolidated with<br>Case No. 17-cv-01873-GPC-WVG<br>Case No. 17-cv-01911-GPC-WVG |
| | **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY PLAINTIFFS PEOPLE OF THE STATE OF CALIFORNIA AND THE CALIFORNIA COASTAL COMMISSION** |
| | Date:           February 9, 2018<br>Time:           1:30 p.m.<br>Courtroom:  2D<br>Judge:          The Honorable Gonzalo P. Curiel |
| | Trial Date:     None Set<br>Action Filed:  September 20, 20 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .............................................................................. 3

    A.    Illegal Entries Plummeted Long Ago at the Southwest Border .............................................................................................. 4

    B.    Personnel and Infrastructure Have Ballooned in the San Diego and El Centro Sectors ................................................... 4

    C.    The Sites for the Border Wall Projects Are No Longer High Priority ............................................................................ 5

        1.    The San Diego Sector and the San Diego Waiver .......... 6

        2.    The El Centro Sector and the Calexico Waiver ............. 8

LEGISLATIVE HISTORY OF SECTION 102 AND DHS'S USE OF WAIVERS BEFORE DECEMBER 31, 2008 ................................................. 8

JURISDICTION OF THIS DISTRICT COURT ...................................... 12

CALIFORNIA HAS ARTICLE III STANDING .................................... 13

ARGUMENT ..................................................................................................... 14

    I.    Standard of Review on Summary Judgment ...................... 14

    II.    It is Undisputed That Defendants Violated NEPA, the CZMA and the APA (First and Second Claims) .................................. 14

    III.    Nothing in Section 102 Authorizes the Border Wall Projects (Third Claim) ............................................................................ 16

        A.    Section 102 Is Inapplicable Because the San Diego and Calexico Projects Are Not Located in "Areas of High Illegal Entry" ................................................................. 16

        B.    Section 102 Permits Only the Installation of "Additional" Barriers and Roads, Not the Replacement of Existing Fences ........................................................................... 18

        C.    Defendants Exceeded Their Statutory Authority by Constructing Fencing in Areas Where the Barriers Would Not Be "Most Practical or Effective" ................................. 20

        D.    Because Defendants Lack Authority to Build the Border Wall Projects, the 2017 Waivers Are Invalid ...................... 21

    IV.    The 2017 Waivers Are Invalid Because the Waiver Authority Expired On December 31, 2008 (Fourth Claim) ....................... 21

    V.    Defendants Exceeded Their Statutory Authority in Issuing the 2017 Waivers By Making No Findings (Fifth Claim) ................ 23

    VI.    The 2017 Waivers Interfere with California's Equal Sovereignty and Police Powers In Violation of the Tenth Amendment's Federalism Principles (Eleventh Claim) ............ 24

i

# TABLE OF CONTENTS
(continued)

Page

VII.  Section 102(c)'s Procedural Hurdles and the Vague 2017 Waivers Violate California's Article III and Due Process Rights (Sixth Claim)................................................................28

VIII.  The 2017 Waivers Violate the Separation of Powers Doctrine (Seventh Claim)..............................................30

IX.  Section 102(c) and the 2017 Waivers Violate the Non-Delegation Doctrine (Eighth Claim)...............................32

    A.  The Section 102(c) Waiver Provision Lacks a Sufficient Intelligible Principle ..............................33

    B.  The Lack of Judicial Review Violates the Non-Delegation Doctrine ................................................34

X.  Section 102(c) and the 2017 Waivers Violate Article I, Section 3, of the United States Constitution (Ninth Claim)............35

XI.  Section 102(c) and the 2017 Waivers Violate the Presentment Clause (Art. I, Section 7) (Tenth Claim) ...........................37

CONCLUSION...........................................................................40

ii

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

# TABLE OF AUTHORITIES

**Page**

CASES

*A.L.A. Schechter Poultry Corp. v. United States*
  295 U.S. 495 (1935) ...............................................................32, 34, 35

*Am. Power & Light Co. v. SEC*
  329 U.S. 90, 106 (1946) .................................................................. 34

*Amalgamated Meat Cutters and Butcher Workmen v. Connally*
  337 F.Supp. 737 (D.D.C. 1971) .......................................................33, 34

*BE & K Const. Co. v. NLRB*
  536 U.S. 516 (2002) ........................................................................ 30

*Berger v. United States*
  295 U.S. 78 (1935) .......................................................................... 36

*Bond v. United States*
  134 S. Ct. 2077 (2014) ................................................................... 27

*Bowsher v. Synar*
  478 U.S. 714 (1986) ....................................................................... 31

*Buckley v. Valeo*
  424 U.S. 1 (1976) ........................................................................... 31

*California v. Norton*
  311 F.3d 1162 (9th Cir. 2002) .......................................................... 15

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) ....................................................................... 14

*City of Boerne v. Flores*
  521 U.S. 507 (1997) ....................................................................25, 27

*Clinton v. New York*
  524 U.S. 417 (1988) ...........................................................31, 37, 38, 39

*Commodity Futures Trading Comm. v. Schor*
  478 U.S. 833 (1986) ....................................................................... 30

iii

## **TABLE OF AUTHORITIES**
### (continued)

**Page**

*County of El Paso v. Chertoff*
   No. EP-08-CA-196-FM, 2008 WL 4372693 (W.D. Tex. 2008) ........................ 33

*Defenders of Wildlife v. Chertoff*
   527 F. Supp. 2d 119 (D.D.C. 2007) ......................................................... 33, 34, 39

*Dennis v. Sparks*
   449 U.S. 24 (1980) ................................................................................. 35, 36

*Dickson v. Sec'y. of Def.*
   68 F.3d 1396 (D.C. Cir. 1995) ..................................................................... 24

*Duncan v. Walker*
   533 U.S. 167 (2001) ...................................................................................... 23

*FCC v. Fox Television Stations, Inc.*
   567 U.S. 239 (2012) ...................................................................................... 28

*Field v. Clark*
   143 U.S. 649 (1892) ................................................................... 31, 32, 37, 38

*Flores-Miramontes v. INS*
   212 F.3d 1133 (9th Cir. 2000) ................................................................. 12, 27

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*
   528 U.S. 167 (2000) ...................................................................................... 13

*Gonzales v. Oregon*
   546 U.S. 243 (2006) ................................................................................. 23, 27

*Ex Parte Grossman*
   267 U.S. 87 (1925) ........................................................................................ 36

*Gutierrez v. Holder*
   662 F.3d 1083 (9th Cir. 2011) ...................................................................... 12

*Hartford Cas. Ins. Co. v. FDIC*
   21 F.3d 696 (5th Cir. 1994) ......................................................................... 30

*Humphrey v. Baker*
   848 F.2d 211 (D.D.C. 1988) ........................................................................ 35

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Workers' Compensation Refund*
   46 F.3d 813 (8th Cir. 1995) ............................................................. 30

*INS v. Chadha*
   462 U.S. 919 (1983) ............................................................. 31, 37

*J.W. Hampton, Jr. & Co. v. United States*
   276 U.S. 394 (1928) ............................................................. 31, 32

*La. Pub. Serv. Comm'n v. FCC*
   476 U.S. 355 (1986) ............................................................. 12

*Leedom v. Kyne*
   358 U.S. 184 (1958) ............................................................. 13

*Loving v. United States*
   517 U.S. 748 (1996) ............................................................. 32

*Marbury v. Madison*
   5 U.S. 137 (1803) ............................................................. 36

*Massachusetts v. EPA*
   549 U.S. 497 (2007) ............................................................. 13

*McNeill v. United States*
   563 U.S. 816 (2011) ............................................................. 19

*Mistretta v. United States*
   488 U.S. 361 (1989) ............................................................. 30, 31

*O'Shea v. Littleton*
   414 U.S. 488 (1974) ............................................................. 35

*Organized Village of Kake v. United States Dep't of Agric.*
   795 F.3d 956 (9th Cir. 2015) ............................................................. 23

*Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.*
   827 F.3d 1203 (9th Cir. 2016) ............................................................. 13

*Pazcoguin v. Radcliffe*
   292 F.3d 1209 (9th Cir. 2002) ............................................................. 12

v

**TABLE OF AUTHORITIES**
(continued)

Page

*Robertson v. Methow Valley Citizens Council*
  490 U.S. 332 (1989) .................................................................. 14, 15

*Save Our Heritage Organization v. Gonzalez*
  533 F. Supp. 2d 58 (D.D.C. 2008) ............................................. 33, 39

*Setser v. United States*
  566 U.S. 231 (2012) ............................................................................ 21

*Shelby Cty., Ala. v. Holder*
  133 S. Ct. 2612  (2013) ................................................................. *passim*

*Sierra Club v. Ashcroft*
  No. 04CV0272-LAB (JMA) (S.D. Cal. 2005) .................................... 33

*Sierra Forest Legacy v. Sherman*
  646 F.3d 1161 (9th Cir. 2011) ........................................................... 13

*Stone v. INS*
  514 U.S. 386 (1995) ............................................................................ 21

*Touby v. United States*
  500 U.S. 160 (1991) ...................................................................... 35, 37

*U.S. v. Lee*
  106 U.S. 196 (1882) ............................................................................ 36

*United States v. Nixon*
  418 U.S. 683 (1974) ............................................................................ 36

*Whitman v. Am. Trucking Assocs.*
  531 U.S. 457 (2001) ............................................................................ 33

*Wilson v. Iseminger*
  185 U.S. 55 (1902) .............................................................................. 30

*Yakus v. United States*
  321 U.S. 414 (1944) ............................................................................ 33

*Youngstown Sheet & Tube Co. v. Sawyer*
  343 U.S. 579 (1952) ............................................................................ 31

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

5 U.S.C.
§ 551 *et seq.* ..................................................................................... 1
§ 702 ........................................................................................... 15
§ 704 ........................................................................................... 15
§ 706 ........................................................................................... 15
§ 706(1) ................................................................................... 15, 16
§ 706(2)(A) .............................................................................. 15, 16
§ 706(2)(D) .............................................................................. 15, 16

8 U.S.C.
§ 1103(a) ..................................................................................... 16
§ 1103(a) n. ............................................................................ 16, 19
§ 1103(a) n. ................................................................................. 23
§ 1103(b)(1)(A) n. ................................................................... 20, 23
§ 1103(b)(1) note .................................................................... 19, 20
§ 1103 (c)(1) note ............................................................. 12, 21, 23
§ 1103 n. ............................................................................... *passim*

10 U.S.C.
§ 433 ........................................................................................... 39

16 U.S.C.
§ 1451 *et seq.* ................................................................................ 1
§ 1452 ......................................................................................... 15
§ 1456(c)(1)(A) ........................................................................... 15

22 U.S.C.
§ 7207(a)(3) ................................................................................ 39

28 U.S.C.
§ 1331 ......................................................................................... 12

33 U.S.C.
§ 1319(c) ..................................................................................... 36

42 U.S.C. § 1983 .......................................................................... 36

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<strong><u>Page</u></strong>

§ 4321 *et seq.* ............................................................................................*passim*
    § 4332(2)(C) ...................................................................... 14, 15
    § 6928 ............................................................................................ 36

Cal. Pub. Res. Code
    § 30008 .......................................................................................... 15
    § 30210-13 ...................................................................................... 15
    § 30220-21 ...................................................................................... 15
    § 30223 .......................................................................................... 15
    § 30233 .......................................................................................... 15
    § 30236 .......................................................................................... 15
    § 30240 .......................................................................................... 15
    § 30244 .......................................................................................... 15
    § 30251 .......................................................................................... 15
    § 30330 .......................................................................................... 15

Illegal Immigration Reform and Immigrant Responsibility Act of 1996
    Pub. L. 104-208, Div. C, Title I, § 102(a) to (c), 110 Stat. 3009-554
    (Sept. 30, 1996) ........................................................... 4, 5, 9, 19, 32

Real ID Act of 2005............................................................................
    Pub. L. 109-113, div. B, tit. I § 102(c)(1), 119 Stat. 231 (May 11,
    2005). ................................................................................................ 9

