CHAD A. READLER
Acting Assistant Attorney General
Civil Division
JOHN R. TYLER
Assistant Branch Director
GALEN N. THORP
Senior Counsel
VA State Bar No. 75517
950 Pennsylvania Avenue NW
Washington, DC  20530
Tel: (202) 514-4781
Fax: (202) 616-8460
Email: galen.thorp@usdoj.gov

*Attorneys for Defendants*

[Additional counsel listed below]

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| | Case No. 17cv1215-GPC(WVG) |
| IN RE: BORDER INFRASTRUCTURE ENVIRONMENTAL LITIGATION | Consolidated with Case No. 17cv1873 GPC (WVG) Case No. 17cv1911 GPC (WVG) |
| | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| | Date: February 9, 2018 Time: 1:30 pm Courtroom: 2D Hon. Gonzalo P. Curiel |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. ii

TABLE OF AUTHORITIES ...................................................................... iv

TABLE OF EXHIBITS ............................................................................. xi

INTRODUCTION ...................................................................................... 1

ARGUMENT .............................................................................................. 2

I.   California Has Not Carried Its Burden to Establish Standing ..................... 2

II.  The Court Lacks Jurisdiction to Consider Plaintiffs' Non-
     Constitutional Claims Regarding the Waiver Decisions ............................ 4

     A.  Plaintiffs Cannot Carve Up Each Waiver Determination into
         Multiple Distinct Decisions Subject to APA Review ........................... 6

     B.  Congress Barred *Ultra Vires* Challenges Along with Other Non-
         Constitutional Claims ............................................................................ 8

III. To the Extent the Court Conducts *Ultra Vires* Review, Plaintiffs
     Have Failed to Make the "Two-Part" Showing Required in this
     Circuit .................................................................................................... 12

     A.  Plaintiffs Have Not Established That They Have Statutory Rights
         to Vindicate Through Litigation .......................................................... 13

     B.  Plaintiffs Have Not Established that the Secretary Violated Any
         Clear Command in the Statute ............................................................ 14

         1.  Section 102(a) plausibly states a general mandate that can be
             applied apart from the specific Congressional priorities
             identified in § 102(b) .................................................................... 14

         2.  Plaintiffs have not shown that § 102(c) waiver authority has
             unambiguously expired .................................................................. 18

         3.  Plaintiffs have not shown that § 102(c) unambiguously
             requires that the Federal Register notice of a waiver
             determination include detailed "findings" .................................... 19

         4.  Plaintiffs cannot show that key statutory terms
             unambiguously preclude the waiver determinations at issue
             here ................................................................................................ 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IV. Plaintiffs' Constitutional Claims Fail .......................................................... 24

    A.  The Waiver Provision Does Not Violate Article I § 1 ......................... 24

    B.  The Waiver Provision Does Not Violate Article I § 3 ......................... 26

    C.  The Waiver Provision Does Not Violate Article I § 7 ......................... 27

    D.  The Waiver Provision Does Not Violate Constitutional Provisions Regarding Access to the Courts ........................................................... 29

    E.  The Waiver Provision Does Not Violate the Tenth Amendment ........ 32

V.  Plaintiffs Are Not Entitled to Relief Under Other Statutes or to the Remedies They Seek for Their Constitutional and *Ultra Vires* Claims ..... 35

CONCLUSION ................................................................................................. 37

# TABLE OF AUTHORITIES

*Cases*

*Acree v. Republic of Iraq*,
  370 F.3d 41 (D.C. Cir. 2004) ................................................ 28

*Akiak Native Cmty. v. U.S. Postal Serv.*,
  213 F.3d 1140 (9th Cir. 2000) .............................................. 36

*Am. Airlines, Inc. v. Herman*,
  176 F.3d 283 (5th Cir. 1999) ............................................... 19

*Am. Soc'y of Anesthesiologists v. Shalala*,
  90 F. Supp. 2d 973 (N.D. Ill. 2000) ....................................... 12

*Barnum Timber Co. v. EPA*,
  No. 08-1988, 2008 WL 4447690 (N.D. Cal. Sept. 29, 2008) ............. 3-4

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin.*,
  Inc., 502 U.S. 32 (1991) ......................................... 8, 10, 11, 13

*Bear Valley Mut. Water Co. v. Jewell*,
  790 F.3d 977 (9th Cir. 2015) ............................................... 16

*Bowen v. Michigan Acad. of Family Physicians*,
  476 U.S. 667 (1986) ...................................................... 4, 5

*Boyd v. United States*,
  No. 15-3494, 2017 WL 1133512 (N.D. Cal. Mar. 27, 2017) .................. 3

*Cal. Sportfishing Prot. Alliance v. U.S. Bureau of Reclamation*,
  No. 15-912, 2015 WL 6167521 (E.D. Cal. Oct. 202015) .................... 13

*Chamber of Commerce v. Reich*,
  74 F.2d 1322 (D.C. Cir. 1996) ............................................. 9

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ...................................................... 33

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ...................................................... 27

*County of El Paso v. Chertoff*,
  No. 08-196, 2008 WL 4372693 (W.D. Tex. 2008) .................. 24, 27, 34

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) ................................................................ 2

*Defenders of Wildlife v. Chertoff*,
  527 F. Supp. 2d 119 (D.D.C. 2007) .................................... 24, 25, 26, 27

*Duldulao v. INS*,
  90 F.3d 396 (9th Cir. 1996) ...................................................... 5

*Estep v. United States*,
  327 U.S. 114 (1946) ............................................................. 5, 8

*George v. Evans*,
  311 F. App'x 426 (2d Cir. 2009) ............................................... 36

*Gebhardt v. Nielsen*,
  _ F.3d _, 2018 WL 326238 (9th Cir. Jan. 9, 2018) ............................ 9

*Gila River Indian Community v. United States*,
  729 F.3d 1139 (9th Cir. 2013) ................................................. 32

*Gonzalez v. Raich*,
  500 F.3d 850 (9th Cir. 2007) .................................................. 32

*Griffith v. FLRA*,
  842 F.2d 487, 494 (D.C. Cir. 1988) ........................................... 23

*Harland Clarke Holding Corp. v. Milken*,
  646 F. App'x 223 (3d Cir. 2016) ............................................... 7

*Harper/Nielsen-Dillingham, Builders, Inc. v. United States*,
  81 Fed. Cl. 667 (2008) ........................................................ 31

*Hawaii v. Trump*,
  878 F.3d 662 (9th Cir. 2017) ................................................... 9

*Haywood v. Drown*,
  556 U.S. 729 (2009) ........................................................... 30

*Heath v. Alabama*,
  474 U.S. 82 (1985) ............................................................ 32

*Hirschkop v. Snead*,
  594 F.2d 356 (4th Cir. 1979) .................................................. 31

*In re Nat'l Security Agency Telecomm. Records Litig.*,
  671 F.3d 881 (9th Cir. 2011) ........................................... 24, 26, 28

*Isau v. Smith*,
    511 F.3d 881 (9th Cir. 2007) ................................................................... 5

*J.W. Hampton, Jr. Co. v. United States*,
    276 U.S. 394 (1928) ........................................................................... 24

*Kucana v. Holder*,
    558 U.S. 233 (2010) ............................................................................ 4

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ....................................................................... 8, 11

*Levin v. Commerce Energy, Inc.*,
    560 U.S. 413 (2010) .......................................................................... 29

*Lindahl v. OPM*,
    470 U.S. 768 (1985) ...................................................................... 11-12

*Logan v. U.S. Bank Nat'l Ass'n*,
    722 F.3d 1163 (9th Cir. 2013) ............................................................ 13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................ 3

*Maldonado v. Fasano*,
    67 F. Supp. 2d 1170 (S.D. Cal. 1999) .............................................. 6, 28

*Mistretta v. United States*,
    488 U.S. 361 (1989) .......................................................................... 24

*Moyle v. Dir., Office of Workers' Compensation Programs*,
    147 F.3d 1116 (9th Cir. 1998) ............................................................ 28

*Munguia v. Frias*,
    No. 07-1016, 2009 WL 3157482 (S.D. Cal. Sept. 24, 2009) .................. 29

*New York v. United States*,
    505 U.S. 144 (1992) .......................................................................... 33

*Northcoast Envtl. Ctr. v. Glickman*,
    136 F.3d 660 (9th Cir. 1998) ............................................................. 36

*Osborn v. Bartos*,
    No. 08-2193, 2010 WL 3809847 (D. Ariz. Sept. 20, 2010) .................. 18

*O'Brien v. Welty*,
    818 F.3d 920 (9th Cir. 2016) ............................................................. 31

*Pacific Mar. Ass'n v. NLRB*,
    827 F.3d 1203 (9th Cir. 2016) ................................................................. 12, 14, 18

*Pinnacle Armor, Inc. v. United States*,
    648 F.3d 708 (9th Cir. 2011) ......................................................... 4, 5, 11

*Printz v. United States*,
    521 U.S. 898 (1997) ................................................................. 33

*Ralpho v. Bell*,
    569 F.2d 607 (D.C. Cir. 1977) ................................................................. 8

*Ringgold-Lockhart v. Cnty. of Los Angeles*,
    761 F.3d 1057 (9th Cir. 2014) ................................................................. 29

*Rodrigues v. Donovan*,
    769 F.2d 1344 (9th Cir. 1985) ................................................................. 10

*Rodriguez v. Robbins*,
    No. 07-3239, 2012 WL 12953870 (C.D. Cal. May 3, 2012) ............................... 6-7

*Roller v. Gunn*,
    107 F.3d 227 (4th Cir.1997) ................................................................. 29

*S. Cal. Edison Co. v. Lynch*,
    307 F.3d 794 (9th Cir. 2002) ................................................................. 32

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ................................................................. 19, 23

*Sanchez v. Johnson*,
    416 F.3d 1051 (9th Cir. 2005) ................................................................. 13

*Save Our Heritage Org. v. Gonzales*,
    533 F. Supp. 2d 58 (D.D.C. 2008) ................................................. 14, 14-15, 15, 24

*Sec'y of the Interior v. California*,
    464 U.S. 312 (1984) ................................................................. 36

*Shelby County v. Holder*,
    133 S. Ct. 2612 (2013) ................................................................. 33, 34, 35

*Sierra Club v. Ashcroft*,
    No. 04-272, 2005 U.S. Dist. LEXIS 44244 (S.D. Cal. Dec. 13, 2005) .......... passim

*Smith v. Fed. Reserve Bank of N.Y.*,
    280 F. Supp. 2d 314 (S.D.N.Y. 2003) ................................................................. 28

*Spencer v. World Vision, Inc.*,
    633 F.3d 723 (9th Cir. 2011) .................................................................... 6

*Staacke v. U.S. Sec'y of Labor*,
    841 F.2d 278 (9th Cir. 1988) .................................... 10, 11, 14, 18, 19, 23

*Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ.*,
    272 F.3d 1155 (9th Cir. 2001) .............................................................. 17

*Switchmen's Union v. Nat'l Mediation Bd.*,
    320 U.S. 297 (1943) ........................................................................ 9, 10

*Tennessee v. Lane*,
    541 U.S. 509 (2004) .............................................................................. 33

*Texas Border Coal. v. Napolitano*,
    614 F. Supp. 2d 54, (D.D.C. 2009) ...................................................... 23

*Touby v. United States*,
    500 U.S. 160 (1991) .............................................................................. 25

*U.S. Postal Serv. v. Gregory*,
    534 U.S. 1 (2001) .................................................................................. 19

*United States v. Geiger*,
    263 F.3d 1034 (9th Cir. 2001) .............................................................. 32

*United States v. Jones*,
    231 F.3d 508 (9th Cir. 2000) ................................................................ 32

*United States v. Meek*
    s, 366 F.3d 705 (9th Cir. 2004) ............................................................ 17

*United States v. Moreno-Morillo*,
    334 F.3d 819 (9th Cir. 2003) ............................................................. 5, 6

*United States v. Spiegel*,
    995 F.2d 138 (9th Cir. 1993) ................................................................ 12

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .............................................................................. 25

*Wilbur v. Locke*,
    423 F.3d 1101 (9th Cir. 2005) .............................................................. 29

*Wilkinson v. Austin*,
    545 U.S. 209 (2005) .............................................................................. 30

*Zivotofsky v. Kerry*,
  135 S. Ct. 2076 (2015) ........................................................................ 26

**Constitutional Provisions**

Art. I § 1 .....................................................................................................24

