UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: BORDER INFRASTRUCTURE ENVIRONMENTAL LITIGATION** | Case No.:  17cv1215-GPC(WVG) Consolidated with: 17cv1873-GPC(WVG) 17cv1911-GPC(WVG) **ORDER DENYING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** **[Dkt. Nos. 18, 28, 29, 30, 35.]** |

These three consolidated cases involve challenges to Waiver Determinations made by former Secretaries of the Department of Homeland Security on August 2, 2017 and September 12, 2017 pursuant to section 102 of IIRIRA[1] waiving the legal requirements of

---

[1] Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

NEPA,[2] the ESA,[3] the CZMA[4] and more than 30 additional laws not at issue in these cases.  The Waiver Determinations concern two types of border wall construction projects in San Diego County: (1) the "border wall prototype project"; and (2) the replacement of fifteen miles of existing border fence in the San Diego Sector and three miles of existing border fence in the El Centro Sector  ("border fence replacement projects").  The Plaintiffs allege variously that (1) the Waivers are ultra vires acts that exceed the authority delegated by Congress; and (2) the Waivers are unconstitutional acts under a variety of legal doctrines.

The Court is aware that the subject of these lawsuits, border barriers, is currently the subject of heated political debate in and between the United States and the Republic of Mexico as to the need, efficacy and the source of funding for such barriers.  In its review of this case, the Court cannot and does not consider whether underlying decisions to construct the border barriers are politically wise or prudent.  As fellow Indiana native Chief Justice Roberts observed in addressing a case surrounded by political disagreement: "Court[s] are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people

---

[2] National Environmental Policy Act of 1969.
[3] Endangered Species Act.
[4] Coastal Zone Management Act.

2

disagree with them.  It is not our job to protect the people from the consequences of their political choices."  Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012).  Here, the Court will focus on whether Congress has the power under the Constitution to enact the challenged law and whether the Secretary of Department of Homeland Security properly exercised the powers delegated by Congress.

Before the Court are three cross-motions for summary judgment.  A hearing was held on February 9, 2018. (Dkt. No. 44.)  Michael Cayaban, Esq. and Noah Golden Frasner, Esq. appeared on behalf of Plaintiffs People of the State of California and the California Coastal Commission; Brian Segee, Esq. and Brendan Cummings, Esq. appeared on behalf of Plaintiff Center for Biological Diversity; and Sarah Hanneken, Esq. appeared on behalf of the Plaintiffs Defenders of Wildlife, Sierra Club, and Animal Legal Defense Fund.  (Id.)  Galen Thorp, Esq. appeared on behalf of Defendants.  (Id.)  The parties filed supplemental briefs on February 13, 2018.  (Dkt. Nos. 46, 47, 48, 49.)

Based on the parties' briefs, the supporting documentation, the applicable law, the arguments made at the hearing and the supplemental briefing, the Court DENIES Plaintiffs' motions for summary judgment and GRANTS Defendants' motions for summary judgment.

///

///

///

# I.     BACKGROUND

## A.     Section 102 of Illegal Immigration Reform and Immigrant Responsibility Act

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which, pursuant to Section 102(a), required the Attorney General to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  Pub. L. No. 104–208, Div. C., Title I, § 102(a), 110 Stat. 3009, 3009–554 (1996), codified at 8 U.S.C. § 1103 note.  IIRIRA Section 102(c), as originally enacted, authorized the Attorney General to waive the Endangered Species Act of 1973 ("ESA") and the National Environmental Policy Act of 1969 ("NEPA") when he determined such waiver "was necessary to ensure expeditious construction of the barriers and roads under this section."  Id. § 102(c).  The Homeland Security Act of 2002 abolished the Immigration and Naturalization Service and transferred responsibility for the construction of border barriers from the Attorney General to the Department of Homeland Security ("DHS").  Pub. L. No. 107–296, 116 Stat. 2135 (2002).  In 2005, the REAL ID Act, Pub. L. No. 109-13, Div. B, Title I, § 102, 119 Stat. 231, 302, 306 (May 11, 2005), amended the waiver authority of section 102(c) expanding the Secretary of DHS' authority to waive "all legal requirements" that the Secretary, in his or her own

4

discretion, determines "necessary to ensure expeditious construction of the barriers and roads under this section." Id.  It also added a judicial review provision that limited the district court's jurisdiction to hear any causes or action concerning the Secretary's waiver authority to solely constitutional claims.  Id. § 102(c)(2)(A).  Further, the provision foreclosed appellate court review and directed any review of the district court's decision be raised by petition for a writ of certiorari with the Supreme Court of the United States. Id. § 102(c)(2)(C).

Section 102 consists of three sections: (1) section 102(a) describes the general purpose of the statute; (2) section 102(b) specifies Congress' mandate for specific border barrier construction; and (3) section 102(c) grants the Secretary the discretion to waive "all legal requirements" he or she "determines necessary to ensure expeditious construction of the barriers and roads" and provides for limited judicial review of the Secretary's waiver decision to solely constitutional violations.  See 8 U.S.C. § 1103 note.

Since its enactment in 1996, IIRIRA section 102 has been amended three times although the general purpose of the statute under section 102(a) has remained the same. When IIRIRA was first enacted in 1996, section 102(b) mandated "construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward of second and third fences, in addition to the existing reinforced fence, and for roads between the fences."  8 U.S.C. § 1103(b) (1996).

5

The Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638 (Oct. 26, 2006), amended the specific mandates of section 102(b).  It directed the DHS to "provide for at least 2 layers of reinforced fencing, [and] the installation of additional physical barriers, roads, lighting, cameras, and sensors" in five specific segments along the U.S.-Mexico border encompassing the states of California, Arizona, New Mexico and Texas. Id.  It also set dates of completion for two segments to be completed by certain dates in 2008.  Id.

Fourteen months later, the Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 2090 (Dec. 26, 2007), again amended the mandates of section 102(b) and they currently remain the operative version of the statute.

In its current version, section 102, codified at 8 U.S.C. § 1103 note, provides,

**(a) In general.--**The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

**(b) Construction of fencing and road improvements along the border.--**

**(1) Additional fencing along southwest border.--**

> **(A) Reinforced fencing**.--In carrying out subsection (a) [of this note], the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

**(B) Priority areas**.--In carrying out this section [Pub. L. 104-208, Div. C, Title I, § 102, Sept. 30, 1996, 110 Stat. 3009-554, which amended this section and enacted this note], the Secretary of Homeland Security shall--

**(i)** identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

**(ii)** not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

**(C) Consultation.--**

**(i) In general.--**In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

**(ii) Savings provision.**--Nothing in this subparagraph may be construed to—

**(I)** create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

**(II)** affect the eminent domain laws of the United States or of any State.

**(D) Limitation on requirements.--**Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to

7

achieve and maintain operational control over the international border at such location.

**(2) Prompt acquisition of necessary easements**.--The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act (as inserted by subsection (d)) [subsec. (b) of this section], shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

**(3) Safety features**.--The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

**(4) Authorization of appropriations**.--There are authorized to be appropriated such sums as may be necessary to carry out this subsection. Amounts appropriated under this paragraph are authorized to remain available until expended.

**(c) Waiver.--**

**(1) In general.--**Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

**(2) Federal court review.--**

**(A) In general**.--The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

8

(**B**) **Time for filing of complaint**.--Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

(**C**) **Ability to seek appellate review**.--An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States."

8 U.S.C. § 1103 note (hereinafter "8 U.S.C. § 1103").

## B.     Factual Background

On January 25, 2017, President Donald J. Trump issued Executive Order No. 13767 entitled "Border Security and Immigration Enforcement Improvements."  (Dkt. No. 30-5, Cayaban Decl., Ex. 7, Executive Order, 82 Fed. Reg. 8793.)  Section 4 of the Executive Order No. 13767 concerns "Physical Security of the Southern Border of the United States" and provides, in part,

The Secretary shall immediately take the following steps to obtain complete operational control, as determined by the Secretary, of the southern border:

(a)  In accordance with existing law, including the Secure Fence Act and IIRIRA, take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border, using appropriate materials and technology to most effectively achieve complete operational control of the southern border;
. . .

(d) Produce a comprehensive study of the security of the southern border, to be completed within 180 days of this order, that shall include the current state of southern border security, all geophysical and topographical aspects

9

of the southern border, the availability of Federal and State resources necessary to achieve complete operational control of the southern border, and a strategy to obtain and maintain complete operational control of the southern border.

(Id. at §§ 4(a) & (d).)  "'Wall' shall mean a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier."  (Id. at § 3(e).)

On August 2, 2017, former DHS Secretary John Kelly issued a Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended ("August 2 Waiver Determination" or "San Diego Waiver") in the Federal Register invoking section 102(c)'s waiver of the application of NEPA, the ESA, the Coastal Zone Management Act ("CZMA") and more than thirty additional laws not at issue in this lawsuit to "various border infrastructure projects" in the "Project Area," which is defined as "an approximately fifteen mile segment of the border within the San Diego Sector that starts at the Pacific Ocean and extends eastward," starting at "the Pacific Ocean and extending to approximately one mile east of Border Monument 251."  (Dkt. No. 30-6, Cayaban Decl., Ex. 11, 82 Fed. Reg. 35,984-85.)  Secretary Kelly determined that the Project Area "is an area of high illegal entry."  (Id. at 35,985.)

Two projects are specified in the August 2 Waiver Determination.  (Id. at 35,984-85.)  One project is the replacement of about 15 miles of existing primary fencing near San Diego.  (Id.)  The second project is the construction of prototype border walls on the eastern end of the secondary barrier near San Diego.  (Id. at 35,984; Dkt. No. 18-2, Ds'

Index of Exs., Ex. 14, Memorandum, Construction and Evaluation of Border Wall Prototypes, U.S. Border Patrol, San Diego Sector, California (Sept. 25, 2017).)

On September 12, 2017, former DHS Acting Secretary Elaine Duke, issued a Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended ("September 12 Waiver Determination" or "Calexico Waiver") in the Federal Register also invoking section 102(c)'s waiver authority as to compliance with NEPA, the ESA and numerous other statutes not at issue in this lawsuit to the Project Area in the El Centro Sector.  (Dkt. No. 30-6, Cayaban Decl., Ex. 12, 82 Fed. Reg. 42,829-30.)  Secretary Duke determined that the "El Centro Sector is an area of high illegal entry."  (Id. at 42,830.)  The Determination seeks to build a replacement fence in the El Centro Sector "along an approximately three mile segment of the border that starts at the Calexico West Land Port of Entry and extends westward." (Id.)

Contracts for the prototype project were awarded on August 31 and September 7, 2017.  (Dkt. No. 39-1, Cal. Ps' Response to Ds' SSUF, No. 10.)  Construction for the prototypes began on September 26, 2017 and was completed on October 26, 2017.  (Dkt. No. 49-4, Enriquez Decl. ¶ 11.)  Construction of the Calexico three-mile replacement fence was set to begin on February 15, 2018 while the San Diego Sector replacement fence is scheduled for construction in August 2018.  (Id. ¶¶ 10, 36.)

///

## C.     Procedural History

On September 6, 2017, Plaintiff Center for Biological Diversity ("Center Plaintiff") filed its operative second amended complaint ("SAC") for declaratory and injunctive relief against U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); and Elaine Duke, Acting Secretary of U.S. Department of Homeland Security challenging the August 2 Waiver Determination under section 102 of IIRIRA concerning the two border wall construction projects located in the San Diego Sector.[5]  (Dkt. No. 16, SAC.)

On November 21, 2017, Plaintiffs Defenders of Wildlife, Sierra Club and Animal Legal Defense Fund ("Coalition Plaintiffs") filed their operative first amended complaint ("FAC") against DHS; Elaine Duke, Acting Secretary of DHS; and United States of America for declaratory and injunctive relief for violations of section 102 and constitutional claims concerning the two border wall construction projects located in the San Diego and El Centro Sectors based on the two Waiver Determinations.[6]   (Dkt. No. 26.)

_____

[5] Center Plaintiff alleges causes of action for (1) ultra vires violations of section 102(c); (2) violation of the Take Care Clause under Article II, Section 3 of the U.S. Constitution; (3) violation of the separation of powers of the U.S. Constitution; (4) violation of the Presentment Clause under Article I, Section 7 of the U.S. Constitution; (5) violations of NEPA; (6) violations of ESA; and (7) violation of the Freedom of Information Act ("FOIA"), and alternatively, violation of the Administrative Procedure Act ("APA"). (Dkt. No. 16, Ctr. Ps' SAC.)

[6] The Coalition Plaintiffs' FAC alleges (1) ultra vires agency action under section 102(c); (2) violation of sections 102(a) and 102(b)(1)(C); (3) violation of the Presentment Clause under Article 1, Section 7

On September 20, 2017, People of the State of California ("California") and the California Coastal Commission (collectively "California Plaintiffs") filed a complaint against United States of America; DHS; Acting Secretary of DHS Elaine Duke; CBP; and Acting Commissioner of CBP Kevin K. McAleenan.  (Dkt. No. 17cv1911, Dkt. No. 1.) The complaint alleges declaratory and injunctive relief based on numerous violations of the U.S. Constitution, and statutes relating to the border wall construction projects in the San Diego and El Centro Sectors based on the two Waiver Determinations.[7]

In summary, all Plaintiffs[8] allege the Secretaries' Waiver Determinations are ultra vires acts that are not authorized under section 102.  Because the Waiver Determinations are void based on the ultra vires acts of the Secretaries, Plaintiffs also assert violations of NEPA, ESA, CZMA and the APA.  Plaintiffs also allege the following violations of the U.S. Constitution:

_____

of the U.S. Constitution; (4) violation of non-delegation doctrine under Article I, Section 1 and Article II, Section 1 of the U.S. Constitution; and (5) violations of Article III, the First Amendment right to petition, the Tenth Amendment by removing concurrent jurisdiction of state courts, and due process rights under the Fifth Amendment of the U.S. Constitution.  (Dkt. No. 26.)

[7] The California Plaintiffs' complaint seeks declaratory and/or injunctive relief claiming Defendants (1) failed to comply with NEPA and the APA; (2) failed to comply with the CZMA and the APA; (3) the Border Wall Projects are not authorized by section 102 based on ultra vires actions; (4) the Secretary's waiver authority expired on December 31, 2008; (5) the Waivers are invalid because they fail to satisfy section 102's requirements; (6) violation of Article III of the U.S. Constitution and the due process clause of the Fifth Amendment; (7) violation of the separation of powers doctrine; 8) violation of Article I, Section 1 of the U.S. Constitution; (9) violation of Article I, Section 3 of the U.S. Constitution; (10) violation of Article I, Section 7 of the U.S. Constitution; and (11) violation of the Tenth Amendment of the U.S. Constitution.

[8] Center Plaintiff only challenges the August 2, 2017 Waiver Determination while Coalition Plaintiffs and California Plaintiffs challenge both the August 2, and September 12, 2017 Waiver Determinations.

- Violation of Article I, Section 1 - the Non-Delegation Doctrine/Separation of Powers (by all Plaintiffs)

- Violation of Article II, Section 3 - Take Care Clause (by Center Plaintiff)

- Violation of Article I, Sections 2 & 3 (by California Plaintiffs)

- Violation of Article I, Section 7 - Presentment Clause (by all Plaintiffs)

- Violation of Due Process, Article III, and First Amendment right to petition the government (by Coalition Plaintiffs and California Plaintiffs)

- Violation of the Tenth Amendment - Concurrent State and Federal Jurisdiction (by Coalition Plaintiffs)

- Violation of the Tenth Amendment (by California Plaintiffs)

On October 24, 2017, the Court granted the parties' joint motion to consolidate the three cases and the parties' agreed upon briefing schedule on their cross-motions for summary judgment.  (Dkt. Nos. 21, 22.)

Prior to consolidation, on October 6, 2017, Defendants filed a motion to dismiss Center Plaintiff's second amended complaint which was converted to a motion for summary judgment in the Court's consolidation order.  (Dkt. Nos. 18, 22.)  On November 22, 2017, Center Plaintiff filed a cross-motion for summary judgment[9] and an opposition

---

[9] Center Plaintiff notes that its FOIA claim, Claim 7, is not subject to the cross-motions and will be resolved either via settlement or separate briefing.  (Dkt. No. 28-1 at 14 n. 1.)  Defendants agree arguing that the FOIA claim is not yet ripe for adjudication but also argue that the alternative APA claim regarding the processing of the FOIA requests should be dismissed since FOIA, itself, provides an

14

to Defendants' motion for summary judgment.  (Dkt. No. 28.)  On December 20, 2017, Defendants filed an omnibus brief that included their reply in support of their motion for summary judgment and an opposition to Center Plaintiff's motion for summary judgment.  (Dkt. No. 35.)  On January 5, 2018, Center Plaintiff filed a reply to Defendants' opposition.  (Dkt. No. 36.)