Secure Fence Act of 2006
    Pub. L. 109-367, § 3, 120 Stat. 2638 (Oct. 26, 2006) ................... 9, 19

Homeland Security Appropriations Act, 2008
    Pub. L. 110-161, div. E, tit. V § 564, 121 Stat. 2090 (Dec. 26,
    2007)........................................................................................ 9, 10, 22
    Pub. L. 110-161, div E, tit. V, § 564, 121 Stat. 2090 (Dec. 26,
    2007)............................................................................................. 10
    Pub. L. 110-161, div. E, tit. V, § 564(a), 121 Stat. 2090 (Dec. 26,
    2007)............................................................................................. 19

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

### TABLE OF AUTHORITIES
#### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution ...................................................................... 1, 2, 12, 24
    article I ................................................................................................. 25, 31
    article I, section 1 ................................................................................ 31, 32
    article I, section 2 ..................................................................................... 36
    article I, section 3 ..................................................................................... 35
    article I, section 4, cl. 1 ............................................................................ 27
    article I, section 7, cl. 2 ............................................................................ 37
    article II, section 3 ................................................................................... 31
    article III ...................................................................... 13, 14, 28, 30
    First Amendment ...................................................................................... 30
    Tenth Amendment ............................................................... 2, 24, 26, 27
    Fifteenth Amendment ................................................................................ 25

**COURT RULES**

Federal Rules of Civil Procedure
    Rule 56(c) ................................................................................................. 14

**OTHER AUTHORITIES**

15 C.F.R.
    § 930.32 .................................................................................................... 15
    § 930.39 .................................................................................................... 15
    § 9320.36 .................................................................................................. 15

40 C.F.R.
    § 1501.2 .................................................................................................... 15
    § 1502.2(g) ............................................................................................... 15
    § 1502.5 .................................................................................................... 15
    § 1508.23 .................................................................................................. 15
    § 1508.25 .................................................................................................. 15

70 Fed. Reg. 55,622-02 (Sept. 22, 2005) .......................................................... 11

72 Fed. Reg. 2,535-01 (Jan. 19, 2007) ............................................................. 11

72 Fed. Reg. 60,870-01 (Oct. 26, 2007) ........................................................... 11

## <u>TABLE OF AUTHORITIES</u>
### (continued)

**Page**

73 Fed. Reg. 19,077-01 (Apr. 8, 2008) ................................................... 11

73 Fed. Reg. 19078-01 (Apr. 8, 2008) ................................................... 11

82 Fed. Reg. 8,793 § 4(a) (Jan. 25, 2017) ................................................ 3

82 Fed. Reg. 35,984-01 (Aug. 2, 2017) ................................................... 6

82 Fed. Reg. 42,829-01 (Sept. 12, 2017) ................................................ 8

Department of Homeland Security, https://www.cbp.gov/border-
    security/along-us-borders/border-patrol-sectors/el-centro-sector-
    california (last visited 10/31/2017) .................................................... 8

Department of Homeland Security, https://www.cbp.gov/border-
    security/along-us-borders/border-patrol-sectors/san-diego-sector-
    california (last visited November 10, 2017) ......................................... 7

http://www.c-span.org/video/?312302-1/dhs-sec-napolitano-testifies-
    immigration-reform (last visited November 22, 2017) ......................... 22

http://www.sandiegouniontribune.com/visuals/photography/sd-pg-
    trump-border-wall-prototypes-finished-20171025-
    photogallery.html (last visited November 21, 2017) ........................... 16

https://www.youtube.com/watch?v=OPMt5mxyBQw, Televised
    Interview with Attorney General Jeff Sessions and then Homeland
    Security Secretary John Kelly ("Kelly TV Interview"), April, 20
    2017, 2:10–2:27 (last visited Nov. 19, 2017) ...................................... 6

Merriam-Webster Online Dictionary, 2017, http://www.merriam-
    webster.com (Oct. 23, 2017) ............................................................. 34

Webster's Third New International Dictionary, Copyright 2002 ........................... 20

x

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

**INTRODUCTION**

The Trump administration is building a "big beautiful wall" along the U.S.-Mexico border without conducting any environmental review or complying with any environmental protection laws despite irreparable harm to wildlife, plants, and habitat. Plaintiffs, the People of the State of California and the California Coastal Commission (collectively "California"), have brought this action to require the Trump administration to comply with the United States Constitution and federal and state laws. Defendants[1] have already violated the National Environmental Policy Act[2] ("NEPA"), the Coastal Zone Management Act[3] ("CZMA") and the Administrative Procedure Act[4] ("APA"), but claim to have waived those statutes and other laws designed to provide invaluable information to California and its citizens concerning threats to their environment, health, and natural resources.

Defendants contend that NEPA, the CZMA, and numerous other federal and state laws were waived by former and acting DHS Secretaries on August 2, 2017 ("San Diego Waiver") and September 12, 2017 ("Calexico Waiver") for the planning and construction of a border wall and related border barrier projects along the southwest border, including significant projects in California ("Border Wall Projects"). These waivers ("2017 Waivers") cite 8 U.S.C. § 1103 note, commonly referred to as Section 102 ("Section 102"), as the source of the Secretary's authority to construct the Border Wall Projects and waive any and all laws related to them.

However, Defendants' reliance on Section 102 to build the Border Wall Projects and waive laws related to that construction is misplaced. Section 102

---

[1] Defendants include the United States of America, the U.S. Department of Homeland Security ("DHS"), former DHS Secretary John Kelly in his official capacity, acting DHS Secretary Elaine Duke in her official capacity, the U.S. Customs and Border Protection ("CBP"), and acting CBP Commissioner Kevin K. McAleenan in his official capacity (collectively, "Defendants").
[2] 42 U.S.C. § 4321 *et seq.*
[3] 16 U.S.C. § 1451 *et seq.*
[4] 5 U.S.C. § 551 *et seq.*

1

1    simply does not authorize the fence replacement and prototype projects that are at
2    the heart of the Border Wall Projects in California. Defendants are choosing to
3    ignore the threshold requirements and limitations Congress laid out in that statute.
4    Section 102, for example, limits the Secretary's authority to the installation of
5    "additional" barriers in "areas of high illegal entry" and where the barriers would be
6    "most practical and effective" in deterring illegal entries. The undisputed facts
7    establish that the Border Wall Projects at issue in the 2017 Waivers are not in areas
8    of high illegal entry or located where they would be most practical and effective,
9    despite the Secretary's conclusory statements to the contrary. Defendants are trying
10   to shoehorn these particular projects into a statute that was not drafted for these
11   purposes, simply to take advantage of the statute's waiver provision.

12        Moreover, Defendants are relying on a waiver and expedited construction
13   provision that expired nine years ago. In late 2007, Congress amended Section 102
14   by imposing a deadline for the identification and expedited construction of barriers
15   in priority areas. That deadline expired on December 31, 2008. The amendments
16   reflect that Section 102 was not intended to give the Secretary unilateral authority
17   to waive all laws along a two-thousand-mile border in perpetuity. Thus, Defendants
18   cannot now rely on the expedited construction provision nine years after the
19   deadline to expedite construction in priority areas expired.

20        Finally, Section 102 and DHS's application of that provision through the 2017
21   Waivers violate several provisions of the United States Constitution and long-
22   standing constitutional doctrines. By burdening some geographic regions but not
23   others and invading California's traditional police powers, in the absence of
24   evidence justifying the targeted application of the waiver in particular areas of San
25   Diego and Imperial Counties, the 2017 Waivers fly in the face of the federalism
26   principles embodied in the Tenth Amendment. Moreover, the vagueness of the
27   2017 Waivers, combined with Section 102(c)'s unreasonable procedural hurdles,
28   contravene the due process rights of all Californians to petition their government

2

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1   and receive a fair hearing. Section 102 also unconstitutionally effects a wholesale

2   transfer of legislative duties to the executive by empowering the Secretary with

3   unchecked discretion to pick and choose which laws to obey or ignore without any

4   meaningful guidance on how to exercise that discretion, in violation of the

5   Separation of Powers Doctrine, the Non-Delegation Doctrine, and the Presentment

6   Clause. Finally, in permitting the Secretary to waive all criminal laws, Section 102

7   exceeds constitutional limits on the ability of the Executive Branch to immunize

8   criminal acts.

9        Defendants are exploiting these constitutional deficiencies through the 2017

10   Waivers, which waive a myriad of federal and unidentified state laws, including

11   criminal laws, in order to construct various projects in areas where fencing already

12   exists and the rates of illegal entries are the lowest. Section 102 and the 2017

13   Waivers cannot be used to trample on the rights of the sovereign State of California

14   and the rights of its residents. Plaintiffs are therefore entitled to summary judgment.

15                     **FACTUAL BACKGROUND**

16        On January 25, 2017, President Donald J. Trump issued an Executive Order

17   directing the DHS Secretary to take steps toward planning and constructing a

18   "physical wall along the southern border." (Ex. 7, Exec. Order No. 13767, 82 Fed.

19   Reg. 8,793 § 4(a) (Jan. 25, 2017).)[5] President Trump referenced a purported "recent

20   surge in illegal immigration" and mandated that DHS "[p]roduce a comprehensive

21   study of the security of the southern border, to be completed within 180 days of this

22   order, that shall include the current state of southern border security." *Id.* §§ 1, 4(a),

23   (d). The Secretary never produced the study mandated by the Executive Order.

24   However, DHS has issued reports and statements showing that existing

25   infrastructure, along with staffing and other border technology, has curtailed illegal

26   crossings at the southwest border, which plummeted years ago. These reports also

27   _____

28       [5] Each exhibit referenced in this memorandum is attached to and described in the Declaration of Michael Cayaban, filed herewith in support of Plaintiffs' motion.

3

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1  establish that over the past two decades there have been dramatic reductions in the

2  number of illegal crossings in the particular areas where DHS is now choosing to

3  replace existing fencing and, thus, that DHS's targeted application of Section 102's

4  waiver provision in California is unwarranted.

### A.   Illegal Entries Plummeted Long Ago at the Southwest Border

7  In DHS's own words, illegal entries along the southwest border are at their

8  lowest levels "since 2000, and likely since the early 1970s." (Ex. 8, "Efforts by

9  DHS to Estimate Southwest Border Security Between Ports of Entry," Dep't of

10  Homeland Sec., Office of Immigration Statistics, Sept. 2017, pp. 19.) In the

11  September 2017 report supporting that assessment, DHS estimated that the number

12  of successful illegal entries at the southern border has declined by 91% since 2000.

13  *Id.* pp. 17-18. DHS's assessment is consistent with data published by CBP, which

14  show that the number of migrants apprehended by CBP while illegally crossing the

15  southwest border has fallen sharply since 2000, and particularly since 2006. (Ex. 2,

16  USBP Total Illegal Alien Apprehensions by Month, 2000-2016.)[6] According to

17  DHS, illegal border crossings have declined because "the southwest land border is

18  more difficult to illegally cross today than ever before." (Ex. 8, p. 19.)

### B.   Personnel and Infrastructure Have Ballooned in the San Diego and El Centro Sectors

21  Since Congress passed the Illegal Immigration Reform and Immigrant

22  Responsibility Act of 1996 ("IIRIRA"), the federal government has spent billions

23  of dollars on personnel and other resources along the southwest border, especially

24  in the San Diego and El Centro sectors affected by the Border Wall Projects. (Ex. 3,

25  Congressional Research Service, Border Security: Barriers Along the U.S.

---

26  [6] The CBP and its enforcement arm, the United States Border Patrol ("USBP"), maintain data on the number of illegal entrants apprehended crossing within each CBP sector of the southwest border. (Ex. 1, excerpts from Government Accountability Office Report, February 2017, GAO-17-331, pp. 1, 46-56, Ex. 2.) The southwest border is divided into nine sectors.  (Ex. 1, pp. 45-46; Ex. 2.)