Art. I § 2 .................................................................................................... 26

Art. I § 3 .................................................................................................... 26

Art. II § 3 ................................................................................................... 24

1st Amend ............................................................................................ 29, 31

5th Amend ................................................................................................. 30

10th Amend ......................................................................................... 32, 33

14th Amend .............................................................................................. 33

**Statutes**

5 U.S.C. § 701 ........................................................................................... 19

5 U.S.C. § 8128(b) .................................................................................... 10

8 U.S.C. § 1154 ........................................................................................... 9

8 U.S.C. § 1330 ........................................................................................ 22

16 U.S.C. § 1446 ...................................................................................... 36

33 U.S.C. § 2326 ...................................................................................... 15

Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009-554 (Sept. 30, 1996) passim

Pub. L. No. 109-13, Div. B, Title I §102, 119 Stat. 231 (May 11, 2005) ............17, 28

Pub. L. No. 109-367, § 3, 120 Stat. 2638 (Oct. 26, 2006) ..............................15, 16, 22

Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 2090 (Dec. 26, 2007) ..16, 18, 21

Cal. Civil Code § 3480 ............................................................................... 3

Cal. Gov. Code. § 12606 ............................................................................. 3

Cal. Gov. Code. § 12607 ............................................................................. 3

Cal. Health & Safety Code § 25100 ............................................................ 3

Cal. Public Resource Code § 40000 ............................................................ 3

Cal. Water Code § 13000 ............................................................................ 3

**Regulations**

82 Fed. Reg. 35984 (Aug. 2, 2017) .............................................. 22, 26, 31

1   82 Fed. Reg. 42829 (Sept. 12, 2017) .....................................................22, 26

2   14 Cal. Code Regs. § 17380-17386 .............................................. 3

3

4   *Legislative Materials*

5   H.R. Rep. 104-828 (Sept. 24, 1996) (Conf. Rep.) .......................................17

    H.R. Rep. 109-72 (May 3, 2005) (Conf. Rep.) .........................................5, 7, 17, 19, 20

6   151 Cong. Rec. H553-559 (Feb. 10, 2005).....................................................7

7   151 Cong. Rec. E247 (Feb. 15, 2005) .........................................................7

8   152 Cong. Rec. S9870 (Sept. 21, 2006).......................................................20

9   *Walls & Waivers: Expedited Construction of the Southern Border Wall and*
        *Collateral Impacts to Communities and the Environment: Joint Oversight*
10      *Field Hearing Before Subcommittees to H. Comm. on Natural Resources,*
11      110th Cong. (2008) ....................................................................21

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF EXHIBITS**

***Congressional Documents (attached at ECF No. 18-2)***

1. H.R. Rep. 104-828 (Sept. 24, 1996) (Conf. Rep.)

2. H.R. Rep. 109-72 (May 3, 2005) (Conf. Rep.)

3. H.R. 1268 (109th Cong.) (engrossed in House, Mar. 16, 2005)

4. 142 Cong. Rec. H11076 (Sept. 25, 1996)

5. 150 Cong. Rec. H8899 (Oct. 8, 2004)

6. 151 Cong. Rec. H453-471 (Feb. 9, 2005)

7. 151 Cong. Rec. H553-559 (Feb. 10, 2005)

8. 151 Cong. Rec. E243-47 (Feb. 15, 2005)

9. 152 Cong. Rec. S9870 (Sept. 21, 2006)

10. *Walls & Waivers: Expedited Construction of the Southern Border Wall and Collateral Impacts to Communities and the Environment:  Joint Oversight Field Hearing Before Subcommittees to H. Comm. on Natural Resources*, 110th Cong. (2008) (excerpts)

11. Cong. Research Serv., RL33659, *Border Security: Barriers Along the U.S. Int'l Border* (Mar. 16, 2009)

***Customs & Border Protection Documents (attached at ECF No. 18-2)***

12. Solicitation No. HSBP1017R0022 (as amended, Apr. 1, 2017) (link) (excerpts)

13. Solicitation No. HSBP1017R0023 (as amended, Apr. 1, 2017) (link) (excerpts)

14. Memorandum, Construction and Evaluation of Border Wall Prototypes, U.S. Border Patrol, San Diego Sector, California (Sept. 25, 2017)

15. Press Release, Construction Begin on Wall Prototypes (Sept. 26, 2017) (link)

16. Press Release, CBP Awards Contract for "Other Materials" Border Wall Prototypes (Sept. 7, 2017) (link)

17. Press Release, CBP Awards Contracts for Border Wall Prototypes (Aug. 30, 2017) (link)

18. U.S. Border Patrol, Sector Profile – Fiscal Year 2016 (link)

19. CBP Finding of No Significant Impact for Infrastructure (Nov. 19, 2003)

***Customs & Border Protection Documents (supplemental)***

20.   Press Release, CBP Completes Construction of Border Wall Prototypes (Oct. 26, 2017) (link), ECF No. 35-4

21.   CBP, Chula Vista Station (Mar. 11, 2014) (link), ECF No. 35-5

22.   CBP, Brown Field Station (Mar. 11, 2014) (link), ECF No. 35-6

23.   U.S. Border Patrol, Environmental Stewardship Plan for Nogales Fence Replacement Project (Nov. 2011) (excerpt) *(attached to this filing)*

24.   Letter to U.S. Fish & Wildlife Service (Jan. 18, 2018) *(attached to this filing)*

25.   Letter to California Department of Parks and Recreation (Jan. 18, 2018) *(attached to this filing)*

26.   Letter to Fort Yuma Quechan Indian Tribe (Jan. 18, 2018) *(attached to this filing)*

27.   Letter to City of Calexico (Jan. 18, 2018) *(attached to this filing)*

# INTRODUCTION

Plaintiffs are irreconcilably opposed to Congress's decision to prioritize border infrastructure construction, as expressed in the passage and amendment of § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Congress determined that expeditious completion of such construction is important enough to outweigh compliance with other laws—including environmental laws and others that can lead to protracted litigation.  Thus, Plaintiffs' goal in these consolidated cases is to force the narrowest possible reading of this statute and to thwart the construction of border infrastructure.  The Court should reject their various attempts to neuter § 102 and overturn Congress's exercise of legislative judgment.

First, the Department of Homeland Security ("DHS") has shown that Congress withdrew this Court's jurisdiction to consider non-constitutional claims "arising from any action undertaken, or any decision made" pursuant to § 102's waiver authority.  IIRIRA § 102(c)(2)(A).  This bars not only Plaintiffs' claims under the environmental statutes, but also Plaintiffs' efforts to press "arbitrary and capricious" challenges under the Administrative Procedure Act ("APA") for aspects of the waiver determinations.  It also is one of the exceptional circumstances in which Congress has barred review of whether the agency action was within the scope of statutory authority.  While courts generally presume that Congress intends to permit such *ultra vires* review, here the statutory text, context, and legislative history demand the conclusion that Congress did not want agency action delayed by such legal challenges.  Accordingly, it is for Congress to police DHS's exercise of this delegated authority, not the courts.

Second, even if *ultra vires* review were available—and it is not—the waiver determinations must be upheld.  Plaintiffs have fallen far short of their heavy burden to establish that DHS has violated a clear statutory mandate or prohibition.  Their lead argument—that the only construction authority is found in § 102(b) and § 102(a) confers no additional authority—was specifically rejected by another court and is not

1   the most plausible reading of the statutory text and Congress's intent.  More

2   egregiously, Plaintiffs attempt to turn deadlines set by Congress in 2007 to ensure

3   swift completion of certain projects into a provision causing the expiration of all § 102

4   authority.  This distortion cannot be reconciled with the text or Congress's intent.  Nor

5   have Plaintiffs established that any of the phrases they pluck from the statute

6   constitute clear mandates or prohibitions that DHS has violated.  The Court should

7   decline Plaintiffs' invitation to convert the extraordinarily limited *ultra vires* inquiry

8   into ordinary APA review.

9     Third, Plaintiffs have not established that any of the constitutional provisions on

10  which they rely prohibit Congress from delegating authority to waive other laws or

11  limiting judicial review of such waiver determinations.  Many of Plaintiffs' claims

12  have been repeatedly rejected by courts considering § 102, and the others are novel

13  applications of constitutional doctrine that can be quickly rejected.  None raise

14  questions serious enough to justify application of the canon of constitutional

15  avoidance in construing § 102's plain text.

16    Accordingly, Defendants are entitled to summary judgment, and Plaintiffs'

17  motions for summary judgment should be denied.

18  **ARGUMENT**

19  **I. CALIFORNIA HAS NOT CARRIED ITS BURDEN TO ESTABLISH**

20  **STANDING**

21    California has abandoned its claimed injury to its tourism industry, which, as

22  DHS explained is not traceable to the challenged agency actions.  *See* Defs.' Br. at 9;

23  Cal. Reply at 1-3.  California also lacks standing to press claims regarding

24  infrastructure projects "along the entire 2000-mile southern border," Cal. Reply at 3,

25  other than those specified in the 2017 waiver determinations.  California has not

26  established standing for projects outside its borders, nor has it established that any

27  other projects within the state are sufficiently imminent to cause cognizable injury.

28  *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *see infra*, Arg. § V.

1    As for its "sovereign interests," California has not carried its burden to establish

2  that the waivers impacted state laws which would actually have been enforceable in

3  connection with these specific projects—other than state laws involving permitting

4  pursuant to the federal Coastal Zone Management Act ("CZMA").  *See* Cal. Compl.

5  ¶¶ 38-39, 112-115 (claiming violation of state laws related to the CZMA).  Its reply

6  brief merely string-cites eight portions of the state code or regulations without

7  explaining how these requirements would apply to the challenged projects.[1]

8  Accordingly, California has failed to establish each of essential elements of standing.

9  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).[2]  Its string-cite does

10  not pass muster for an issue that is Plaintiffs' burden to establish.  *See, e.g.*, *Boyd v.*

11  *United States*, No. 15-3494, 2017 WL 1133512, at *3 (N.D. Cal. Mar. 27, 2017);

12  *Barnum Timber Co. v. EPA*, No. 08-1988, 2008 WL 4447690, at *5 (N.D. Cal. Sept.

13

14  [1] The citations are far from self-evident.  California does not explain how its
15  provisions allowing its Attorney General to bring or intervene in legal actions have
   been preempted.  *See* Cal. Gov. Code §§ 12606, 12607.  Similarly, it does not
16  establish how the state definition of "public nuisance," Cal. Civil Code § 3480, could
17  be enforceable against a federal construction project on federal land.  Such state laws
   provide no jurisdiction or enforcement power against the United States.  Moreover,
18  California Public Resource Code § 40000 and California Health and Safety Code §
19  25100 appear to implement provisions of two federal statutes—the Comprehensive
   Environmental Response, Compensation, and Liability Act ("CERCLA") and
20  Resource Conservation and Recovery Act ("RCRA")—but it is not at all clear that the
21  projects at issue here will involve hazardous waste and certainly do not involve
   Superfund sites.  California cites generally to "Cal. Water Code § 13000 *et seq.*,"
22  which appears to include provisions implementing the federal Clean Water Act, but
23  does not explain what provisions could be relevant here.  And the only regulation it
   cites, 14 Cal. Code Regs. §§ 17380-17386, is an article that expressly does not apply
24  to entities that "generate . . . debris . . . at the site of the construction work" or import
25  debris to "be used in the construction work."  *See id.* § 13780(g) (further explaining
   that "public works agencies constructing roads . . . are not subject to these regulations
26  during the course of the construction work").

27  [2] Hereinafter, internal quotation marks, alterations, and citations are omitted from
28  quotations unless otherwise noted.

29, 2008).  Thus, California has failed to establish standing for any claim dependent on a showing that state laws other than those incident to the CZMA could be implicated by the projects but have been rendered unenforceable.

## II.   THE COURT LACKS JURISDICTION TO CONSIDER PLAINTIFFS' NON-CONSTITUTIONAL CLAIMS REGARDING THE WAIVER DECISIONS

DHS has established that Congress expressly withdrew jurisdiction for courts to consider non-constitutional claims regarding the waiver determinations and construction conducted pursuant to those determinations.  *See* Defs.' Br. at 10-23. Congress crafted language designed to overcome the "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986).  As the Supreme Court has explained, this presumption is merely an "interpretive guide" that is "dislodge[d]" when it is clear that Congress intended to preclude judicial review.  *Kucana v. Holder*, 558 U.S. 233, 251 (2010); *see also Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011) (stating that presumption of judicial review for administrative action "is overcome" when "Congress expressly bars review by statute").  And Congress has overcome that presumption here by providing:

> The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1).  A cause of action or claim may only be brought alleging a violation of the Constitution of the United States.  The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

IIRIRA, Pub. L. No. 104-208, Div. C, Title I § 102(c)(2)(A), 110 Stat. 3009-554 (Sept. 30, 1996), as amended (codified at 8 U.S.C. § 1103 note).