On November 22, 2017, Coalition Plaintiffs and the California Plaintiffs filed their motions for summary judgment.  (Dkt. Nos. 29, 30.)  On December 20, 2017, all Defendants filed an omnibus cross-motion for summary judgment and opposition to Coalition and California Plaintiffs' motions for summary judgment.  (Dkt. No. 35.)

On January 5, 2018, the Coalition Plaintiffs and California Plaintiffs separately filed their oppositions to Defendants' cross-motion for summary judgment and replies to their motions.  (Dkt. Nos. 38, 39.)   On January 23, 2018, Defendants filed their reply to their cross-motion for summary judgment.  (Dkt. No. 42.)

## II.     ANALYSIS

### A.     Legal Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477

---

adequate remedy.  (Dkt. No. 35-1 at 94-95.)  The Court declines to address the alternative APA claim based on the FOIA requests until after the FOIA claim, itself, is resolved.

U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## B.    Article III Standing as to the State of California

The State of California argues it has Article III standing because it will suffer injury to its real property that it owns and manages adjacent to the border wall projects.[10] It contends that the Waiver Determinations infringe on California's procedural and sovereign rights in creating and enforcing its own laws and obtaining benefits provided under NEPA and the APA.  Defendants respond that California has not carried its burden to establish standing as to each of its numerous claims and has not demonstrated that the Waiver Determinations impact state laws which would be enforceable in connection with the projects at issue.

---

[10] Initially, California argued it has a concrete and particularized interest in protecting its natural, recreational, agricultural, historical, and cultural resources for the use, enjoyment and benefit of its residents but did not reassert these interests in its reply.

16

Article III, Section 2 of the United States Constitution requires that a plaintiff have standing to bring a claim.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). In order "to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000) (citing Lujan, 504 U.S. at 560–61).  The party seeking federal jurisdiction has the burden of establishing its existence.  Lujan, 504 U.S. at 561.  "A plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  Davis v. Fed. Election Comm'n, 552 U.S. 724, 734 (2008).

States have a "procedural right" and "quasi-sovereign interests" in protecting its natural resources, such as air quality.  Massachusetts v. EPA, 549 U.S. 497, 520 (2007) ("EPA's steadfast refusal to regulate greenhouse gas emissions presents a risk of harm to Massachusetts that is both 'actual' and 'imminent.'").  In Georgia v. Tennessee Copper Co., 206 U.S. 230, 237 (1907), the State of Georgia filed an action to protect its citizens from air pollution originating from outside its borders and the Court asserted that a state, in its capacity as a quasi-sovereign, has an "interest independent of and behind the titles of its citizens, in all the earth and air within its domain.  It has the last word as to whether

17

its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." Id.

Here, the parties dispute whether California has demonstrated an injury in fact, and whether the injury in fact is traceable to the Waiver Determinations.  As held by the U.S. Supreme Court, California has a procedural right and quasi-sovereign right in the environmental protections afforded by NEPA and the APA.  See id.  California provided declarations from experts detailing the possible harm to the Tijuana Estuary and harm to rare, threatened or endangered species.  (Dkt. No. 30-7, Clark Decl.; Dkt. No. 30-8, Vanderplank Decl.; Dkt. No. 30-9, Delaplaine Decl.)  Eight prototype walls have already been constructed demonstrating that the injury is actual and the El Centro Sector border fence replacement project, which is currently undergoing consultation and may have already begun construction, is also imminent.  The Court concludes that California has demonstrated an injury-in-fact that is concrete and particularized, and actual or imminent.

Moreover, California argues it has a legally protected sovereign interest in creating and enforcing its own laws.  The Waiver Determinations will preclude the enforcement of California's laws which will affect its sovereign interests.  Defendants object because Plaintiffs merely string cite to eight state code or regulations without explaining how these provisions apply to the projects at issue.  But, as noted by Plaintiff, the Waiver Determinations do not identify which California law or regulation Defendants are waiving and as an example it provides some provisions where the waiver would bar

18

California's enforcement of its laws as to DHS, its contractors, or to the State's permitting authority or other legal actions.

It is not disputed that the Waiver Determinations waive all legal requirements and include related state laws.  (See Dkt. No. 30-6, Cayaban Decl., Ex. 11, 82 Fed. Reg. 35,984-85; id., Ex. 12, 82 Fed. Reg. 42,829-30.)  Defendants do not deny that California state laws are being waived. The Court agrees with California that a bar to enforcing its own state laws related to the border wall projects is an injury in fact that supports Article III standing.  The Court concludes that California has Article III standing.

## C.     Whether the Court has Jurisdiction Over Plaintiffs' Non-Constitutional Claims based on Ultra Vires Acts of the Secretary of the DHS

Defendants contend that the Court lacks jurisdiction to consider Plaintiffs' non-constitutional claims, including whether the Secretaries' actions concerning the two Waiver Determinations are ultra vires.  They explain that section 102 explicitly expresses Congress' intent to bar the district court from exercising jurisdiction over any claims arising from the Secretary of DHS's waiver determination except for a constitutional violation.  Plaintiffs argue that the Court may consider whether the Waivers exercised by the Secretaries constitute ultra vires acts as they exceed the authority granted to the Secretaries under section 102; therefore, they contend section 102(c)(2)'s judicial review bar on non-constitutional claims does not apply.  For the reasons stated below, the Court finds that it may consider whether the Secretaries have violated any clear and mandatory

19

statutory obligations set forth in section 102.  Finding that there are no such violations, the Court upholds the jurisdictional bar and concludes that it does not have the jurisdiction to hear any claims other than constitutional claims.

Section 102(c)(2)(A) provides that the "district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1) [the waiver provision].  A cause of action or claim may only be brought alleging a violation of the Constitution of the United States.  The court shall not have jurisdiction to hear any claim not specified in this subparagraph."  8 U.S.C. § 1103(c)(2)(A).

As a starting point, there is a "strong presumption that Congress intends judicial review of administrative action."  Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667, 670 (1986); El Paso Natural Gas Co. v. United States, 632 F.3d 1272, 1276 (D.C. Cir. 2011) (quoting Bowen, 476 U.S. at 670) ("When considering whether a statute bars judicial review, '[w]e begin with the strong presumption that Congress intends judicial review of administrative action.'").  In order to overcome the strong presumption, there must be "clear and convincing" evidence of a contrary legislative intent.  Bowen, 476 U.S. at 671-72.  The strong presumption may be overcome by "specific language or specific legislative history that is a reliable indicator of congressional intent," or a

"specific congressional intent to preclude judicial review that is 'fairly discernible' in the detail of the legislative scheme."  Id. at 673.

In this case, the Center Plaintiff does not dispute that the presumption favoring judicial review has been overcome by the express language of section 102(c)(1) and does not challenge Defendants' argument on this issue.  Instead, all Plaintiffs argue that the August 2, 2017 and September 12, 2017 Waiver Determinations constitute ultra vires acts of the Secretary that do not fall under section 102 because the Waivers are not authorized by sections 102(a) or (b) and were not decisions made "pursuant to" section 102(c)(1).  Therefore, according to Plaintiffs, section 102(c)(2) does not apply, and the Waiver Determinations are subject to review by the Court.  Defendants respond that Plaintiffs cannot bypass the jurisdictional bar by framing their claims as ultra vires challenges when judicial review is expressly prohibited.  They argue that the Court should consider the plain meaning of section 102(c)(2) and that should be the end of the matter.

Here, Congress expressly barred the district court's review of non-constitutional claims under section 102(c)(2), and this provision rebuts the strong presumption favoring judicial review of administrative actions.  However, the United States Supreme Court has identified a narrow exception to an express statutory bar on judicial review when there is a claim that an agency acted beyond its statutory authority.  See Leedom v. Kyne, 358

U.S. 184 (1958);[11] <u>Bd. of Governors of Fed. Reserve Sys. v. MCorp. Fin., Inc.</u>, 502 U.S. 32 (1991); <u>see also</u> <u>Dart v. United States</u>, 848 F.2d 217 (D.C. Cir. 1988).

In <u>Kyne</u>, the Supreme Court held that a district court had jurisdiction to review a non-final agency order "made in excess of its delegated powers and contrary to a specific prohibition in the [National Labor Relations Act]." <u>Kyne</u>, 358 U.S. at 188. The <u>Kyne</u> court found that a National Labor Relations Board's ("NLRB") determination that a unit involving both professional and non-professional employees was appropriate for collective bargaining purposes was in excess of delegated powers because it was in direct conflict with the provisions of § 9(b)(1) of the National Labor Relations Act ("NLRA") dictating that it "shall not" do so "unless a majority of such professional employees vote for inclusion in such unit." <u>Kyne</u>, 358 U.S. at 185. Consequently, the district court had jurisdiction to set aside a certification of the NLRB where that agency had refused to poll professional employees before combining them in a bargaining unit with non-professional employees. <u>Id.</u> at 188-89. In the ordinary case, a decision certifying a bargaining unit is not a final order that can be reviewed but the Court explained that first, the "suit [was] not one to 'review,' in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather, it [was] one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in

---

[11] Plaintiffs note that the ability to bring an ultra vires claim was first recognized by the Supreme Court decades earlier in <u>American School of Magnetic Healing v. McAnnulty</u>, 187 U.S. 94, 110 (1902).

the Act." Id. at 188.  Second, because, in the ordinary case, only an employer can initiate an unfair labor practice charge, and ultimately a reviewable final order, by refusing to bargain after an election, the aggrieved employees in this case had "no other means, within their control . . . to protect and enforce" their statutory rights.  Id. at 190.  In other words, "absence of jurisdiction of the federal courts would mean a sacrifice or obliteration of a right which Congress has given professional employees."  Id.  In conclusion, the Court stated it "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." Id.

MCorp Fin., Inc., relied on by Defendants, involved an express bar on judicial review, and the Court found the Fifth Circuit erred when it held that it had jurisdiction to consider the merits of MCorp's challenge to the Board of Governors of the Federal Reserve System ("Board") and held that the Financial Institutional Supervisory Act's ("FISA") preclusion provision barred judicial review of pending Board administrative actions.  MCorp Fin., Inc., 502 U.S. at 43-44.

In its analysis, the Court distinguished its ruling from Kyne noting two differences. First, the Court noted that "central" to its decision in Kyne was "the fact that the Board's interpretation of the Act would wholly deprive the union of a meaningful and adequate means of vindicating its statutory right." Id. at 43.  In MCorp. Fin., Inc., FISA provided MCorp with a meaningful and adequate opportunity for judicial review by challenging

the Board's findings.  <u>Id.</u> at 43-44.  Second, the Court emphasized "the clarity of the congressional preclusion of review in FISA" where Congress clearly stated: "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any [Board] notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order." <u>Id.</u> at 44 (quoting 12 U.S.C. § 1818(i)(1)).  In <u>Kyne</u>, the statutory provision implied, by its silence, a preclusion of review.  <u>Id.</u>  In contrast, FISA provides "clear and convincing evidence that Congress intended to deny the district court's jurisdiction to review and enjoin the Board's ongoing administrative proceedings." <u>Id.</u>  The Court reversed the decision by the Fifth Circuit and held that it did not have jurisdiction to consider MCorp's challenge.  <u>Id.</u> at 44-45.

Next, in <u>Dart</u>, relied on by Plaintiffs, the D.C. Circuit held that the Secretary of Commerce's reversal of the administrative law judge's decision exceeded his authority under the Export Administration Act ("EAA").  <u>Dart</u>, 848 F.2d at 231.  The EAA provides two finality clauses that certain "functions exercised under the Act" were excluded from certain sections of the APA and the "Secretary shall, in a written order, affirm, modify, or vacate the decision of the administrative law judge.  The order of the Secretary shall be final and is not subject to judicial review." <u>Id.</u> at 221.  Because the Secretary did not "affirm, modify or vacate" the ALJ's decision but instead reversed, it was not among the orders placed beyond review of the finality provision.  <u>Id.</u> at 227.  The D.C. Circuit held that review is available when the Secretary exercises functions that are

24

not specified in the statute.  Id. at 221.  In explaining its ruling, it stated the even "where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction."  Id.  The court's analysis focused on the plain language of the statute, the structure of the statutory scheme, the legislative history, and the nature of the administrative action involved.  Id. at 224-27.  It concluded that the presumption of judicial review applied in that case, explaining that the finality clause did not preclude judicial review of facial violations of the statute.  Id. at 222 (citing Kyne, 358 U.S. 184).

The Dart court recognized that "[w]hen an executive acts ultra vires, courts are normally available to reestablish the limits on his authority."  Id. at 224.  However, the court noted that the "exception for review of facial violations should remain narrow."  Id. at 231.  It also explained that "Congress' finality clause must be given effect, and an agency action allegedly 'in excess of authority' must not simply involve a dispute over statutory interpretation or challenged findings of fact."  Id.  The court recognized that invoking the exception is "extraordinary" noting "that to justify such jurisdiction, there must be a 'specific provision of the Act which, although it is [ ]clear and mandatory, [ ]' was nevertheless violated."  Id. (quoting Council of Prison Locals v. Brewer, 735 F.2d 1497, 1501 (D.C. Cir. 1984) (citation omitted)).  The court in Dart concluded that the

"requirement that the Secretary of Commerce 'affirm, modify or vacate' ALJ enforcement decisions was 'clear and mandatory' and was nevertheless violated." Id.

The exception to the statutory bar on judicial review is an "extremely narrow one" and "extraordinary." Nat'l Air Traffic Controllers Ass'n AFL–CIO v. Fed. Serv. Impasses Panel, 437 F.3d 1256, 1263 (D.C. Cir. 2006); American Airlines, Inc. v. Herman, 176 F.3d 283, 293 (5th Cir. 1999) (courts "have interpreted Kyne as sanctioning [review] in a very narrow situation in which there is a 'plain' violation of an unambiguous and mandatory provision of the statute.").  The D.C. Circuit described that a Kyne claim is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." Nyunt v. Chairman, Broad. Bd. of Governors, 589 F.3d 445, 449 (D.C. Cir. 2009).

In sum, in order for the Kyne exception to apply, a plaintiff must satisfy the following two factors: 1) that the agency acted "in excess of its delegated powers" contrary to "clear and mandatory statutory language" and 2) "the party seeking review must be 'wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights." Pac. Mar. Ass'n v. NLRB, 827 F.3d 1203, 1208 (9th Cir. 2016) (citations omitted); Nat'l Air Traffic Controllers, 437 F.3d at 1263 (the Kyne exception can apply to cases involving "either negative or positive statutory commands.").

Courts have cautioned that "review of an 'agency action allegedly in excess of authority must not simply involve a dispute over statutory interpretation.'" Herman, 176

F.3d at 293 (quoting Kirby Corp. v. Pena, 109 F.3d 258, 269 (5th Cir. 1997)); Dart, 848

F.2d at 231 (noting that facial challenges to agency action as allegedly "'in excess of

authority' must not simply involve a dispute over statutory interpretation or challenged

findings of fact."); see also Nebraska State Legislative Bd., United Transp. Union v.

Slater, 245 F.3d 656, 659-60 (8th Cir. 2001).  For example, in Baxter Healthcare Corp. v.

Weeks, 643 F. Supp. 2d 111 (D.D.C. 2009), the court explained that Health and Human

Services ("HHS") has the "authority under the Medicare statute to determine whether a

product is a single source drug, a biological, or a multiple source drug."  Id. at 115 n. 2.

Whether HHS made the correct determination about [the drug] is a "dispute over

statutory interpretation" that does not rise to the level of an ultra vires claim."  Id.

       Contrary to Defendants' argument that the Court cannot even consider whether the

two Waivers were ultra vires acts, courts have consistently conducted judicial review of

facial, ultra vires claims despite a statutory bar on judicial review.[12]  See Lindahl v. OPM,

470 U.S. 768, 789, 791 (1985) (statutory bar did not bar review of alleged errors of law

or procedure but it did bar review of factual determinations); Dart, 848 F.2d at 225;

Staacke v. U.S. Sec'y of Labor, 841 F.2d 278, 281 (9th Cir. 1988) (noting review is

---

[12] The parties dispute the origins of ultra vires review.  Coalition Plaintiffs claim courts have inherent authority to review ultra vires jurisdiction, (Dkt. No. 29-1 at 19; Dkt. No. 38 at 7), while Defendants argue that ultra vires review is an application of the rebuttable presumption of congressional intent in favor of judicial review.  (Dkt. No. 35-1 at 35; Dkt. No. 42 at 20.)  A decision on the origins of ultra vires review is not dispositive and the Court declines to resolve this issue.

available "where defendant is charged with violating a clear statutory mandate or prohibition" even where a statute "absolutely bars judicial review"); Oestereich v. Selective Serv. Sys. Local Bd. No. 11, 393 U.S. 233 (1968) (despite an express preclusion of pre-induction review, the Court reversed the plaintiff's draft classification); Spencer Enters., Inc. v. United States, 345 F.3d 683, 689 (9th Cir. 2003) (courts retain jurisdiction to review whether a particular decision of the Attorney General is ultra vires despite the discretion granted to the Attorney General).