4

1  International Border, September 21, 2006, pp. 3-4.) Between 1995 and 2016, the

2  number of border patrol agents assigned to the southwest border nearly quadrupled

3  from 4,388 to 17,026 agents. During that same time, El Centro patrol agent staffing

4  levels increased by nearly 500%. By 2016, nearly 900 more patrol agents were

5  assigned to the San Diego sector than in 1995. (Ex. 4, USBP Border Patrol Agent

6  Staffing by Fiscal Year (as of Oct. 1, 2016), pp. 1-4.)

7       CBP has also installed hundreds of miles of additional barriers along the

8  southwest border pursuant to Congressional mandates, including an amendment to

9  Section 102 requiring expedited construction in priority areas before the end of

10  2008. CBP installed 143 miles of fencing along the southwest border before late

11  2005. By the middle of 2009, CBP had installed an additional 490 miles of fencing.

12  (Ex. 5, U.S. Government Accountability Office, GAO-09-896, Sept. 2009.)

13  Currently, there are 705 miles of fencing along 654 miles of the U.S.-Mexico

14  border. (Ex. 6, USBP, Mileage of Pedestrian and Vehicle Fencing, August 2, 2017.)

15  This includes CBP's installation of 37 miles of secondary fencing and 14 miles of

16  tertiary fencing, completing the goal of 700 miles as contemplated in Section 102.

17  *Id.*

### C. The Sites for the Border Wall Projects Are No Longer High Priority

18

19       Citing the decline in illegal crossings and adequacy of existing barriers, the

20  federal government and the Secretary have concluded that areas with existing

21  fencing—such as the San Diego and El Centro sectors—are no longer areas of high

22  illegal entry and that the San Diego and El Centro areas are DHS's *lowest* priority

23  for replacing existing fencing. In a March 27, 2017, infrastructure planning

24  document relating to the Border Wall Project, CBP divided the southwest border

25  into nine sectors and assessed the infrastructure needs within each sector. (Ex. 9,

26  Dep't of Homeland Security, Building the Wall, Strategy & Way Forward, March

27  27, 2017, p. 15.) Each sector was rated as "Very High," "High," and "Moderate."

28  *Id.* CBP used its lowest priority rating, "moderate," to describe its infrastructure

5

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1   needs within the San Diego and El Centro sectors affected by the 2017 Waivers. *Id.*

2   In a televised interview a month later, then Secretary Kelly confirmed this

3   assessment, explaining that existing fencing is "very, very effective" and

4   "remarkably effective in keeping down the amount of illegal movement across" the

5   border.[7] Notably, most of California's 140-mile border with Mexico already has

6   fencing, including the areas covered by the 2017 Waivers. (Ex. 1, pp. 46-50; Ex. 10,

7   U.S. Customs and Border Protection, Border Fencing as of June 2011.) Despite the

8   admitted adequacy of existing barriers and sharp decrease in illegal crossings, DHS

9   is attempting to expedite the replacement of existing fencing in the San Diego and

10  El Centro sectors.

### 1. The San Diego Sector and the San Diego Waiver

12      On August 2, 2017, former DHS Secretary Kelly issued the San Diego Waiver

13  by publishing a Notice of Determination in the Federal Register. (Ex. 11, 82 Fed.

14  Reg. 35,984-01 (Aug. 2, 2017).) The San Diego Waiver purports to waive 37

15  federal laws—including NEPA, the Endangered Species Act ("ESA"), the CZMA,

16  and the APA—as well as "all federal, state, or other laws . . . related to" the same

17  "subject matter." *Id.* The ostensible purpose of the San Diego Waiver is to expedite

18  the construction of infrastructure projects within a 15-mile segment of the border

19  described as the "project area," beginning at the Pacific Ocean and extending

20  eastward. *Id.*

21      The San Diego Waiver states that DHS will "immediately implement various

22  border infrastructure projects" within the project area, but only identifies two

23  projects expressly: the replacement of the 14-mile primary fence and the

24  construction of prototype barriers. *Id.* DHS and Trump Administration officials

25  have stated they intend to also begin projects that are not specifically mentioned in

---

[7] https://www.youtube.com/watch?v=OPMt5mxyBQw, Televised Interview with Attorney General Jeff Sessions and then Homeland Security Secretary John Kelly ("Kelly TV Interview"), April, 20 2017, 2:10–2:27 (last viewed Nov. 19, 2017).

6

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1    the San Diego Waiver, such as replacing the existing 14-mile secondary fence

2    (which was completed less than nine years ago) with a solid wall. (Ex. 9, p. 18.)

3    The various infrastructure projects referenced in the San Diego Waiver, both

4    disclosed and undisclosed, are referenced collectively herein as the San Diego

5    Project.

6        The San Diego sector is located entirely within California and extends 60

7    miles east from the Pacific Ocean along the southwest border. (Ex. 1, pp. 46-48.)

8    The San Diego sector includes several land ports of entry, several inland

9    checkpoints, and hundreds of miles of coastline.[8] The San Diego sector has about

10   46 miles of existing primary fencing along its 60-mile border with Mexico. (Ex. 1,

11   p. 48; Ex. 6, Ex. 10.) Multiple layers of fencing (primary, secondary, and tertiary)

12   span the western-most segment of the border at the site of the San Diego Project.

13   (Ex. 1, p. 48; Exs. 23 and 24, Photographs of the San Diego Triple Fence;

14   Declaration of M. Cayaban, ¶¶ 24-26; Ex. 22, Appendix D.)

15       The number of illegal entries in the San Diego sector has fallen significantly

16   over the last two decades and at a steeper rate than in other sectors. (Ex. 1, pp. 46-

17   47; Ex. 2; Ex. 8, pp. 18-19.)[9] CBP's apprehension data indicates there were 483,815

18   in 1996 compared to 31,891 in 2016, a reduction of over 93%. (Ex, 2, pp. 1, 17; Ex.

19   22, pp. 12-15 and appendix G.) San Diego sector apprehensions fell to just 7% of

20   the total number of apprehensions along the entire southwest border between 2013

21   and 2015, far less than sectors in other states. (Ex. 1, pp. 45-46, 48; Ex. 2; Ex. 6, p.

22   19; Ex. 20, p. 19-20.) Additionally, personnel from the Imperial Beach and Chula

23   Vista patrol stations, which have had the lowest rates of illegal entry within the San

24   Diego Sector for several years, patrol the San Diego Project Area. (Ex. 22,

25   _____

26   [8] Official website of the Department of Homeland Security,
     https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/san-
27   diego-sector-california (last visited November 10, 2017).
     [9] See also, Official website of the Department of Homeland Security,
28   https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/san-
     diego-sector-california (last visited November 10, 2017).

1   Congressional Research Service, Border Security: Barriers Along the U.S.

2   International Border, March 16, 2009, pp. 11-15.)

3                    **2. The El Centro Sector and the Calexico Waiver**

4        On September 12, 2017, acting Secretary Duke issued the Calexico Waiver by

5   publishing a Notice of Determination in the Federal Register. (Ex. 12, 82 Fed. Reg.

6   42,829-01 (Sept. 12, 2017).)  The Calexico waiver purports to waive the application

7   of 27 federal laws, and all state laws related to the same subject matter, in order to

8   expedite the construction of infrastructure projects in the El Centro sector. As with

9   the San Diego Waiver, the Calexico Waiver purports to waive NEPA, the CZMA,

10  and the APA. *Id.* The ostensible purpose of the Calexico Waiver is to expedite the

11  replacement of three miles of existing primary fence near the Calexico port of entry

12  in the El Centro sector, referred to herein as the Calexico Project.

13       CBP's El Centro sector covers areas within Imperial County and Riverside

14  County, California.[10] The sector is comprised of a land border that is 70 miles in

15  length with 59 miles of existing primary fencing along its border with Mexico. *Id.*

16       Just as in the San Diego sector, there have also been significant declines in the

17  number of undocumented entries in the El Centro sector over the last two decades.

18  The USBP apprehended 238,126 deportable migrants in the El Centro sector in

19  2000 compared to just 19,448 in 2016, a reduction of nearly 92%. (Ex. 2, pp. 1, 17.)

20  Between 2013 and 2015, apprehensions in the El Centro sector represented just 4%

21  of the total number of apprehensions along the entire southwest border. (Ex. 1, p.

22  49.)

23

24

25

26

_____

27  [10] Official website of the Department of Homeland Security, U.S. Customs and
    Border Protection, https://www.cbp.gov/border-security/along-us-borders/border-
28  patrol-sectors/el-centro-sector-california (last visited 10/31/2017).

## LEGISLATIVE HISTORY OF SECTION 102 AND DHS'S USE OF WAIVERS BEFORE DECEMBER 31, 2008

Before 1996, there was no express statutory authority regarding construction of barriers along the southwest border. That changed when Congress passed the first iteration of Section 102. See IIRIRA, Pub. L. 104-208, div. C., tit. I § 102, 110 Stat. 3009, 3009-554 (Sept. 30, 2996). The first iteration of Section 102 authorized the U.S. Attorney General, in consultation with the Commissioner of Immigration and Naturalization, to "take such actions as may be necessary to install additional physical barriers and roads . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." *Id*. Section 102(a). It also required construction of second and third fences parallel to a 14-mile segment of primary fencing installed a few years earlier along the border near San Diego. That 14-mile segment starts at the Pacific Ocean and extends 14 miles east. *Id.* § 102(b). Further, the first iteration of Section 102 contained a provision that permitted the Attorney General to waive application of the ESA and NEPA "to the extent the Attorney General determines necessary to ensure expeditious construction of the barriers and roads under this section." *Id.* § 102(c).

The Real ID Act of 2005 amended Section 102 by transferring the waiver authority from the Attorney General to the Secretary of Homeland Security, and expanding the waiver authority to include "all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." Pub. L. 109-113, div. B, tit. I § 102(c)(1), 119 Stat. 231 (May 11, 2005). That version of Section 102 did not specify the laws that Congress authorized the Secretary to waive. It also purported to limit legal challenges concerning any waiver decision to constitutional claims and eliminated appellate court review. *Id*.

The Secure Fence Act of 2006 (Pub. L. 109-367) amended Section 102 again by removing the provisions referring specifically to the 14-miles of fencing in San

9

1  Diego, and instead directed DHS to construct two layers of reinforced fencing along

2  five separate segments of the border, totaling more than 800 miles.  Pub. L. 109-

3  367, §§ 2-3, 120 Stat. 2638 (Oct. 26, 2006).

4      The Department of Homeland Security Appropriations Act, 2008 ("2008

5  Amendment") amended Section 102 a third and final time by removing

6  requirements for doubled-layered fencing in specific locations, and by providing the

7  Secretary with specific direction in "carrying out subsection (a)" of Section 102.

8  Pub. L. 110-161, div E, tit. V, § 564, 121 Stat. 2090 (Dec. 26, 2007). The 2008

9  Amendment directs the Secretary of Homeland Security to construct reinforced

10  fencing along not less than 700 miles along the southern border where it would be

11  "most practical and effective." The 2008 Amendment also amended the statute by

12  compelling the Secretary of Homeland Security to designate "Priority Areas" for

13  370 miles of additional fencing by not later than December 31, 2008, and by

14  obligating the Secretary to expedite the construction of fencing in these "priority

15  areas," requiring the completion of construction by not later than December 31,

16  2008. *Id.* Thus, Congress imposed a December 31, 2008, deadline for the

17  designation and expedited construction of additional barriers and roads in priority

18  areas under Section 102.

19      There have been no amendments to Section 102 since the 2008 Amendment

20  was signed into law. Subsections (a) and (b) of Section 102 currently state that:

21      (a)    In General. — The Secretary of Homeland Security shall
take such actions as may be necessary to install additional physical

22  barriers and roads (including the removal of obstacles to detection of
illegal entrants) in the vicinity of the United States border to deter

23  illegal crossings in areas of high illegal entry into the United States.

24      (b)  Construction of Fencing and Road Improvements Along the
Border.—

25      (1)    Additional fencing along southwest border.—

26

27      (A)    Reinforced fencing.— In carrying out subsection (a), the
Secretary of Homeland Security shall construct reinforced fencing along
not less than 700 miles of the southwest border where fencing would be

28  most practical and effective and provide for the installation of additional

10

physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

(B)   Priority areas. — In carrying out this section, the Secretary of Homeland Security shall —

(i)   identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

(ii)   not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

Subsection (c) of Section 102 further states "[n]otwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." Subsection (c) is limited to the installation of "additional barriers and roads . . . in areas of high illegal entry." *Id.* § 1103 note.