As previously noted, this statutory language is emphatic and comprehensive.  It expansively encompasses not only claims challenging "any [waiver] decision made" by the Secretary but also "any action undertaken" pursuant to that determination.  *Id.* It makes district court jurisdiction "exclusive," *id.*, thereby preempting any concurrent

state court jurisdiction.  And it narrows district court jurisdiction by expressly identifying the sort of suits that may be brought:  "only . . . alleging a violation of the Constitution," and expressly removing jurisdiction over "any claim not specified in this subparagraph."  *Id.*  As explained in the accompanying conference report, this provision was intended "to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver."  *See* Defs.' Ex. 2, H.R. Rep. No. 109-72 at 172 (Conf. Rep.).

Congress has plainly exercised its authority "to define the jurisdiction of the lower federal courts," *Duldulao v. INS*, 90 F.3d 396, 400 (9th Cir. 1996), and "make exceptions to the historic practice whereby courts review agency action." *Bowen*, 476 U.S. at 672-73; *see also Estep v. United States*, 327 U.S. 114, 120 (1946).  A court in this district found § 102(c) straightforward, declaring that it "restricted judicial review of any claims to constitutional claims."  *See Sierra Club v. Ashcroft*, No. 04-272, 2005 U.S. Dist. LEXIS 44244, at *28 (S.D. Cal. Dec. 13, 2005).  Plaintiffs cannot dispute this.  Instead, they seek to evade it by claiming that the jurisdictional bar does not apply to the findings included in the waiver determinations that relate to § 102(a) or (b) and that the jurisdictional bar is not express enough to preclude *ultra vires* review.  Neither argument can defeat Congress's unambiguous limitation on jurisdiction.[3]

---

[3] Defendants agree that the Court has "jurisdiction to determine jurisdiction," *Isau v. Smith*, 511 F.3d 881, 891 (9th Cir. 2007), which makes it appropriate for the Court to review the parties' arguments for and against jurisdiction here.  But this authority cannot, as California would have it, serve as an independent basis to determine merits questions such as "whether Sections 102(a) and (b) authorize the San Diego and Calexico Projects."  Cal. Reply at 4-5.  These are not "jurisdictional facts" necessary to assess the Court's jurisdiction under § 102(c)(1)(A).  *Isau*, 511 F.3d at 891; *see also United States v. Moreno-Morillo*, 334 F.3d 819, 830 (9th Cir. 2003) (limiting inquiry to "necessary precursor to the district court's determination regarding ... jurisdiction").

**A.      Plaintiffs Cannot Carve Up Each Waiver Determination into Multiple Distinct Decisions Subject to APA Review**

Plaintiffs claim that they should be free to challenge the Secretary's findings regarding the need to install infrastructure on the notion that this is a "cause[] of action[] unrelated to waiver decisions." *Id.* at 9.  This argument fails for two reasons. First, Plaintiffs' efforts to cabin the jurisdictional bar so narrowly leaves them paying only lip service to the statutory text.  After all, even in "attempt[ing] to read the jurisdiction stripping provisions . . . narrowly, [a court] cannot escape the principle that 'courts must presume that a legislature says in a statute what it means and means in a statute what it says.'" *Maldonado v. Fasano*, 67 F. Supp. 2d 1170, 1182 n.13 (S.D. Cal. 1999) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).  And second, Plaintiffs disregard the fact that the findings they wish to challenge are integral to the waiver determination itself.

Plaintiffs' argument rests on § 102(c)(2)(A)'s use of the phrase "pursuant to paragraph (1)" to cross-reference § 102(c)(1).  *See* Coal. Reply at 8; Cal. Reply at 4; Ctr. Reply at 2.  They claim that this phrase narrowly limits the jurisdictional bar to the selection of what legal requirements to waive.  But their reading does not give effect to the full text of the provision.  *See Spencer v. World Vision, Inc.*, 633 F.3d 723, 743 (9th Cir. 2011) ("It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute.").  Even if the phrase "decision made . . . pursuant to paragraph (1)" in § 102(c)(2)(A) could plausibly refer to the waiver determination in isolation, *cf. id.* § 102(c)(1) ("[a]ny such decision"), the text is more expansive in two ways.  First, the text also includes "any action undertaken . . . pursuant to paragraph (1)," which encompasses more than the waiver determination itself.  Second, Congress expansively limited jurisdiction for "all causes or claims arising from" such actions or decisions, not merely challenges to an action or decision in isolation.  Plaintiffs' reading must be rejected because it would make both "arising from" and "action undertaken" superfluous.  *See Rodriguez v.*

1   *Robbins*, No. 07-3239, 2012 WL 12953870, at *3 (C.D. Cal. May 3, 2012) (rejecting

2   reading that would make "arising from the proceedings of which the . . . application is

3   a part" redundant with "arising from the adjudication of the . . . application"); *cf.*

4   *Harland Clarke Holding Corp. v. Milken*, 646 F. App'x 223, 227 (3d Cir. 2016)

5   (interpreting contract so that separate "arising under" clause was not "superfluous").

6       Plaintiffs' reading is also implausible because it would frustrate Congress'

7   purpose for the jurisdictional limitation and waiver provision—to prevent litigation

8   delays. *See* H.R. Rep. No. 109-72 at 172 (Conf. Rep.) (explaining congressional

9   intent that "judicial review of actions or decisions of the Secretary not delay the

10  expeditious construction of border security infrastructure").[4]  Plaintiffs' reading would

11  make every waiver determination subject to ordinary APA review for whether the

12  project was really "necessary" in the first place. *See* Coal. Reply at 11-12 (arguing

13  that agency's decision must justify "that these border infrastructure projects were

14  'necessary,'" that they were in areas of high illegal entry, and that they were in the

15  vicinity of the border); Cal. Reply at 12 (demanding "meaningful review of the

16  Secretary's actions" and "findings").  This would cause the very litigation delays that

17  § 102(c)(2)(A) targeted.

18      Here, Plaintiffs cannot establish that any of their legal challenges "arise" from

19  something other than the decisions made and actions taken pursuant to § 102(c)(1)'s

20  waiver authority.  The Secretary issued a single "notice of determination" for each of

21  the two waiver decisions, including findings relevant to the statutory criteria that the

22

23  _____

    [4] Plaintiffs cannot distinguish this clear statement of Congressional intent.  The same

24  scope is reflected in the statements of individual legislators.  *See* Defs.' Ex. 7, 151

    Cong. Rec. H557 (Feb. 10, 2005) (statement of Congresswoman Davis) (objecting to

25  provision because it "bars judicial review of any claim arising from the construction

    of barriers and roads at borders"); Defs.' Ex. 8, 151 Cong. Rec. E247 (statement of

26  Congressman James Langevin) ("This overly broad provision would give

    unprecedented power to the Secretary to undertake large construction projects without

27  any accountability or judicial review.").

28

1  waiver be "necessary to ensure expeditious construction of the barriers and roads

2  under this section."  IIRIRA § 102(c)(1).  Plaintiffs rely on this notice as the "final

3  agency action" purportedly subject to APA review, *see* Coal. Reply at 7, despite the

4  fact that this is the very determination and action for which Congress strictly limited

5  judicial review.  But Plaintiffs have not, and cannot, show that findings necessary for

6  issuance of a waiver—which were included in the waiver determination itself—can be

7  considered separate final agency actions.  And even if they could force such a

8  distinction, they would still not evade Congress's clear intent to encompass all

9  "actions undertaken" pursuant to the waiver authority.  In sum, the APA does not give

10  the Court jurisdiction that Congress has expressly withdrawn.

> **B.  Congress Barred *Ultra Vires* Challenges Along with Other Non-Constitutional Claims**

12        DHS has shown that *ultra vires* review is not an inherent judicial authority, but

13  instead an application of the same rebuttable presumption of congressional intent to

14  permit judicial review discussed above.  *See* Defs.' Br. at 17-18 & n.10.  As the

15  Supreme Court explained, *Leedom v. Kyne*, 358 U.S. 184 (1958), and other *ultra vires*

16  cases merely apply "the familiar proposition that only upon a showing of clear and

17  convincing evidence of a contrary legislative intent should the courts restrict access to

18  judicial review."  *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S.

19  32, 44 (1991).  *Kyne* and its progeny do not authorize judicial review of every "agency

20  action that is alleged to have exceeded the agency's statutory authority."  *Id.* at 43.

21        Accordingly, Plaintiffs err in claiming that judicial review of whether an agency

22  exceeded its statutory authority must always be available.  Coal. Reply at 1-2 & n.1;

23  Cal. Reply at 5.  As the D.C. Circuit observed, nothing "prevent[s] [Congress] from

24  shielding even the most patent deviation from the statutory scheme from judicial

25  redress where the Constitution is in no wise implicated."  *Ralpho v. Bell*, 569 F.2d

26  607, 622 n.101 (D.C. Cir. 1977) (citing *Switchmen's Union v. Nat'l Mediation Bd.*,

27  320 U.S. 297, 301 (1943)).  *See also Estep*, 327 U.S. at 120 ("[E]xcept when the

Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses.").  In *Switchmen's Union*, the Supreme Court found that it lacked authority to consider an *ultra vires* claim because the Railway Labor Act impliedly precluded judicial review because congressional "intent seems plain" that "[t]here was to be no dragging of the controversy into other tribunals of law."  *See Switchmen's Union*, 320 U.S. at 305; *id.* at 301 ("All constitutional questions aside, it is for Congress to determine how the rights which it creates will be enforced.").

Ninth Circuit caselaw is consistent with these principles.  For example, this month, the Ninth Circuit concluded it lacked jurisdiction to review an *ultra vires* challenge because 8 U.S.C. § 1154(a)(1)(A)(viii)(I) left the decision to the Secretary's "sole and unreviewable discretion."  *Gebhardt v. Nielsen*, _ F.3d _, 2018 WL 326238, at *5 (9th Cir. Jan. 9, 2018).  And in *Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir. 2017), the Ninth Circuit relied on *Chamber of Commerce v. Reich*, 74 F.2d 1322, 1327-28 (D.C. Cir. 1996), for the conclusion—undisputed here—that *ultra vires* review is not dependent on availability of the APA.[5]  In the passage cited favorably by *Hawaii*, the D.C. Circuit observed that while "courts are normally available to reestablish the limits on [executive] authority" when an *ultra vires* action occurs, "if Congress precluded [such] non-statutory judicial review . . . that would be another matter."  74 F.2d at 1328.  Thus, the *Hawaii* decision is entirely consistent with the conclusion that Congress can bar *ultra vires* review if it chooses.[6]

---

[5] *Hawaii* described *ultra vires* review as a "cause of action[] which exists outside of the APA."  878 F.3d at 682.  *Reich* elaborates that the "enactment of the APA . . . does not repeal the review of *ultra vires* actions recognized long before."  74 F.2d at 1328.

[6] California badly mischaracterizes *Hawaii*.  That case did not conclude "that courts 'necessarily' retain jurisdiction to review whether executive actions are '*ultra vires*.'"  Cal. Reply at 5 (quoting three words from *Hawaii*, 878 F.3d at 679).  Instead, the Ninth Circuit simply stated that it was implicit in a prior Supreme Court case, that "[b]y reaching the merits" the Supreme Court "necessarily first decided that the Court had jurisdiction."  878 F.3d at 679.  Similarly, California omits key language that distorts another quotation:  "It is the duty of the courts, *in cases properly before them*,

1    Plaintiffs gain no traction by pointing to a pair of Ninth Circuit cases
2    characterizing 5 U.S.C. § 8128(b) as containing an "absolute jurisdictional bar" but
3    nevertheless subject to *ultra vires* review.  *See* Coal. Reply at 2 (quoting *Markham v.*
4    *United States*, 434 F.3d 1185, 1187 (9th Cir. 2006); *Staacke v. U.S. Sec'y of Labor*,
5    841 F.2d 278, 281 (9th Cir. 1988)).  These cases, like all the others, turn on the
6    question of what Congress intended to bar.  The "absolute" bar to which these cases
7    refer is a "finality provision" prohibiting judicial review of the *merits* of an agency
8    decision "allowing or denying a payment under this subchapter."  *Rodrigues v.*
9    *Donovan*, 769 F.2d 1344, 1347-48 (9th Cir. 1985).  Both cases cited by Plaintiffs rely
10   on *Rodrigues* which makes clear that the inquiry is still one of "congressional intent."
11   *Id.* at 1347.  The Ninth Circuit simply concluded that Congress did not intend this
12   absolute bar on review of the merits to prohibit review of constitutional or *ultra vires*
13   claims.  *See id.* at 1347-48 (reviewing constitutional claims because "Congress's
14   intent was that the courts not be burdened by a flood of small claims challenging the
15   merits of compensation decisions . . . and that the Secretary should be left free to
16   make the policy choices associated with disability decisions"); *Staacke*, 841 F.2d at
17   281 (extending *Rodrigues* to *ultra vires* claims).