Even the cases relied upon by Defendants fail to support their position. In Staacke, the Ninth Circuit stated that on a claim that the defendant violated a clear statutory mandate or prohibition, the court may consider the claim despite a judicial bar but its "task is limited to determining whether the statute in question contains a clear command that the Secretary has transgressed." Staacke, 841 F.2d at 282. After determining there was no violation of a clear statutory mandate, the Ninth Circuit upheld the bar on judicial review. Id. Similarly, in Gebhardt v. Nielson, 879 F.3d 980, 989 (9th Cir. 2018), the Ninth Circuit affirmed a judgment of the district court, which dismissed an action based on a judicial bar on the Secretary's discretion in making "no risk" determinations. Id. at 989. The Secretary of DHS denied the plaintiff's petitions for permanent resident status filed on behalf of his wife and his wife's three children pursuant to the Adam Walsh Child Protection and Safety Act of 2006 based on the plaintiff's prior state conviction for committing a "lewd and lascivious act with a child under the age of fourteen." Id. at 983-

28

84.  The Ninth Circuit stated that it may review the plaintiff's claims to the extent he challenged the scope of the Secretary's discretion.  Id.  After determining that the claimed action did not exceed the Secretary's discretion, the Ninth Circuit, upheld the judicial bar on the Secretary's discretionary "no risk" determination.  Id. at 5.  These cases demonstrate that the Court may consider whether there has been a plain violation of an unambiguous and mandatory provision of law despite a statutory bar on judicial review.

The Court concludes that it may conduct judicial review of facial, ultra vires claims despite a statutory bar on judicial review.  Accordingly, the Court next considers whether the Secretaries acted in excess of their delegated powers.

**D.     Whether the Waiver Determinations Are Ultra Vires Acts under Section 102(c)'s Waiver Authority**

Defendants contend that the DHS Secretaries' actions are ultra vires only if they are in excess of delegated powers that are contrary to "clear and mandatory" statutory language as required in Kyne.[13]  Plaintiffs reply that the Kyne line of cases do not apply and, instead, the Dart test applies so that the government has the burden to show "clear and convincing" evidence that Congress foreclosed its jurisdiction over their case.  Dart, 848 F.3d at 224.  However, Plaintiffs are confusing the standard that is required to

---

[13] A Ninth Circuit panel has also referred to the "clear and mandatory" standard as "unambiguous and mandatory" provision of a statute.  See Charlie Rossi Ford, Inc. v. Price, 564 F.2d 372, 373 (9th Cir. 1977).

29

overcome the presumption that Congress intends judicial review of administrative actions, a "clear and convincing" standard, with the "clear and mandatory" statutory language requirement for application of the <u>Kyne</u> exception to the statutory bar of judicial review.  In fact, the court in <u>Dart</u> applied the <u>Kyne</u> test when it held that the Secretary of Commerce facially violated a specific provision of the EAA which was "clear and mandatory."  <u>Dart</u>, 848 F.2d at 231.  An agency's action is ultra vires if it contravenes "clear and mandatory" statutory language.  <u>Pac. Mar. Ass'n</u>, 827 F.3d at 1208 (quoting <u>Kyne</u>, 358 U.S. at 188); <u>Dart</u>, 848 F.2d at 231; <u>Staacke</u>, 841 F.2d at 281.  In order to make that determination, courts look to the language of the statute and its legislative history.  See <u>Int'l Ass'n of Tool Craftsmen v. Leedom</u>, 276 F.2d 514, 516 (D.C. Cir. 1960) ("statutory language itself and the legislative history" support invoking district court's equity jurisdiction to consider whether Board violated a "clear and mandatory" statutory prohibition); <u>Teamsters, Chauffeurs, Helpers and Delivery Drivers, Local 690 v. NLRB</u>, 375 F.2d 966, 971 (9th Cir. 1967) (a court looks to statutory text and legislative history to determine if the Board violated a "clear and mandatory" statutory provision).

Here, in order for the narrow exception of <u>Kyne</u> to apply, Plaintiffs must show that Secretaries Kelly and Duke acted in excess of their delegated powers by showing that the issuance of the two Waiver Determinations was in contravention of "clear and mandatory" language contained in section 102.  See <u>Pac. Mar. Ass'n</u>, 827 F.3d at 1208;

Dart, 848 F.2d at 222 (The question "whether an agency has acted 'in excess of its delegated powers' has alternatively been phrased as whether the agency action 'on its face' violated a statute.").   Plaintiffs must also show that barring judicial review would deprive them of a "meaningful and adequate means of vindicating [their] statutory rights." Id.

### 1.     Violation of a "Clear and Mandatory" Statutory Provision

The Court now turns to whether Plaintiffs have established that the Secretaries facially violated a specific provision of section 102 which was "clear and mandatory."  .

### a.     Whether Section 102(c) Waiver Provision Applies Only to Projects Identified in Section 102(b)

Plaintiffs argue that that the statutory authority to waive laws under section 102(c) does not apply to the two border wall projects because they were not specifically mandated by Congress under section 102(b).  Further, when construed as a whole, the two projects fall outside the limits of the waiver authority because Congress did not intend section 102(c) to apply to projects beyond those specifically mandated in section 102(b). Defendants disagree arguing that the waiver provision applies to section 102 as a whole, and is not limited to only Congress' priorities identified in section 102(b).  Upon review of the statute and legislative history, both interpretations are plausible.  As such, there is no violation of "clear and mandatory" language with respect to the application of the waiver.

31

Statutory construction always begins with the "language of the statute itself" or "plain meaning of the statute" and if unambiguous, that meaning controls.  Brock v. Writers Guild of America, West, Inc., 762 F.2d 1349, 1353 (9th Cir. 1985); Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cnty., 627 F.3d 1268, 1271 (9th Cir. 2010).  If the language is not clear, then a court looks at the legislative history.  Brock v. Writers Guild of America, West, Inc., 762 F.2d 1349, 1353 (9th Cir. 1985); Avendano-Ramirez v. Ashcroft, 365 F.3d 813, 816 (9th Cir. 2004).  Legislative history is also looked at if the statutory language is clear but there is "clearly expressed legislative intention" which is contrary to the plain meaning of the statute.  Heppner v. Alyeska Pipeline Serv. Co., 665 F.2d 868, 871 (9th Cir. 1981).

Section 102(c) states,

> (1) In general.--Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads **under this section**. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

8 U.S.C. § 1103(c) (emphasis added).

Defendants argue that the words "under this section" refer to section 102 as a whole and are not limited to subsection 102(b).  This includes actions under any part of section 102 that meet section 102(c)(1)'s criteria.  In support, they cite to the Guide to Legislative Drafting which explains that section 102(a) is a "subsection"; section

32

102(b)(1) is a "paragraph" and section 102(b)(1)(A) is a "sub-paragraph."  See House Office of the Legislative Counsel, Guide to Legislative Drafting.  Therefore, "this section" in section 102(c)(1) cannot be read to refer exclusively to 102(b) but applies to the entirety of section 102.

Plaintiffs respond that the waiver authority must be interpreted as limited to specific border barriers specified in section 102(b) because Defendants' reliance on the standardized format interpretation of "this section" is flawed.  They argue that Defendants' position produces an absurd result in interpreting sections 102(b)(2)-(4).  These sections address the procedures for obtaining easements and appropriations, and refer to and apply only to "this subsection" which is section 102(b).  According to Defendants' interpretation, the procedures and directives regarding easements and appropriations would not apply to section 102(a) border projects and without those provisions, a border barrier could not be built.  Moreover, the terms "section" and "subsection" are used inconsistently as section 102(b)(1)(A) uses the phrase "[i]n carrying out subsection (a)" while section 102(b)(1)(B) & (C) uses the phrase "[i]n carrying out this section" under section 102(b).

Defendants reply that "when Congress identifies certain specific applications of a general grant of authority, those specific requirements cannot generally be understood to

prohibit all other applications of the general authority." (Dkt. No. 18-1 at 30.[14])  Second, a reading that limits section 102(c) to section 102(b) would render section 102(a) superfluous.  Third, the subsequent amendments demonstrate that section 102(b)(1) merely identified Congress' shifting priorities and specific areas for action.  Finally, Defendants argue that Plaintiffs cannot overcome the plain meaning of the statute by pointing out that Congress, in passing section 102 in 1996 and the amendment to section 102(c) in 2005, was primarily focused on portions of fencing near San Diego.  Congress could have limited the provision to construction near San Diego; instead, it established a broad general mandate in section 102(a) that is not geographically limited and used the words "under this section" to extend section 102(c) to the entire section.

Certainly, section 102 is not a model of legislative precision.  Given the inconsistencies in the use of "this section", the Court looks to the legislative history for further guidance.  The parties rely on the legislative history that supports their respective positions.  Defendants cite to Conference Report 109-72 to support their interpretation because the Report broadly states it "provides for construction and strengthening of barriers along U.S. land borders." (Dkt. No. 18-2, Ds' Index of Exs., Ex. 2, H.R. Rep. 109-72 at p. 170 (May 3, 2005).  However, the Conference Report also references section 102(b) as to the waiver's application to the 14 miles of barriers and roads, mandated by

---

[14] Pages numbers to the docket are based on the CM/ECF pagination.

1996 IIRIRA along the border near San Diego that had been halted due to environmental challenges.  Id.

Defendants argue that the breadth of section 102(c) is noted by comments made by representatives who were opposed to the 2005 REAL ID Act which were not contradicted by its sponsors.  (See Dkt. No. 18-2, Ds' Index of Exs., Ex. 6, 151 Cong. Rec. H459 (Feb. 9, 2005) (statement of Cong. Jackson-Lee) ("[The waiver provision is] so broad that it would not just apply to the San Diego border fence that is the underlying reason for this provision. It would apply any other barrier or fence that may come about in the future."); id., 151 Cong. Rec. H454 (Feb. 9, 2005) (statement of Cong. Conyers) ("waiving all Federal laws concerning construction of barriers and fences anywhere within the United States"); id., 151 Cong. Rec. H554 (Feb. 10, 2005) (statement of Cong. Harman) ("[T]he reach is beyond the San Diego border.  According to the language in this legislation, it is all areas along and in the vicinity of our international borders with Mexico and Canada."); id., 151 Cong. Rec. H556 (Feb. 10, 2005) (memorandum by Cong. Farr) ("[waiver authority] seem[s] to apply to all the barriers that may be constructed under the authority of § 102 of IIRIRA (i.e., barriers constructed in the vicinity of the border and the barrier that is to be constructed near the San Diego area)"); id., 151 Cong. Rec. H559 (statement of Cong. Udall) (objecting to bill because "the language of the bill is not limited to the construction of a fence in [San Diego]" but instead includes "all laws for all U.S. borders").  Defendants note the concerns of the breadth of section 102 repeated by

opponents at least five times in two days were not merely "fears and doubts of the opposition" that can be dismissed.

Defendants also point to a comment made by a member of Congress in 1996 addressing concern that section 102(c) extended beyond San Diego. (See Dkt. No. 18-2, Ds' Index of Exs., Ex. 4, 142 Cong. Rec. H11076 (Sept. 25, 1996), (statement of Rep. Saxton) ("[Section 102(c)] is intended to address an issue that has to do with the California-Texas-Mexico border; however, the way this section is written, the exemption applies to the entire border of the United States, not just the California-Mexico border near San Diego.").

On the other hand, Plaintiffs rely on the legislative history which shows the sponsor's and supporters' intent to limit the expanded waiver authority to the San Diego fencing under section 102(b). The bill's author, Representative Sensenbrenner, described the amendment as "the REAL ID Act will waive Federal laws to the extent necessary to complete gaps in the San Diego border security fence, which is still stymied 8 years after congressional authorization. Neither the public safety nor the environment are benefitting from the current stalemate." (Dkt. No. 18-2, Ds' Index of Exs., Ex. 6, 151 Cong. Rec. H454 (Feb. 9, 2005).) Supporters of the bill also made statements limiting the amendment to the fence in San Diego. (Id., 151 Cong. Rec. H453-471 (Feb. 9, 2005) (Statement of Rep. Hoekstra) ("H.R. 418 provides the Secretary of Homeland Security

with authority to waive environmental laws, so that the border fence running 14 miles east from the Pacific Ocean at San Diego may finally be completed.").)

   "The fears and doubts of the opposition are no authoritative guide to the construction of legislation.  It is the sponsors that we look to when the meaning of the statutory words is in doubt." NLRB v. Fruit Packers, 377 U.S. 58, 66 (1964) (citing Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394-95 (1951)).  "In their zeal to defeat a bill, they understandably tend to overstate its reach." Id.  In this case, even though the Court has looked at the sponsors' comments to determine the meaning of the statute, the sharp contrast in the legislative history statements and plausible interpretations on both sides do not provide the Court with definitive guidance as to the breadth of section 102(c).

   Each side offers additional plausible interpretations to support their position.  For example, since 2005, the waiver provision has been invoked five times in order to comply with the specific mandates of the various amendments to section 102(b).  See 70 Fed. Reg. 55,622-02 (Sept. 22, 2005)[15] (concerning completion of section 102(b) mandated in

---

[15] In the 2005 waiver determination, former DHS Secretary Michael Chertoff noted that nine years had passed since Congress specifically sought the construction of 14 miles of building second and third fences to the existing reinforced fence under section 102(b).  Therefore, in order to expedite the completion of section 102(b) of IIRIRA, he invoked the waiver provision in section 102(c) for "all federal, state, or other laws, regulations and legal requirements" related to the construction.  See 70 Fed. Reg. 55,622-02 (Sept. 22, 2005). The impetus for broadening section 102(c) to all legal requirements was the lengthy delay caused by challenges made by environmental groups.

1996); 72 Fed. Reg. 2,535-01 (Jan. 19, 2007); 72 Fed. Reg. 60,870-01 (Oct. 26, 2007); 72 Fed. Reg. 10,077-01 (Apr. 8, 2008); 72 Fed. Reg. 19078-01 (Apr. 8, 2008). These waivers indicate that their use was limited to the mandates of section 102(b). However, Defendants point out that section 102(a)'s general mandate is broad and geographically includes "the United States border." This was confirmed by a district court in Save Our Heritage where it concluded that even though Congress did not include San Diego when section 102(b) was amended by the 2006 Fence Act, the Secretary's general authority to construct border barriers under section 102(a) is broad, does not include any geographical restrictions and authorized the San Diego barrier project even though it was included in the prior version of section 102(b) of the 2005 REAL ID Act. Save Our Heritage Org. v. Gonzalez, 533 F. Supp. 2d 58, 61 (D.D.C. 2008). Even though San Diego was included in section 102(b) in the REAL ID Act, the district court's reasoning to conclude that the Secretary had authority to construct the San Diego barrier was based on the broad provision of section 102(a), not because it was mandated in the prior version. Id.

Plaintiffs also cite to Judge Burns's decision in Sierra Club v. Ashcroft, Case No. 04cv272-LAB(JMA), 2005 WL 8153059 (S.D. Cal. Dec. 13, 2005) where the plaintiffs challenged the Secretary's waiver determination in September 2005 invoked pursuant to the 2005 REAL ID Act for the border fence construction of the Triple Fence Project. They note that the court repeatedly emphasized the limitation of the waiver to the "narrow purpose of expeditious completion of the Triple Fence authorized by the

IIRIRA." Id. at 5. However, Plaintiffs were challenging the waiver determination to complete the project that was specifically authorized in section 102(b), and therefore, the Court's language focused on section 102(b). As such, the Sierra Club case is not as helpful as Plaintiffs propose.

The parties' varying plausible interpretations concerning the scope of section 102(c) demonstrate the lack of a clear statutory mandate. See Staacke, 841 F.2d at 282 ("Where, as here, the statute is capable of two plausible interpretations, the Secretary's decision to adopt one interpretation over the other cannot constitute a violation of a clear statutory mandate."). In view of the competing plausible interpretations, the Court cannot conclude that the Secretaries acted in excess of their delegated powers contrary to a "clear and mandatory" provision in section 102.

### b.   Whether Key Statutory Terms Preclude the Waiver Determinations

#### i.   "additional barriers and roads"

Section 102(a) grants the Secretary the authority to "to install additional physical barriers and roads." 8 U.S.C. § 1103(a). Coalition Plaintiffs and California Plaintiffs argue that section 102 only allows for the installation of "additional" barriers and roads and does not authorize the replacement of existing fences. Plaintiffs cite to the dictionary that defines "additional" as "more", "extra" and "added" while "replacement" is defined as resulting in no net gain or addition and because the new barrier is a substitute or

successor to the fence, it is replacing, not adding.  Moreover, they argue that the construction of additional barriers through various amendments since 1996 focused solely on adding mileage to the existing fencing such as adding fencing where none existed or adding new layers of fencing to supplement the existing primary fence.  Section 102 does not address on-going maintenance or replacement of existing barriers.  They contend that none of the prior waivers were initiated for the purpose of replacing, repairing, or enhancing existing barriers.