During the period of September 2005 through October 2007, former Secretary Chertoff initiated three waivers to expedite the construction of additional fencing in different project areas. (Ex. 13, 70 Fed. Reg. 55,622-02 (Sept. 22, 2005); Ex. 14, 72 Fed. Reg. 2,535-01 (Jan. 19, 2007); Ex. 15, 72 Fed. Reg. 60,870-01 (Oct. 26, 2007).) This resulted in the completion of the 14-mile, multi-layered fencing project in San Diego and the completion of additional fencing in two project areas in Arizona. In April 2008, following the 2008 Amendment to Section 102, former Secretary Chertoff initiated two more waivers in an effort to construct the additional fencing before the December 31, 2008 deadline. (Ex. 16, 73 Fed. Reg. 19,077-01 (Apr. 8, 2008); Ex. 17, 73 Fed. Reg. 19078-01 (Apr. 8, 2008).) As justification for the April 2008 waivers, which called for the expedited construction of hundreds of miles of fencing in the four southern border states, former Secretary Chertoff cited Congressional mandates articulated under subsection (b) of Section

11

102, "including priority miles of fencing that must be completed by December of 2008." (Ex. 17.)

## JURISDICTION OF THIS DISTRICT COURT

"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. This Court has subject matter jurisdiction over this action because Plaintiffs' claims arise under the United States Constitution and several federal statutes. Plaintiffs' statutory claims include claims for relief under NEPA, the CZMA, and the APA.

In defense of their failure to comply with these and other federal and state laws, Defendants assert that these laws were waived by the DHS Secretary in the 2017 Waivers pursuant to Section 102(c). 8 U.S.C. § 1103 note (c)(1). Defendants also contend that this Court is barred from hearing statutory and other non-constitutional challenges to the 2017 Waivers, citing language in 102 (c) that appears to limit the district court's jurisdiction to claims asserting constitutional violations. *Id.*

Defendants' position, however, conflicts with Supreme Court and Ninth Circuit precedent. Federal courts clearly retain jurisdiction to review threshold issues such as whether underlying factual findings would trigger the purported jurisdictional bar. *Pazcoguin v. Radcliffe*, 292 F.3d 1209, 1212 (9th Cir. 2002); *Flores-Miramontes v. INS*, 212 F.3d 1133, 1135 (9th Cir. 2000). In other words, the federal courts "have jurisdiction to determine whether jurisdiction exists." *Gutierrez v. Holder*, 662 F.3d 1083, 1086 (9th Cir. 2011) (quoting *Flores-Miramontes*, 212 F.3d at 1135). Here, Plaintiffs assert that Section 102 does not authorize Defendants' proposed projects and thus that the entire statute, including the waiver provision, is inapplicable. These claims require this Court to examine these threshold issues before it reaches questions such as whether the 2017 Waivers comply with the Constitution.

12

1    Federal courts also retain jurisdiction to determine whether a federal agency is

2   acting within the scope of its congressionally delegated authority. *La. Pub. Serv.*

3   *Comm'n v. FCC,* 476 U.S. 355, 374 (1986). Even where Congress has limited

4   courts' jurisdiction to review an agency's actions, federal courts retain jurisdiction

5   where: (1) an agency's action is ultra vires in that it contravenes clear statutory

6   language; and (2) absent district court jurisdiction, the party seeking review would

7   be wholly deprived of "a meaningful and adequate means of vindicating its

8   statutory rights." *Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.,* 827 F.3d 1203,

9   1208 (9th Cir. 2016) (quoting *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin.,*

10   *Inc.,* 502 U.S. 32, 43 (1991)); *Leedom v. Kyne*, 358 U.S. 184, 188–90 (1958). Here,

11   Plaintiffs assert Defendants are acting outside the scope of their authority granted

12   by Section 102, as defined by clear statutory language, and, the absence of district

13   court jurisdiction will wholly deprive Plaintiffs of adequate means to vindicate their

14   statutory rights.

15   **CALIFORNIA HAS ARTICLE III STANDING**

16   "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it

17   has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual

18   or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the

19   challenged action of the defendant; and (3) it is likely, as opposed to merely

20   speculative, that the injury will be redressed by a favorable decision." *Friends of*

21   *the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000) (citing

22   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Here, California has

23   met all Article III standing requirements. California will suffer injury to its real

24   property that it owns and manages adjacent to DHS's Border Wall Projects.

25   California also has concrete and particularized interests in protecting its natural,

26   recreational, agricultural, historical and cultural resources for the use, enjoyment

27   and benefit of California's residents. *Massachusetts v. EPA*, 549 U.S. 497, 518

28   (2007); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011). In

13

1  addition, the Border Wall Projects have caused injury to California's tourism

2  economy from the "chilling effect" on California tourism from Mexico. Finally, the

3  waivers infringe upon California's procedural and sovereign rights in creating and

4  enforcing its own laws and receiving the benefits afforded to it under NEPA and the

5  CZMA. California therefore has Article III standing to bring this case.

6  **ARGUMENT**

7  **I.   STANDARD OF REVIEW ON SUMMARY JUDGMENT**

8       Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment

9  is proper "if the pleadings, depositions, answers to interrogatories, and admissions

10  on file, together with the affidavits, if any, show that there is no genuine issue as to

11  any material fact and that the moving party is entitled to a judgment as a matter of

12  law." Summary judgment "may, and should, be granted so long as whatever is

13  before the district court demonstrates that the standard for the entry of summary

14  judgment, as set forth in Rule 56(c), is satisfied." *Celotex Corp. v. Catrett*, 477

15  U.S. 317, 322-323 (1986).

16  **II.   IT IS UNDISPUTED THAT DEFENDANTS VIOLATED NEPA, THE CZMA**
17  **AND THE APA (FIRST AND SECOND CLAIMS)**

18       The area where Defendants are constructing the Border Wall Projects is rich in

19  biodiversity and includes multiple fragile and sensitive habitats, in particular the

20  Tijuana Estuary which is a "Wetland of International Importance." Decl. of M.

21  Delaplaine ¶ 6; Decl. of S. Vanderplank ¶¶ 23-25, 40-54.  It also includes 33 plant

22  varieties that are rare, threatened, or endangered in California, and numerous

23  endangered and threatened wildlife species such as the least Bell's vireo that are

24  protected by federal and state law. Delaplaine Decl. ¶¶ 6, 9; Vanderplank Decl. ¶ 8;

25  Decl. of K. Clark ¶¶ 8-31.

26       To protect the environment, NEPA mandates environmental review

27  procedures that ensure informed agency decision-making and facilitate public

28  participation. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348-49

14

1   (1989). To comply with NEPA, federal agencies must prepare an environmental

2   impact statement to evaluate the environmental effects of major federal actions,

3   such as the Border Wall Projects, before the action is undertaken. 42 U.S.C. §

4   4332(2)(C); *Robertson*, 490 U.S. at 348-49; *see also* 40 C.F.R. §§ 1501.2,

5   1502.2(g), 1502.5, 1508.23, 1508.25. Claims asserting NEPA and CZMA

6   noncompliance are reviewed under the APA. 5 U.S.C. §§ 702, 704, 706; *California*

7   *v. Norton,* 311 F.3d 1162, 1170 (9th Cir. 2002). Defendants violated NEPA and the

8   APA by conducting no public environmental review of the Border Wall Projects,

9   including the San Diego and Calexico Projects, which will cause significant harm

10  to the environment. Clark Decl. ¶¶ 8-31; Vanderplank Decl. ¶¶ 8, 11, 20-61; 5

11  U.S.C. §§ 702, 704, 706(1), 706(2)(A) & (D); 42 U.S.C. § 4332(2)(C).

12      The CZMA is meant to "preserve, protect, develop and where possible, to

13  restore and enhance the resources of the nation's coastal zone." 16 U.S.C. § 1452.

14  The California Coastal Commission ("Commission") implements the CZMA in

15  California. Cal. Pub. Res. Code §§ 30008, 30330. When a federal agency

16  undertakes an activity that affects any land, water uses, or natural resources of the

17  coastal zone, the CZMA requires that agency to provide a "consistency

18  determination" to the Commission that confirms the activity is consistent to the

19  maximum extent practicable with the California Coastal Management Program. 16

20  U.S.C. §§ 1456(c)(1)(A); 15 C.F.R. §§ 930.32, 9320.36, 930.39.

21      For the San Diego Project, a consistency determination is required because it

22  will affect numerous resources in the coastal zone, including endangered species,

23  water quality, public recreation and access to open space, the coast's scenic and

24  visual quality, and archaeological resources. Delaplaine Decl. ¶¶ 4-10; Ex. 18, Map

25  Depicting Coastal Zone Boundaries, Cal. Pub. Res. Code §§ 30210-13, 30220-21,

26  30223, 30233, 30236, 30240, 30244, 30251. To date, Defendants have not

27  submitted a consistency determination to the Commission for the San Diego

28  Project, or even contacted the Commission about it. Delaplaine Decl. ¶ 10.

15

California Pls.' Mem. In Supp. of Mot. For Summ. J. (17cv1215-GPC(WVG))

1   Accordingly, the Court should find that Defendants violated NEPA and the CZMA,

2   grant summary judgment to Plaintiffs and enjoin them from proceeding with the

3   Border Wall Projects. *See Norton,* 311 F.3d at 1169-70, 1178 (setting aside

4   approval of offshore lease suspensions because federal government failed to

5   undertake consistency review of the suspensions pursuant to the CZMA); 5 U.S.C.

6   §§ 706(1), 706(2)(A) & (D).

7   **III.   NOTHING IN SECTION 102 AUTHORIZES THE BORDER WALL PROJECTS**
         **(THIRD CLAIM)**
8

9        The 2017 Waivers seek to waive laws for projects that are not authorized by

10   Section 102. In relying on the waiver provision in Section 102(c), Defendants put

11   the cart before the horse; because the Border Wall Projects are not authorized by

12   Section 102(a) or (b), DHS has no authority to build the projects, and any waiver

13   under Section 102(c) cannot save the Defendants' illegal activity. Here, the Border

14   Wall Projects fail to satisfy three requirements in Section 102(a) and (b), namely,

15   that projects be built: (1) in areas of high illegal entry; (2) as additional barriers, not

16   as replacements for existing fencing; and (3) where the barriers are most practical

17   and effective. Defendants' failure to satisfy any one of these requirements renders

18   their actions unlawful and is a basis for summary judgment.[11]

19       **A.   Section 102 Is Inapplicable Because the San Diego**
              **and Calexico Projects Are Not Located in "Areas of**
20              **High Illegal Entry"**

21        Contrary to what might be gleaned from President Trump's Executive Order,

22   Section 102 does not authorize the construction of a wall across the entire two-

23   thousand-mile southwest border. The plain language of Section 102 only authorizes

24   the Secretary to install additional physical barriers "to deter illegal crossings in

25   _____
      [11] The San Diego Project also fails to satisfy Section 102's requirement that
26   barriers be installed so as "to deter illegal crossings." 8 U.S.C. § 1103(a). The
      prototypes built in the San Diego Project Area were constructed with large gaps in
27   between them—rendering them ineffective as a border security tool.
      http://www.sandiegouniontribune.com/visuals/photography/sd-pg-trump-border-
28   wall-prototypes-finished-20171025-photogallery.html (last visited November 21,
      2017).

16

1   **areas of high illegal entry**." 8 U.S.C. § 1103(a) note (emphasis added).

2   Acknowledging this limitation, the 2017 Waivers assert that the San Diego and El

3   Centro sectors are areas of high illegal entry. To support this assertion, the San

4   Diego Waiver points to the amount of drugs seized and number of persons

5   apprehended during the last fiscal year throughout the entire San Diego sector. (Ex.