18   Congress is also free to bar *ultra vires* claims even if there is no other avenue
19   for judicial review.  *MCorp Financial* makes clear that either of two factors prohibit
20   judicial review under the *Kyne* exception:  1) if the absence of immediate judicial
21   review would not "wholly deprive the [plaintiff] of a meaningful and adequate means
22   of vindicating its statutory rights," or 2) if "Congress has spoken clearly and directly"
23   to preclude "review of the contested determination."  502 U.S. at 43-44.  Plaintiffs
24   argue that only the first factor matters.  They claim that even if Congress clearly

25

26   to say where those statutory and constitutional boundaries lie."  878 F.3d at 679
27   (emphasis added); *cf.* Cal. Reply at 5 (omitting the emphasized clause).  The full
     quotation makes clear that it does not address the issue here—whether Congress
28   withdrew the Court's jurisdiction to discern and enforce the statutory boundaries.

precluded review, *ultra vires* review must be employed if there is no other means for judicial review.  *See* Ctr. Reply at 4-5; Coal. Reply at 2-3, Cal. Reply at 5.  This view inherently conflicts with *Kyne*'s logic of congressional intent, which depends on the observation that courts "*cannot lightly infer* that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers."  358 U.S. at 190 (emphasis added).  And *MCorp Financial* treated each factor as an independently "critical" distinction precluding review.  *See* 502 U.S. at 43; *see id.* at 44 ("[T]he statute provides us with clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin the [challenged agency action].").[7]  The Ninth Circuit has recognized as much.  *See, e.g.*, *Pinnacle Armor*, 648 F.3d at 719 (relying on *MCorp Financial* to conclude that the presumption of judicial review for administrative action "is overcome" when "Congress expressly bars review by statute," without reference to other avenues for judicial review).  Nor is such a reading necessary as a matter of constitutional avoidance.  *See infra*, Arg. § IV (showing that Plaintiffs' constitutional arguments that judicial review is essential are meritless).

In § 102(c)(2)(A), Congress has adopted language radically different from the finality provisions common in other statutes.  In expressly stating "[t]he court shall not have jurisdiction to hear any claim not specified in this subparagraph," Congress made clear that its purpose was broader than banning judicial review of the merits of

---

[7] Plaintiffs misuse the Supreme Court's observation that the "clarity of the congressional preclusion of review" factor is "related" to the vindication factor.  This observation does not mean that the preclusion factor is "inextricably . . . bound up with" the vindication factor.  Ctr. Reply at 5.  The Supreme Court's discussion of both factors does not make either one irrelevant standing alone.  Instead, it suggest that either "critical" factor can be fatal to judicial review under the "narrow window" recognized by *Kyne*.  *See Staacke*, 841 F.2d at 281.  And, by concluding with an emphasis on "clear and convincing evidence" of Congress's intent, 502 U.S. at 44, *MCorp Financial* suggests that the second factor may be more dispositive.

the waiver determination.[8]  *Cf. Lindahl v. OPM*, 470 U.S. 768, 779-80 (1985) ("[W]hen Congress intends to bar judicial review altogether, it typically employs language far more unambiguous and comprehensive than" 5 U.S.C. § 8347(c)'s provision that "decisions concerning these matters are final and conclusive and are not subject to review").  In permitting only constitutional claims to proceed, Congress was preempting all other sources of litigation delay.  *Cf. United States v. Spiegel*, 995 F.2d 138, 140 (9th Cir. 1993) (interpreting statute at issue in *MCorp Financial* to "leave[] no room to doubt that Congress provided only one avenue for challenging" covered agency action).  It is difficult to imagine language more tailored to prohibiting *ultra vires* review.  Congress's choice must be respected.  "Federal courts are not, after all, superlegislatures entitled to invoke a generalized presumption to trump an express 'hands off' direction from Congress."  *Am. Soc'y of Anesthesiologists v. Shalala*, 90 F. Supp. 2d 973, 975 (N.D. Ill. 2000), *aff'd*, 279 F.3d 447 (7th Cir. 2002).

## III.   TO THE EXTENT THE COURT CONDUCTS *ULTRA VIRES* REVIEW, PLAINTIFFS HAVE FAILED TO MAKE THE "TWO-PART" SHOWING REQUIRED IN THIS CIRCUIT

Even if Congress's intent to prohibit *ultra vires* review was unconvincing, Plaintiffs have not established that they satisfy *Kyne*'s "narrow exception" by making the "two-part showing" required in this Circuit:  (1) that the challenged action "contravene[s] clear and mandatory statutory language" and (2) that "absent district court jurisdiction, [plaintiff would] be wholly deprived of a meaningful and adequate means of vindicating its statutory rights."  *Pacific Mar. Ass'n v. NLRB*, 827 F.3d 1203, 1208 (9th Cir. 2016).  Plaintiffs' failure to establish either of these prongs is fatal to their attempt to invoke *ultra vires* review.

---

[8] Plaintiffs err in suggesting that finality provisions "are *more* preclusive than § 102." Ctr. Reply at 7.  As discussed above, a finality provision's absoluteness has often been found to shield the merits of a decision from review.  Here, by contrast, Congress expressly barred any form of jurisdiction except the review of constitutional claims.

### A.    Plaintiffs Have Not Established That They Have Statutory Rights to Vindicate Through Litigation

DHS has shown that courts have emphasized that nonstatutory *ultra vires* review is appropriate only as a last resort to protect statutory rights.  *See* Defs.' Br. at 23-25; *see, e.g.*, *MCorp Fin.*, 502 U.S. at 43 (explaining that the fact that the plaintiff would have been "wholly depriv[ed] . . . of a . . . means of *vindicating its statutory rights*" was "central to our decision in *Kyne*" (emphasis added)).  Accordingly, Plaintiffs cannot merely identify a "statutory obligation" for the agency, but instead must identify a "statutory right" by which Plaintiffs are entitled to vindication.  *See Cal. Sportfishing Prot. Alliance v. U.S. Bureau of Reclamation*, No. 15-912, 2015 WL 6167521, at *11 & n.8 (E.D. Cal. Oct. 20, 2015).  Plaintiffs make no attempt to establish that their *ultra vires* claims are tied to a statutory right providing individual benefits.  *See* Cal. Reply at 5 n.4 (merely expressing interest in "prevent[ing] the Secretary from taking unchecked actions that exceed statutory authority").  Nor could they, because the statutory language they seek to enforce is general and not the sort of language creating statutory rights.  *See, e.g.*, *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1171 (9th Cir. 2013); *Sanchez v. Johnson*, 416 F.3d 1051, 1057 (9th Cir. 2005).  Plaintiffs do not seek to vindicate their own statutory rights but instead pursue their abstract interests in enforcing their own interpretation of the statute.  Accordingly, it would be an unwarranted extension of *ultra vires* review to apply it to the circumstances here.[9]

---

[9] California appears to assert that it need not respond to this claim because DHS "conceded" that the prong is not in dispute.  *See* Cal. Reply at 5 n.4.  This is incorrect for two reasons.  First, for DHS to make a more limited argument as to one plaintiff does not concede the issue as to another plaintiff in a separate cause of action.  Second, the passage California cites focused on the judicial review aspect of the prong, and said nothing about the statutory rights aspect of the prong.  *See* Defs.' Br. at 16 n.10.  DHS has therefore not contradicted its prior observation, but merely developed another aspect of the prong in light of the *California Sportfishing* decision.

**B.      Plaintiffs Have Not Established that the Secretary Violated Any Clear Command in the Statute**

Alternatively, under the extraordinarily deferential *ultra vires* review standard, the Court must conclude that the Secretary did not exceed his statutory authority.  As the Ninth Circuit has explained:

> Our task is limited to determining whether the statute in question contains a clear command that the Secretary has transgressed. Where . . . the statute is capable of two plausible interpretations, the Secretary's decision to adopt one interpretation over the other cannot constitute a violation of a clear statutory mandate.

*Staacke*, 841 F.2d at 282; *see also Pacific Mar. Ass'n*, 827 F.3d at 1208 (agency action must "contravene clear and mandatory statutory language").[10]  None of Plaintiffs' arguments render the Secretary's interpretation of § 102 implausible. Accordingly, their *ultra vires* claims must be denied.

**1.      Section 102(a) plausibly states a general mandate that can be applied apart from the specific Congressional priorities identified in § 102(b)**

DHS has shown that § 102(a) provides a general mandate calling for the Secretary to "take such actions as may be necessary to install additional physical barriers and roads" along the border.  Defs.' Br. at 26-35.  The government has consistently taken the position that "section 102(a) confers authority on the Secretary to construct barriers in the vicinity of the U.S.-Mexico border, including the San Diego Barrier, that are not explicitly mandated by section 102(b)."  *Save Our Heritage Org. v. Gonzales*, 533 F. Supp. 2d 58, 60 (D.D.C. 2008) (characterizing the government's position); *see also* Defs.' Mot. to Dismiss at 6-7, ECF No. 36, *Sierra Club, et al. v. Ashcroft, et al.*, No. 04-0272 (S.D. Cal. Nov. 11, 2005) (arguing that § 102(b)(1) simply provided "a required method of achieving [§ 102(a)'s] important

---

[10] The Center cannot avoid this standard by citing a standard for determining whether the court had jurisdiction to review an *ultra vires* claim.  *See* Ctr. Reply at 8.  Once a court finds jurisdiction, it looks for a "clear command."  *Staacke*, 841 F.2d at 282.

1  goal in one geographic area").  And the only court to address the issue agreed.  *See*

2  *Save Our Heritage*, 533 F. Supp. 2d at 61 (holding "that section 102(a), on its face,

3  authorizes construction of barriers such as the San Diego Barrier in areas that the

4  Secretary determines are areas of high illegal entry into the United States").

5      Plaintiffs' restrictive view that § 102 only empowers Congress to construct the

6  projects selected by Congress in § 102(b) would produce odd results.  As noted in

7  *Save Our Heritage*, it would mean that when Congress struck language about

8  construction near San Diego from § 102(b)(1) and replaced it with language regarding

9  five other locations, *see* Defs.' Br. at 3 (discussing Secure Fence Act), Congress was

10  foreclosing further reliance on § 102 for construction near San Diego (which remained

11  ongoing until at least 2007).  *See Save Our Heritage*, 533 F. Supp. 2d at 60 (rejecting

12  argument that 2006 amendment made "construction of the San Diego Barrier . . . no

13  longer authorized by statute").  But instead, Congress's amendment of § 102(b)

14  merely sixteen months after it vigorously pressed for completion of the San Diego

15  Barrier in 2005 demonstrates that § 102(b) is a repository for congressional priorities

16  rather than the exclusive list of projects that may be constructed under § 102.[11]  *Cf.*

17  *Save Our Heritage*, 533 F. Supp. 2d at 61 (refusing to "interpret the 2006 amendment

18  to section 102(b) as narrowing the Secretary's authority" because "[t]he statute's

19  explicit language does not support such an interpretation.").