In response, the government argues Plaintiffs' narrow interpretation of "additional" is not supported by the statutory language nor the legislative history.  According to Defendants, the installation of "lighting, cameras and sensors", 8 U.S.C. § 1103(b)(1)(A), falls under "additional barriers and roads" under section 102(a) which indicate a broader definition of "additional."  Defendants also cite the legislative history of the 2005 REAL ID Act where representatives described section 102 as providing for "construction and strengthening of barriers along U.S. land borders" suggesting a broad definition of "additional."  (Dkt. No. 18-2, Ds' Index of Exs., Ex. 2, H.R. Rep. 109-72 at 170 (May 3, 2005).)  In 2006, Senator Kyl discussed section 102 and explained the project as "replacing the so-called landing mat fencing, which does look like a wall, with chain link-type fencing that you can see through."  (Dkt. No. 18-2, Ds' Index of Exs., Ex. 9, 152 Cong. Rec. S9871 (Sept. 21, 2006).)  He explained that the current fencing is deteriorating and difficult to repair because of its age.  (Id.)  Moreover, DHS has used

section 102 to replace fencing in 2011 in Arizona, the Nogales Fence Replacement Project, and invoked section 102(c)'s waiver authority.[16]  (Dkt. No. 42-2, Ds' Index of Exs., Ex. 23.)  The authority for the project was derived from sections 102(a) and 102(b)(1)(A).  (Id. at 5.)  The Nogales Fence Replacement Project was to remove and replace about 2.8 miles of existing primary fence along the United States/Mexico international border, the repair and maintenance of a 20 foot wide construction road parallel to the fence and replacement of a 20-foot-wide gate at a port of entry.  (Id. at 4.)

The legislative history and the prior projects invoking section 102(c) for the replacement of border fences support the position that building "additional barriers" has a broad meaning and can include replacement of fencing.  To the extent that this interpretation is plausible, Plaintiffs have not demonstrated the replacement fence clearly falls outside the scope of "additional physical barriers" to show that the Secretary violated a "clear and mandatory" statutory provision.  See, e.g., Staacke, 841 F.2d at 281 (noting that both parties' construction of "in addition" were plausible where one party asserted it meant "concurrent with" and the other party maintained it meant "subsequent to").

///

///

---

[16] 73 Fed. Reg. 19078 (Apr. 8, 2008).

41

### ii.     "areas of high illegal entry"

Plaintiffs argue that the Waiver Determinations' conclusions that the San Diego and El Centro sectors are "areas of high illegal entry," are improperly based on sector-wide data which are not good indications of whether the Project Areas are areas of high illegal entry.  Moreover, sector wide data are not reliable because the amount of drugs seized in a sector usually occur far from the Mexican border at highway checkpoints, during vehicle searches at the points of entry or when border patrol agents discover a drug-smuggling boat or drone.  Sector wide data do not demonstrate that the project areas themselves are areas of high illegal entry and the data are less probative when the facts show that the San Diego Project Area has fewer illegal border crossings than the San Diego Sector as a whole.  However, even if the Court were to consider sector-wide data, Plaintiffs argue DHS's apprehension records show that these two sectors are no longer areas of high illegal entry.

Defendants argue that Congress has set no specific threshold for "high illegal entry" but Congress has expressly stated that one of the statute's purposes is "to achieve and maintain operational control over the international border."  8 U.S.C. § 1103(b)(1)(D).  "Operational control" "means the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband."  Pub. L. No. 109-367 § 2(b), 120 Stat. 2638 (2006) (codified at 8 U.S.C. § 1701 note).  Moreover, they note that the number of

apprehensions had fallen from more than 480,000 to less than 150,000 by 2006.  But when Congress amended section 102 in 2006 and 2008, it did not suggest there was no longer "high illegal entry" along the border.  Lastly, Congress frequently refers to sector-wide data when discussing the needs for such projects; therefore the use of sector-wide data is not misplaced.  (Dkt. No. 35-1 at 65 (citation to legislative history using sector-wide data).)

The August 2, 2017 Waiver Determination states that the San Diego Sector is one of the busiest and in 2016, the CBP apprehended over 31,000 illegal aliens and seized about 9,167 pounds of marijuana and about 1,317 pounds of cocaine in the San Diego Sector.  (Dkt. No. 30-6, Cayaban Decl., Ex. 11, 82 Fed. Reg. 35984.)  Based on this, the Secretary determined that the San Diego Project Area, "is an area of high illegal entry." (Id. at 35985.)  The September 12, 2017 Waiver Determination states that the El Centro Sector is an area of high illegal entry.  (Id., Ex. 12, 82 Fed. Reg. 42,830.)  In 2016, the CPB apprehended over 19,000 illegal aliens and seized about 2,900 pounds of marijuana and about 126 pounds of cocaine.  (Id.)

Congress did not define "area of high illegal entry" so as to provide "clear and mandatory" metrics.  Similarly, the government's use of sector wide data to support its "area of high illegal entry" determination is not a clear violation of the statute.  See Key Med. Supply, Inc. v. Burwell, 764 F.3d 955, 964 (8th Cir. 2014) (Congress did not instruct the Agency as to how to ensure or achieve category-wide cost savings and the

use of pre-existing scheduled prices as maximum bid caps was not "a clear departure from [the] statutory mandate").  As a result, the Court cannot conclude the Secretaries violated their mandate to deter crossings in areas of "high illegal entry" when they determined that apprehension of 31,000 undocumented aliens in the San Diego Sector in 2016, and 19,000 apprehended illegal entries in El Centro Sector in 2016 "remain[] area[s] of high illegal entry."  (Dkt. No. 30-6, Cayaban Decl., Ex. 11, 82 Fed. Reg. 35984; id., Ex. 12, 82 Fed. Reg. 42,830.)

The parties present certain facts and data in varying forms, based on geographic locations or years, to support their respective positions.  Plaintiffs focus on the dramatic improvement over the years on the number of apprehensions.  Again, the Court finds that both sides offer conflicting plausible interpretations of section 102(a).  As a result, the Secretary's decision to adopt one interpretation over the other cannot constitute an ultra vires act.

### iii.    "deter illegal crossings"

Coalition Plaintiffs contend that the border wall prototype project, to evaluate various design features for potential inclusion in a future border wall, is outside the scope of section 102 because it has no deterrent effect since there are gaps between each of the eight prototypes built.  They also contend that DHS has already spent more than $2 billion to install 705 miles of fencing along the border and the two projects are not "necessary . . . to deter illegal crossings."  (Dkt. No. 29-1 at 17.)  The government argues

44

that Coalition Plaintiffs cannot second-guess the Secretary's conclusion that the projects "will further Border Patrol's ability to deter and prevent illegal crossings." (Dkt. No. 35-1 at 66.)

Section 102(a) provides that the Secretary must take actions "necessary to install additional physical barriers and roads" . . . "to deter illegal crossings." 8 U.S.C. § 1103(a). In the Waiver Determinations, the Secretaries determined that the prototypes are "intended to deter illegal crossings" and "necessary for future border wall design and construction." (Dkt. No. 30-6, Cayaban Decl., Ex. 11, 82 Fed. Reg. at 35,985, id., Ex. 12, 82 Fed. Reg. at 42,830.)

Once again, the issue of what constitutes "deter[ing] illegal crossings" comes down to statutory interpretation. The Secretary is granted broad discretion in determining how to "achieve and maintain operational control" of the border. Plaintiffs have not identified "clear and mandatory" statutory language that the Secretary violated to establish the claimed ultra vires conduct.

### iv.   "most practical and effective"

California Plaintiffs argue that Defendants exceeded their authority by constructing fencing where the barriers would not be "most practical or effective." See 8 U.S.C. § 1103(b)(1)(A). The facts show that the project area sites are no longer high priority sites. According to a CBP document, the California border was rated as "moderate" compared to "high" or "very high" when it came to geographic/investment priorities. (Dkt. No. 30-

5, Cayaban Decl., Ex. 9 at 45.)  Moreover, in a television interview, Secretary of DHS Kelly stated that the existing fencing is "very, very effective" and "remarkably effective in keeping down the amount of illegal movements across" the border.  California Plaintiffs argue that most of California's 140 miles border already has fencing including the Project Areas covered by the Waivers.  (Dkt. No. 30-4, Cayaban Decl., Ex. 1 at 10-14.)

Defendants respond that the Secretary's decision to assess where fencing "would be most practical and effective", 8 U.S.C. § 1103(b)(1)(A), did not limit the broad mandate of section 102(a).  Moreover, section 102 also provides that the Secretary is to determine whether the "use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border."  8 U.S.C. § 1103(b)(1)(D).  They also argue that the facts to support Plaintiffs' conclusions are misplaced as the CBP document relied upon was dated March 27, 2017 which was five months prior to the Secretary's first waiver determination.  Also, Secretary Kelly's comments did not specifically address the San Diego Sector or El Centro Sector.

The Secretary of DHS has discretion to determine "where fencing would be the most practical and effective" and California Plaintiffs' facts do not demonstrate that the Secretary contravened a "clear and mandatory" provision in the statute.

///

///

46

### v. "consultation"

Coalition Plaintiffs argue that the waiver is unavailable unless the Secretary has consulted with the parties identified in section 102(b)(1)(C) which she has not done. Defendants argue that the waiver provision does not expressly or implicitly depend on the completion of the consultation requirement. Nonetheless, Defendants assert that they have and are still in the process of complying with the consultation provision.

Based on the parties' briefing and arguments at the hearing, it did not appear that the Secretary had complied with the consultation provision as to the border wall prototype project and the evidence provided did not support compliance with the consultation provision regarding the two replacement fences. Therefore, at the hearing, the Court directed the parties to file supplemental briefs on the consultation issue and how the lack of consultation affects ultra vires and the constitutional claims, if at all.[17]

The consultation provision states, "[i]n carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life

---

[17] Defendants note and the Court recognizes that that Coalition Plaintiffs are the only plaintiffs to have raised the consultation issue in their summary judgment motion. To the extent all Plaintiffs raise similar arguments in their supplemental briefs, the Court considers them.

for the communities and residents located near the sites at which such fencing is to be constructed." 8 U.S.C. § 1103(b)(1)(C).  This provision is mandatory.

According to Real Estate and Environmental Branch Chief for the Border Patrol and Air and Marine Program Management Office ("BPAM")[18], an office within the CBP, the prototype project began on September 26, 2017 and was completed on October 26, 2017.  (Dkt. No. 49-4, Ds' Index of Exs., Ex. 31, Enriquez Decl. ¶ 11.)  The prototype project area is located on Federal government property and used as an enforcement zone for border security purposes and is heavily disturbed.  (Id. ¶ 15.)  CBP did not meet with USDA, the State of California, local government or Indian Tribes as it determined they were not stakeholders.  (Id.)  However, CBP met with one adjacent landowner and in response to the landowner's concerns, installed temporary fencing to prevent unauthorized construction access across the landowner's property.  (Id.)  Prior to the San Diego Waiver, on July 13, 2017, CBP met with U.S. Department of Interior, ("DOI"), U.S. Fish and Wildlife Service, ("USFWS"), and Bureau of Land Management ("BLM")'s staff, toured the project area and discussed potential environmental impacts. (Id. ¶ 16.)  Before the waiver, CBP also met with General Service Administration ("GSA") to discuss potential environmental impacts and routing of construction traffic as

-----

[18] The BPAM is responsible for constructing and maintaining facilities, tactical infrastructure and border infrastructure which also includes environmental planning and compliance associated with these activities.  (Dkt. No. 49-4, Ds' Index of Exs., Ex. 31, Enriquez Decl. ¶ 3.)

it manages an access road in the project area.  (Id. ¶ 17.)  CBP also conducted a field

survey concerning natural and biological resources and the results are summarized in a

final Biological Resources Survey Report dated October 2017.  (Dkt. No. 49-5, Ds' Index

of Exs., Ex. 31.A, Enriquez Decl., Ex. A.)  It also conducted a field survey and records

search to identify any cultural and historical resources in the project area and the results

are summarized in a final Cultural Resources Survey Report dated October 2017.  (Dkt.

No. 49-6, Ds' Index of Exs., Ex. 31.B, Enriquez Decl., Ex. B.)  After the surveys were

completed, CBP conducted additional consultation with DOI.  (Dkt. No. 49-4, Ds' Index

of Exs., Ex. 31, Enriquez Decl. ¶ 19.)  In September 2017, CBP sent USFWS the results

of the biological survey and asked for input from USFWS concerning potential impacts

from the project but no response was provided.  (Id.)  Based on the resource surveys,

CBP prepared a Memorandum for the Record ("MFR") dated September 25, 2017

analyzing the potential environmental impacts.  (Id. ¶ 21; Dkt. No. 49-7, Ds' Index of

Exs., Ex. 31.C, Enriquez Decl., Ex. C.)  The Memorandum concluded that the prototype

project would have no impact on cultural or historic resources and would not have a

significant impact on any endangered species as there are no threatened and endangered

species in the project area, and no vernal pools, wetlands, or other surface water located

within the project area.  (Dkt. No. 49-4, Ds' Index of Exs., Ex. 31, Enriquez Decl. ¶ 22.)

Further, CBP mandated its contractors to follow certain Best Management Practices

("BMPs").  (Id. ¶ 23.)  CBP made adjustments to the prototype project based on the results of the resource surveys and consultation with stakeholders.  (Id. ¶ 20.)

The Calexico fence replacement project is located primarily on federal land that is managed by CBP or GSA and used primarily for border enforcement or port operations. (Id. ¶ 37.)  The project also includes a Media and First Amendment area on land owned by the City of Calexico.  (Id.)

Prior to the Calexico Waiver Determination, on July 13, 2017, CBP met with DOI representatives including USFWS and BLM to provide information to them, (id. ¶ 38), and consulted with the California State Historic Preservation Officer ("CASHPO") and Native American Tribes to make sure the geo-technical testing did not impact historic or cultural resources.  (Id. ¶ 39.)

After the Waiver Determination, CBP conducted field surveys to identify natural and biological resources which were summarized in a Biological Survey Report dated January 2018, (Dkt. No. 49-9, Ds' Index of Exs., Ex. 31.E, Enriquez Decl., Ex. E), conducted field surveys of cultural and historical resources which are summarized in a Cultural Resources Survey dated January 5, 2018, (Dkt. No. 49-10, Ds' Index of Exs., Ex. 31.F, Enriquez Decl., Ex. F), and conducted surveys to document and delineate potential wetlands and waters in the project area which are summarized in a Wetland Delineation Report dated January 2018.  (Dkt. No. 49-11, Ds' Index of Exs., Ex. 31.G, Enriquez Decl., Ex. G.)  After the surveys were completed, CBP conducted additional

outreach and sent consultation letters, on January 18 and 19, 2018, to USFWS, the California Department of Fish and Wildlife, CASHPO, two Native American tribes, the Colorado River Basin Regional Water Quality Control Board ("CRBRWQCB"), the U.S. Army Corps of Engineers Regulatory Division ("USACE"), the Imperial Irrigation District ("IID"), Imperial County Air Pollution Control District, and the City of Calexico. (Dkt. No. 49-4, Ds' Index of Exs., Ex. 31, Enriquez Decl. ¶ 41; Dkt. No. 49-12, Ds' Index of Exs., Ex. 31.H-Q, Enriquez Decl., Exs. H-Q.)  To date, CBP received responses from three entities, IID, CRBRWQCB, and USACE.  (Dkt. No. 49-13, Ds' Index of Exs., Ex. 31.R-T, Enriquez Decl., Exs. R-T.)  The CBP concluded that the USDA and private property owners were not stakeholders in the Calexico replacement fence project.  (Id.) Based on this information, CBP prepared the Calexico MFR.  (Dkt. No. 49-8, Ds' Index of Exs., Ex. 31.D, Enriquez Decl., Ex. D.)

The San Diego fence replacement project will occur on federal land.  (Dkt. No. 49-4, Ds' Index of Exs., Ex. 31, Enriquez Decl. ¶ 26.)  On July 13, 2017, prior to the Waiver, CBP conducted an on-site meeting with DOI, USFWS and BLM officials to discuss the project, and USFWS provided CPB with data and information concerning vernal pools and areas occupied by burrowing owls and the possible presence of habitat for the quino checkerspot butterfly and the California gnatcatcher.  (Id. ¶ 27.)

CBP has conducted resource surveys, including biological, cultural and wetlands within the project area and is currently preparing these reports.  (Id. ¶ 28.)  Based on

these surveys, CBP has made adjustments to the San Diego fence replacement project. (Id. ¶ 29.)  For example, CBP identified two historic sites that will be avoided during construction and is planning on plant and topsoil salvage and making arrangements to have full time environmental and historic/cultural monitors on-site during construction. (Id.)  Prior to the start of construction, CBP will send out letters to stakeholders including Federal, State, and local agencies and Native Americans in the Spring of 2018 to solicit more information.  (Id. ¶ 30.)  Once that is completed, it will prepare an Environmental Stewardship Plan ("ESP") for public review which will include its assessment of potential impacts, BMP's, and if necessary, mitigation or conservation measures.  (Id.) Because of the project's location, CBP determined that the USDA and private property owners "are not likely to be stakeholders for this project."  (Id. ¶ 31.)