6   11.) The Calexico Waiver points to similar sector-wide data from the El Centro

7   sector. (Ex. 12.) Reliance on such sector-wide data is misplaced because it fails to

8   show that the San Diego and Calexico Project Areas are themselves areas of high

9   illegal entry.

10      First, the amount of drugs seized by border patrol agents in a sector says

11   nothing about whether a particular segment of that sector is an area of high illegal

12   entry. Large drug seizures often occur far from the Mexican border at highway

13   checkpoints, during vehicle searches at the points of entry, or when border patrol

14   agents discover a drug-smuggling boat or drone. (Ex. 19, DHS Press Releases and

15   Media Report Concerning USBP Drug Seizures in San Diego and El Centro

16   Sectors.) Nothing suggests such seizures occurred at the segments of the border

17   targeted for the San Diego and Calexico Projects, much less that the amount of

18   drugs seized correlates with the number of illegal entries there.

19      Second, sector-wide apprehension data does not establish that the project areas

20   themselves are areas of high illegal entry. The Calexico Project Area represents

21   only about 4% of the total 70-mile border in the El Centro sector. The San Diego

22   Project Area represents just 1/4 of the 60-mile border within the San Diego sector.

23   Moreover, the Secretary offers no factual findings to demonstrate that these two

24   areas are priority areas within the San Diego and El Centro sectors.

25      The sector-wide apprehension figures are even less probative when one

26   considers that the San Diego Project Area has fewer illegal border crossings than

27   the San Diego sector as a whole. DHS maintains apprehension data for the stations

28   responsible for specific segments of the border, but the 2017 Waivers do not

17

1  mention this information. The reason for this omission is obvious: the most recent,

2  publicly available, station-specific apprehension data demonstrates that the number

3  of illegal entries is much lower in the San Diego Project Area, which is patrolled by

4  the Imperial Beach and Chula Vista Stations, than in the San Diego sector as a

5  whole. (Ex. 3, pp. 8-12; Ex. 20, pp. 19-20; Ex. 22, pp. 10-15 and app. G.) This is

6  unsurprising given that the San Diego Project Area is already the most heavily

7  fortified area along the entire southwest border, with at least two layers of fencing

8  along a 14-mile segment and three layers of fencing in certain areas. (Ex. 1, p. 48,

9  Ex. 22, pp. 10-15 and app. D; Exs. 23-24, Photographs of Triple Fence; Declaration

10  of M. Cayaban, ¶¶ 24-26; Exs. 3, 6, 10.)

11       Further, to the extent sector-wide data is relevant, DHS's apprehension records

12  show that the San Diego and El Centro sectors are no longer areas of high illegal

13  entry. For example, the CBP's apprehension data indicates the number of

14  deportable migrants apprehended in the San Diego sector fell from 483,815 in 1996

15  (the year Section 102 of IIRIRA was enacted) to 31,891 in 2016, a reduction of

16  over 93%. (Ex, 2, pp. 1, 17; Ex. 22, pp. 12-15 and appendix G.) Between 2013 and

17  2015, the San Diego sector represented just 7% of the total number of

18  apprehensions along the southwest border, far less than sectors in other states. (Ex.

19  1, pp. 46-49.) The decline in El Centro sector apprehensions has been even more

20  dramatic, with a reduction of nearly 92% from 2000 to 2016. (Ex. 2, pp. 1, 17.)

21  Moreover, El Centro sector apprehensions accounted for just 4% of the total

22  number across the entire southwest border between 2013 and 2015. (Ex. 1, pp. 46-

23  49.)

24       Thus, the San Diego and El Centro sectors are not sectors of high illegal entry

25  regardless of whether that term is measured using historical standards or by

26  comparing the current rates of illegal entry across all southwest border sectors.

27  Because Section 102 only authorizes the installation of barriers in areas of high

28

1    illegal entry, DHS cannot establish that its San Diego and Calexico Projects satisfy

2    this requirement. Accordingly, the projects are not authorized by Section 102.

3    **B.    Section 102 Permits Only the Installation of**
     **"Additional" Barriers and Roads, Not the**
4    **Replacement of Existing Fences**

5    Section 102 repeatedly uses the word "additional" to describe the types of barriers

6    and roads authorized by the statute. At the outset, Section 102(a) provides:

7        The Secretary of Homeland Security shall take such actions as may be
         necessary to install **additional** physical barriers and roads (including the
8        removal of obstacles to the detection of illegal entrants) in the vicinity of
         the United States border to deter illegal crossings in areas of high illegal
9        entry into the United States. (emphasis added)

10   8 U.S.C. § 1103(a) note. Section 102(b)(1) uses the phrase "additional fencing

11   along southwest border" to describe the 700 miles of fencing, including 370 miles

12   of expedited fencing in priority areas, that the Secretary must construct by no later

13   than December 31, 2008. *Id.* § 1103(b)(1) note. And Section 102(b)(3) uses the

14   term again in directing DHS to incorporate safety features. *Id.* § 1103(b)(1) note

15   (requiring safety features "while constructing the additional fencing").

16       Congress' repeated use of the word "additional" makes sense given the

17   evolution of border infrastructure along the southwest border and the evolution of

18   Section 102: with each new iteration of Section 102, Congress sought to install

19   fencing in areas where none existed at the time. When Section 102 was originally

20   enacted, Congress sought to add new layers of fencing to supplement the existing

21   primary fence in San Diego. Pub. L. 104-208, div. C, title I, § 102(a) to (c), 110

22   Stat. 3009-554 (Sept. 30, 1996). When amending Section 102 in 2006, Congress

23   sought to add at least 800 miles of double layered fencing along the border. Pub. L.

24   109-367, § 3, 120 Stat. 2638 (Oct. 26, 2006). Finally, in amending the statute for

25   the last time, Congress imposed a December 31, 2008, deadline for adding

26   hundreds of more miles of fencing in priority areas on an expedited schedule. Pub.

27   L. 110-161, div. E, tit. V, § 564(a), 121 Stat. 2090 (Dec. 26, 2007).

28       This "context," which courts consider in determining a statute's meaning,

19

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1  makes clear that Congress intended Section 102 to permit only the installation of

2  additional fencing, meaning fencing where none existed. *McNeill v. United States*,

3  563 U.S. 816, 819 (2011). That reading is consistent with the ordinary meaning of

4  the term "additional," which is defined as: existing or coming by way of addition:

5  added, further. Webster's Third New International Dictionary, Copyright 2002.

6  Notably, this is exactly how Section 102 was interpreted in the five waivers

7  initiated by former Secretary Chertoff between September 2005 and April 2008.

8  Each waiver identified projects that proposed the construction of additional fencing

9  in areas where none existed at the time. None of the waivers were initiated for the

10  purpose of replacing, repairing, or enhancing existing barriers. See Exs. 13-17.

11      Unlike the previous waivers and contrary to the express terms of Section 102,

12  the 2017 Waivers do not provide for installation of "additional" barriers or fences.

13  Instead, the 2017 Waivers purport to authorize the replacement of existing fencing.

14  Neither the San Diego or Calexico Projects would result in more miles of fencing

15  along the southwest border. Because Section 102 only allows for the installation of

16  additional fencing, the Secretary and DHS acted beyond the statutory authority

17  granted by Section 102 in commencing construction of the Border Wall Projects.

18      **C.  Defendants Exceeded Their Statutory Authority by**
        **Constructing Fencing in Areas Where the Barriers**
19      **Would Not Be "Most Practical or Effective"**

20      In 2008, Section 102 was amended to specify the amount and location of

21  fencing permitted under Section 102(a). 8 U.S.C. § 1103(a) note. The 2008

22  Amendment gave the Secretary more discretion concerning the location of

23  additional fencing, but required that the fencing be constructed in areas where it

24  would be "most practical and effective."[12]

25  _____

26  [12] The clause "most practical and effective" is used twice within Section
    102(b). 8 U.S.C. § 1103(b)(1)(A) note; *Id.* § 1103(b)(1)(B) note. In light of the
27  context in which it is used and the stated "purpose of carrying out subsection (a),"
    the phrase "most practical and effective" must be interpreted as applying to areas
28  where additional fencing would be most the effective in deterring illegal entries.

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1  DHS officials admit that the San Diego and Calexico Project Areas are not

2  areas where additional infrastructure would be most practical or effective in

3  deterring illegal entries. Former Secretary Kelly has opined that existing fences are

4  "extremely effective" in reducing illegal entries, and DHS concedes that these

5  sectors have the lowest priority for infrastructure projects. (Kelly TV Interview,

6  2:10–2:27; Ex. 9, p. 15.) DHS also acknowledges it does not have any high priority

7  infrastructure needs in either the San Diego or El Centro sectors. Id. Thus, DHS and

8  the Secretary have clearly acted beyond their statutory authority.

9          **D.    Because Defendants Lack Authority to Build the**
10               **Border Wall Projects, the 2017 Waivers Are Invalid**

11  Because DHS and the Secretary lack authority to construct the Border Wall

12  Projects under either Section 102(a) or (b), they also lack authority to waive laws to

13  expedite that construction under Section 102(c). Section 102(c) provides that:

14       Notwithstanding any other provision of law, the Secretary shall have the
        authority to waive all legal requirements such Secretary, in such
15      Secretary's sole discretion, determines necessary to ensure expeditious
        construction of the barriers and roads **under this section.**
16

17  8 U.S.C. § 1103(c)(1) note (emphasis added). As Defendants themselves concede,

18  the phrase "this section" unambiguously refers to Section 102. (Case No. 3:17-cv-

19  01215-GPC-WVG, Doc. 18-1, p 17.) Accordingly, the phrase "under this section"

20  limits the Secretary's waiver authority to construction authorized by Section 102.

21  *See Setser v. United States*, 566 U.S. 231, 239 (2012) (courts should give effect "to

22  every clause and word of an Act"). Because construction of the Border Wall

23  Projects is not authorized by Section 102 for the reasons explained above, the 2017

24  Waivers likewise are invalid.

25  **IV.   THE 2017 WAIVERS ARE INVALID BECAUSE THE WAIVER AUTHORITY**
         **EXPIRED ON DECEMBER 31, 2008 (FOURTH CLAIM)**
26

27  Alternatively, even assuming Section 102 authorizes construction of the

28  Border Wall Projects, the 2017 Waivers are invalid because the authority to issue

21

them has expired. To hold otherwise would violate the well-established rule that, "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995).

In its 2008 Amendment to Section 102, Congress changed the statute to require the Secretary to "construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical." Pub. L. 110-161, div. E, tit. V § 564, 121 Stat. 2090 (Dec. 26, 2007). Under the heading "PRIORITY AREAS," Congress also required the Secretary, "in carrying out this section," to identify 370 miles "where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States." *Id.* Significantly, the 2008 Amendment provided that the authority to determine any "other mileage" for priority area fencing "shall expire on December 31, 2008." *Id.* The 2008 Amendment also imposed a deadline of December 31, 2008, for the expedited construction of fencing in priority areas. *Id.*

Recognizing the mandate to complete expedited fencing projects by the end of the year, former Secretary Chertoff in 2008 identified more than 370 miles of priority areas for expedited construction, issued waivers for this expedited construction, and committed DHS to a total of 661 miles of border fencing by the first half of 2009. (Ex. 5, pp. 2 (unnumbered), 8-9.) By April of 2013, DHS reported that it had completed all but a one-mile stretch of these projects, which ultimately involved 705 miles of fencing. (Ex. 6, USBP Mileage of Pedestrian and Vehicle Fencing by State.)[13]

---

[13]See also "The Border Security, Economic Opportunity, and Immigration Modernization Act, S. 744: Hearing Before the Senate Committee on the Judiciary," April 23, 2013 (remarks by DHS Secretary Janet Napolitano in response to question, stating that the U.S. Border Patrol had completed all but one-mile of the fencing) transcript available at http://www.c-span.org/video/?312302-1/dhs-sec-napolitano-testifies-immigration-reform (last visited November 22, 2017).