20      Indeed, Plaintiffs offer no response to DHS's demonstration that Congress has

21  routinely used the phrase "in carrying out" to bridge between a general mandate and

22  specific guidance.  *See* Defs.' Br. at 29 & n.20; *see, e.g.*, 33 U.S.C. § 2326(a)(1)(A),

23  (f) (giving Secretary of the Interior general responsibility to "develop . . . regional

24  sediment management plans" and specifying that "[i]n carrying out this section, the

25

26  [11] Plaintiffs suggest that *Save Our Heritage* is somehow "distinguishable" because
    Congress had previously "primarily focused on the completion" of the San Diego
27  infrastructure.  Ctr. Reply at 10 n.7.  But Plaintiffs' theory demands that the current
    text of § 102(b) controls, not prior versions.
28

Secretary shall give priority to [projects] in the vicinity of [eleven specific

locations]").  Nor do Plaintiffs meaningfully respond to DHS's three key reasons

Plaintiffs' interpretation should be rejected:

> 1) specific requirements cannot generally be understood to prohibit all other applications of the general authority,[12] *see Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003); *FTC v. Tarriff*, 584 F.3d 1088, 1091 (D.C. Cir. 2009); *Otsuka Pharm. Co. v. Burwell*, No. 15-852, 2015 WL 1962240, at \*7 (D. Md. Apr. 29, 2015); *Sidney Coal Co. v. SSA*, 427 F.3d 336, 348 (6th Cir. 2005); *Save Our Heritage Org.*, 533 F. Supp. 2d at 61;

> (2) the specific terms of the IIRIRA as originally enacted cut sharply against Plaintiffs' reading because the broad mandate would be confusing and superfluous if Congress had already identified the only location for construction,[13] *see Hooks v. Ktsap Tenant Support Servs., Inc.*, 816 F.3d 550, 560 (9th Cir. 2016); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 929 (9th Cir. 2004); *Pacific Mut. Life Ins. Co. v. Am. Guaranty Life Ins. Co.*, 722 F.2d 1498, 1500 (9th Cir. 1984), *overruled on other grounds by In re McLinn*, 739 F.2d 1395 (9th Cir. 1984), and

> (3) the changes to § 102(b) made in 2006 and 2007 further demonstrate that this subsection merely identifies reflects Congress' shifting priorities.  *See* Defs.' Br. at 32-33.

Plaintiffs cannot overcome these textual and contextual reasons based on the

legislative history or the *Sierra Club* decision.  While it is undisputed that completion

---

[12] Plaintiffs' observation that "[j]udicial decisions addressing eminent domain disputes consistently cite[d] to § 102(b)," Ctr. Reply at 11, is not in tension with DHS's position because those land acquisitions were implementing Congress's priority projects identified in § 102(b).  It is logical to cite the most specific authority for the agency's actions, without implying that there is no other authority available.

[13] The Center suggests that *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977 (9th Cir. 2015) demonstrates that Plaintiffs' reading would not render § 102(a) surplusage. That case rejected an attempt to enforce "Congressional findings and declarations of purposes and policy" on the ground that the provision was a "non-operative statement of policy."  790 F.3d at 986-87.  This case does not help Plaintiffs because on the one hand, they rely on § 102(a) as more than an inoperative policy statement, and on the other hand, they cannot explain why the section's substantive conditions were created in 1996 when there was only one project listed in § 102(b).

of the San Diego project was the catalyst for passage of § 102 and the 2005 amendment, DHS has shown that the legislative history establishes that the scope of the provisions was obviously broader and was not limited to that one project.  *See* Defs.' Ex. 1, H.R. Rep. 104-828 at 200 (Sept. 24, 1996) (Conf. Rep.) (broadly describing § 102 as "requir[ing] the Attorney General to install additional fences and roads to deter illegal immigration" and separately characterizing the construction Congress had called for "[i]n the San Diego Sector"); H.R. Rep. 109-72 at 170 (May 3, 2005) (Conf. Rep.) (broadly describing § 102 as "provid[ing] for construction and strengthening of barriers along U.S. land borders"); *see also id.* at 171 (describing the waiver authority as "ensur[ing] expeditious construction of barriers and roads" and "the expeditious construction of security infrastructure along the border"); Defs.' Br. at 34-35 & n.28 (quoting the uncontradicted, repeated observations in Congress that the text of the waiver provision extended beyond the San Diego project).[14]

DHS has also explained that the *Sierra Club* decision should not be read to adopt Plaintiffs' reading of the interaction between § 102(a) and (b).  *See* Defs.' Br. at 30-31 n.21.  *Sierra Club*'s observations about the "barriers and roads" to which § 102(c) was being applied are best understood as references to the fact that the delegated authority was only being used for a construction project that Congress itself had specified.  *See* 2005 U.S. Dist. LEXIS 44244, at \*8-9 (emphasizing Congress's selection of the 14-mile location for construction); *id.* at \*19 ("[T]he 'barriers and roads' alluded to are the same in both articulations of Section 102(c): the Triple Fence

---

[14] At most, Plaintiffs could claim that the legislative history is indeterminate based on the perceived tension between the portions of that history cited by DHS and Plaintiffs' citation of portions of the legislative history in which proponents of the legislation exclusively discussed the San Diego catalyst.  *See, e.g.*, Ctr. Reply at 13.  But the evidence is not contradictory, and regardless an indeterminate legislative history cannot be a basis for overruling a reasonable interpretation of the statutory text.  *See United States v. Meeks*, 366 F.3d 705, 720 (9th Cir. 2004); *Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ.*, 272 F.3d 1155, 1165 (9th Cir. 2001).

project located along the U.S.-Mexico border in the vicinity of San Diego."). Alternatively, if *Sierra Club* did read § 102(b) as the exclusive basis for a waiver decision, this assumption is not persuasive because the court received no briefing on that issue, *see* Defs.' Br. at 30-31 n.21, and the court provided no explanation for such a statutory interpretation. *Cf. Osborn v. Bartos*, No. 08-2193, 2010 WL 3809847, at *4 n.8 (D. Ariz. Sept. 20, 2010) (rejecting as nonpersuasive another district court decision that "proffered no explanation" for its conclusion). Such a mistaken assumption certainly would not render the government's interpretation of § 102 implausible or clearly erroneous. *See Staacke*, 841 F.2d at 282; *Pacific Mar. Ass'n*, 827 F.3d at 1208.

In sum, the government's consistent interpretation of § 102(a) as calling for additional construction of border infrastructure beyond the specific locations identified by Congress in § 102(b) does not "contravene clear and mandatory statutory language," *Pacific Mar. Ass'n*, 827 F.3d at 1208, and cannot be the basis for striking down agency action under *ultra vires* review.

## 2. Plaintiffs have not shown that § 102(c) waiver authority has unambiguously expired

DHS has shown that Plaintiffs' argument that the December 31, 2008 deadline in § 102(b)(1)(B) applies generally to § 102(c) or § 102 as a whole is wholly implausible. *See* Defs.' Br. at 36-38. Congress plainly expected construction under § 102 to continue after the end of 2008. It set this deadline in December 2007 to ensure that 370 miles of construction in "[p]riority areas" was completed within one year. IIRIRA § 102(b)(1)(B). But the deadline plainly did not apply to the simultaneous requirement to "construct reinforced fencing along not less than 700 miles of the southwest border," *id.* § 102(b)(1)(A), for which construction continued after 2008. And if the deadline did not apply to other provisions of § 102(b), it certainly cannot be interpreted to require the sunsetting of § 102(a) and 102(c) authority. Plaintiffs claim that this straightforward reading "renders the deadlines . . . superfluous." Cal. Reply

1   at 10.  Not so.  The deadlines performed their purpose.  They were not intended to

2   limit DHS authority to construct border infrastructure in the future, but instead were

3   intended to ensure that DHS moved quickly to construct a minimum amount of

4   additional infrastructure within the following year.

5           **3.**    **Plaintiffs have not shown that § 102(c) unambiguously requires that the Federal Register notice of a waiver determination include detailed "findings"**

6

7         As discussed above, Plaintiffs' argument that the waiver determination must

8   include detailed "findings necessary for adequate judicial review," Cal. Reply at 12;

9   Coal. Reply at 11, depends on the mistaken belief that APA review is available for

10  some aspects of the waiver determination.  *See supra*, Arg. § II(A).  And general

11  caselaw about what is required to pass muster under APA review, *see, e.g.*, Cal. Reply

12  at 12 (citing *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1405 (D.C. Cir. 1995)),

13  cannot give rise to an *ultra vires* claim.  Plaintiffs point to no statutory requirement

14  that the Federal Register notice contain such findings.  *See* IIRIRA § 102(c)(1)

15  (stating only that notice of the Secretary's decision must be "published in the Federal

16  Register"); *cf.* H.R. Rep. 109-72, at 170 (May 3, 2005) (Conf. Rep.) (explaining that

17  the limited purpose of the publication requirement was to "ensur[e] appropriate public

18  notice of such determinations").[15]  DHS has shown that *ultra vires* review should, at

19  most, reach no further than confirming that the Secretary made the determination on

20  the basis of the statutory criteria, *see Staacke*, 841 F.2d at 281 (looking only for

21  violation of "a clear statutory mandate or prohibition"); *Am. Airlines v. Herman*, 176

22  F.3d 283, 293 (5th Cir. 1999) ("a plain violation of an unambiguous and mandatory

23  provision of the statute"), and that the Secretary's determinations were made on the

24  basis of the statutory criteria.  *See* Defs.' Br. at 39-41.  This showing satisfies *ultra*

25

26  [15] Plaintiffs also offer no response to DHS's showing that, because the waiver

27  determination is to be made in the Secretary's "sole discretion," its exercise is "committed to agency discretion by law."  Defs.' Br. at 39 (quoting 5 U.S.C.

28  § 701(a)(2)).

1   *vires* review; and these determinations, well within the Secretary's expertise and

2   delegated "sole discretion," should not be subject to judicial second-guessing.[16]

3       **4.**   **Plaintiffs cannot show that key statutory terms unambiguously**
        **preclude the waiver determinations at issue here**

4

5       On reply, Plaintiffs continue to press the Court to engage in ordinary APA

6   review of three phrases in § 102 under the guise of *ultra vires* review.  *See* Cal. Br. at

7   6-10; Coal. Br. at 10-14.[17]  None of the statutory phrases unambiguously preclude the

8   use of § 102(c) waiver authority for the construction projects at issue here.

9           *a.*   *"Additional barriers and roads"*

10      DHS has shown that § 102(a)'s provision for "install[ing] additional physical

11  barriers" should not be read to exclude replacement of existing infrastructure with

12  taller and more operationally effective barriers.  *See* Defs.' Br. at 42-44.  It is evident

13  that Congress intended "additional" in a capacious sense.  First, Congress expressly

14  included "the removal of obstacles to detection of illegal entrants" within the meaning

15  of the term, § 102(a); along with the installation of "lighting, cameras, and sensors,"

16  *id.* § 102(b)(1)(A).  Second, Congress, in the conference report explained that § 102

17  "provides for construction *and strengthening* of barriers along U.S. land borders."

18  H.R. Rep. 109-72 at 170 (May 3, 2005) (Conf. Rep.) (emphasis added)); *see also* 152

19  Cong. Rec. S9871 (Sept. 21, 2006) (statement of Sen. Kyl) (discussing using § 102

20  [16] California claims that "DHS and its Secretary have made public statements

21  contradicting" the findings in the waiver determinations.  Cal. Reply at 12.  This is

22  untrue.  Comments about the general effectiveness of border infrastructure, *see* Defs.'
Resp. to Stmts. of Facts at 31, are not inconsistent with the need to replace outmoded

23  1990s fencing; and sector-wide priority assessments, *see id.* at 38-39, do not suggest

24  that specific areas cannot meet § 102's "high illegal entry" requirement.  Plaintiffs
have not overcome the presumption of regularity that attaches to agency action.  *See*

25  *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001); *San Luis & Delta-Mendota Water*

26  *Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

27  [17] Because Plaintiffs make no further arguments on reply regarding the phrases "deter
illegal crossings," and "most practical and effective," DHS rests on its prior brief

28  addressing those arguments.  *See* Defs.' Br. at 48-50.

1  authority for "replacing the so-called landing mat fencing," in part because it "is

2  deteriorating," is "very difficult to repair because of its age," and is disadvantageous

3  because Border Patrol "can't see through it.").  And there is no inherent dichotomy

4  between "replacement" and "additional."  *See* Defs.' Br. at 42 (comparing dictionary

5  definitions).[18]  It is implausible that Congress gave DHS only one shot at improving

6  border security at any given location under § 102.  Nor can repair of infrastructure be

7  excluded from the scope of § 102, *see* Cal. Reply at 9-10, without substantially

8  impairing DHS's ability to maintain infrastructure in locations that depend on § 102's

9  waiver authority.  *See, e.g.*, Defs.' Ex. 10, *Walls & Waivers Hearing*, 110th Cong. 17

10  (explaining that a waiver is necessary for construction in "national wildlife refuges

11  and wilderness areas").  Indeed, DHS has used § 102 to replace fencing in the past.