Consistent with Defendants' prior argument that "carrying out this section" applies to section 102 as a whole, the Court concludes that the consultation provision applies to any border construction project under section 102.

As to the prototype project, it appears that the consultation requirement was met. Prior to the Waiver Determinations, CBP met with representatives of the DOI, including USFWS and BLM, as well as GSA, as these are agencies that would be affected by the project.  (Dkt. No. 49-4, Ds' Index of Exs., Ex. 31, Enriquez Decl. ¶¶ 16, 17.)  They also met with one landowner but it is not clear when that occurred; however, CBP responded

by installing temporary fencing due to the landowner's concern.  (Id. ¶ 15.)  Defendants did not believe that any other agencies would be affected by the prototype project.  (Id.)

Next, as to the Calexico replacement fence which may have begun construction on February 15, 2018, the CBP met with representatives of DOI, including USFWS and BLM, as well as the CASHPO and Native American tribes before the Waiver Determination.  (Id. ¶¶ 38, 39.)  But it did not consult with the City of Calexico prior to the Waiver Determination.  Instead, it sent a consultation letter on January 19, 2018 with a requested response date by February 2, 2018.  (Dkt. No. 49-12, Ds' Index of Exs., Ex. 31.O, Enriquez Decl., Ex. O at 15.)  It also sent consultation letters to nine additional identified stakeholders.  (Id., Exs. H-Q.)  To date, only three entities responded with one entity seeking additional time.  (Id., Exs. R-T.)  While the consultation letters were sent less than a month before construction is to begin, it is not clear that the consultation provision was violated.

As to the San Diego replacement project, so far, CBP had a meeting with representatives of DOI, USFWS and BLM, prior to the Waiver Determination and subsequently conducted surveys but has not yet consulted with other stakeholders.

Plaintiffs argue that the consultation should occur prior to any waiver determinations as that information is critical in determining whether to waive certain laws.  In contrast, Defendants argue the consultation provision does not expressly specify the subject matter for consultation, when the consultation should happen, or the degree of

consultation required. Its purpose is to minimize the impact of construction once a project has been selected. They also assert Congress intended the consultation provision to be enforced through its appropriations power but then note that for the appropriations for the projects at issue, Pub. L. No. 115-31, 131 Stat. 135, 434 (May 5, 2017), Congress did not require consultation. They further claim that the saving clause precludes a private right of action concerning the consultation requirement.

Plaintiffs' argument that the consultation should occur prior to any waiver determinations so that the Secretary is fully informed when the determination is made is logical. In addition, it makes sense that consultation should occur before contracts are drafted and executed so that the information can have a practical influence on the decision making process and to permit environmental and mitigation measures to be incorporated into the contract. The question is whether such timing is mandatory. Section 102 does not provide any specific limitation or guidance concerning when or how consultation is to occur except expressly stating who shall be consulted.

Consultation on the Calexico replacement wall is on-going and responses may be forthcoming despite the fact that construction on the project may have already begun. In the Court's opinion, the belated contact with stakeholders reduces the practical benefit of the consultation process. But given the lack of a "clear and mandatory" mandate regarding the timing of consultation, the Court cannot conclude that the Secretaries acted

in excess of their delegated powers by approving the waivers or executing construction contracts prior to completing the consultation process.

### vi.   "necessary to ensure expeditious construction"

Section 102(c) provides that the Secretary of the DHS "shall have the authority to waive all legal requirements" that the Secretary, in his or her "sole discretion" determines "necessary to ensure expeditious construction of the barriers and roads under this section."  8 U.S.C. § 1103(c)(1).  This mandatory language gives the Secretary of the DHS discretion to make this determination.

Coalition Plaintiffs argue that section 102(c)'s waiver is subject to the Secretary's determination that it is "necessary to ensure expeditious construction of the barriers and roads under this section", 8 U.S.C. § 1103(c)(1), but the government has failed to provide any information or bases to support the conclusion that these waivers are necessary. Meanwhile, Center Plaintiff contends that section 102(c)'s requirement that waivers be "necessary to ensure expeditious construction" demonstrates that Congress intended to limit the scope of the section 102(c) waiver to specific border barriers under section 102(b).  They contend that a logical interpretation of "expeditious construction" is that Congress provided the DHS Secretary with the authority to waive laws in order to build the specific border barriers required under section 102(b) as soon as possible after the law's enactment and not to the wall replacement project or the prototype project started a decade later.  Also, the text of the statute indicates that the waiver authority was intended

to apply only for specific projects mandated by section 102(b) which have long been completed.

Here, the words used by Plaintiffs in their argument such as "logical interpretation" "intended" and "[i[t is far more reasonable to limit the 102(c) waiver authority to those barriers that have been specifically mandated by Congress under §102(b) than to adopt the government's boundless interpretation", (Dkt. No. 28-1 at 39), demonstrate that a determination that a waiver is "necessary to ensure expeditious construction of barriers and roads" is one of statutory interpretation.  The Court cannot conclude that the Waiver Determinations are in contravention of clear and mandatory language in section 102(c). See Staacke, 841 F.2d at 282 (where the statute is subject to two plausible interpretations, the Secretary of Labor's interpretation cannot constitute a "violation of a clear mandatory mandate" and noting that the Secretary's statutory discretion to make policy choices with disability decisions is "virtually limitless").

### c.    Whether Section 102(c)'s Waiver Authority has Expired

Center Plaintiff argues that there is no evidence in the text or the legislative history that Congress intended the waiver authority to exist in perpetuity or even that Congress intended the waiver authority to be extended beyond the initial San Diego fence.  They argue that expeditious construction refers solely to section 102(b) projects as there are time constraints limiting DHS's authority to determine "other mileage" to expire on December 31, 2008.  California Plaintiffs similarly argue that the 2008 amendment

imposed deadlines for the expedited construction of fencing in priority areas.  In 2008, former Secretary of DHS Chertoff identified more than 370 miles of priority areas and by April 2013, DHS reported it had completed all but a one-mile stretch of these projects which involved 705 miles of fencing.  (Dkt. No. 30-4, Cayaban Decl, Ex. 5; id., Ex. 6.)

Defendants contend that Plaintiffs' argument that the December 31, 2008 deadline in section 102(b)(1)(B) applies generally to section 102(c) or section 102 as a whole is implausible.  Nothing in the statute demonstrates that Congress intended the waiver authority to sunset and that expeditious construction is limited to section 102(b).  When Congress amended section 102(b) in December 2007, it mandated that about half of the "not less than 700 miles" be completed within a year, by December 31, 2008.  Because Congress did not provide a deadline for the remaining miles, they argue that there is no expiration date on building additional fencing.  Moreover, they assert that the section 102(c) waivers would be applicable to the remaining miles to be built.

In 2008, Congress amended section 102(b) requiring DHS to construct reinforced fencing "along not less than 700 miles of the southwest border where fencing would be most practical and effect."  8 U.S.C. § 1103(b)(1)(A).  As to priority areas, section 102(b) mandated that the DHS Secretary "identify 370 miles, or other mileage determined by the Secretary" and the authority to determine "other mileage" would expire on December 31, 2008 and Congress imposed a deadline of December 31, 2008 to complete construction of the fencing.  Id. § 1103(b)(1)(B).

In <u>United States v. Arizona</u>, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *8 (D. Az. Oct. 21, 2011), the district court addressed section 102(b)(1)(A)'s mandate directing the Secretary to construct 700 miles of fencing. In that decision, the district court stated that there are no deadlines requiring completion of the fencing and infrastructure projects by a specific time. <u>Id.</u> at 8. It explained that section 102 uses mandatory language but grants the Secretary "substantial discretion" in determining "how, when, and where to complete the construction." <u>Id.</u>

This argument is similar to Plaintiffs' earlier argument that section 102(c)'s waiver provision applies only to projects identified in section 102(b) which was previously rejected by the Court. The parties' varying plausible interpretations concerning the scope of section 102(c) demonstrate that the statutory language is not clear and unambiguous and the parties' argument is essentially a dispute regarding statutory interpretation. As such, Plaintiffs have not demonstrated that the Secretaries violated a clear and mandatory statutory provision.

### d. Whether Section 102 Requires that the Waiver Determinations Include Findings

California Plaintiffs assert that the Waivers are invalid because the Secretaries failed to make the requisite findings to demonstrate the requirements of section 102 and only used boiler plate language copied from section 102 without providing reasons behind each Waiver Determination. (Dkt. No. 30-2 at 34-35.) Defendants respond that

58

nothing in section 102(c) requires that the Secretaries explain the factual basis of their Waiver Determinations in the Federal Register.

California Plaintiffs cite to <u>Dickson v. Sec'y of Defense</u>, 68 F.3d 1396, 1404-05 (D.C. Cir. 1995) and <u>Organized Vill. of Kake v. U.S. Dep't of Agric.</u>, 795 F.3d 956, 967 (9th Cir. 2015) in support of their argument.  These cases involve agency determinations that were found to be arbitrary and capricious under the APA where an agency failed to provide a reasoned explanation for its decision.  Unlike the current case, the challenged agency rulings in those cases were subject to judicial review.  In this case, the APA's standard of review and requirement for findings concerning an agency's decision are inapplicable.

Section 102 only requires that the Secretary's decision be "published in the Federal Register."  8 U.S.C. § 1103(c)(1).  While the Waiver Determinations use predicate terms in section 102 such as "areas of high illegal entry", "necessary", "deter and prevent illegal crossings" and "most practical and effective", Plaintiffs have not demonstrated that more is mandated under section 102 to support an ultra vires claim.  Accordingly, the Court concludes that California Plaintiffs' argument lacks merit.

In view of the foregoing, the Plaintiffs have failed to demonstrate that the waivers violated a clear and mandatory provision of section 102.  Consequently, the Court lacks jurisdiction to hear any non-constitutional claim.

**2.      Whether Barring Review Deprives Plaintiffs of a Meaningful and Adequate Means of Violating Their Statutory Rights**

The second step in an ultra vires analysis requires that Plaintiffs demonstrate that barring review would deprive them of a "meaningful and adequate means of vindicating" their statutory rights.  See MCorp., 502 U.S. at 43.  Analogizing to 42 U.S.C. § 1983 cases and private right of actions cases, Defendants argue that California Plaintiffs have not identified a statutory right in section 102 as opposed to a statutory obligation.  See California Sportfishing Prot. Alliance v. U.S. Bureau of Reclamation, 15cv912 LJO BAM, 2015 WL 6167521, at *11 n. 8 (E.D. Cal. Oct. 20, 2014) (water quality standards are better described as "statutory obligations" rather than "statutory rights.").

Meanwhile, no Plaintiff has conducted a meaningful analysis on this prong. Instead, California Plaintiffs generally assert that the absence of district court jurisdiction will deprive them of adequate means to vindicate their statutory rights.  (Dkt. No. 30-2 at 24.)  Assuming for argument's sake that Plaintiffs satisfied the second prong, they have failed to establish the first prong.  That is, the Court concludes that Plaintiffs have not established a plain violation of an unambiguous and mandatory provision of section 102, and, therefore, the Court lacks jurisdiction to hear non-constitutional claims under section 102(c)(2)(A).

///

///

**E.   Whether the Secretaries' Decisions under Sections 102(a) & (b) are Subject to APA Review**

In order to invoke judicial review under the APA, Coalition Plaintiffs present an alternative argument starting with a strong presumption of judicial review of agency action.[19]  They argue that the judicial review limiting provision of section 102(c) is distinct from sections 102(a) & (b) because the Secretary must comply with the requirements of sections 102(a) and (b) prior to invoking the waiver provision. Therefore, because sections 102(a) and (b) are separate determinations from section 102(c), and the waivers constitute final agency decisions reviewable by a district court, the Secretaries' decisions on the two projects are subject to APA review and under the APA, the two Waivers are "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law."  <u>See</u> 5 U.S.C. § 706(2)(A).

Specifically, Coalition Plaintiffs contend that the language "notwithstanding any other provision of law" which is contained in section 102(c)(1) "demonstrates an intent to limit the waiver authority solely to laws other than the one in which the waiver is contained, meaning the requirements of the section itself are not waivable." (Dkt. No. 29-1 at 13.)  Accordingly, the requirement of "high illegal entry" and the "consultation"

───────────────

[19] In contrast, Center Plaintiff conceded that the strong presumption of judicial review is rebutted by the express statutory language of section 102(c).  (Dkt. No. 28-1 at 22.)

requirements of sections 102(a) and (b) must be satisfied before the Secretary can invoke section 102(c)'s waiver authority.

Defendants counter that the section 102(c) waiver determination arises from "any action undertaken" pursuant to section 102(c)(1) and cannot be separated from sections 102(a) or (b). They contend that Plaintiffs improperly seek to challenge findings that are integral to the waiver determination itself. Even if the phrase "pursuant to paragraph (1)" in section 102(c)(2)(A), refers to the waiver determination in isolation, the terms "any action undertaken . . . pursuant to paragraph (1)" and "all clauses or claims arising from" such actions or decision, broadens the judicial review provision to include more than just the waiver determination, itself. Next, they contend that Plaintiffs' reading that provides sections 102(a) and (b) are subject to APA review would frustrate Congress' purpose in enacting the jurisdictional limitation and waiver provisions which were intended to prevent litigation delays since any invocation of the waiver would be subject to APA review to determine whether the waiver was justified in the first place.

In reply, Coalition Plaintiffs argue that the Secretaries' decisions under section 102(c)(1) to waive any laws as "necessary to ensure expeditious construction" do not address whether there is authority to construct the border projects themselves. The authority to construct the border projects are in sections 102(a) and (b). They also argue that these decisions are final agency decisions as they mark the "consummation" of the agency's decisionmaking and "alter[] the legal regime to which the action agency is

subject".  (Dkt. No. 38 at 13.)  "[S]ince subsections 102(a) and (b) are final agency actions and outside the scope of subparagraph 102(c)(2)(A), the Court may review these actions pursuant to 5 U.S.C. § 706(2)."  (Id.)

Under the APA, "[a] person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Court are limited to review of a final agency action.  Or. Nat'l Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006).  Under the APA, the court determines whether the agency actions are "arbitrary, capricious, or an abuse of discretion."  5 U.S.C. § 706(2)(A).  However, judicial review is not available "to the extent that statutes preclude [it]."  5 U.S.C. § 701(a)(1); see also Pinnacle Armor, Inc. v. United States, 648 F.3d 708, 719 (9th Cir. 2011) (citing 5 U.S.C. § 701(a)(2)).

Section 102(c)(2)(A) provides that

> The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1).  A cause of action or claim may only be brought alleging a violation of the Constitution of the United States.  The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

8 U.S.C. § 1103(c)(2)(A).  This is an express statutory bar on judicial review of non-constitutional claims and APA review is not allowed.  However, the question is whether

the express statutory bar applies solely to section 102(c) decisions or to the entirety of section 102, including sections 102(a) and (b).

The judicial review provision under section 102(c)(2)(A) states that the district courts have exclusive jurisdiction to "hear all causes or claims arising from any action undertaken" . . . "pursuant to paragraph (1)."  While paragraph (1) refers to the Secretary's waiver authority, the language "all causes or claims arising from any action undertaken" is broad enough to encompass the determination under section 102(a) that the two projects are "necessary" to "deter illegal crossings in areas of high illegal entry into the United States."  See 8 U.S.C. § 1103(a); U.S. Dept. of Energy v. Ohio, 503 U.S. 607, 626 (1992) (describing "arising under Federal law" in the case as a "broad" and "seemingly expansive phrase"); Ford Ord Toxics Project, Inc. v. Cal. E.P.A., 189 F.3d 828, 832 (9th Cir. 1999) (statutory language that district courts have exclusive jurisdiction over "all controversies arising under" CERCLA, indicated "Congress used language more expansive than would be necessary if it intended to limit exclusive jurisdiction to 'those claims created by CERCLA'"); North East Ins. Co. v. Masonmar, Inc., No. 13cv364 AWI SAB, 2014 WL 1247604, at *6 (E.D. Cal. Mar. 25, 2014) (California courts gives terms such as "arising out of" and "arising from" expansive meanings); Nova Biomedical Corp. v. Moller, 629 F.2d 190, 195 n. 9 (1st Cir. 1980) (noting that other courts have adopted an expansive view of "arising from" language).

Based on the statutory language, the Court declines to adopt Coalition Plaintiffs' argument that APA review is available for decisions made solely under sections 102(a) and (b).  The judicial review bar of non-constitutional challenges applies to any action taken to invoke the section 102(c) waiver authority which includes actions under sections 102(a) and (b).