22

1   The imposition of a firm deadline to expedite construction establishes that

2   Congress did not grant the Secretary waiver authority in perpetuity to be used for

3   any and all construction of border fencing. Nor could an unlimited waiver authority

4   be squared with the plain language of Section 102's waiver provision, which

5   provides that a waiver may be used only when "necessary to ensure expeditious

6   construction of the barriers and roads under this section." 8 U.S.C. § 1103(c)(1)

7   note. Defendants' position to the contrary would render impermissibly superfluous

8   the limitations Congress placed on the Secretary's authority to identify priority

9   areas and to complete construction by the end of 2008. *See Duncan v. Walker*, 533

10  U.S. 167, 174 (2001). Accordingly, because the waiver authority has already

11  expired, the 2017 Waivers exceeded the Secretary's authority and are therefore

12  invalid.

13  **V.   DEFENDANTS EXCEEDED THEIR STATUTORY AUTHORITY IN ISSUING
       THE 2017 WAIVERS BY MAKING NO FINDINGS (FIFTH CLAIM)**

14

15  Alternatively, even if Section 102 authorizes the Border Wall Projects and the

16  deadline to expedite construction has yet to expire, the 2017 Waivers are invalid

17  because the Secretary failed to make the requisite findings to show that the projects

18  comply with the requirements of Section 102. In issuing the 2017 Waivers, the

19  Secretary must do more than "paraphrase the statutory language." *Gonzales v.*

20  *Oregon*, 546 U.S. 243, 257 (2006). Where, as here, an agency alters the application

21  of existing laws, it must give "good reasons" for doing so. *Organized Village of*

22  *Kake v. United States Dep't of Agric.*, 795 F.3d 956, 967, 969 (9th Cir. 2015)

23  (holding agency action invalid because it "failed to provide a reasoned

24  explanation") (citation omitted).

25  The statute's plain language requires the Secretary to determine that the

26  Border Wall Projects meet the requirements of Section 102. Section 102(a) requires

27  that projects be "necessary," limited to "additional physical barriers and roads," and

28  in "areas of high illegal entry." 8 U.S.C. § 1103(a) note. Section 102(b) requires the

23

1  Secretary to construct fencing where it would be "most practical and effective." *Id.*

2  at § 1103(b)(1)(a) note. And Section 102(c) requires the Secretary to determine that

3  waiving certain legal requirements is "necessary to ensure expeditious construction

4  of the barriers and roads." *Id*. § 1103(c)(1) note. These findings are necessary so

5  that a court can assess whether the Secretary selected qualifying projects and issued

6  a valid waiver.

7      Here, the Secretary has provided insufficient findings to justify the 2017

8  Waivers. Using boiler plate language copied from the statute, the 2017 Waivers

9  claim that there is an "immediate need to construct border barriers and roads" in the

10 San Diego and Calexico Project Areas because they are "areas of high illegal

11 entry." (Exs. 11, 12.) Such findings are inadequate because an agency that "merely

12 parrots the language of a statute without providing an account of how it reached its

13 results . . . has not adequately explained the basis for its decision." *Dickson v. Sec'y.*

14 *of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) (rejecting agency's waiver decision).

15 The 2017 Waivers also fail to support their conclusory statements that replacement

16 of fencing will "deter and prevent illegal crossings." (Exs. 11, 12.) And the Waivers

17 do not even contend that the Border Wall Project Areas are where fencing would be

18 "most practical and effective," as required by Section 102(b). Because the 2017

19 Waivers' boiler plate statements offer no good reasons for stripping Californians of

20 their legal rights, the 2017 Waivers are invalid.

**VI.  THE 2017 WAIVERS INTERFERE WITH CALIFORNIA'S EQUAL**
21 **SOVEREIGNTY AND POLICE POWERS IN VIOLATION OF THE TENTH**
22 **AMENDMENT'S FEDERALISM PRINCIPLES (ELEVENTH CLAIM)**

23     The Tenth Amendment to U.S. Constitution states that "[t]he powers not

24 delegated to the United States by the Constitution, nor prohibited by it to the States,

25 are reserved to the States respectively, or to the people." The Supreme Court has

26 interpreted this amendment to protect states and their people from federal

27 overreach, including a federal law that burdens some geographic regions but not

28 others or invades realms traditionally reserved to the states absent a showing that it

24

1    is "sufficiently related to the problem that it targets." *Shelby Cty., Ala. v. Holder*,

2    133 S. Ct. 2612, 2622 (2013) (citation omitted). The Court has recognized that a

3    federal statute violates the Tenth Amendment as over-inclusive in either of two

4    ways. First, a validly enacted federal statute that burdens a subset of states but not

5    others will become unconstitutional if progress is made curbing the problem the

6    statute seeks to prevent. *Id.* at 2628-29. Second, a federal statute that interferes with

7    states' traditional police powers by enabling the nullification of laws which do not

8    impede the statute's object is a disproportionate and therefore unconstitutional

9    means to an end. *City of Boerne v. Flores*, 521 U.S. 507, 534-535 (1997). Because

10   Section 102(c) suffers from both these constitutional infirmities, it cannot validly

11   strip California and its people of their legal protections.

12         The Supreme Court recently curbed the same type of federal overreach on

13   display here. In *Shelby County*, the Court struck down a federal statute authorizing

14   the Executive Branch to suspend certain election laws in several California counties

15   and nine states because imposing such a burden on some geographic regions and

16   not others violated the "'fundamental principle of *equal* sovereignty" among the

17   states. *Id.* at 2622 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S.

18   193, 203 (2009)). The Court acknowledged that, in barring literacy tests and other

19   racially-motivated forms of vote suppression, the federal law at issue—Section 4(b)

20   of the Voting Rights Act ("VRA")—was constitutionally enacted pursuant to the

21   Fifteenth Amendment and Article I, which affords Congress "significant control

22   over federal elections." *Id.* at 2623, 2629.

23         Nonetheless, the Court held that Section 4(b) had become unconstitutional in

24   recent years because, by 2013, its disparate treatment of covered and non-covered

25   states no longer could be justified by "current needs," making it "irrational." *Id.* at

26   2630–31. The Court found that the VRA had reduced the disparity between

27   African-American and white voter turnout in those regions. *Id.* At the same time,

28   the Executive Branch had curtailed its exercise of the VRA-created power to

25

1    suspend local laws, underscoring the lack of need for federal interference in at least

2    some states or local areas. *Id.* at 2626. Because *some* states and local areas had

3    shown signs of progress, the Court held that the VRA's "disparate treatment of the

4    States" was unconstitutional as to *all* of them. *Id.*

5        Here, changed circumstances—dramatic reductions across the entire southwest

6    border and even steeper declines in illegal border crossings within the specific

7    project areas selected by DHS—have similarly rendered Section 102

8    unconstitutional. As in *Shelby County*, the success of earlier federal action has

9    eliminated the justification for continuing to subject some states and not others to

10   federal interference, such as the waiver of existing California law and the waiver of

11   California's rights under federal law. In the two decades following the 1996

12   passage of Section 102, illegal border crossings dropped by over 93% in the San

13   Diego Sector (Ex. 2, pp. 1, 17; Ex. 22, pp. 12-15; Appendix G) and 92% in the El

14   Centro Sector over the past 16 years. Moreover, illegal crossings along the entire

15   Southwest border have fallen 75% since their peak. (Ex. 2; pp 1, 17; Ex. 8, p. 19.)

16   In addition, in the last eight years, illegal border crossings in the San Diego Project

17   Area have declined by 75% (Ex. 2). Texas and Arizona now account for 92% of the

18   relatively few illegal crossings that continue. (Ex. 1, pp. 45-46; Ex. 2, p. 17; Ex. 20,

19   p. 20).

20       This progress "cannot be ignored" and confirms that continued federal

21   interference in state police powers and state sovereignty is no longer justified.

22   *Shelby Cty.*, 133 S. Ct. at 2628. Because some regions, such as the project areas

23   within California, no longer suffer from the once widespread problem that Congress

24   sought to combat, the "substantial federalism costs" that Section 102(c) imposes are

25   no longer justified. *Id.* at 2622. Much like in *Shelby*, the disparate treatment of

26   California, which has been targeted for the waiver of state laws even though the

27   California sectors are no longer experiencing larger numbers of illegal entries,

28   renders the entire statute unconstitutional under the Tenth Amendment.

26

California Pls.' Mem. In Supp. of Mot. For Summ. J. (17cv1215-GPC(WVG))

1    Moreover, the sweeping waiver provision in Section 102(c) is far broader and

2  interferes far more with state sovereignty than any statute before it. According to

3  the DHS, Section 102(c) permits the Executive Branch to indefinitely waive all

4  state and local laws and regulations, requires no factual findings to justify it, and

5  deprives a litigant of any forum to challenge whether the statute's requirements

6  were even met. In contrast, the section of the VRA struck down by the Supreme

7  Court permitted the Executive Branch to suspend only "a discrete class" of state

8  laws, and allowed any covered region to exempt itself from federal oversight

9  simply by showing in court that the harm the VRA sought to prevent had not

10  occurred in "the preceding five years." *City of Boerne*, 521 U.S. at 533-535

11  (citation omitted).

12    Alternatively, Section 102(c) is unconstitutional because it is a "considerable

13  congressional intrusion into the States' traditional prerogatives and general

14  authority to regulate for the health and welfare of their citizens." *City of Boerne*,

15  521 U.S. at 534. It is well-established that the federal government "possesses only

16  limited powers," whereas the Tenth Amendment ensures that "the States and the

17  people retain the remainder." *Bond v. United States*, 134 S. Ct. 2077, 2086 (2014).;

18  U.S. Const., amend. X. And even where Congress acts pursuant to those limited

19  powers, it may still run afoul of federalism principles—as in *Shelby County*, where

20  the Court struck down the VRA. U.S. Const. art. I, Section 4, cl. 1; *Shelby Cty.*, 133

21  S. Ct. at 2623. "States have broad authority to enact legislation for the public

22  good—what we have often called a 'police power.'" *Bond*, 134 S. Ct. at 2086.

23  Applying these principles, the Supreme Court has refused to enforce federal laws

24  that, like Section 102(c), curtail states' "great latitude under their police powers to

25  legislate as to the protection of the lives, limbs, health, comfort, and quiet of all

26  persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006). The Court also

27  recognized that a federal law is unconstitutional where it so interferes with states'

28  traditional police powers as to be "out of proportion" to its object. *City of Boerne*,

27

1   521 U.S. at 533-536 (act which provided broad powers to nullify state laws not

2   justifiable based on current needs, as the legislative history contained only old or

3   "anecdotal evidence" of the harm Congress sought to curtail).

4        Section 102(c) reflects an even more disproportionate response to a

5   nonexistent need. Like the act at issue in *City of Boerne,* Section 102(c) is grossly

6   overbroad; its "sweeping coverage ensures its intrusion at every level of

7   government" and purports to allow the waiver of "all federal and state law." *Id.* at

8   532. Such federal overreach is disproportionate because it endangers laws that do

9   not work the evil Congress sought to combat, such as California's work place

10   safety, contract, and anti-graft laws. Further, forcing states to "beseech the Federal

11   Government for permission to implement laws" they otherwise could enforce in

12   their own courts is an unconstitutional intrusion into state sovereignty. *Shelby Cty.,*

13   133 S. Ct. at 2624. Because this "federal intrusion into sensitive areas of state and

14   local policymaking" is an "extraordinary departure from the traditional course of

15   relations between the States and the Federal Government," Section 102(c) must fail.

16   *Id.* at 2624 (citation omitted).

17   **VII. SECTION 102(C)'S PROCEDURAL HURDLES AND THE VAGUE 2017
    WAIVERS VIOLATE CALIFORNIA'S ARTICLE III AND DUE PROCESS**

18   **RIGHTS (SIXTH CLAIM)**

19        DHS's vague 2017 Waivers and Section 102(c)'s unreasonable procedural

20   hurdles are an impermissible assault on Californians' Article III and due process

21   rights and the rights of potential parties to petition the Court. "A fundamental

22   principle in our legal system is that laws which regulate persons or entities must

23   give fair notice of conduct that is forbidden or required." *FCC v. Fox Television*

24   *Stations, Inc.*, 567 U.S. 239, 253 (2012). The 2017 Waivers violate that principle by

25   failing to identify the state laws that are purportedly waived. For example, the 2017

26   Waivers purport not only to waive the 37 federal laws identified in the waivers but

27   also "all . . . state, or other laws, regulations and legal requirements of, deriving

28   from, or related to the subject of" those federal statutes. California and its citizens

28

1   are placed in the position of having to guess which state laws have been waived

2   and, thus, unable to determine the scope of conduct that remains the subject of its

3   own laws.