12  *See, e.g.*, Defs.' Ex. 23, U.S. Border Patrol, Envt'l Stewardship Plan for Nogales

13  Fence Replacement Project (Nov. 2011) (attached).

14                    b.      *"Areas of high illegal entry"*

15          DHS has shown that it would be unwarranted for a court, as Plaintiffs propose,

16  *see* Cal. Reply at 6-9, to set some absolute threshold for "high illegal entry" based on

17  a comparison to the flow of illegal immigration at the time the statute was enacted or

18  amended.  *See* Defs.' Br. at 44-48.  Congress set no specific threshold for "high illegal

19  entry" and any interpretation of the term must be tied to the Act's purpose, as

20  amended, "to achieve and maintain operational control over the international border"

21  § 102(b)(1)(D), and Congress's choice to continue to use § 102 even though illegal

22  immigration had significantly declined from 1990s levels.  *See* Defs.' Br. at 44-45.

23  Thus, California's claim that 100,000 apprehensions per year in a sector would not

24

25  ───────────────────

26  [18] California now argues that because the 2007 Amendments "focus solely on adding mileage to the existing inventory," the term "additional" must be defined with that goal in mind.  Cal. Reply at 9.  But this one application of § 102(a) authority does not reasonably narrow the broad scope of the term, especially where none of the prior versions of § 102(b)(1) focused on mileage.

27

28

1   qualify as "high illegal entry," Cal. Reply at 9, must be rejected.  DHS's approach

2   continues to "give[] effect" to the phrase as a "geographical limitation on DHS's

3   ability to install" barriers under § 102.  Cal. Reply at 7.  The Secretary concluded here

4   that each project area and the sector in which it was located remained an area of high

5   illegal entry.  *See* 82 Fed. Reg. at 35984, 42830.  DHS does not maintain that § 102

6   would authorize construction where such a finding could not be made.  But there is no

7   need to settle on a threshold for purposes of *ultra vires* review here because tens of

8   thousands of illegal entries of people and contraband per year plausibly comes within

9   the plain meaning of the term.  *See id.*[19]

10       DHS does not dispute the Coalition Plaintiffs' suggestion that "high" involves

11  "a relative description" and "must at least mean the opposite of 'areas of low illegal

12  entry.'"  Coal. Reply at 12.  DHS simply maintains that "high" and "low" must be

13  assessed in light of the congressionally-imposed goal of operational control.[20]  And

14  here, where both sectors are in the upper third of sectors nationwide as ranked by

15  number of apprehensions, *see* Ex. 18, U.S. Border Patrol, Sector Profile – Fiscal Year

16

17  ―――――――――――――
    [19] Plaintiffs err in claiming that contraband seizure statistics are irrelevant.  *See* Cal.
18  Reply at 8 n.9.  Congress included contraband in its definition of operational control.
    *See* Pub. L. No. 109-367 § 2(b).  And CBP maintains separate statistics for seizures at
19  ports of entry by its Office of Field Operations and seizures between ports of entry by
    U.S. Border Patrol.  *See, e.g.*, CBP Enforcement Statistics FY2018 (link); CBP,
20  Border Security: Along U.S. Borders (link) (explaining that U.S. Border Patrol is
    responsible for the area "between ports of entry").
21
    [20] DHS does not argue that high illegal entry is "equivalent to those areas of which
22  Border Patrol lacks 'operational control.'"  Coal. Reply at 12.  Plaintiffs have not
23  shown that consideration of "operational control" is irrelevant to the relative
    assessment required by "areas of high illegal entry."  While they suggest that 8 U.S.C.
24  § 1330(b)(3)(A)(iii), which references "areas experiencing high levels of
    apprehensions of illegal aliens," is useful for interpreting § 102(a), they do not explain
25  how that language would further support any specific interpretation.  *See* Coal. Reply
26  at 13 n.7.  Indeed, the most obvious result of a comparison is to suggest that § 102(a)
27  is broader because it is not limited the "apprehensions" of people but also includes
28  illegal entry of contraband.  *See* Defs.' Br. at 45 n.35.

1  2016, it cannot reasonably be concluded that these projects are in areas of

2  comparatively "low" illegal entry.  Plaintiffs cannot defeat the Secretary's conclusion

3  by relying on station-level data from 2004.  *See* Defs.' Br. at 47 (explaining the

4  limitations of the evidence in Cal. Ex. 22, which contains data from 1992 to 2004,

5  including that the information is more than a decade out of date); Cal. Reply at 8 n.9

6  (insisting that Plaintiffs' can rely on station data from 2004 and earlier because it is

7  "[t]he most current data publically available"); *cf. San Luis & Delta-Mendota Water*

8  *Auth.*, 747 F.3d at 601 (providing "presumption of regularity" to agency action).

9                                    *c.     "Consultation"*

10        Finally, the Coalition Plaintiffs have not established that § 102(b)(1)(C)'s

11  consultation requirement is a basis for invalidating a waiver determination.  As DHS

12  has explained, nothing in the waiver provision is expressly or implicitly dependent on

13  completion of the consultation requirement.  *See* Defs.' Br. at 50-51.  Nor can

14  Plaintiffs separately enforce the provision because it does not give rise to a private

15  cause of action.  *See* IIRIRA § 102(b)(1)(C)(ii) (stating that consultation requirement

16  does not "create . . . any right of action for a . . . person or entity affected by this

17  subsection"); *Texas Border Coal. v. Napolitano*, 614 F. Supp. 2d 54, (D.D.C. 2009).

18  Plaintiffs offer no response to DHS's arguments.  At any rate, consultation pursuant to

19  this provision is ongoing.  *See, e.g.*, Defs.' Exs. 24-27 (attached to this filing)

20  (coordination letters regarding the Calexico project dated January 18 and 19, 2018).

21        In sum, each of these statutory terms fails to provide Plaintiffs with a "clear

22  command that the Secretary has transgressed."  *Staacke*, 841 F.2d at 282.  Instead,

23  their arguments suggest that at most "the statute is capable of two plausible

24  interpretations," and the Ninth Circuit has held that "the Secretary's decision to adopt

25  one interpretation over the other cannot constitute a violation of a clear statutory

26  mandate."  *Id.*; *see also Griffith v. FLRA*, 842 F.2d 487, 494 (D.C. Cir. 1988)

27  (rejecting *ultra vires* challenge where agency's approach was "not the only possible

28

1  interpretation of the statutory language" but "surely a colorable one").

2  **IV.    PLAINTIFFS' CONSTITUTIONAL CLAIMS FAIL**

3          Plaintiffs' constitutional claims, the only claims properly before the Court,

4  IIRIRA § 102(c)(2)(A), fail to establish that Congress cannot (1) permit the Secretary

5  to determine which laws to waive and (2) strictly limit judicial review of such waiver

6  determinations.[21]

7          **A.    The Waiver Provision Does Not Violate Article I § 1**

8          DHS has shown that § 102(c) does not unconstitutionally delegate legislative

9  power to the DHS Secretary.  *See* Defs.' Br. at 52-57.  As the Ninth Circuit observed,

10  the last time the Supreme Court "invalidated legislation under this doctrine" was more

11  than "seventy-five years ago."  *In re Nat'l Security Agency Telecomm. Records Litig.*

12  (hereinafter "*Telecomm. Records*"), 671 F.3d 881, 895 (9th Cir. 2011).  And every

13  court to consider a nondelegation challenge to § 102(c) has rejected it, beginning with

14  a decision in this district.  *See Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *16-25;

15  *see also County of El Paso v. Chertoff*, No. 08-196, 2008 WL 4372693, at *2-4 (W.D.

16  Tex. 2008), *cert. denied*, 557 U.S. 915 (2009); *Save Our Heritage*, 533 F. Supp. 2d at

17  63-64; *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007), *cert.*

18  *denied*, 554 U.S. 918 (2008).

19          Here, Congress provided "an intelligible principle to which the person or body

20  authorized to [act] is directed to conform."  *J.W. Hampton, Jr. Co. v. United States*,

21  276 U.S. 394, 409 (1928).[22]  DHS has shown that § 102(a) delineates a "general

22

23  _____

23  [21] The Center's Take Care Clause claim under Article II § 3 is not further addressed

24  here because briefing has been completed on that claim.  *See* Defs.' Mot. to Dismiss at

24  30-33, ECF No. 18-1; Defs.' Br. at 63-65.

25  [22] California claims that *J.W. Hampton* and a predecessor case "limit" the

26  nondelegation doctrine where the delegated power is the "modifi[cation] or

27  terminat[ion]" of tariffs or laws.  Cal. Reply at 19.  To the contrary, those cases

27  merely found the intelligible principle standard easier to apply where "nothing . . . was

28  left to the determination of the President" other than "ascertain[ing] and declar[ing]"

policy," *Mistretta v. United States*, 488 U.S. 361, 373 (1989)—that improving border protection by expediting the construction of necessary barriers and roads is a high Congressional priority.  *See, e.g.*, *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at \*20; *Defenders of Wildlife*, 527 F. Supp. 2d at 127.  There is also no doubt about "the boundaries of this delegated authority."  *Mistretta*, 488 U.S. at 373.  Congress included a geographic boundary—waivers may only be issued in connection with construction "in the vicinity of the United States border."  *See* Defs.' Br. at 54 (quoting IIRIRA § 102(a)).  And Congress included temporal "necessity" as a second boundary.  *See id.* § 102(c)(2) (permitting waiver of legal requirements where "necessary to ensure expeditious construction" at those locations); *Defenders of Wildlife*, 527 F. Supp. 2d at 127.  As DHS has explained, Congress adopted this approach of targeted flexibility because it could not sufficiently anticipate the ways that existing laws would be wielded to frustrate Congress' priorities.  *See* Defs.' Br. at 55.  Such "necessity" determinations can be delegated.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001); *Touby v. United States*, 500 U.S. 160, 163 (1991).

On reply, Plaintiffs emphasize that, in *Whitman*, the discretion provided under the Clean Air Act to set air quality standards for particular pollutants depended on significant technical background and criteria.  *See* Coal. Reply at 17.  But this cannot take away from the extraordinary discretion involved in "setting air standards that affect the entire national economy."  *Whitman*, 531 U.S. at 475 (not requiring "the statute to decree . . . how 'necessary' was necessary enough").  Despite Plaintiffs' protestations to the contrary, § 102 involves far less than such a "sweeping regulatory scheme[]."  *Id.*  Waiving laws to expedite border infrastructure construction is a far more limited power.  Accordingly, it can appropriately include less "substantial guidance."  *Id.* ("[T]he degree of agency discretion that is acceptable varies according

---

that the triggering event had occurred.  *J.W. Hampton*, at 410-11.  California cites no authority suggesting that these cases create a heightened standard for any category of cases.  For that reason, DHS did not discuss them separately.

1    to the scope of the power congressionally conferred."). As discussed above, the

2    guidance and boundaries Congress provided are sufficient.  While Plaintiffs wish

3    Congress had adopted additional restrictions, such as applying § 102 exclusively to

4    the U.S.-Mexico border, Coal. Reply at 18, the absence of such restrictions does not

5    make the delegated authority unconstitutional.

6          Finally, as other courts have recognized, Congress may delegate in broader

7    terms regarding border infrastructure because the Executive Branch has significant

8    independent control over immigration, foreign affairs, and national security.  *See*

9    Defs.' Br. at 56; *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *22-23; *Defenders of*

10   *Wildlife*, 527 F. Supp. 2d at 126, 129; *cf. Telecomm. Records*, 671 F.3d at 897

11   (holding that when the delegation "arises within the realm of national security . . . the

12   intelligible principle standard need not be overly rigid").  While it must "still [be] the

13   Legislative Branch, not the Executive Branch, that makes the law," *Zivotofsky v.*

14   *Kerry*, 135 S. Ct. 2076, 2079 (2015), Congress has made the law here.  The delegated

15   authority to waive laws impeding expeditious construction of this important

16   infrastructure does not usurp that function.

17   **B.     The Waiver Provision Does Not Violate Article I § 3**

18          California insists that "Congress cannot . . . allow the Executive to choose, in

19   advance, which criminal laws to waive and when to waive them."  Cal. Reply at 18.