In conclusion, the Court GRANTS Defendants' motions for summary judgment on non-constitutional claims alleging violations of NEPA, the ESA, the CZMA and the APA, and DENIES Plaintiffs' motions for summary judgment on these claims.  Next, the Court considers Plaintiffs' constitutional challenges which are subject to review by this Court.  See 8 U.S.C. § 1103(c)(2)(A).

## F.   Constitutional Violations

### 1.   Article I, Section 1 - Non-Delegation Doctrine & Separation of Powers[20]

All Plaintiffs allege a violation of the non-delegation doctrine arguing that section 102 allows the DHS Secretary to pick and choose among enacted laws and determine, with unfettered discretion, which ones shall be waived without specifically stating which laws will be waived or why.  In essence, Plaintiffs contend, section 102(c) has granted the

---

[20] California Plaintiffs separate their separation of powers and violation of the non-delegation doctrine into two causes of action despite similar arguments on both claims.  The Court also notes that Coalition Plaintiffs have not sufficiently briefed the issue of separation of powers.  They raise the issue of "separation of powers" in a heading, but their analysis consists of essentially one sentence.  (Dkt. No. 29-1 at 34-35.)  Because the non-delegation doctrine is rooted in the principle of separation of powers, the Court considers the two claims together.  See Mistretta v. United States, 488 U.S. 361, 371 (1989).

65

Executive Branch a blanket waiver which is a violation of the non-delegation doctrine and separation of powers.

"The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." Mistretta v. United States, 488 U.S. 361, 371 (1989).  Article I, Section 1 of the Constitution vests all legislative powers in Congress.  U.S. Const. art. I, § 1.  Generally, Congress cannot delegate or transfer the legislative functions with which it is vested.  Panama Refining Co. v. Ryan, 293 U.S. 388, 425-26 (1935).  The Supreme Court has recognized, however, "that the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." Mistretta, 488 U.S. at 372.  "In our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." Id. (citing Opp Cotton Mills, Inc. v. Adm'r of Wage and Hour Div. of Dept. of Labor, 312 U.S. 126, 145 (1941)).

As a result of this broad constitutional standard, the Supreme Court has upheld all Congressional delegations of power since 1935.[21] See Mistretta, 488 U.S. at 373 (noting

---

[21] Notably, although the Court has not since struck down a challenged statute, it has narrowly construed statutory delegations. See, e.g., Indus. Union Dep't, AFL-CIO v. American Petroleum Inst., 448 U.S. 607, 646 (1980) (standard promulgated by Occupational Safety and Health Act ("OSHA") limiting occupational exposure to benzene held to be invalid); Nat'l Cable Television Ass'n. v. United States, 415 U.S. 336, 342 (1974) (challenge to revision of fee schedule by the Federal Communications Commission was remanded to Commission to use the proper standard in setting annual fee).

66

that since 1935, ". . . we have upheld, again without deviation, Congress' ability to delegate power under broad standards"); <u>Loving v. United States</u>, 517 U.S. 748, 771 (1996) (affirming that ". . . we have since upheld, without exception, delegations under standards phrased in sweeping terms").  Meanwhile, in 1935, the Supreme Court struck down two statutes on delegation grounds.  <u>See</u> <u>A.L.A. Schechter Poultry Corp. v. United States</u>, 295 U.S. 495 (1935) (invalidating the delegation of code-making authority contained in the National Industrial Recovery Act as unconstitutional because of the Act's failure to impose limitations on discretion); <u>Panama Refining Co</u>., 293 U.S. at 388 (invalidating the delegation of power to the President to "prohibit the transportation . . . of petroleum" as exceeding constitutional limits because Congress failed to articulate a policy to limit the President's discretion).

The Supreme Court has held that Congress may delegate its authority so long as it provides, by legislative act, "an intelligible principle to which the person or body authorized to [act] is directed to conform."  <u>Id.</u> (citing <u>J.W. Hampton, Jr. & Co. v. United States</u>, 276 U.S. 394, 406 (1928)).   Under the intelligible principle standard, a statute delegating authority is constitutional if it "clearly delineates [(1)] the general policy, [(2)] the public agency which is to apply it, and [(3)] the boundaries of the delegated authority."  <u>Mistretta</u>, 488 U.S. at 372-73 (citing <u>American Power & Light Co. v. SEC</u>, 329 U.S. 90, 105, (1946)).

In addition, while courts have recognized limits on Congress' authority to delegate its legislative power, those limits are less rigid where the entity "itself possesses independent authority over the subject matter." Loving, 517 U.S. at 772 (quoting United States v. Mazurie, 419 U.S. 544, 556-57 (1975)); see also United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-22 (1936).

Accordingly, there are two inquiries this Court must consider when determining whether section 102(c) is a constitutional delegation of power: (1) whether section 102 meets the three requirements of the intelligible principle standard; and (2) whether the degree of discretion granted to the DHS Secretary in section 102(c) is appropriate considering the Secretary's independent authority over the subject matter. See Mistretta, 488 U.S. at 372-72; Loving, 517 U.S. at 772.

### a.  Prong One: Whether Section 102 Clearly Delineates a "General Policy"

Coalition Plaintiffs claim that section 102 fails to identify a general policy because prior courts identified different general policies. They cite to two recent cases, Sierra Club, 2005 WL 8153059, and Defenders of Wildlife v. Chertoff, 527 F. Supp. 2d 119 (D.D.C. 2007), cert denied, 554 U.S. 918 (2008), where the courts stated different policy goals in section 102. Coalition Plaintiffs assert "[w]hen courts cannot identify a common statutory policy goal, and the policy some did point to was incorrect, the statutory scheme cannot survive Mistretta scrutiny." (Dkt. No. 29-1 at 30.)

Defendants argue that Congress defined a "general policy" to guide the DHS Secretary on how to exercise its delegated authority, satisfying the first prong of the intelligible principle standard. That policy is install necessary barriers and roads to "deter illegal crossings in areas of high illegal entry into the United States" through, under section 102(c) "expeditious construction of barriers and roads under this section." (Dkt. No. 35-1 at 71.) Defendants further contend that there is no conflict between the statements of general policy by the <u>Sierra Club</u> and the <u>Defenders of Wildlife</u> courts. Rather, one is just more specific than the other. <u>Id.</u> Furthermore, later courts found no conflict in the prior courts' conclusions as to the general policy.

Under section 102(a), the general policy states the Secretary of DHS shall take actions as necessary to "deter illegal crossings in areas of high illegal entry into the United States." 8 U.S.C. § 1103(a). To carry out this policy, Congress authorizes the DHS Secretary to "take such actions as may be necessary to install additional physical barriers and roads." <u>Id.</u>

The first district court to address whether the amended section 102 contains a "general policy" was in this district. In <u>Sierra Club</u>, the court held that "improvement of U.S. border protection is the 'clearly delineated general policy.'" <u>Sierra Club</u>, 2005 WL 8153059, at *6. Two years later, the District of Columbia District Court addressed this same question and similarly found that the general policy was clearly delineated as "to expeditiously 'install additional physical barriers and roads . . . to deter illegal crossings

in areas of high illegal entry.'"  <u>Defenders of Wildlife</u>, 527 F. Supp. 2d at 127.  Notably, the court further held that this identification of the statute's general policy was not contrary to that recognized by the <u>Sierra Club</u> court, but rather "in accord with the only other decision to address the question of whether [IIRIRA's] waiver provision is a constitutional delegation." <u>Id.</u> (citing <u>Sierra Club</u>, 2005 WL 8153059, at *6).

While using slightly different language, both courts identified the general policy as border protection.  Both courts identified deterrence of illegal crossing as a motivating factor in this policy.  And both courts recognized that in articulating this policy, Congress permitted the construction of physical barriers and roads.

Moreover, the District Court for the Western District of Texas noted the general policy of section 102 to be "construction of a border fence" which is consistent with the general policy asserted in <u>Sierra Club</u> and <u>Defenders of Wildlife</u>.  <u>Cnty. of El Paso v. Chertoff</u>, No. EP-08-CA-196-FM, 2008 WL 4372693, at *3 (W.D. Tex. Aug. 29, 2008). Thus, while prior courts have used different language to articulate Congress's stated policy goal, they do not provide contradictory interpretations of section 102's general policy.

Therefore, the Court finds that Congress clearly delineated the "general policy" of section 102 as deterrence of illegal crossings through construction of additional physical barriers to improve U.S. border protection, 8 U.S.C. § 1103, and has satisfied the first prong of the intelligible principle standard.

70

### b.       Prong Two: Whether Section 102 Clearly Delineates a Public Agency

It is undisputed that IIRIRA satisfies the second prong of the intelligible principle standard because "the Secretary of Homeland Security" is to apply the general policy. See 8 U.S.C. § 1103(c)(1).

### c.       Prong Three: Whether Section 102 Clearly Delineates "the Boundaries of Delegated Authority"

All Plaintiffs challenge section 102(c) on the third factor of the intelligible principle standard, arguing that the boundaries of the delegated authority are not clearly delineated.   They distinguish the Waivers from past waivers found to be constitutional. Past waivers focused solely on building new fencing pursuant to the specific mandates of Congress in section 102(b) which limited the DHS Secretary's waiver authority to the initial border construction.  However, the Waivers at issue concern projects not previously identified by section 102.  Therefore, they argue that the grant of waiver authority does not apply to these new projects.

Defendants argue that Congress provided specific boundaries for its delegated authority, satisfying the third prong of the intelligible principle standard.  This authority may only be exercised to "waive all legal requirements [the] Secretary . . . determines *necessary* to ensure expeditious construction of the barriers and roads *under this section*." (Dkt. No. 35-1 at 72.)  The boundaries, they contend, are both geographic, DHS can only

waive laws in connection with construction of a physical barrier at the U.S. border, and temporally necessary, DHS can only waive laws necessary to quickly construct a wall. Contrary to Plaintiffs' demand for specificity, the boundary need not include specific criteria or guidelines.[22]  In short, Congress has the power to be flexible and broad when delegating authority.

Here, section 102(c) provides boundaries that limit the Secretary's authority to waive all laws that are "necessary to ensure expeditious construction of the barriers and roads."  See Defenders of Wildlife, 527 F. Supp. 2d at 127 (boundaries clearly defined by Congress' requirement that Secretary may only waive laws that he determines are "necessary to ensure expeditious construction"); Sierra Club, 2005 WL 8153059, at *6 (boundary of authority was limited to actions "necessary to install additional barriers and roads" and specifically, the construction of the Triple Fence in San Diego); Cnty. of El Paso, 2008 WL 43726993, at *4 (boundaries clearly defined relying on reasoning in Sierra Club and Defenders of Wildlife).

---

[22] California Plaintiffs argue that Defendants fail to address their argument that while the non-delegation doctrine applies to cases where Congress provides the Executive power to decide which laws could be modified or terminated and under what circumstances, it has not authorized the Secretary to pick and choose among enacted laws and decide, which legislation to waive.  Section 102 does not provide the Secretary with guidance as to which laws are to be waived or why.  Because Defendants failed to address this argument, California Plaintiffs argue section 102(c) is unconstitutional and must be invalidated.  However, Defendants addressed the boundaries of the Secretary's authority to waive laws limited to construction along the U.S. border and only those laws "necessary to ensure expeditious construction."  (Dkt. No. 42 at 37.)

While it is true that section 102(c) contains considerably fewer details than other challenged statutes,[23] the Supreme Court does not demand that Congress outline specific factors or criteria when delegating authority.[24]  Rather, Congress need only delineate the boundaries of the delegated authority in broad and general terms.  See Opp Cotton Mills, Inc., 312 U.S. at 145.  For example, in upholding Congress's broad delegation of power to the EPA Administrator, the Whitman Court noted that "even in sweeping regulatory schemes we have never demanded . . . that statutes provide a 'determinate criterion' for saying 'how much [of the regulated harm] is too much.'"  Whitman v. American Trucking Ass'ns, 531 U.S. 457, 475 (2001).  This is consistent with prior Supreme Court precedent holding that "[o]nly if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding [Congress's] choice of means for effecting its declared purpose. . . ."  Yakus v. United States, 321 U.S. 414, 426 (1944).

---

[23] In Mistretta, for example, the statute in question authorized an independent Sentencing Commission to formulate sentencing guidelines for federal offenses.  Mistretta, 488 U.S. at 367.  Congress identified three goals, four purposes, numerous guidelines, eleven factors for sentencing consideration, a prohibition on certain factors for sentencing consideration.  Mistretta, 488 U.S. at 374-78.

[24] In fact, the Court in Mistretta even recognized that the Act in question set forth "***more than*** merely an 'intelligible principle.'"  Mistretta, 488 U.S. at 379 (emphasis added).

Section 102 of IIRIRA is easily distinguishable from the statutes in <u>Panama Refining Co</u>. and <u>A.L.A. Schechter Poultry Corp.</u>  The statute at issue in <u>Panama Refining Co.</u> "provided literally no guidance for the exercise of discretion," while the statute challenged in <u>A.L.A. Schechter Poultry Corp</u> "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'"  <u>Whitman,</u> 531 U.S. at 474.

Here, however, Congress expressly limits the DHS Secretary's discretion to waive laws to those "necessary to ensure expeditious construction of the barriers and roads under this section."  8 U.S.C. § 1103(c)(1).  Congress's use of the word "necessary" to define the scope of discretion is well with the limits of non-delegation precedents.  In <u>Touby</u>, for example, the Supreme Court upheld a provision of the Controlled Substances Act that permitted the Attorney General to schedule a drug when doing so is "necessary to avoid an imminent hazard to the public safety."  <u>Touby v. United States</u>, 500 U.S. 160, 165 (1991).  Similarly, in <u>Indus. Union Dep't</u>, the Supreme Court upheld a provision of the Occupational Safety and Health Act that empowered the Secretary of Labor to promulgate standards that are "reasonably necessary or appropriate to provide safe or healthful employment and places of employment."  <u>Indus. Union Dep't., AFL-CIO v. American Petroleum Inst.,</u> 448 U.S. 607, 646 (1980).  Finally, in <u>Whitman</u>, the Supreme Court upheld a provision of the Clean Air Act that directed the EPA Administrator to set standards that are "requisite to protect the public health" with "an adequate margin of

74

safety." <u>Whitman</u>, 531 U.S. at 475. "Requisite," in this context, "mean[s] sufficient, but not more than necessary." <u>Id.</u> at 473. Furthermore, this limit on authority is the same limit that was approved by the court in <u>Sierra Club</u>.

Both Congress and the Executive share responsibilities in protecting the country from terrorists and contraband illegally entering at the borders. Border barriers, roads, and detection equipment help provide a measure of deterrence against illegal entries. With section 102, Congress delegated to its executive counterpart, the responsibility to construct border barriers as needed in areas of high illegal entry to detect and deter illegal entries. In an increasingly complex and changing world, this delegation avoids the need for Congress to pass a new law to authorize the construction of every border project. Similarly, Congress enacted a law which attempts to avoid delays caused by lawsuits challenging the construction of barriers by allowing the Secretary to waive the application and enforcement of federal, state and local laws during the construction of a border barrier as necessary. The Court concludes that Congress has clearly delineated the "boundaries of delegated authority" in terms previously upheld by the Supreme Court, thereby satisfying the third prong of the intelligible principle standard.

> ### d.   Whether Congress's Grant of Authority Constitutes "Unfettered Discretion"

Coalition Plaintiffs cite to <u>Zivotofsky</u> to suggest that the DHS secretary does not have exclusive control over foreign affairs, and thus the statutory grant of discretion

should be more limited.  Zivotofsky v. Kerry, 135 S. Ct. 2076, 2089-90 (2015).

Defendants argue that the Executive Branch has significant, independent control over immigration, foreign affairs, and national security, and therefore broad waiver authority is justified.  (Dkt. No. 35 at 74.)  They attack Coalition Plaintiffs' reliance on Zivotofsky and cite to binding precedent in support of their position.  See Knauff v. Shaughnessy, 338 U.S. 537, 542-43 (1950) ("The exclusion of aliens is a fundamental act of sovereignty . . . [and] is inherent in the executive power to control the foreign affairs of the nation.").

Congress can confer more discretion to an entity when that entity already has significant, independent authority over the subject matter.  See Loving, 517 U.S. at 772-73.  Here, Congress delegated broad authority to the DHS Secretary, an agent of the Executive Branch.  See 8 U.S.C. § 1103(c).

As stated in Sierra Club, the Executive Branch has independent and significant constitutional authority in the area of "immigration and border control enforcement and national security."  Sierra Club, 2005 WL 8153059, at *6 (citing Knauff, 338 U.S. at 542-43).  Additionally, the court in Save Our Heritage confirmed that the construction of San Diego barriers relate to "foreign affairs and immigration control—areas over which the Executive Branch traditionally exercises independent authority."  Save Our Heritage, 533 F. Supp. 2d at 63 (citing Defenders of Wildlife, 527 F. Supp. 2d at 129).