4       Moreover, the San Diego Waiver is hopelessly vague when it states that DHS

5   intends to install "various border infrastructure projects" within the "Project Area,"

6   a 15-mile segment of the border. (Ex. 11.) While the San Diego Waiver identifies

7   two examples of infrastructure projects DHS intends to build (prototypes and the

8   replacement of the primary fence), it fails to describe the other "various border

9   infrastructure projects" that DHS may elect to build sometime in the future. The

10  San Diego Waiver, therefore: (1) does not provide sufficient information to

11  determine whether the undisclosed projects are authorized by Section 102; (2) gives

12  no notice to property owners that their land may be burdened by the waiver; and,

13  (3) leaves open the possibility that DHS may attempt to build additional projects

14  not authorized by Section 102.

15      In addition, the San Diego Waiver fails to provide reasonable notice of when

16  any of these undisclosed projects will be constructed and purports to waive federal

17  and state laws for the on-going maintenance of those structures. This means DHS

18  may attempt to build a solid wall, or some other undisclosed structure, five or ten

19  years from now and claim the San Diego Waiver still applies, or may even assert

20  that the San Diego Waiver applies in perpetuity. The San Diego Waiver also fails to

21  specify how far the project area will extend in a northerly direction, leaving open

22  the possibility these undisclosed projects will lead to the condemnation of

23  additional state-owned or private property.

24      These uncertainties leave California and its citizens in legal limbo - unable to

25  determine whether the various infrastructure projects will be the types of projects

26  authorized under Section 102, whether the area will be considered an area of high

27  illegal entry at the time it is installed, and whether they should file a claim to

28  protect their individual rights.

29

1    The problems created by the 2017 Waivers' lack of clarity are compounded by

2  a 60-day statute of limitations that runs upon their publication, creating the risk that

3  Californians will not learn about the full extent of the 2017 Waivers until it is too

4  late. The Supreme Court has recognized that "all statutes of limitation must proceed

5  on the idea that the party has full opportunity afforded him to try his right in the

6  courts." *Wilson v. Iseminger*, 185 U.S. 55, 62–63 (1902). Here, Section 102's 60-

7  day limitations period is "manifestly unjust" because, when combined with the

8  2017 Waivers' lack of clarity, it deprives a litigant "of a forum without giving . . .

9  adequate notice to protect its otherwise valid rights." *Hartford Cas. Ins. Co. v.*

10 *FDIC*, 21 F.3d 696, 701–04 (5th Cir. 1994). In effect, the 60-day limitations period

11 and the vague nature of the 2017 Waivers are being used to strip California and

12 other litigants of their rights afforded under Section 102(c) and Article III of the

13 United States Constitution.

14    In addition, by barring all non-constitutional claims from being heard in any

15 forum, Section 102(c)(2)(A) unconstitutionally interferes with the "right of access

16 to the courts"—one of the "most precious" liberties safeguarded by the First

17 Amendment. *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 524-525 (2002); U.S.

18 Const. amend. I; *see also, Commodity Futures Trading Comm. v. Schor*, 478 U.S.

19 833, 848 (1986). A statute like Section 102 that imposes burdens to discourage

20 litigants from challenging its "validity or enforcement," is especially suspect. *See,*

21 *In re Workers' Compensation Refund*, 46 F.3d 813, 821–22 (8th Cir. 1995).

22 Accordingly, Section 102's procedural hurdles, combined with the 2017 Waivers'

23 vagueness, amount to "an unlawful attempt to extinguish rights arbitrarily." *Wilson*,

24 185 U.S. at 62–63.

25 **VIII. THE 2017 WAIVERS VIOLATE THE SEPARATION OF POWERS**
   **DOCTRINE (SEVENTH CLAIM)**
26

27    The Supreme Court has consistently reaffirmed "the central judgment of the

28 Framers of the Constitution that, within our political scheme, the separation of

30

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1  governmental powers into three coordinate Branches is essential to the preservation
2  of liberty." *Mistretta v. United States,* 488 U.S. 361, 380-384 (1989). The Court has
3  also recognized that "our constitutional system imposes upon the Branches a degree
4  of overlapping responsibility, a duty of interdependence as well as independence
5  the absence of which 'would preclude the establishment of a Nation capable of
6  governing itself effectively.'" *Id.* The key constitutional concern is whether actions
7  or provisions of law "either accrete to a single Branch powers more appropriately
8  diffused among separate Branches or that undermine the authority and
9  independence of one or another coordinate Branch." *Id.*

10       The Constitution separates the power to make law from the power and duty to
11  execute the law. Article I vests "[a]ll legislative powers" in the Congress. U.S.
12  Const. art. I, section 1. The President's constitutional role is to "take Care that the
13  Laws be faithfully executed." U.S. Const. art. II, Section 3. This separation of
14  legislative and executive power is a central foundation of our government. *See, e.g.,*
15  *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587 (1952); *Buckley v.*
16  *Valeo,* 424 U.S. 1, 129 (1976); *Chadha,* 462 U.S. 919; *Bowsher v. Synar,* 478 U.S.
17  714 (1986). Therefore, Congress cannot vest its own legislative powers in the
18  Executive Branch even if Congress intended such a result. *Clinton v. New York*, 524
19  U.S. 417, 444-447 (1988). As the Court explained in *Youngstown Sheet & Tube*
20  *Co.,* 343 U.S. at 587, "the President's power to see that the laws are faithfully
21  executed refutes the idea that he is to be a lawmaker."

22       The Supreme Court has upheld statutes where Congress "legislated in the
23  contingency" by providing the Executive Branch with specific laws that Congress
24  has deemed appropriate to waive in certain contingent circumstances. For example,
25  the Court rejected challenges under the separation of powers doctrine in cases such
26  as *Field v. Clark*, 143 U.S. 649 (1892) and *J.W. Hampton, Jr. & Co. v. United*
27  *States,* 276 U.S. 394 (1928), where Congress performed the legislative function of
28  deciding which specific tariffs, or laws, could be modified or terminated and under

31

1    what circumstances, and the President was "the mere agent of the lawmaking

2    department to ascertain and declare the event upon which its expressed will was to

3    take effect." *J.W. Hampton, Jr. & Co.,* 276 U.S. at 411. Another example is the

4    original version of Section 102, where Congress allowed for the waiver of two

5    specific acts of Congress, NEPA and the ESA, under certain circumstances, and

6    where the laws were clearly spelled out.  In that case, the Executive Branch was

7    merely provided with discretion on how to implement the waivers of two statutes

8    that Congress had already chosen. Pub. L. 104-208, div. C, § 102(c).

9        In stark contrast, the current version of Section 102 authorizes the DHS

10   Secretary to pick and choose among enacted laws and determine, in his or her sole

11   discretion, which pieces shall be waived. In enacting Section 102,

12   Congress has not stated which laws are to be waived or why, and has instead given

13   the Executive Branch that authority.  Section 102 was not "legislated in the

14   contingency" as the Supreme Court allowed in the *Field* and *J.W. Hampton* cases,

15   and Congress had no idea which laws were going to be waived when it enacted the

16   law, nor did the President when he signed the law. Congress has thus impermissibly

17   granted the Executive Branch the essential legislative power of waiving existing

18   law. Such a blanket waiver is investing legislative functions in the Executive

19   Branch, a clear violation of the doctrine of the separation of powers. This waiver

20   authority must therefore be declared unconstitutional and the 2017 Waivers must be

21   invalidated.

22   **IX.  SECTION 102(C) AND THE 2017 WAIVERS VIOLATE THE NON-
     DELEGATION DOCTRINE (EIGHTH CLAIM)**

23

24       "The fundamental precept of the delegation doctrine is that the lawmaking

25   function belongs to Congress . . . and may not be conveyed to another branch or

26   entity." *Loving v. United States*, 517 U.S. 748, 758 (1996) (citing *Field v. Clark*,

27   143 U.S. 649, 692 (1892)). "The Congress is not permitted to abdicate or to transfer

28   to others the essential legislative functions with which it is thus vested." *A.L.A.*

32

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

*Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). This doctrine stems from Article 1, Section I of the U.S. Constitution, which provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States . . . ."

### A. The Section 102(c) Waiver Provision Lacks a Sufficient Intelligible Principle

Congress may delegate legislative power if it provides sufficient guidance for the recipient of that delegation. "[W]hen Congress confers decision making authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). This "intelligible principle" limits the scope of the delegation and enables review of whether the agency has properly exercised the delegated authority to achieve Congress' objective. *Amalgamated Meat Cutters and Butcher Workmen v. Connally*, 337 F.Supp. 737, 746 (D.D.C. 1971). It must be sufficiently definite to "enable Congress, the courts and the public to ascertain whether the [recipient of delegated authority] has conformed to those standards." *Yakus v. United States*, 321 U.S. 414, 426 (1944).

Previous district courts have found an intelligible principle in Section 102(c)'s inclusion of the words "necessary to ensure expeditious construction of the barriers and roads under this section." *E.g., Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 128 (D.D.C. 2007); *County of El Paso v. Chertoff*, No. EP-08-CA-196-FM, 2008 WL 4372693 (W.D. Tex. 2008). All four district courts to consider the question reasoned that the circumstances in which the waiver could be exercised were narrow enough that it was an appropriate delegation of congressional authority. *Defenders of Wildlife*, 527 F. Supp. 2d at 128; *County of El Paso*, 2008 WL 4372693; *Save Our Heritage Organization v. Gonzales*, 533 F. Supp. 2d 58

33

1   (D.D.C. 2008); *Sierra Club v. Ashcroft*, No. 04CV0272-LAB (JMA) (S.D. Cal.

2   2005). As one court explained, "the Secretary may only exercise the waiver

3   authority for the 'narrow purpose' prescribed by Congress: 'expeditious

4   completion' of the border fences authorized by Section 102 in areas of high illegal

5   entry." *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d at 128.

6        However, even if this guidance provided a sufficiently intelligible principle

7   when Section 102(c) was enacted, it no longer serves that purpose today. The

8   passage of time rendered the criteria of "expeditious construction" useless as an

9   intelligible principle; the word "expeditious" is defined as "marked by or acting

10  with prompt efficiency."  Merriam-Webster Online Dictionary, 2017.

11  http://www.merriam-webster.com (Oct. 23, 2017). Applying the phrase

12  "expeditious construction" to new border infrastructure projects, planned and built

13  nearly a decade after the last amendment to Section 102, would strain that

14  definition.

### B. The Lack of Judicial Review Violates the Non-Delegation Doctrine

17       The availability of review—whether it be judicial review, administrative

18  review, or congressional oversight—is critical to a proper delegation of

19  congressional authority. "The safeguarding of meaningful judicial review is one of

20  the primary functions of the doctrine prohibiting undue delegation of legislative

21  powers." *Amalgamated Meat Cutters*, 337 F. Supp. at 759. Judicial review ensures

22  that the agency or official to which Congress has delegated power adheres to the

23  intelligible principle Congress provided. "The legislative policies and standards

24  being clear, judicial review of the remedies adopted by the [agency] safeguards

25  against statutory or constitutional excesses." *Am. Power & Light Co. v. SEC*, 329

26  U.S. 90, 106 (1946). Without an opportunity for meaningful review of whether an

27  agency or official is acting within the scope of Congress' delegation of authority,

28  the intelligible principle performs no function at all.