20   But DHS has shown that none of Plaintiffs' citations support this sweeping

21   conclusion, and that it would be counterintuitive to conclude that Congress had less

22   power to delegate authority to relieve criminal sanctions than in other areas.  *See*

23   Defs.' Br. at 57-58.  Plaintiffs certainly cannot derive such a principle from the dictum

24   that "no one is above the law."  That dictum has no meaningful application here where

25   the seven criminal provisions to which they point, Cal. Reply at 19 n.17, were not

26   waived to encourage or protect otherwise criminal action, but instead are merely part

27   of broader waivers of the Endangered Species Act, the Clean Air Act, Clean Water

28

1  Act, and other less prominent statutes, to avoid civil litigation and expedite

2  construction.  *See* 82 Fed. Reg. at 35985, 42830.

3       **C.**     **The Waiver Provision Does Not Violate Article I § 7**

4       Plaintiffs' claims under the Presentment Clauses fail because the waiver

5  determinations at issue here do not constitute "partial repeal" of the underlying

6  statutes.  *See* Defs.' Br. at 58-62.  The Supreme Court holds that the Constitution does

7  not authorize the President "to enact, to amend, or to repeal statutes."  *Clinton v. City*

8  *of New York*, 524 U.S. 417, 438 (1998).  But limited waivers of statutory provisions

9  have never been held to fall afoul of this principle.  Both courts to consider such a

10  challenge to § 102(c) have rejected it.  *See County of El Paso*, 2008 WL 4372693, at

11  *6-7; *Defenders of Wildlife*, 527 F. Supp. 2d at 123-26.  Accordingly, the parties

12  dedicate very little space in their reply briefs to preserving this claim.  *See* Ctr. Reply

13  at 18-19; Cal. Reply at 20.

14       DHS has shown that the waivers at issue here differ in dispositive ways from

15  the Line Item Veto Act, which gave the President the authority to "cancel" certain

16  appropriated spending items that had been passed by Congress.  *Clinton*, 524 U.S. at

17  438.  That statute failed because cancellation prevented the items "from having legal

18  force or effect" and thus in "both legal and practical effect, the President has amended

19  two Acts of Congress by repealing a portion of each."  *Id.*; *see also id.* at 447 (holding

20  it improper to give the President "unilateral power to change the text of duly enacted

21  statutes").  Here, by contrast, the waivers prevent no statutory provision "from having

22  legal force or effect" because the provisions continue in force for almost all of their

23  applications.  *See Defenders of Wildlife*, 527 F. Supp. 2d at 124 ("Each of the [] laws

24  waived by the Secretary . . . retains the same legal force and effect as it had when it

25  was passed by both houses of Congress and presented to the President.").[23]

26  _____

27  [23] Plaintiffs quote an academic article by a recently graduated law student to show that

28  *Defenders of Wildlife* was "wrong," but that article's reasoning about "a statutory
bargain being overridden," Ctr. Reply at 18, would be much more far reaching than

1  Plaintiffs do not respond to most of DHS's argument.  They cannot dispute that

2  then-Judge John Roberts characterized waivers as "a far cry from the line-item veto at

3  issue in *Clinton*."  *See Acree v. Republic of Iraq*, 370 F.3d 41, 64 n.3 (D.C. Cir. 2004)

4  (Roberts, J., concurring).  Nor do they attempt to distinguish *Telecommunications*

5  *Records*, in which the Ninth Circuit rejected a Presentment Clause challenge on the

6  ground that an "executive grant of immunity or waiver of claim" has "never been

7  recognized as a form of legislative repeal."  *See Telecomm. Records*, 671 F.3d at 895.

8  Such grants of immunity prevent civil actions to enforce the otherwise applicable

9  laws, just as the waivers prevent civil actions to enforce the environmental statutes,

10  but the Ninth Circuit found no constitutional defect because "[t]he law remains as it

11  was when Congress approved it and the President signed it."  *Id.* at 894-95.[24]

12  Plaintiffs also offer no response to DHS's explanation that § 102(c) does not raise the

13  same separation of powers concerns as *Clinton* because there is nothing unseemly in

14  the Secretary's implementation of the intent Congress expressed in 2005 for the

15  narrow waiver of NEPA, the ESA, and the CZMA, passed decades earlier.  *See Smith*

16  *v. Fed. Reserve Bank of N.Y.*, 280 F. Supp. 2d 314, 324 (S.D.N.Y. 2003); *Moyle v.*

17  *Dir., Office of Workers' Compensation Programs*, 147 F.3d 1116, 1120 (9th Cir.

18  1998); *Maldonado*, 67 F. Supp. 2d at 1180.

19  Finally, Plaintiffs suggest that DHS's approach lacks a limiting principle.  *See*

20  Ctr. Reply at 19.  But DHS has expressly provided one:  "[u]nder the logic of *Clinton*

21  and other precedent, so long as a waiver does not leave a statutory provision with no

22  legal effect, there is no plausible claim for a legislative repeal in violation of the

23  Presentment Clauses."  Defs.' Br. at 61 n.49 (citing *Acree*, 370 F.3d at 64 n.3;

24

25  current Supreme Court and Ninth Circuit precedent.

26  [24] Plaintiffs attempt to distinguish the waiver authority here from other waiver statutes

27  by the scope of the waiver or the availability of judicial review, *see* Ctr. Br. at 33-34;

    Cal. Br. at 39; but they do not purport to canvas all other waiver statutes enacted by

28  Congress and cannot show that any court found such distinctions relevant.

1  *Telecomm. Records*, 671 F.3d at 895).  In sum, the other courts to address this matter

2  correctly concluded that § 102(c) does not violate the Presentment Clauses.

3      **D.**    **The Waiver Provision Does Not Violate Constitutional Provisions Regarding Access to the Courts**

4

5         DHS has shown that each of Plaintiffs' three arguments about access to the

6  courts or due process fail to establish any constitutional violation here.  *See* Defs.' Br.

7  at 65-70.  First, Plaintiffs ask the Court to conclude that the "right of access to the

8  courts"—based in the First Amendment right to "petition for redress of grievances"

9  (the "Petition Clause")—acts as a limit on Congress's authority to limit the

10  jurisdiction of the lower courts.  DHS has shown that the Petition Clause protects

11  against obstructions to available administrative or judicial proceedings.  *See, e.g.*,

12  *Ringgold-Lockhart v. Cnty. of Los Angeles*, 761 F.3d 1057, 1061-62 (9th Cir. 2014);

13  *Munguia v. Frias*, No. 07-1016, 2009 WL 3157482, at *12 (S.D. Cal. Sept. 24, 2009).

14  It would be entirely novel to apply it to the creation of administrative or judicial

15  jurisdiction in the first place.  *See* Defs.' Br. at 66-67.  Nor do Plaintiffs explain how

16  such a notion could be reconciled to Congress's well-established authority to limit the

17  jurisdiction of the lower federal courts.  As DHS noted, while there is no binding

18  precedent on this issue, the closest cases show that Plaintiffs' proposal must be

19  rejected.  *See, e.g., Roller v. Gunn*, 107 F.3d 227, 231 (4th Cir.1997) ("[T]he right of

20  access to federal courts . . . is subject to Congress' Article III power to set limits on

21  federal jurisdiction.");[25] *Wilbur v. Locke*, 423 F.3d 1101, 1116 (9th Cir. 2005),

22  *abrogated on other grounds*, *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010)

23  (right of access "is not absolute" and "must be exercised within the limits of the

24  courts' prescribed procedures").[26]

---

25  [25] Plaintiffs claim that *Roller* is irrelevant because it did not mention the Petition

26  Clause.  Cal. Reply at 17 n.16.  But its observations are relevant because the Ninth

27  Circuit has explained that "right of access" caselaw is rooted in numerous overlapping
   constitutional provisions.  *See Ringgold-Lockhart*, 761 F.3d at 1061-62.

28  [26] The Supreme Court abrogated *Wilber* on the threshold question of comity for state

1   Second, Plaintiffs argue that Congress cannot "eliminate concurrent state court

2   jurisdiction" without providing a federal forum for that claim to be heard.  Coal. Reply

3   at 19.  But as DHS has shown, there is no support for that notion and Plaintiffs' claim

4   is undermined by the primary case on which they rely.  *See* Defs. Br. at 68.

5   Concurrent state court jurisdiction "depends altogether upon the pleasure of Congress,

6   and may be revoked and extinguished whenever they think proper, in every case in

7   which the subject-matter *can* constitutionally be made cognizable in the Federal

8   courts."  *Haywood v. Drown*, 556 U.S. 729, 747 (2009) (Thomas, J., dissenting)

9   (quoting *Plaquemines Tropical Fruit Co. v. Henderson*, 170 U.S. 511, 517-18 (1898))

10  (emphasis added).  Here, Congress has expressly made federal jurisdiction exclusive

11  for challenges to the waiver determinations, which is plainly a matter cognizable in

12  federal court.  *See* IIRIRA § 102(c)(2)(A).  And to the extent Plaintiffs are referring to

13  the waived state laws, DHS limited its waivers to those for which the subject-matter

14  can be made cognizable in federal court.  *See, e.g.*, 82 Fed. Reg. at 35985 (waiving

15  "state . . . laws, regulations, and legal requirements of, deriving from, or related to the

16  subject of, the following [federal] statutes").

17  Third, Plaintiffs claim that the challenged waiver determinations fail to provide

18  adequate notice in violation of the Due Process Clause of the Fifth Amendment.  DHS

19  has shown that Plaintiffs have failed to carry their burden to establish a cognizable

20  life, liberty, or property interest for which due process is required.  *See* Defs.' Br. at

21  69; *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  On reply, only California

22  addresses this issue, claiming an "interest in the enforcement of its state laws" and

23  "preservation of [state] property . . . adjacent to the" projects.  Cal. Reply at 17 (citing

24  Cal. Br. at 13).  These terse assertions from California's discussion of its

25  constitutional standing do not carry its burden.  California provides no support for the

26

27  court jurisdiction and did not address *Wilber*'s treatment of the merits argument about

28  "right of access."  *See Levin*, 560 U.S. at 417, 420; *Wilbur*, 423 F.3d at 1110, 1115-16.

notion that its parochial enforcement interest is cognizable under the Fifth

Amendment, and it has not shown any deprivation of its property interests stemming

from the waivers.  *See* Defs.' Resp. to Pls.' Stmt. of Facts at 23, ECF No. 35-3.[27]

Moreover, California cannot show that the waiver determinations fail to provide

sufficient notice of the waiver of state law.  Because state law that can bind federal

action is vanishingly rare, the set of laws that would otherwise be enforceable is quite

limited and it should not be difficult to determine whether such a law is "related to"

one of the waived federal statutes.[28]  As California obliquely acknowledged, the

statutes primarily affected are those related to environmental "permitting authority."

*See* Cal. Reply at 3 n.3; *see also* Cal. Compl. ¶¶ 38-39, 112-15.  Any lingering

uncertainty would not harm California because it could initiate an enforcement action,

whereupon the enforceability of the provision could be tested in court.[29]  Nor does

California lack sufficient notice of the project areas or construction projects.  DHS has

clarified that the two projects specified in the San Diego waiver determination are the

only projects DHS will complete pursuant to that notice.  *See* Defs.' Br. at 70; Defs.'

Resp. to Stmt. of Facts at 34-35.[30]

---

[27] California also claims that its "void-for-vagueness challenge" can proceed
independently from the Due Process Clause, citing a case stating that an
unconstitutionally vague law can violate the Free Speech Clause.  *See* Cal. Reply at 17
(citing *O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016)).  While *Welby* used "First
Amendment" as shorthand for the Free Speech Clause, Plaintiffs cannot show that the
underlying rationales, such as chilling speech or being unaware that one's behavior
could be punished, 818 F.3d at 930, would equally apply to the Petition Clause.

[28] As for California's claim that "courts routinely apply California law to federal
construction projects," Cal. Reply at 17, its only example involves state contract law,
which is undoubtedly unaffected by the waiver determinations.  *See Harper/Nielsen-
Dillingham, Builders, Inc. v. United States*, 81 Fed. Cl. 667, 679 (2008).

[29] Thus California's interest differs significantly from an individual who lacks
knowledge of "what is permissible and what is forbidden."  Cal. Reply at 16 (quoting
*Hirschkop v. Snead*, 594 F.2d 356, 371, 375 (4th Cir. 1979)).