Nothing about DHS's authority has changed since prior rulings.  The only difference between this case and prior cases is the type of barrier being constructed.  This distinction is not relevant under this analysis.

Coalition Plaintiffs' reliance on <u>Zivotofsky</u> is not persuasive.  The power contemplated in <u>Zivotofsky</u> was the President's power to recognize foreign nations and governments and the issue was whether the President has exclusive power to recognize nations.  <u>Zivotofsky</u>, 135 S. Ct. at 2084.

Here, the issue is not whether the President has exclusive power over foreign affairs, but whether the DHS Secretary, acting as an agent of the Executive, has significant, independent control over immigration.  Therefore, because the DHS Secretary, acting as an agent of the Executive Branch, has significant, independent authority over immigration, Congress is justified in delegating broad authority.  The Court concludes that section 102 does not violate the non-delegation doctrine.

California Plaintiffs also present a separate argument that the lack of judicial review under section 102 violates the non-delegation doctrine and essentially imports a fourth requirement to the intelligible principle standard.  (Dkt. No. 30-2 at 45.)  By limiting review to only constitutional challenges, California Plaintiffs argue, Congress is preventing the judicial branch from reviewing Congress's delegation of authority.  California Plaintiffs further contend that judicial review is the only way to ensure that the DHS Secretary adheres to the intelligible principle Congress provided.  California cites to

three Supreme Court cases in support of this argument.[25]  In none of these cases, however, did the Court strike down the statute for lack of judicial review.[26]

Defendants argue that Plaintiffs' argument has been expressly rejected by the Ninth Circuit.  <u>United States v. Bozarov</u>, 974 F.2d 1037, 1041-45 (9th Cir. 1992). In <u>Bozarov</u>, the Ninth Circuit held that the nondelegation doctrine was not violated because the EAA precluded judicial review.  "In sum, we believe that the Supreme Court cases upholding judicial preclusion of agency decisions, the language of the APA, and the fact that the EAA involves foreign policy issues support our conclusion that the EAA's preclusion of judicial review is constitutional."  <u>Id.</u> at 1044.  Furthermore, the Ninth Circuit also noted that its conclusion that the prelusion of judicial review did not violate the nondelegation clause was "bolstered" by the availability of judicial review for constitutional claims and ultra vires claims.  <u>Id.</u> at 1044-45.  Similarly, in <u>Cnty. of El Paso</u>, the same argument concerning whether judicial review was a requirement of the intelligible principle standard was rejected by the court.  <u>Cnty. of El Paso</u>, 2008 WL 4372693 at *4-6.

---

[25] <u>A.L.A. Schechter Poultry Corp.</u>, 295 U.S. at 533; <u>American Power & Light Co. v. SEC</u>, 329 U.S. 90, 106 (1946); and <u>Touby</u>, 500 U.S. at 165.

[26] In <u>A.L.A. Schechter Poultry</u>, the Court struck down the statute not on the grounds that it lacked judicial review, but because of the Act's failure to impose limitations on discretion.  295 U.S. at 533.  In <u>American Power,</u> the plaintiffs challenged the statute not on the grounds that it lacked judicial review, but rather because it lacked "ascertainable standards," thereby granting the SEC unfettered discretion. 329 U.S. at 104.  In <u>Touby,</u> the dispositive issue was not judicial review, rather whether the delegation afforded too much discretion.  500 U.S. at 165.

It is true that the Supreme Court has recognized that judicial review provides an important check on the power delegated by Congress.  See Touby, 500 U.S. at 167-69; A.L.A. Schechter Poultry Corp., 295 U.S. at 533; Yakus, 321 U.S. at 426 (recognizing the importance of judicial review by observing that one of the purposes of requiring Congress to provide intelligible principles was so that a tribunal "in a proper proceeding [may] ascertain whether the will of Congress has been obeyed.").  These cases recognize that judicial review allows for the enforcement of the intelligible principle requirement and the separation of powers.  At the same time, a Supreme Court nondelegation doctrine case has never turned on the presence or absence of judicial review.

While unlimited judicial review would assure compliance with all legal requirements, it would defeat the purpose of the law to expedite the construction of border barriers and roads in areas where they are needed.  In this case, as in Bozarov, section 102 allows judicial review of constitutional claims as well as ultra vires claim which bolsters the conclusion that section 102 does not violate the nondelegation doctrine.  Accordingly, the California Plaintiffs' argument concerning violation of the non-delegation doctrine based on lack of judicial review is unsupported by law.

In conclusion, the Court GRANTS Defendants' motions for summary judgment and DENIES Plaintiffs' motions for summary judgment on the Non-Delegation Doctrine and separation of powers claims.

///

### 2.      Article II, Section 3 of the U.S. Constitution - Take Care Clause

Center Plaintiff alleges that the August 2 Waiver Determination violates the Take Care Clause contending that it applies to Executive Officers, including the Secretary of DHS.  First, it claims that the DHS exceeded the authority delegated to it by issuing the August 2 Waiver under section 102 even though it was not authorized by section 102(b). (Dkt. No. 28-1 at 42-43.)  Second, it asserts that even if section 102(c) waiver provision is not limited to those barriers mandated under section 102(b), the August 2 Waiver Determination does not comply with the direction in section 102(a) that the barriers be built in "areas of high illegal entry."  (Id. at 43.)  Therefore, Center Plaintiff argues, the August 2 Waiver Determination violated the Executive's duty to faithfully execute the statutory mandate.  (Id.)  The Center Plaintiff's SAC alleges that "[a]mong the laws the Take Care Clause mandates be 'faithfully executed' are NEPA and the ESA, as well as the conditions and limitations of IIRIRA section 102 itself."  (Dkt. No. 16, SAC ¶ 145.)

Defendants argue that the Take Care Clause only applies to the actions of the President and not the Secretary, that no court has treated the Take Care Clause as a basis for affirmative relief, and that it is an improper attempt by Center Plaintiff to recast its ultra vires challenge under the Take Care Clause.

Article II, Section 3 of the United States Constitution states that the President "shall take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 2, cl. 3.

First, the Court disagrees with Defendants' argument that the Take Care Clause applies only to the President, and not his cabinet members. "The vesting of the executive power in the President was essentially a grant of power to execute the laws. But the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." Myers v. United States, 272 U.S. 52, 117 (1926); see also Printz v. United States, 521 U.S. 898, 922 (1997) ("The Constitution does not leave to speculation who is to administer the laws enacted by Congress; the President, it says, "shall take Care that the Laws be faithfully executed," Art. II, § 3, personally and through officers whom he appoints . . . .") Moreover, when the Supreme Court granted certiorari in United States v. Texas, it, *sua sponte*, asked for additional briefing on "Whether the Guidance[27] violates the Take Care Clause of the Constitution, Art. II, 3." United States v. Texas, 136 S. Ct. 906 (2016). The issue was whether the Secretary of DHS' actions establishing Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") violated the Take Care Clause, an issue not addressed by the district court.[28] Texas v. United States, 86 F. Supp. 3d 591, 607 (2015). Therefore, the Supreme Court's

---

[27] The government described Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") as "Deferred Action Guidance." Texas v. United States, 86 F. Supp. 3d 591, 667 (2015).

[28] The district court in Texas noted that the issue was whether the Secretary of DHS has the power to establish DAPA stating that the President had not issued any executive orders or presidential proclamation or communique concerning DAPA but that it was solely established by the Secretary. Texas, 86 F. Supp. 3d at 607. In contrast, in this case, President Trump issued an Executive Order on January 25, 2017 directing the Secretary of DHS to take steps to "obtain complete operations control . . . of the southern border." (Dkt. No. 30-5, Cayaban Decl., Ex. 7, Executive Order, 82 Fed. Reg. 8793.)

decision to *sua sponte* address the Take Care clause in relation to an act of the Secretary of DHS indicates that the Take Care clause applies not only to the President but also his Executive officers.

As to whether the August 2 Waiver Determination violates the Take Care clause, Center Plaintiff cites to three cases to support the assertion that the Executive is required to "execute the laws, not make them."  First, it cites to a sentence in the conclusion of Medellin v. Texas, 552 U.S. 491, 532 (2008) stating that the Take Care clause that laws be faithfully executed requires the Executive to "execute the law, not make them."  Id. at 532.  But Medellin dealt with the legal effect of an international treaty on domestic law. Id. at 504.  In fact, the Court mentioned that the Take Care clause did not apply in the case since the International Court of Justice's decision was an international judgment.  Id. at 532.  Medellin did not concern a statute enacted by Congress and is not helpful in the Take Care analysis.

Next, Center Plaintiff cites to Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952) in support of its argument that the President's power is to faithfully execute the laws, not make them.  Due to an impending nation-wide strike of the steel mills, the President, on his own, issued an Executive Order directing the Secretary of Commerce to take possession of most of the country's steel mills and keep them running. Id. at 583.  The steel mill owners filed suit alleging that the seizures were not authorized by Congress or any other constitutional provision.  Id.  The Court agreed explaining that

the President's power must come from either an act of Congress or from the Constitution. Id. at 585. However, in the case, the Executive Order "did not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." Id. at 588. Such conduct to make laws is only delegated to Congress, and not the President. Id. The Supreme Court affirmed the district court's preliminary injunction restraining the Secretary from enforcing the Executive Order. Id. at 584. In contrast, in this case, Congress enacted section 102(c), which grants the Secretary of DHS not only the discretion to waive all laws when "necessary to ensure expeditious construction of the barriers and roads" but also discretion to determine whether it is necessary to install barriers to deter "illegal crossings in areas of high illegal entry." See 8 U.S.C. §§ 1103(a) & (c). Therefore, Youngstown Sheet & Tube Co. does not support Center Plaintiff's position.

Finally, in Myers v. United States, 272 U.S. 52 (1926), the question presented to the Supreme Court was "whether under the Constitution the President has the exclusive power of removing executive officers of the United States whom he has appointed by and with the advice and consent of the Senate." Id. at 60. The case dealt with the power of the President to appoint and remove executive officers as opposed to the discretion of the Secretary of the DHS to carry out section 102, a provision enacted by Congress.

The cases cited by Center Plaintiff do not address the application of the Take Care clause. It merely cite to these cases for the assertion that the President's duty under the

Take Care clause is to execute laws, not make them.  However, none of the cases cited by Center Plaintiff address an executive head's exercise of his or her discretionary authority to carry out the mandates of Congress.  As a result, they provide no guidance as to how the Take Care clause would or should apply in this case.  Moreover, given that the challenged steps taken by the Secretary are ones that are plausibly called for by an act of Congress, a Take Care challenge in this case would essentially open the doors to an undisciplined and unguided review process for all decisions made by the Executive Department.

Consequently, Center Plaintiff has not demonstrated that the Take Care clause in this case has been violated.  Thus, the Court GRANTS Defendants' motion for summary judgment and DENIES Center Plaintiff's motion for summary judgment on the Take Care Clause claim.

### 3.    Article I, Sections 2 & 3 of the United States Constitution

California Plaintiffs argue that section 102(c) violates Article I, Sections 2 and 3 of the U.S. Constitution by allowing the Secretary to waive numerous criminal laws concerning the border wall projects without providing a specific list of criminal laws that are waived.[29]  Defendants contend that California Plaintiffs have provided no legal

---

[29] For example, California Plaintiffs argue the Secretary waived the Resource Conservation Recovery Act, 42 U.S.C. § 6928, which makes it a crime to knowingly dump hazardous waste that puts another person in imminent danger of death or serious bodily injury, and waived the Clean Water Act, 33 U.S.C. § 1319(c) making it a crime to knowingly pollute a river, stream or other water.

84

authority to support their argument that Article I, Sections 2 and 3 address Congress'

delegation of power to waive criminal law to the Executive.

Article 1 Section 3 provides,

> Judgment in Cases of Impeachment shall not extend further than to removal
> from Office, and disqualification to hold and enjoy any Office . . . but the
> Party convicted shall nevertheless be liable and subject to Indictment, Trial,
> Judgment and Punishment, according to Law.

U.S. Const. art. I, § 3, cl. 7.  This section concerns impeachment and punishment of

conviction and is "an attempt by the framers to anticipate and respond to questions that

might arise regarding the procedural right of the accused during the impeachment

process."  United States v. Claiborne, 727 F.2d 842, 846 (9th Cir. 1984) (quoting United

States v. Hastings, 681 F.2d 706, 710 (11th Cir. 1982)).  California Plaintiffs also cite to

Article I, Section 2 which states that the President "shall have Power to grant Reprieves

and Pardons for Offenses against the United States, except in Cases of Impeachment."

U.S. Const. art I, § 2, cl. 1.

California Plaintiffs invoke these two constitutional provisions arguing that

Congress cannot grant the Executive Branch sweeping powers to waive federal criminal

laws without specifically listing the criminal laws to be waived and that it places the

Executive Branch above the law.  However, California Plaintiffs provide no legal

authority to support their argument that Article I, Sections 2 & 3 supports their

proposition.  None of their cited cases concern the application of Article I, Sections 2 or 3

of the U.S. Constitution.  California Plaintiffs have not demonstrated they are entitled to judgment as a matter of law that section 102 and the Waiver Determinations violate Article I, Sections 2 and 3 of the U.S. Constitution.  The Court GRANTS Defendant's motion for summary judgment and DENIES California Plaintiffs' motion for summary judgment on this claim.

### 4.    Article I, Section 7 of the U.S. Constitution - Presentment Clause

All Plaintiffs assert that the DHS Secretaries' waiver of more than thirty environmental laws through section 102(c) violates Article I, Section 7 of the U.S. Constitution.  They rely heavily on <u>Clinton v. City of New York</u>, 524 U.S. 417 (1998) arguing that allowing DHS to waive laws through section 102(c) amounts to an amendment or repeal of statutes.  Section 102 gives the DHS Secretary "nearly unbridled discretion" to waive laws and would waive laws in which DHS has no expertise.  (Dkt. No. 30-2 at 49.)  Since Congress provides no guidance as to which laws to waive, the Secretary's actions will solely reflect the Executive's will.  (<u>Id.</u> at 50.)

Defendants argue that the waiver of the environmental laws through section 102(c) does not amount to an amendment or repeal of statute and only select statutes are waived in an effort to build roads and barriers next to portions of the border.  Defendants liken the waiver to an "executive grant of immunity or waiver of claim" which "has never been recognized as a form of legislative repeal."  <u>Id.</u> (quoting <u>In re Nat'l Sec. Agency Telecomm. Records Litig.</u>, 671 F.3d 881 (9th Cir. 2011)).  Defendants argue that here,

86

like in <u>Telecomm.</u>, there is no constitutional violation of the Presentment Clause because the partially waived statutes remain the same from when Congress approved the statute and the President signed it.  Defendants contend that here, unlike <u>Clinton</u>, there is no separation of powers issue because Congress gave DHS authority to partially waive statutes for a border wall when Congress amended section 102.   Defendants distinguish the situation here from <u>Clinton</u> by noting that DHS Secretary is implementing congressional intent rather than rejecting it.

According to the Presentment Clause, "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it."  U.S. Const. art I., § 7. The Constitution does not allow the Executive "to enact, to amend, or to repeal statutes." <u>Clinton v. City of New York</u>, 524 U.S. 417, 438 (1998).  "'Amendment and repeal of statutes, no less than enactment, must conform with' the bicameralism and presentment requirements of Article I." <u>Defenders of Wildlife</u>, 527 F. Supp. 2d at 123-24 (quoting <u>INS v. Chadha</u>, 462 U.S. 919, 954 (1983)).

In <u>Clinton</u>, the U.S. Supreme Court invalidated the Line Item Veto Act because "[i]n both legal and practical effect," the Line Item Veto gave the President the power to amend "Acts of Congress by repealing a portion of each." <u>Clinton</u>, 524 U.S. at 438.  In

87

Clinton, cancellation of legal provisions altered the statute's "legal force or effect."  Id. at 437.  In essence, the Line Item Veto Act replaced the once legally-passed bills with truncated replacements.  Id. at 438.  The Supreme Court considered this alteration a disruption of the bicameralism and presentment requirements of the Presentment Clause.  Id.

This situation, however, is distinguishable from Clinton.  Here, the Waivers are narrow in scope and only for the purpose of building border barriers something that is permitted by section 102(c).  In Clinton, the Line Item Veto Act rendered the cancelled legal provisions powerless and effectively changed the law entirely.  Id. at 437.  Here, the statutes largely retain legal force and effect because the §102(c) waivers only disturb the waived statutes for a specific purpose and for a specific time.

In Defenders of Wildlife, the district court addressed the plaintiffs' presentment clause challenge to section 102(c) and stated,

> The REAL ID Act's waiver provision differs significantly from the Line Item Veto Act.  The Secretary has no authority to alter the text of any statute, repeal any law, or cancel any statutory provision, in whole or in part.  Each of the twenty laws waived by the Secretary on October 26, 2007, retains the same legal force and effect as it had when it was passed by both houses of Congress and presented to the President.