34

1    In *A.L.A. Schechter Poultry*, the Court struck down the National Industrial

2  Recovery Act. There, the Court expressed concern about the lack of review

3  provided by the statute, explaining that the statute in question dispensed with the

4  administrative procedures in place under the Federal Trade Commission Act "and

5  with any administrative procedure of an analogous character." *A.L.A. Schechter*

6  *Poultry*, 295 U.S. at 533. The Court focused on the fact the National Industrial

7  Recovery Act included no procedures at all for review of whether actions taken by

8  the President came within the scope of Congress' delegated authority. Id. This lack

9  of review, combined with the lack of an intelligible principle, resulted in the

10 Court's decision to strike down the statute.

11   Courts have on numerous occasions found that it was the review —judicial or

12 otherwise—provided by the statute in question that saved the statute from a non-

13 delegation challenge. *See e.g. Touby v. United States*, 500 U.S. 160 (1991);

14 *Humphrey v. Baker*, 848 F.2d 211 (D.D.C. 1988). Section 102(c)'s waiver

15 provision, however, provides no meaningful opportunity for review of the

16 Secretary's exercise of the waiver if the only challenges that can be brought are

17 constitutional challenges and the Secretary is allowed to exercise congressional

18 powers in his or her sole discretion and without regard to prerequisites set forth in

19 the statute. Because there is no meaningful opportunity for review of whether the

20 Secretary's invocation of the waiver authority adheres to any intelligible principle,

21 Section 102(c) violates the non-delegation doctrine.

22 **X.   SECTION 102(C) AND THE 2017 WAIVERS VIOLATE ARTICLE I, SECTION**
**     3, OF THE UNITED STATES CONSTITUTION (NINTH CLAIM)**
23

24   Article I, Section 3 of the United States Constitution states in regard to

25 impeachment that "the Party convicted shall nevertheless be liable and subject to

26 Indictment, Trial, Judgment and Punishment, according to Law." The Supreme

27 Court has stated on numerous occasions that this means the Constitution does not

28 provide immunity to criminal laws or criminal prosecution. *O'Shea v. Littleton*, 414

35

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1    U.S. 488, 503-504 (1974); *Dennis v. Sparks*, 449 U.S. 24, 31-32 (1980). The Court

2    has repeatedly drawn distinctions between officials' powers to overcome civil law

3    and powers to overcome criminal law. In *Dennis v. Sparks*, the Supreme Court held

4    that a state judge could be held criminally liable for conspiracy involving bribery

5    under 42 U.S.C. § 1983, despite the judge being immune to civil liability under the

6    same statute. *Dennis,* 449 U.S. at 27-29. In other words, no person is above the law.

7    *U.S. v. Lee*, 106 U.S. 196, 220 (1882).

8    　　　Further, Article I, Section 2 of the U.S. Constitution states that the President

9    "shall have Power to grant Reprieves and Pardons for Offences against the United

10   States, except in Cases of Impeachment." This is the Executive Branch's check on

11   the power of the other two branches when acting in the criminal law sphere. *Ex*

12   *Parte Grossman,* 267 U.S. 87, 119-120 (1925). But the President and the Executive

13   Branch appointees are not immune from criminal prosecution and cannot simply

14   ignore or unilaterally waive a criminal law of the United States. *See United States v.*

15   *Nixon*, 418 U.S. 683, 707-708 (1974); *Marbury v. Madison*, 5 U.S. 137, 165-166

16   (1803). This is at the very heart of our Constitution. *Nixon,* 418 U.S. at 709; *Berger*

17   *v. United States*, 295 U.S. 78, 85-87 (1935).

18   　　　Here, the Secretary has waived numerous criminal laws concerning Border

19   Wall Projects' construction. The Secretary, for example, has waived the Resource

20   Conservation Recovery Act provision (42 U.S.C. § 6928) making it a crime to

21   knowingly dump hazardous waste that puts another person in imminent danger of

22   death or serious bodily injury. The Secretary has also waived a law making it a

23   crime to knowingly pollute a river, stream or other water of the United States in a

24   way that places another person in imminent danger of death or serious bodily harm

25   in contravention of the federal Clean Water Act, 33 U.S.C. § 1319(c). Congress

26   cannot provide the President or the Executive Branch with such sweeping powers to

27   waive federal criminal laws in its sole discretion, without even listing which

28   criminal laws can be waived. This is contrary to our legal system and puts the

36

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1    Executive Branch above the law of the United States.

2         In addition, the Supreme Court has not resolved the question of whether more

3    specific guidance from Congress is required than the ordinary "intelligible

4    principle" where the delegation of legislative powers to the Executive Branch

5    pertains to criminal law or criminal sanctions. *Touby v. United States*, 500 U.S.

6    160, 165-66 (1991) ("Our cases are not entirely clear as to whether more specific

7    guidance is in fact required.") Here, however, Section 102, if it even provides the

8    necessary guidance required by the "intelligible principle," certainly does not

9    provide any further guidance that may be required for acting in the criminal sphere.

10   In fact, Section 102 allows the Executive Branch to immunize itself and its

11   contractors from any criminal law it deems necessary in its sole discretion.

12   Congress does not even name the criminal laws that can be waived. Therefore,

13   Section 102 has not met the heightened standard required of delegating in the

14   criminal sphere and has allowed the Executive Branch to put itself above the law.

15   Section 102's waiver authority must therefore be declared unconstitutional and the

16   2017 Waivers should be declared invalid.

17   **XI.  SECTION 102(C) AND THE 2017 WAIVERS VIOLATE THE PRESENTMENT
        CLAUSE (ART. I, SECTION 7) (TENTH CLAIM)**

18

19        The Presentment Clause provides that "[e]very Bill which shall have passed

20   the House of Representatives and the Senate, shall, before it becomes a Law, be

21   presented to the President of the United States; if he approves he shall sign it, but if

22   not he shall return it." U.S. Const. art. I, Section 7, cl. 2. The Supreme Court has

23   interpreted these procedural requirements to apply to both the enactment and repeal

24   of statutes. *INS v. Chadha*, 462 U.S. 919, 954 (1983).

25        Section 102(c) suffers from the same constitutional weaknesses as the Line

26   Item Veto Act at issue in *Clinton v. City of New York*, 524 U.S. 417 (1998). There,

27   the Supreme Court struck down the line item veto under the Presentment Clause

28   because the act, in legal and practical effect, allowed the President to partially

37

1  repeal laws, depriving the vetoed provisions of legal force and effect. *Id.* at 438. In

2  arriving at this conclusion, the Court distinguished the Line Item Veto Act from the

3  Tariff Act it upheld in *Field v. Clark*, 143 U.S. 649 (1892). The Court identified

4  three critical differences between the two acts that demonstrated the

5  unconstitutionality of the Line Item Veto Act. *Clinton*, 524 U.S. at 443. First,

6  exercise of the line item veto was contingent on conditions that existed when

7  Congress passed the laws the President partially vetoed, whereas suspension of

8  import duty exemptions in *Field* was contingent on conditions that did not exist

9  when Congress passed the Tariff Act issuing those exemptions. *Id.* Second, in

10  *Clinton*, after making congressionally prescribed determinations, the Executive

11  retained unbridled discretion regarding whether to veto spending measures. *Id.* at

12  443–44. And third, in issuing a line item veto, the President was acting contrary to

13  congressional intent. *Id.* at 444. The Line Item Veto Act, therefore, gave the

14  President "unilateral power to change the text of duly enacted statutes" in violation

15  of the Presentment Clause. *Id.* at 447.

16      Here, Section 102(c) grants the Secretary nearly unbridled discretion in

17  determining which laws to waive, under what timeline, and the scope of activities

18  covered by the waiver. Unlike *Field*, in which the President had a duty to act in

19  congressionally defined ways after determining a threshold condition had been met,

20  here the Secretary has unchecked authority to waive any laws for an indefinite time

21  period once he or she determines it necessary for expeditious border security. In

22  fact, the Secretary's discretion to waive any laws is broader in some ways than that

23  of the President to exercise the line item veto in *Clinton*. There, the President could

24  exercise the line item veto only with respect to spending measures and Congress

25  retained the power to reject the line item veto. *Clinton,* 524 U.S. at 436. Here, the

26  Secretary has authority to waive any law regardless of subject matter, including

27  laws far outside the Secretary's homeland security expertise, and Congress has

28  retained no authority to reject the waivers.

38

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1   Further, much like the Line Item Veto Act at issue in Clinton, the waiver
2   provision allows the Executive to act contrary to the intent of Congress by waiving
3   laws passed by Congress and intended to apply to activities in the relevant region.
4   By remaining silent as to which laws the Secretary could waive, Congress provides
5   no guidance as to its intent regarding which laws the Secretary should waive. Did
6   Congress intend for the Secretary to waive bribery and racketeering laws, or the
7   prohibition on the intentional disposal of hazardous waste? Section 102(c) grants
8   such broad discretion to the Secretary regarding which, if any, laws to waive that
9   the Secretary's actions only can be said to be implementing the Executive's will,
10  not that of Congress. Also, as in Clinton, the fact that that Congress intended to
11  allow waivers when it passed Section 102(c) is of no import if the waiver provision
12  is unconstitutional. Clinton, 524 U.S. at 445–46.

13  The existence and use of waiver provisions in other laws does not force an
14  alternative conclusion, contrary to the court's view in *Defenders of Wildlife v.*
15  *Chertoff*, 527 F. Supp. 2d 119, 125 (D.D.C. 2007). Other waiver provisions have
16  limited Executive discretion by allowing waiver of a provision within the same act
17  or a limited category of laws, or by mandating specified waiver actions once the
18  Executive determines a threshold event has occurred, and none has precluded
19  judicial review. *See, e.g.*, 10 U.S.C. § 433 (limiting waivable laws to those specific
20  laws regarding management of Federal agencies); 22 U.S.C. § 7207(a)(3) (allowing
21  waiver of restrictions on aid to specified countries for specific reasons). In contrast,
22  the waiver provision in Section 102(c) grants the Secretary unbridled discretion to
23  waive any and all laws for an indefinite time and for undefined activities, and
24  provides for limited judicial review. This waiver, more than those in other statutes,
25  purports to allow the Secretary to unilaterally change statutes.

26  Further, no court to address Section 102(c) has dealt with such a broad
27  application of the waiver provision. *See, e.g., Defenders*, 527 F. Supp. 2d 119; *Save*
28  *Our Heritage Organization v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008). By

39

California Pls.' Mem. In Supp. of Mot. For Summ. J.  (17cv1215-GPC(WVG))

1    expanding the use of the waiver provision, the 2017 Waivers demonstrate more

2    clearly than the previous waivers the similarity between Section 102(c) and the

3    Line Item Veto Act that the Court held unconstitutional in *Clinton*. The Secretary

4    has used nearly unbridled discretion to effectively repeal dozens of laws – robbing

5    them of legal force and effect for an indefinite time period and for as yet undefined

6    activities in the region. Therefore, the Secretary's application of Section 102(c) in

7    the 2017 Waivers violates the Presentment Clause of the Constitution.

8                                    **CONCLUSION**

9          Defendants' ill-defined and ill-considered project to construct a massive

10   border wall and related barriers along our international border with Mexico is

11   beginning to lunge forward in virtually secret-until-the-last-minute steps. This

12   piecemeal activity is occurring without the comprehensive and reasoned public

13   review and mitigation of the adverse environmental impacts of Defendants'

14   proposed multibillion dollar development that is envisioned by fundamental federal

15   statutes such as NEPA and the CZMA. This unlawful conduct cannot be justified

16   by the outdated and inapplicable waiver provisions of Section 102 and is wholly

17   inconsistent with the constitutional safeguards discussed above. Accordingly, the

18   People of the State of California and the California Coastal Commission

19   respectfully request the Court to enter summary judgment in favor of their claims.

20   Dated:  November 22, 2017          Respectfully Submitted,

21                                      XAVIER BECERRA
                                        Attorney General of California
22                                      TIMOTHY R. PATTERSON
                                        Supervising Deputy Attorney General
23

24                                      s/Michael P. Cayaban
                                        MICHAEL P. CAYABAN
25                                      Supervising Deputy Attorney General
                                        *Attorneys for the People of the State of*
26                                      *California, by and through Xavier Becerra,*
                                        *Attorney General, and the California Coastal*
27                                      *Commission*

28

                                        40