[30] There is no "admitted constitutional violation" to "cure."  Cal. Reply at 16.  It was

1    **E.   The Waiver Provision Does Not Violate the Tenth Amendment**

2         California has no viable claim that Congress violated the Tenth Amendment by

3    permitting the waiver of state laws that impede expeditious construction of border

4    infrastructure.  It is not an intrusion on state sovereignty to preempt state laws for

5    purposes of a federal construction project within Congress's express authority.

6         DHS has shown that the waiver of state law—whether by statute or by

7    regulation—is simply a limited form of federal preemption.  *See* Defs.' Br. at 71.

8    Ninth Circuit law is clear that in general, "if Congress acts under one of its

9    enumerated powers, there can be no violation of the Tenth Amendment."  *United*

10   *States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000); *see also Gila River Indian*

11   *Community v. United States*, 729 F.3d 1139, 1153 (9th Cir. 2013).  And California

12   does not dispute DHS's showing that Ninth Circuit caselaw is also clear that the

13   power to preempt state laws that conflict with or serve as an obstacle to the purposes

14   of federal law does not "intrude on the rights reserved under the Tenth Amendment."

15   *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 808 (9th Cir. 2002); *see also United States*

16   *v. Geiger*, 263 F.3d 1034, 1040 (9th Cir. 2001).[31]  California likewise does not dispute

17   DHS's showing that the state's police power claims are not enough to raise a viable

18   Tenth Amendment claim because "[g]enerally speaking, . . . a power granted to

19   Congress trumps a competing claim based on a state's police power."  *Gonzalez v.*

20

21   not impermissibly vague for the San Diego notice to reference "various border
22   infrastructure projects" and then identify the two that will be constructed.  *See* 82 Fed.
     Reg. at 35984-85.  California's concern that the waiver would be used for other
23   projects has been addressed.  DHS has no need to include subsequently selected
24   projects within this notice because it can simply issue another notice.

25   [31] *Heath v. Alabama*, 474 U.S. 82 (1985), cited by *California*, does not imply that a
     state has sovereign rights against federal preemption.  That case merely applied "the
26   dual sovereignty doctrine" of the Double Jeopardy Clause "to successive prosecutions
     by two States."  *Id.* at 83.  It concluded that the Constitution does not "deny a State its
27   power to enforce its criminal laws because another State has won the race to the
28   courthouse."  *Id.* at 93.

1   *Raich*, 500 F.3d 850, 867 (9th Cir. 2007).  Nor does California dispute that regulation

2   of the border and providing for the enforcement of federal law are quintessentially

3   within Congress' inherent and enumerated powers.  *See* Cal. Reply at 15.

4         Instead, California claims the Supreme Court has "rejected the same cramped

5   interpretation of the Tenth Amendment that Defendants advance here."  Cal. Reply at

6   13.  But Defendants have merely cited controlling Ninth Circuit law.  Accordingly,

7   California's claim that Supreme Court cases from the 1990s undermine more recent

8   Ninth Circuit decisions is not persuasive.  *See* Cal. Reply at 13-14 (citing *New York v.*

9   *United States*, 505 U.S. 144 (1992); *Printz v. United States*, 521 U.S. 898 (1997)).

10  California simply cannot show, in light of the Ninth Circuit caselaw discussed above,

11  that the limited preemption that Congress permitted in § 102(c)(1) does not implicate

12  the States' "inviolable sovereignty."  *New York*, 505 U.S. at 188.  This limited

13  preemption is a far cry from the commandeering at issue in *New York* and *Printz*.  *See*

14  *New York*, 505 U.S. at 188 ("Whatever the outer limits of that sovereignty may be,

15  one thing is clear: The Federal Government may not compel the States to enact or

16  administer a federal regulatory program."); *Printz*, 521 U.S. at 935 ("Congress cannot

17  . . . conscript[] the State's officers directly.").  In no way does the preemption of

18  various state environmental laws that might have been applicable to these federal

19  construction projects along the border implicate the "essential attribute of the States'

20  retained sovereignty that they remain independent and autonomous within their proper

21  sphere of authority."  *Printz*, 521 U.S. at 928.

22        California's reliance on *Shelby County v. Holder*, 133 S. Ct. 2612 (2013) is

23  entirely misplaced.[32]  At bottom, that case simply held that "[t]o serve [the Fifteenth

24

25  ─────────────────────

    [32] While California initially made an "alternative" argument based on *City of Boerne*
26  *v. Flores*, 521 U.S. 507 (1997), Cal. Br. at 27-28, on reply it defends this argument
    only in a footnote.  *See* Cal. Reply at 16 n.14.  As DHS explained, *Boerne* does not
27  stand for the broad principle California suggests.  *See* Defs.' Br. at 73-74.  The
    Supreme Court described *Boerne* as part of a series of cases regarding the Fourteenth
28  Amendment power to abrogate a state's sovereign immunity to "remedy and deter

Amendment] purpose, Congress—if it is to divide the States—must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions." 133 S. Ct. at 2629. When courts are "assessing . . . disparate treatment of States," it must do so in light of the "highly pertinent" and "fundamental principle of equal sovereignty." *Id. Shelby County* has no application here for several reasons. First, the limited preemption of state law, as discussed above, is not an intrusion on state sovereignty, and thus does not implicate equal sovereignty. *See* Defs.' Br. at 72. Unlike the Voting Rights Act requirement that certain states get "federal permission before enacting any law related to voting," 133 S. Ct. at 2618, States remain free to enact and implement any state law—the preempted enforcement of state law for the federal construction projects is no impairment of retained sovereignty. Second, Congress did not distinguish between any states in § 102, and no court has suggested that a disparate *impact* on certain states raises the same concerns as disparate *treatment*. *See id.* at 2619, 2624, 2630 (repeatedly referencing "disparate treatment"). Third, even if disparate impact is relevant, an impact on the states adjoining the U.S. international border remains a "basis that makes sense in light of current conditions." *Id.* at 2629. As DHS has explained, it is irrelevant that illegal entries have declined since 2005, because Congress is always free to preempt state law that impedes its inherent and enumerated powers regarding border and immigration control. *See* Defs.' Br. at 73; *County of El Paso*, No. 08-196, 2008 WL 4372693, at *8 ("The Secretary, pursuant to the Supremacy Clause, has only waived state and local laws which interfere with Congress's purpose to construct the border barrier.").

---

violation of [constitutional] rights." *Tennessee v. Lane*, 541 U.S. 509, 518 (2004). California protests that *Boerne* "never mentions" sovereign immunity, Cal. Reply at 16 n.14, but this context is key because *Boerne* turned on the disconnect between the Religious Freedom Reformation Act and § 5's remedial purpose. *See* 521 U.S. at 532. As DHS explained, that analysis has no application here because preemption is unlike abrogating state immunity and Congress here is free to enact substantive law, rather than being limited to remedial action. *See* Defs.' Br. at 73-74.

1    For all of these reasons, *Shelby County* cannot be generalized into the

2  proposition that "a validly enacted federal statute that burdens a subset of states but

3  not others will become unconstitutional if progress is made curbing the problem the

4  statute seeks to prevent."  Cal. Reply at 14 (quoting Cal. Br. at 25).  "Making

5  progress" would be an utterly untenable standard to apply.  In addition, the Supreme

6  Court did not suggest that "making progress" alone renders a law unconstitutional, but

7  far more narrowly held that any distinction between states must be on a "basis that

8  makes sense in light of current conditions."  133 S. Ct. at 2629.  To whatever extent §

9  102(c)(2)(A) can be characterized as distinguishing between states, the basis for that

10  distinction makes just as much sense today as it did in 2005.

11  **V.    PLAINTIFFS ARE NOT ENTITLED TO RELIEF UNDER OTHER**
       **STATUTES OR TO THE REMEDIES THEY SEEK FOR THEIR**
12     **CONSTITUTIONAL AND *ULTRA VIRES* CLAIMS**

13    Defendants have shown that they are entitled to summary judgment and that

14  Plaintiffs' motions should be denied.  Plaintiffs acknowledge that their statutory

15  claims under NEPA, ESA, and CZMA regarding the projects specified in the 2017

16  waivers must be dismissed if the waivers are upheld.  *See, e.g.*, Cal. Reply at 4.  And

17  as discussed above, the Coalition Plaintiffs' APA claims must be rejected for lack of

18  jurisdiction.  *See supra*, Arg. § II(A).  Accordingly, those claims must be dismissed.

19    California claims that it has caught DHS on a technical failure to dispute its

20  overbroad NEPA claim, and therefore that it is entitled to summary judgment as to the

21  "planning of infrastructure projects that fall outside the scope of any waiver."  Cal.

22  Reply at 3.  DHS did not understand California to be pressing claims regarding

23  infrastructure projects "along the entire 2000-mile southern border."  Cal. Reply at 3.

24  DHS disputes that there is a single "Border Wall Project" to which NEPA could

25  apply.  *See* Defs.' Revised Resp. to Cal. Stmt. of Facts.[33]  California has failed to carry

26

27  ───────────────
   [33] DHS has revised its Response to Plaintiffs' Statements of Fact to clarify the
28  disputed facts in light of California's elaboration of its intent.  *See* Defs.' Revised

its burden to establish its standing to press such claims.  *See supra*, Arg. § I.  Nor has California established that any such planning rises to the level of any concrete proposals that would trigger a NEPA obligation or for which DHS could consider whether any additional waivers would be appropriate.  *See, e.g.*, *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 670 (9th Cir. 1998) (holding that NEPA obligations were not triggered until a federal agency proposed site-specific activities calling for "specific actions directly impacting the physical environment").  This also means there has been no final agency action under the APA upon which to base such a NEPA claim.  *See id.* at 668-69 (noting that NEPA challenges to "broad ill-defined [federal agency] programs that do not cause concrete effects" were not ripe for judicial review under the APA "final agency action" requirement until the agency approved "concrete actions" affecting the environment).  Similarly, because California has not shown that the possibility of later replacing secondary fencing in the San Diego Sector has risen to the level of an "activity" for purposes of the CZMA, 16 U.S.C. § 1446; *Sec'y of the Interior v. California*, 464 U.S. 312, 319 (1984), or final agency action under the APA, Plaintiffs cannot press any claims regarding that potential project here.  *See Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1144 (9th Cir. 2000); *George v. Evans*, 311 F. App'x 426, 428-29 (2d Cir. 2009); *see also* Defs.' Br. at 70; Defs.' Resp. to Stmts. of Facts at 34-35, ECF No. 35-3 (explaining that the San Diego waiver determination is limited to the primary fence replacement project and the prototypes project).  For all of these reasons, California cannot receive summary judgment for DHS activities outside the scope of the 2017 waiver determinations.

Finally, Plaintiffs have not disputed Defendants' request that, if the Court rules for Plaintiffs, Defendants be provided the opportunity to provide separate briefing on remedy.  *See* Defs.' Br. at 77.

---

Resp. to Cal. Stmt. of Facts (attached herewith).

1

**CONCLUSION**

2

For the foregoing reasons, the Court should grant summary judgment to

3

Defendants on all counts and deny Plaintiffs' motions for summary judgment on all

4

counts, with the exception of the Center's FOIA claim in its Count 7 which is not yet

5

ripe for disposition.

6

7

Dated:  January 23, 2018                      Respectfully submitted,

8

                                              CHAD A. READLER
9                                             Acting Assistant Attorney General
                                              Civil Division
10
                                              JOHN R. TYLER
11                                            Assistant Director

12                                            /s/ Galen N. Thorp
13                                            GALEN N. THORP
                                              Senior Counsel
14                                            VA State Bar No. 75517
                                              U.S. Department of Justice
15                                            Civil Division, Federal Programs Branch
                                              950 Pennsylvania Avenue NW
16                                            Washington, DC  20530
                                              Tel: (202) 514-4781
17                                            Fax: (202) 616-8460
                                              Email: galen.thorp@usdoj.gov
18

19                                            ADAM BRAVERMAN
                                              United States Attorney
20                                            REBECCA G. CHURCH
                                              Assistant U.S. Attorney
21                                            Cal. State Bar No. 259652
                                              Email: rebecca.church@usdoj.gov
22                                            Telephone: (619) 546-7721
                                              Office of the U.S. Attorney
23                                            880 Front Street, Room 6293
                                              San Diego, CA 92101-8893
24                                            Facsimile: (619) 546-7751

25

26                                            *Attorneys for Federal Defendants*

27

28