527 F. Supp. 2d at 124; see also Cnty. of El Paso, 2008 WL 4372693, at *6-7.  The court also explained that the waiver did not constitute an unconstitutional "partial repeal" because this was not an instance in which "any waiver, no matter how limited in scope,

would violate Article I because it would allow the Executive Branch to unilaterally 'repeal' or nullify the law with respect to the limited purpose delineated by the waiver legislation." Defenders of Wildlife, 527 F. Supp. at 124. The Court concludes that the Secretaries' Waiver Determinations made pursuant section 102(c) do not violate the Presentment Clause. The Court GRANTS Defendants' motions for summary judgment and DENIES Plaintiffs' motions for summary judgment on this issue.

### 5.    Access to the Courts

#### a.    Due Process/First Amendment Right to Petition/Article III[30]

Coalition Plaintiffs argue in their motion, but not in their reply, in one paragraph, that section 102(c)(2) deprives them of their due process rights and impairs their First Amendment right to petition the government. (Dkt. No. 29-1 at 36-37.) They argue they have a property and liberty interest in ensuring environmental laws and interests are protected and section 102(c)(2) removes any procedure that would protect their interests from arbitrary and capricious conduct by the Secretary.

---

[30] In reply, California Plaintiffs appear to assert a void-for-vagueness challenge under the First Amendment in response to an argument made in Defendants' brief. (Dkt. No. at 25; Dkt. No. 35-1 at 84 n.53.) The void-for vagueness argument, raised initially in California Plaintiffs' reply, morphed into a claim based on the parties' argument. California Plaintiffs did not raise the issue of void for vagueness under the First Amendment in their moving papers, and in fact, is not a claim alleged in their complaint. Instead, their complaint and their moving brief claim that section 102(c) is vague and therefore a violation of their due process rights under the Fifth Amendment which is distinct from a void-for-vagueness claim. The Court declines to address the void-for-vagueness challenge, an issue not raised in California Plaintiffs' complaint or moving brief.

California Plaintiffs argue that section 102(c)'s unreasonable procedural hurdles violate Californians' Article III and due process rights and the rights to potential parties' ability to petition the Court.  They argue that the 2017 Waivers fail to identify the state laws that are purportedly waived.  They also argue that the San Diego Waiver is vague when it states that DHS intends to install "various border infrastructure projects" within the "Project Areas" but fails to describe these other projects.  Next, they argue that the San Diego Waiver does not provide reasonable notice as to when undisclosed projects will be constructed and purports to waive federal and state laws for the on-going maintenance of these structures.  These uncertainties leave California unable to determine whether the projects will be the types of projects authorized by section 102, whether the areas will be considered areas of high illegal entry at the time they are installed and whether California should file a claim to protect their individual rights.  Also, by barring all non-constitutional claims, the California Plaintiffs contend section 102(c)(2)(A) interferes with its right of access to the courts.[31]  California claims it has an interest in enforcing its own state laws and to preserve state property adjacent to the Projects.

---

[31] California Plaintiffs also summarily argue that the 60 day statute of limitations from the date of publication in the Federal Register creates the risk that Californians will not learn about the full extent of the 2017 Waivers as it lacks clarity and fails to provide adequate notice which violates Article III of the U.S. Constitution.  Defendants respond that this challenge is an irrelevant hypothetical as their complaint was timely filed.  California Plaintiffs do not reply to Defendants' argument.  The Court agrees that California Plaintiffs are asserting an argument that has no application to them as they filed their complaint timely; moreover, they provide no case law to support their argument.

Defendants claim that Plaintiffs have not demonstrated that they have a cognizable life, liberty or property interest for a due process violation. They contend that California Plaintiffs' assertion of Article III standing is distinct from a liberty or property interest protected by the Fifth Amendment.

The Fifth Amendment's Due Process Clause states "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. As a threshold, a plaintiff must show a liberty or property interest protected by the Constitution. Ching v. Mayorkas, 725 F.3d 1149, 1155 (9th Cir. 2013).

Coalition Plaintiffs summarily state they have property and liberty interests in ensuring environmental laws and interest are protected.[32] California also claims it has an interest in enforcing its own state laws and to preserve state property adjacent to the Projects. However, Coalition Plaintiffs and California have not provided any case law supporting the claim that their property and/or liberty interests are protected by the Constitution and have failed to provide any meaningful analysis on the due process violation claim. Moreover, the Court notes that many of California Plaintiffs' arguments are speculative and concern issues that may arise in the future with future border wall

---

[32] In their reply, Coalition Plaintiffs dispute Defendants' argument that they failed to identify a liberty or property interest to support a due process claim and argued they asserted their right to access the courts and to enforce environmental and animal-protection laws. (Dkt. No. 38 at 26 n.10.) However, in their moving papers, Coalition Plaintiffs do not assert an interest in their right to access the courts in their due process analysis but solely an interest in "environmental laws and interests." (Dkt. No. 29-1 at 36-37.)

91

17cv1215-GPC(WVG)
Consolidated with:
17cv1873-GPC(WVG)
17cv1911-GPC(WVG)

construction projects and do not address the current projects.  The Court declines to address any issues concerning future projects as California Plaintiffs have not provided legal support for their arguments.

California Plaintiffs also claim that the 2017 Waivers do not identify which specific state laws are purportedly waived as the waiver language waives a specific list of over 30 federal statutes, "including all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of, the following statutes."  (Dkt. No. 30-6, Cayaban Decl., Ex. 11, 82 Fed. Reg. 35985; id., Ex. 12, 82 Fed. Reg. 42830.) California Plaintiffs broadly interpret the provision to include numerous state laws which Defendants argue are inapplicable to the Projects at issue.  Once again, California Plaintiffs fail to provide any legal authority on whether a statute that permits the waiver of laws requires specificity as to which laws are implicated.  The one case cited, FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012), deals with a statute that either requires or forbids conduct, but does not involve the waiver of laws.

Lastly, Coalition Plaintiffs, in one paragraph, and not addressed in their reply, (Dkt. No. 29-1 at 36), and California Plaintiffs, raised in a paragraph, and not in their reply, (Dkt. No. 30-2 at 41), further claim that their First Amendment Right to Petition the government has been abridged by the judicial review bar in section 102(c)(2).

The First Amendment guarantees "the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I.

A one paragraph argument, by Coalition Plaintiffs and California Plaintiffs, is not sufficient to meaningfully address a First Amendment challenge. The Court declines to address an issue not properly briefed by the parties.

Therefore, the Court GRANTS Defendants' motions for summary judgment and DENIES Coalition and California Plaintiffs' motions for summary judgment on these issues.

### 6.   Violation of the Tenth Amendment[33] - Concurrent State and Federal Jurisdiction

Coalition Plaintiffs argue that Congress lacks the power to eliminate the concurrent jurisdiction of state courts unless it vests that power exclusively with a federal court. (Dkt. No. 29-1 at 35-36.) They contend that section 102 eliminates both federal and state jurisdiction by "vesting 'exclusive jurisdiction' over issues into a federal court only then to also remove that judicial power from the very federal court it just vested with that power." (Id. at 36.) Defendants respond that Congress has specifically displaced state court jurisdiction when it enacted section 102(c)(2)(A), and expressly made federal jurisdiction exclusive for challenges to the waiver determinations.

---

[33] In their papers, Coalition Plaintiffs do not allege whether the concurrent federal and state jurisdiction argument is premised on a Tenth Amendment violation. However, their complaint alleges a Tenth Amendment violation based on this argument. (Dkt. No. 26, FAC ¶ 115.)

93

"Under our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause. Under this system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." Tafflin v. Levitt, 493 U.S. 455, 458 (1990). "This deeply rooted presumption in favor of concurrent state court jurisdiction is, of course, rebutted if Congress affirmatively ousts the state courts of jurisdiction over a particular federal claim." Id. at 459.

Section 102(c)(2)(A) grants the federal court with exclusive jurisdiction to handle all causes of action arising under section 102(c)(1) alleging a violation of the Constitution but shall not have jurisdiction over any other claim. 8 U.S.C. § 1103(c)(2)(A). By enacting section 102(c), Congress's authority to grant exclusive jurisdiction to review any waiver determination to the federal district court is undisputed by the parties. Congress specifically granted federal district courts exclusive jurisdiction of any constitutional challenges but barred judicial review of any non-constitutional claim. Coalition Plaintiffs have not provided any legal authority that granting federal court exclusive jurisdiction over waiver determinations for solely constitutional clams violates the federal system of concurrent federal and state jurisdiction.

Accordingly, the Court GRANTS Defendants' motion for summary judgment and DENIES Coalition Plaintiffs' motion for summary judgment on this issue.

94

### 7.     Violation of California's Equal Sovereignty and Police Powers under the Tenth Amendment

The Tenth Amendment states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the States respectively, or to the people."  U.S. Const. amend X.  The State of California argues that under the authority of Shelby Cnty., Alabama v. Holder, 133 S. Ct. 2612 (2013), section 102 violates the Tenth Amendment.  California asserts that the Waivers violate the Tenth Amendment by burdening California, but not other states, when progress has been made curbing the problem that section 102 seeks to address, i.e. the dramatic reduction in the number of illegal crossings at the border.  California also contends that under City of Boerne v. Flores, 521 U.S. 507, 534-35 (1997), section 102 interferes with California's police powers by intruding on its state sovereignty by waiving all state and local laws and regulations without any parameters and intruding on every level of government under a grossly broad law.  Defendants argue that Shelby and City of Boerne are distinguishable and do not support California's argument.

Shelby involved a challenge to the Voting Rights Act ("VRA"), enacted in 1965. Shelby, 133 S. Ct. at 2619.  The Court held that the coverage formula contained in § 4(b) of the VRA, identifying jurisdictions covered by § 5's preclearance requirement, was unconstitutional.  Id. at 2620.  If a state was a covered jurisdiction, § 5 required that no changes could be made to a state's voting procedures unless approved by federal

authorities.  Id.  These provisions were originally meant to be temporary as they were to expire in five years but Congress subsequently reauthorized the Act several times.  Id. While the Court recognized the Supremacy Clause, it also noted the States' broad autonomy "in structuring their governments and pursuing legislative objectives" and that the framers of the Constitution "intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections."  Id. at 2623 (citations omitted) (noting that while the Federal Government has significant control over federal elections, states have "broad powers to determine the conditions under which the right of suffrage may be exercised.").  The Court also noted the "fundamental principle of *equal* 'sovereignty' among the States."  Id. (emphasis in original).

The VRA restriction only applied to nine States and some additional counties thereby violating the principal of equal sovereignty.  Id. at 2624.  In order to justify violating the equal sovereignty of states, the Court required that the statute's requirement be "sufficiently related to the problem that it targets."  Id. at 2622.  The Court found that the conditions that originally justified the VRA's passage, entrenched racial discrimination in voting, no longer existed in the covered states and counties as African-American voter turnout exceeded white voter turnout in the majority of the states covered by § 5.  Id. at 2618-19.  When a law treats one state differently from another, the Supreme Court "requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets."  Id. at 2622 (quoting Nw. Austin

96

Municipal Util. Dist. Number One v. Holder, 557 U.S. 193, 203-04 (2009)).  The court

held that the coverage formula under § 4 was unconstitutional.  Id. at 2631.

Relying on the principles in Shelby, California argues that section 102 violates the

Tenth Amendment because it disparately treats California in imposing waiver of its laws

to build additional barriers even though the number of "high illegal entry" of aliens has

dramatically decreased in recent years.

Here, unlike the State's power to regulate elections in Shelby, the authority vested

in the Secretary of DHS concerning immigration and border security is broad.  See

Arizona, 567 U.S. at 395; Kleindienst, 408 U.S. at 765.  Moreover, a court in this district

concluded that "Section 102 clearly manifests congressional intent to preempt state and

local laws which would interfere with Congress's objective to expeditiously construct the

border fence." Cnty. of El Paso, 2005 WL 4372693, at *10 (concluding that under

section 102(c), state and local laws would be preempted if the state's enforcement of its

statute interfered with federal objective and waiver statute did not violate the Tenth

Amendment).  California has not demonstrated that it has autonomy or authority in

regulating its border with Mexico.  Moreover, as to the principal of equal sovereignty,

section 102 applies with equal force to any state that borders the United States.

Inevitably all states are not border states, and section 102 does not single out a particular

state in imposing requirements on state powers in a discriminatory manner as the VRA in

Shelby.

Next, California argues that section 102 interferes with its police powers relying on City of Boerne.  In City of Boerne, a local zoning authority denied a church a building permit, and the Supreme Court held that the Religious Freedom Reformation Act ("RFRA") was unconstitutional as applied to the states because it was beyond Congress's remedial power to regulate states under Section 5 of the Fourteenth Amendment to the Constitution.  City of Boerne, 521 U.S. at 536.  Section 5 of the Fourteenth Amendment grants Congress broad authority to remedy and deter constitutional violations.  Id. at 518.  The Court noted that RFRA was not remedial or preventive legislation but instead an attempt at "substantive change in constitutional protections."  Id. at 532.  The scope and reach of RFRA was overly broad, as it applied to every agency and official in federal, state and local governments and to any federal and state law, and was temporally broad with no termination date.  Id.

The Court does not find City of Boerne supportive of California's argument.  First, City of Boerne did not involve a claim of a Tenth Amendment violation but addressed Congress' authority under Section 5 of the Fourteenth Amendment, a distinct provision of the Constitution.  California claims its police powers, to legislate for the public good, is being curtailed by section 102 and that section 102(c) is grossly overbroad as it allows for the waiver of "all federal and state law."  While the language of section 102(c) is broad since it applies to a waiver of "all legal requirements" the waiver is circumscribed to those the Secretary determines are "necessary to ensure expeditious construction of the

98

barriers and roads." 8 U.S.C. § 1103(c). The two waivers at issue are limited to the "construction of roads and physical barriers . . . in the Project Area." (Dkt. No. 30-6, Cayaban Decl., Ex. 11, 82 Fed. Reg. at 35985; id., Ex. 12, 82 Fed. Reg. at 42830.) Contrary to Plaintiff's position, section 102's granting the Secretary authority to waive state laws is not indefinite in duration and unlimited. Moreover, as noted by a district court, section 102 does not abrogate the validity of state laws but "merely suspend[s] the effects of the state and local laws." Cnty. of El Paso, 2008 WL 4372693, at *8.

The Court concludes that California Plaintiff's Tenth Amendment claim is without merit, and GRANTS Defendants' motion for summary judgment, and DENIES California Plaintiff's motion for summary judgment on this issue.

### G.      Whether Constitutional Avoidance Compels a Ruling that the August 2 Waiver is Ultra Vires to section 102

In their reply, Coalition Plaintiffs, for the first time, assert that judicial review of sections 102(a) and (b) is necessary to avoid serious constitutional problems. They argue that there are serious constitutional concerns because section 102(c) grants an unelected cabinet official with unbridled power to waive any law that has any remote connection to border security projects. Center Plaintiff also raises for the first time in its reply that the doctrine of constitutional avoidance compels a holding that the August 2 Waiver is ultra vires to section 102. In their reply, Defendants summarily argue that the canon of

constitutional avoidance does not apply since the challenges are not serious enough based on the plain text of section 102.

"The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." FCC v. Fox Tel. Stations, Inc., 556 U.S. 502, 516 (2009) (citation omitted).  If "the statute does not raise constitutional concerns, then there is no basis for employing the canon of constitutional avoidance."  Rodriguez v. Robbins, 715 F.3d 1127, 1140 (9th Cir. 2013) (citation omitted).  Moreover, if there is no ambiguity in the statute, constitutional avoidance has no application.  Warger v. Shauers, 135 S. Ct. 521, 529 (2014) (Federal Rule of Evidence 606(b) is not ambiguous).

"It is a bedrock principle of statutory interpretation that 'where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'"  Hawaii v. Trump, 878 F.3d 662, 690 (9th Cir. 2017) (quoting Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988)).  The constitutional avoidance doctrine may be invoked only if the court has "grave doubts" about the statute's constitutionality.  Ileto v. Glock, Inc., 565 F.3d 1126, 1143 (9th Cir. 2009); Almendarez-Torres v. United States, 523 U.S. 224, 238 (1998) ("those who invoke the doctrine must believe that the alternative is a serious likelihood that the statute will be held unconstitutional.").

As discussed above, the Court does not have serious constitutional doubts as to the constitutionality of section 102(c).  Moreover, prior challenges to the initial amendment of section 102(c) broadening its waiver authority in 2005 have been upheld as constitutional.  Accordingly, the Court declines to apply the doctrine of constitutional avoidance.

## CONCLUSION

Based on the reasoning above, the Court DENIES Plaintiffs' motions for summary judgment and GRANTS Defendants' motions for summary judgment with the exception of the Center Plaintiff's seventh cause of action for FOIA violations.

IT IS SO ORDERED.

Dated:  February 27, 2018

Hon. Gonzalo P. Curiel
United States District Judge